**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**

| | | |
|---|---|---|
| BNSF Railway Company, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. |
| | ) | |
| | ) | |
| Town of Cicero, Illinois, | ) | |
| | ) | |
| Defendant. | ) | |

## COMPLAINT FOR DECLARATORY JUDGMENT AND INJUNCTIVE RELIEF

Plaintiff BNSF Railway Company ("BNSF") files this Complaint for Declaratory Judgment and Injunctive Relief against Defendant the Town of Cicero, Illinois ("Cicero") and in support thereof states:

## INTRODUCTION

1.     Cicero recently adopted a new ordinance governing sewer rates that targets BNSF and constitute discrimination in violation of federal law.  The new ordinance (the "Sewer Rate Ordinance" or "Ordinance") requires railroads—and *only* railroads—to pay an exorbitant $350.00-per-acre charge for monthly sewer use.  The Ordinance resulted in a 1250% increase over BNSF's previous sewer bills, which spiked from $6,643 per month to $90,300 per month.  Meanwhile, the Ordinance charges other local commercial and industrial users based on their actual water usage and has not similarly increased their sewer bills.

2.     The discriminatory nature of the sewer rate charge is obvious when the exorbitant fee charged to BNSF is compared to the fee charged to comparable businesses.  While BNSF is charged by the acre, other commercial and industrial businesses in Cicero, including Citgo, ExxonMobil, Walmart, and the Cicero Marketplace, pay $56.06 per month for an allowance of

3,000 cubic feet, and pay a mere $18.69 for each additional 1,000 cubic feet of water used, irrespective of their acreage or the characteristics of their land.  If BNSF were charged at the rate applicable to other commercial and industrial properties within Cicero, BNSF would pay approximately $150 per month based on its average monthly water use of approximately 7,755 cubic feet—a tiny fraction of the $90,300 per month imposed by Cicero.

3.      The Ordinance's massive increase in sewer charges singles out BNSF for discriminatory treatment and is not justified by any study or data.  The rate imposed by Cicero does not take into account BNSF's actual water use or the volume of flow to Cicero's sewer, and BNSF cannot reduce the charge by reducing its water use.

4.      Cicero imposed this increase without providing any reasonable notice to BNSF and without holding any public hearing or providing any other opportunity for BNSF to be heard. When it first saw that its bill was $90,300 instead of the usual $6,643, BNSF presumed that there had been an error.  Once BNSF learned about the increase, and raised this matter to the Town President, Cicero threatened to "issue a 60-day notice of water and sewer shut off, which may include digging underground to remove pipes as well as the placement of the lien for the unpaid amount" unless payment was made.

5.      Cicero has since escalated its efforts to enforce this discriminatory rate against BNSF.  After BNSF inquired about whether there is a refund process to recover payments if the rate is later deemed unlawful, Cicero's only response was to issue a 60-day notice of termination, demanding immediate payment of $395,450.88 and stating that sewer service at BNSF's railyard otherwise "WILL BE SHUT OFF, DISCONTINUED, AND DISCONNECTED (SIXTY) 60 DAYS FROM MAY 20, 2021"—i.e., on July 19, 2021.  The notice further threatened that "IF THE TOTAL BILL IS NOT PAID AND THE SEWER IS DISCONTINUED AND

DISCONNECTED, THE PROPERTY WILL BECOME A HEALTH DEPARTMENT PROGRAM" and "WILL HAVE TO BE VACATED."

6.      In addition to Cicero's threatened action, which would force BNSF to shut its railyard and would seriously impair a major interstate transportation hub, BNSF faces a continuing "penalty charge" of 20 percent of each monthly bill, to be imposed by Cicero 25 days after each bill is due.

7.      Accordingly, BNSF asks this Court to restrain Cicero from imposing and enforcing exorbitant and discriminatory sewer rates upon BNSF for its railyard property, including by terminating or otherwise interfering with water or sewer service to BNSF's railyard, or by requiring BNSF to vacate its property.  BNSF further seeks a declaration that the Sewer Rate Ordinance is illegal and unenforceable on its face and as applied to BNSF.

## JURISDICTION AND VENUE

8.      Cicero purports to designate the sewer rate as a "fee."  To the extent the sewer rate is considered to be a fee, and is not considered to be a tax, then jurisdiction is proper under 28 U.S.C. § 1331 because BNSF's allegations raise federal questions under the laws of the United States and raise substantial questions of federal law, including whether federal law preempts the sewer rate.  In those circumstances, jurisdiction is also proper under 28 U.S.C. § 1343.

9.      To the extent the sewer rate is considered to be a tax, then jurisdiction is proper under the Railroad Revitalization and Regulatory Reform Act of 1976, § 306, Pub. L. No. 94-210, 90 Stat. 54 (now codified in relevant part as amended at 49 U.S.C. § 11501) (the "4-R Act").  The 4-R Act confers jurisdiction on federal courts to "prevent a violation" of its provisions notwithstanding the Tax Injunction Act, 28 U.S.C. § 1341, which generally prohibits federal courts

from enjoining the collection of state taxes when a plain, speedy and effective remedy may be had in state court. 49 U.S.C. § 11501(c).

10.     Jurisdiction is also proper under 28 U.S.C. § 1332(a)(1) because BNSF and Cicero are citizens of different States and the amount in controversy exceeds $75,000.

11.     Venue is proper in this Court under 28 U.S.C. § 1391(b) because Defendant Cicero resides in this judicial district, BNSF's property in Cicero is located in this judicial district, and a substantial part of the events giving rise to BNSF's claims occurred within this district.

12.     This Court has the authority to enter a declaratory judgment and to provide preliminary and permanent injunctive relief pursuant to Rules 57 and 65 of the Federal Rules of Civil Procedure, and 28 U.S.C. §§ 2201 and 2202.

13.     This Court has personal jurisdiction over Defendant Cicero because it is domiciled in Illinois.

## PARTIES

14.     BNSF Railway Company is a Delaware corporation with its principal place of business in Fort Worth, Texas. BNSF is engaged in interstate commerce as a common carrier by railroad and owns and operates a railyard and rights of way within Cicero.

15.     Cicero is an incorporated town located in Cook County, Illinois.

## FACTS

16.     BNSF operates one of the largest freight railroad networks in North America. BNSF provides services as a common carrier by rail and is regulated by the Surface Transportation Board.

17.     BNSF owns and operates an intermodal rail and maintenance yard at 5601 W. 26th Street in Cicero, Illinois. Intermodal shipping allows for the transfer of containerized freight from

an origin point to a destination and involves the joint provision of service by various types of transportation providers. For example, a freight container can arrive on a ship, the cargo can be transloaded into a standard 53-foot container to be carried by truck, and then that container can be transferred to rail, which efficiently moves the container to a rail hub (like the Cicero railyard). The containerized freight may then ultimately be delivered to its destination with another leg of transport by truck or rail.

18.     BNSF's Cicero railyard serves as a major transportation hub that links the Midwest with the Pacific Northwest and plays a vital role in the interstate transportation of a wide variety of goods and commodities. The Cicero railyard also frequently serves as the destination point for foreign imports shipped across the Pacific Ocean, which are shipped to the Pacific Northwest, then travel by rail through the Cicero railyard to points in the Midwest, Eastern Seaboard, and beyond. Amtrak and Metra trains also pass through the railyard on a daily basis.

19.     The Cicero railyard employs hundreds of individuals, including residents of Cicero and the surrounding area.

20.     Cicero owns and operates a combined storm/sanitary sewer system located within the Metropolitan Water Reclamation District of Greater Chicago.

**Cicero's Sewer Rate Ordinance**

21.     The Sewer Rate Ordinance, set forth in Section 98-266 of Cicero's Code of Ordinances, and reproduced as Exhibit A to this Complaint, currently establishes differential sewer rates for the following categories of properties:

> (1) Residential;
>
> (2) Commercial and industrial;
>
> (3) Railroad yards and rights-of-way; and

(4) Commercial and industrial outside the Town's border.

22.     The Sewer Rate Ordinance imposes a 20 percent penalty charge for non-residential sewer bills not paid within 25 days of the date of billing.

23.     Pursuant to Section 98-187 of Cicero's Code of Ordinances, all properties abutting a public street, thoroughfare, parkway, or alley must be connected to Cicero's sewer system. BNSF is thus required to connect to Cicero's sewer system.

**Cicero Adopts Changes to its Sewer Rate Ordinance Targeting BNSF**

24.     In December 2020, Cicero's Board of Trustees amended the Sewer Rate Ordinance. The Board adopted Ordinance No. 72-20, which amended Subsection (3) of the Sewer Rate Ordinance to significantly and exclusively increase the sewer rates charged to railroads for properties used as railyards.  The Sewer Rate Ordinance singles out railyards for special, discriminatory treatment both in the method and rate of assessment.

25.     The stated purpose of the revision was "to increase rates for railroad yards and rights-of-way to ensure the proper operation and maintenance of the combined waterworks and sewage system."  Cicero, however, did not provide any notice or opportunity for BNSF or the public to ask questions.  Nor did Cicero publish any explanatory study, investigation, or analysis, before adopting the rate increase.

26.     Under the amended Sewer Rate Ordinance, the sewer rate charged to railyards jumped dramatically from $27.42 to $350.00 per month per acre.  As a result of the adoption of Ordinance No. 72-20, and a comparatively modest apparent increase in the acreage Cicero used to calculate BNSF's bill, BNSF's monthly sewer bill for the railyard skyrocketed from $6,643.04 to $90,300, an increase of 1250%.  In contrast, sewer rates charged by Cicero for residential, commercial and industrial service within Cicero remained unchanged.

27.     Sewer rates are assessed against railyards on a per-acre basis regardless of water consumption or actual sewer use.  In contrast, sewer rates for local commercial and industrial service are based on monthly water consumption ($56.06 for the first 3,000 cubic feet and $18.69 for each additional 1,000 cubic feet).  Residential sewer rates are assessed per residential dwelling unit at a bimonthly rate of $26.59.

28.     Because the sewer rate charged to railyards is assessed on a per acre basis regardless of actual water use or the volume of flow to Cicero's sewer, BNSF cannot reduce the amount charged by reducing its water consumption or adopting other measures that would avoid or reduce use of or contributions to Cicero's sewer system.  Cicero ordinances require BNSF to connect its railyard to Cicero's sewer system.  *See* Cicero Code of Ordinances § 98-187(a).  Moreover, unlike other commercial and industrial businesses, BNSF cannot avoid this discriminatory charge by relocating its railyard and associated infrastructure to another municipality or unincorporated area.

29.     If BNSF were charged at the rate applicable to other industrial or commercial properties, BNSF would pay approximately $150 per month based on its average monthly water use of approximately 7,755 cubic feet—a tiny fraction of the $90,300 per month currently demanded by Cicero.

**BNSF Attempts to Work Towards a Resolution with Cicero, and Cicero
Responds by Threatening to Disconnect BNSF's Access to Water and Sewer Service**

30.     Cicero did not inform BNSF of its proposal to single out railyards for the significant rate increase, nor did Cicero host any public hearing.  Cicero also did not provide any meaningful opportunity for BNSF (or any other members of the public) to ask questions or offer comment on the proposed ordinance prior to adoption.

31.      In fact, the only notice of the proposed Sewer Rate Ordinance was the Agenda for the Board's December 8, 2020 meeting which disclosed only that a vote would be taken on "An

Ordinance Amending Chapter 98, Section 98-266 Of The Code Of Ordinances Of The Town Of Cicero, Illinois, Regarding Sewer Rates For The Town Of Cicero, County of Cook, State Of Illinois." Upon information and belief, no further description of the proposed ordinance or proposed ordinance text was made available to the public prior to the meeting.

32. The December 8, 2020 Board meeting also did not provide an opportunity for BNSF or any interested citizens to ask questions or voice concerns about the basis for the sewer rate change. Any questions to be asked at the Board meeting must be submitted to the Town attorney in writing at least 72 hours in advance of the meeting. The Agenda for the December 8, 2020 Board meeting specifically discouraged public participation and reminded members of the public that the meeting was *not* a public hearing. Cicero Code of Ordinances Section 2-66 also specifies that any questions by citizens are relegated to a "public participation period" *after* consideration and action on all Board business.

33. The first "notice" BNSF received of Cicero's exorbitant rate increase was the $90,300 bill it received in February 2021. Because the bill received for a single month of service was more than the sewer bills BNSF paid for the entire previous year ($79,716), BNSF initially believed the bill was an error.

34. After becoming aware of Cicero's adoption of the arbitrary fee increase applicable only to railyards, BNSF contacted Cicero President Larry Dominick to express its concerns that the increase Cicero adopted was arbitrary and capricious, discriminatory, lacked an adequate basis in law, and was contrary to federal and state law. BNSF further expressed concern that Cicero had not notified BNSF of its intention to so significantly increase its sewer rates or otherwise offered BNSF a reasonable opportunity to express its concerns.

35.     Cicero responded by refusing to acknowledge any of BNSF's concerns and threatened to terminate BNSF's water and sewer service unless full payment with penalties was made.  As set forth in a March 16, 2021 email from Cicero's attorney: "Lastly, there is no 'pending dispute' to 'work towards resolution.' There is no provision under the law that permits you to dispute your bills in this manner and simply not pay the bulk of it.  BNSF was sent an invoice and the Town expects payment of the full amount plus a 20% penalty for failure to pay by close of business on March 26, 2021.  If payment is not received, we will issue a 60-day notice of water and sewer shut off, which may include digging underground to remove pipes as well as the placement of a lien for the unpaid amount."

36.     Despite Cicero's threats, BNSF, though its counsel, continued to attempt to engage with Cicero and sought information from Cicero to enable BNSF to understand the justification for the sizable and discriminatory rate increase.  These attempts included multiple telephone conferences between BNSF's counsel, Cicero's counsel, and other Cicero officials.  Despite these repeated communications, Cicero failed to provide requested information.

37.     Because Cicero has attempted to impose an $18,060 late penalty charge per month in addition to the increased rate, BNSF sought to avoid the accumulation of penalties while BNSF investigated and disputed the rate increase.  BNSF therefore asked Cicero if there is a refund process in place to recover payments if it is later determined that BNSF overpaid.

38.     Cicero responded nine days later, on May 19, 2021.  But Cicero did not identify a refund process.  Cicero instead transmitted a 60-day notice of termination, demanding immediate payment of all amounts it claims are due ($395,450.88) and stating that sewer service at BNSF's railyard otherwise "WILL BE SHUT OFF, DISCONTINUED, AND DISCONNECTED (SIXTY) 60 DAYS FROM MAY 20, 2021."  The notice further threatened that "IF THE TOTAL BILL IS

NOT PAID AND THE SEWER IS DISCONTINUED AND DISCONNECTED, THE PROPERTY WILL BECOME A HEALTH DEPARTMENT PROBLEM" and "WILL HAVE TO BE VACATED."

39. BNSF will suffer immediate, irreparable injury, loss, and damage if Cicero continues to impose and enforce the discriminatory sewer rate, including by disconnecting BNSF's sewer service, terminating BNSF's access to water and sewer services, taking action to excavate piping and structures on or connected to BNSF's property, or otherwise requiring BNSF to vacate its railyard property. Access to and use of water and sewer services is required for proper and safe operations at BNSF's Cicero railyard, including the provision of adequate sanitation facilities to hundreds of workers on site. Termination of BNSF's access to water and sewer service would cause a shutdown of the railyard and render a major transportation hub inoperable. Such action would significantly disrupt rail and intermodal service, severely impact interstate commerce, and harm BNSF, its customers, and its employees. BNSF would face competitive harm through business lost to competitors and goodwill lost due to inability to meet customer needs. Customers would be harmed by delays and shortfalls in service. And BNSF's employees would be harmed by being unable to work at the railyard.

40. BNSF also will suffer irreparable injury if BNSF pays the discriminatory rate because Cicero has not offered any process for BNSF to recoup funds in the likely event that the Sewer Rate Ordinance is declared unlawful.

**Cicero Has Offered No Justification for Its Discriminatory Sewer Charge**

41. In adopting revisions to the Sewer Rate Ordinance, the Board did not undertake any study, investigation, or analysis to quantify or measure volume of use or flow to Cicero's sewer facilities by or from railyards. The Board did not undertake any study, investigation, or analysis

to determine the nature of the use or flow to Cicero's sewer facilities. Nor did it undertake any study, investigation, or analysis of the costs or burdens of providing sewer service to railyards. In fact, the Sewer Rate Ordinance amendment was approved along with multiple other ordinances, permit requests, resolutions, reports, and other Town matters during a Tuesday morning Board meeting that lasted less than 15 minutes.

42.     Cicero has not attempted to explain the disparate sewer rate charged to railyard properties by identifying any difference between railyards and other commercial and industrial properties within Cicero. Cicero's Sewer Rate Ordinance, on its face, singles out and discriminates against BNSF by establishing a separate rate category specifically designed to target and burden the railyard property with a significantly higher rate, without any justification.

## COUNT I
## Preemption Under the ICC Termination Act

43.     BNSF repeats and re-alleges the allegations set forth in the previous paragraphs of this Complaint as if fully set forth herein.

44.     Congress enacted the ICC Termination Act of 1995 ("ICCTA"), Pub. L. No. 104-88, 109 Stat. 803 (codified as amended at 49 U.S.C. § 10101 *et seq.*), to abolish the Interstate Commerce Commission and create its successor agency, the Surface Transportation Board ("STB").

45.     ICCTA vests exclusive jurisdiction in the STB over "transportation by rail carriers . . . with respect to rates, classifications, rules . . . , practices, routes, services, and facilities of such carriers" and over "the construction, acquisition, operation, abandonment, or discontinuance of [tracks] or facilities." 49 U.S.C. § 10501(b). BNSF's facility and operations in Cicero fall under ICCTA's broad definition of "transportation," which includes a "property, facility, instrumentality, or equipment of any kind related to the movement of … property … by rail" and "services related

to that movement, including receipt, delivery, elevation, transfer in transit, … storage, handling, and interchange of … property." 49 U.S.C. § 10102(9).

46.     ICCTA preempts all state and local laws that have the effect of managing or governing rail transportation. As relevant here, a local regulation is preempted by ICCTA if it "would have the effect of preventing or unreasonably interfering with railroad transportation." *Union Pacific R. Co. v. Chicago Transit Authority*, 647 F.3d 675, 679 (7th Cir. 2011) (quoting *CSX Transp., Inc.*, FD 34662, 2005 WL 1024490, at *3 (STB served May 3, 2005)). Under that standard, federal courts and the STB have concluded that state and local regulation is permissible only if the regulations do not discriminate against or unreasonably burden railroads. *CSX Transp.*, 2005 WL 1024490, at *4; *see Adrian & Blissfield R. Co. v. Village of Blissfield*, 550 F.3d 533, 541 (6th Cir. 2008); *N.Y. Susquehanna & W. Ry. v. Jackson*, 500 F.3d 238, 252 (3d Cir. 2007); *Green Mountain R.R. v. Vermont*, 404 F.3d 638, 642 (2d Cir. 2005). But "for a state regulation to pass muster, it must address state concerns generally, without targeting the railroad industry." *N.Y. Susquehanna*, 500 F.3d at 254.

47.     The sewer rate charge impermissibly regulates railroad transportation because it discriminates against railroads. The plain text of the Sewer Rate Ordinance singles out and targets railroads for a rate that is higher than the rate paid by other commercial and industrial properties located within Cicero. Accordingly, the Sewer Rate Ordinance impermissibly interferes with railroad transportation by discriminating against transportation by rail. Thus, the Sewer Rate Ordinance is preempted under 49 U.S.C. § 10501(b).

## COUNT II
## Violation of Railroad Revitalization and Regulatory Reform Act of 1976

48.     BNSF repeats and re-alleges the allegations set forth in the previous paragraphs of this Complaint as if fully set forth herein.

49. The Railroad Revitalization and Regulatory Reform Act of 1976, Pub. L. No. 94-210, 90 Stat. 31 (now codified as amended in scattered sections of Title 49), was enacted to, *inter alia*, further the financial stability of the railway system of the United States. Congress recognized that one threat to the economic viability of the railway system was States' discriminatory taxation of railroads and rail activity. "[R]ailroads are easy prey for State and local tax assessors in that they are nonvoting, often nonresident, targets for local taxation, who cannot easily remove themselves from the locality." *Dep't of Revenue of Or. v. ACF Indus., Inc.*, 510 U.S. 332, 336 (1994) (internal quotation marks and citation omitted). To remove the "temptation to excessively tax" railroads "to subsidize general welfare spending," the 4-R Act prohibits state and local tax schemes that discriminate against railroads. *W. Air Lines, Inc. v. Bd. of Equalization of S.D.*, 480 U.S. 123, 131 (1987). Such schemes are diverse, and thus "the nomenclature provided to the [state] charge at issue is not material" to the question whether the charge is a tax in substance under federal law. *Valero Terrestrial Corp. v. Caffrey*, 205 F.3d 130, 134 (4th Cir. 2000). Instead, courts consider whether the charge raises revenue to support the general public welfare (making it a tax), or instead is "tied to a particular benefit obtained by a specific taxpayer" (making it a fee). *Kansas City S. Ry. Co. v. Koeller*, 653 F.3d 496, 507 (7th Cir. 2011).

50. As relevant here, under 49 U.S.C. § 11501(b) a State "may not" impose certain discriminatory property taxes or "[i]mpose another tax that discriminates against a rail carrier." The forbidden taxes include "taxes on rail transportation property and to other taxes if they discriminate against a rail carrier," and a tax that "is imposed on an activity in which only a railroad or railroads engage … is prima facie discriminatory" under the statute. *Burlington N. R.R. v. City of Superior*, 932 F.2d 1185, 1186, 1187 (7th Cir. 1991). "[A] showing that the railroads have been

targeted [for taxation] is enough to prove discrimination" under the 4-R Act. *Koeller*, 653 F.3d at 510.

51. For purposes of this count only, and without prejudice to BNSF's alternative claim, the sewer rate charge is in substance "another tax" within the meaning of 49 U.S.C. § 11501(b)(4).

52. The sewer rate charge impermissibly discriminates against railroads vis-à-vis other local commercial and industrial payers because the plain text of the Sewer Rate Ordinance singles out and targets railroad yards and rights-of-way, which are owned only by railroads, for differential and worse treatment than other similarly-situated property.

53. There is no adequate justification for the discriminatory treatment of railroads under the Sewer Rate Ordinance.

54. The Sewer Rate Ordinance thus discriminates against common carriers by railroad, including BNSF, in violation of the 4-R Act. Therefore, the Sewer Rate Ordinance as applied to BNSF should be declared to be invalid and unenforceable.

## COUNT III
### Violation of Dormant Commerce Clause as Deprivation of Rights, Privileges, or Immunities Under 42 U.S.C. § 1983

55. BNSF repeats and re-alleges the allegations set forth in the previous paragraphs of this Complaint as if fully set forth herein.

56. The Interstate Commerce Clause of the U.S. Constitution provides that "the Congress shall have the power . . . to regulate Commerce . . . among the several States." U.S. Const. art. I, § 8, cl. 3. The promotion and protection of interstate commerce is a central function of the Federal Government, and the Interstate Commerce Clause recognizes that the free flow of goods and materials throughout the nation is essential to the national economy. "Although the Commerce Clause is by its text an affirmative grant of power to Congress to regulate interstate

and foreign commerce," the Supreme Court has explained it also "has long been recognized as a self-executing limitation on the power of the States to enact laws imposing substantial burdens on such commerce." *South-Central Timber Dev., Inc. v. Wunnicke*, 467 U.S. 82, 87 (1984). This is sometimes called the "Dormant" Commerce Clause.

57. State and local laws or regulations that discriminate against or impermissibly interfere with interstate commerce violate the Dormant Commerce Clause and are invalid. In particular, "laws that explicitly discriminate against interstate commerce" or "bear more heavily on interstate commerce than on local commerce" are subject to invalidation under the Dormant Commerce Clause. *Nat'l Paint & Coatings Ass'n v. City of Chicago*, 45 F.3d 1124, 1131 (7th Cir. 1995).

58. The Dormant Commerce Clause forbids the Sewer Rate Ordinance's discriminatory application to railroads (and to BNSF in particular). Because railroads are overwhelmingly channels of *inter*state commerce—and because the operations of BNSF's railyard in Cicero are almost entirely concerned with *inter*state commerce—the Sewer Rate Ordinance's specific application to railroads is facially discriminatory against interstate commerce. At the very least, the Sewer Rate Ordinance's special charge on railroads has the practical effect of discriminating against interstate commerce. The charge represents an attempt by Cicero to disproportionately shift the costs and expenses of maintaining, operating, and improving the sewer system and other Town infrastructure to a key channel of interstate commerce, so as to benefit local interests at the expense of interstate commerce.

59. A State law that regulates a person in violation of the Dormant Commerce Clause deprives that person of "rights, privileges, or immunities secured by the Constitution" within the meaning of 42 U.S.C. § 1983. *Dennis v. Higgins*, 498 U.S. 439 (1991). The Sewer Rate Ordinance

violates the Dormant Commerce Clause and impermissibly deprives BNSF of rights, privileges and immunities secured to it by the Constitution.

60.     Under 42 U.S.C. § 1988(b), BNSF is entitled to recover a reasonable attorney's fee in this case.

## PRAYER FOR RELIEF

WHEREFORE, BNSF respectfully requests that this Court enter judgment against the Town of Cicero including:

A. Issuance of a Temporary Restraining Order, Preliminary Injunction, and Permanent Injunction preventing the Town from enforcing the Sewer Rate Ordinance;

B. Issuance of a judgment and order declaring that the Sewer Rate Ordinance is invalid and unenforceable as applied to railyards and rights of way, including those owned or operated by BNSF;

C. Issuance of a judgment and order awarding BNSF costs and expenses in this action, including reasonable attorneys', accountants', and experts' fees, under any applicable statute or rule; and

D. Granting such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff BNSF Railway Company demands a trial by jury on all claims so triable.

Dated: June 8, 2021

**BNSF RAILWAY COMPANY,**

By: _/s/ Renato Mariotti_

Renato Mariotti
Holly H. Campbell
THOMPSON COBURN LLP
55 East Monroe, 37th Floor
Chicago, Illinois 60603
312.346.7500
rmariotti@thompsoncoburn.com
hcampbell@thompsoncoburn.com

Sara L. Chamberlain
THOMPSON COBURN LLP
One US Bank Plaza
St. Louis, Missouri 63101
314.552.6000
schamberlain@thompsoncoburn.com

Benjamin J. Horwich (*pro hac vice* motion
forthcoming)
Teresa A. Reed Dippo (*pro hac vice* motion
forthcoming)
Rebecca L. Sciarrino (*pro hac vice* motion
forthcoming)
MUNGER, TOLLES & OLSON LLP
560 Mission Street, Twenty-Seventh Floor
San Francisco, California 94105
415.512.4000
ben.horwich@mto.com
teresa.reeddippo@mto.com
rebecca.sciarrino@mto.com

**Attorneys for Plaintiff**