**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**

| | | |
|---|---|---|
| BNSF Railway Company, | ) | |
| | ) | |
| Plaintiff, | ) | **Case No. 21-cv-3072** |
| vs. | ) | |
| | ) | |
| The Town of Cicero, Illinois, | ) | |
| | ) | |
| Defendant. | ) | |

**TOWN'S RESPONSE IN OPPOSITION**

NOW COMES the Defendant, the TOWN OF CICERO, by and through its attorney, Cynthia S. Grandfield, Del Galdo Law Group, LLC and in response in opposition to Plaintiff's motion argues:

A preliminary injunction is an "extraordinary" and "drastic" remedy that is "never awarded as of right," but only upon a "clear showing of need," where the movant "carries the burden of persuasion." Winter v. Natural Resources Defense Council, Inc., 555 U.S. 7, 24 (2008); Mazurek v. Armstrong, 520 U.S. 968, 972 (1997); Cooper v. Salazar, 196 F.3d 809, 813 (7th Cir. 1999). Additionally, a municipal ordinance carries a strong presumption of validity, and can only be declared facially invalid if no set of circumstances under which it would be valid. LMP Services, Inc. v. City of Chicago, 2019 IL 123123, ¶15 (Ill. Sup. Ct. 2019) Here BNSF has failed to meet its burden so as to be granted a preliminary injunction. What is at issue is strictly monetary – the amount of sewer and stormwater fee that BNSF pays. It really comes down to this – BNSF, a multi-billion-dollar company and one of the richest companies in the world, can pay and should pay the assessed fee - but does not want to.

"A party seeking a preliminary injunction must satisfy all three requirements in the 'threshold phase' by showing that (1) it will suffer irreparable harm in the period before the resolution of its claim; (2) traditional legal remedies are inadequate; and (3) there is some

1

likelihood of success on the merits of the claim." HH-Indianapolis, LLC v. Consolidated City of Indianapolis and County of Marion, Indiana, 889 F.3d 432, 437 (7th Cir. 2018). It then moves on to the balancing phase, where a sliding scale "weighs the factors against one another, assessing whether the harm to other parties or the public is sufficiently weighty that the injunction should be denied." Id.[1]

In this case, BNSF brings the following counts: (1) Preemption Under the ICC Termination Act; (2) Violation of the Railroad Revitalization and Regulatory Reform Act of 1976 or "4-R" Act; and (3) Violation of the Dormant Commerce Clause under 42 U.S.C. § 1983. None of these causes of action have any special statutory provisions that allow a plaintiff to obtain an injunction without establishing the common law elements of an injunction. Thus, BNSF must establish all of the elements to obtain injunctive relief. By BNSF's own admission it cannot.

I.    *Any Challenge to the Town's Sewer Fee Ordinance is Barred by the Statute of Limitations and Laches.*

BNSF is also challenging a classification system with respect to sewer and stormwater fees that has been in existence for *at least 40 years*. BNSF's primary objection to the Town's ordinance is that it puts railyards in a separate category that unfairly "targets" or "harasses" them. However, the classification system that BNSF complains of has been in existence since at least 1981. See Geary Affidavit, ¶ 23 attached as *Exhibit 1;* Manetti Affidavit, ¶20 attached as *Exhibit 2.* Any applicable statute of limitations has long since passed and the doctrine of laches surely bars a challenge now. See United States v. Midwest Generation, LLC, 720 F.3d 644, 646

---

[1] While the motion is also styled as a TRO motion, as discussed at the status hearing on June 23, 2021 this is not an emergency matter that requires a TRO. Further, the elements are largely similar. Thus, the Town responds and addresses the motion as a motion for a preliminary injunction.

(7th Cir. 2013), *construed in* United States v. U.S. Steel Corp., 16 F.Supp.3d 944, 949–51 (N.D. Ind. 2014) ("The Seventh Circuit seems to have reached [its] conclusion by applying a statute of limitations to the EPA's injunction claims."); But Cf. Union Carbide Corp. v. State Bd. of Tax Com'rs of State of Ind., 992 F.2d 119, 124 (7th Cir. 1993)(holding that the doctrine of laches not statute of limitations applies to an equitable claim under the 4-R Act). With respect to the statute of limitations, the Court should follow the analysis in §1983 claims and apply a two-year statute of limitations. See Ashafa v. City of Chicago, 146 F.3d 459, 461 (7th Cir. 1998)(collecting cases holding that 2-year statute of limitations applies to § 1983 actions). But really under any statute of limitations deemed to be most appropriate, a challenge to the Town's sewer fee ordinance on grounds that it is discriminatory or otherwise improperly targets railroads by creating a separate category is barred. Nor does the continuing violation doctrine save BNSF's claim, as BNSF should have known its rights were violated when the separate classification was initially created in 1981 and possibly as early as the 50s – which is the discrete act complained of that improperly "targets" railroads. See Turley v. Rednour, 729 F.3d 645, 654 (7th Cir. 2013)(Easterbrook, J., concurring)(*citing to* Nat'l R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 122 S.Ct. 2061, 153 L.Ed.2d 106 (2002), and Ledbetter v. Goodyear Tire & Rubber Co., 550 U.S. 618, 127 S.Ct. 2162, 167 L.Ed.2d 982 (2007).)

Even if the statute of limitations does not, the doctrine of laches also bars this objection to the separate classification of railyards. To support a claim of laches, a showing of both a lack of diligence by the party against whom the defense is asserted and prejudice to the defending party must be made. Costello v. United States, 365 U.S. 265, 282, 81 S.Ct. 534, 543, 5 L.Ed.2d 551 (1961). The Town has had this separate classification system for forty years now and has assessed and apportioned its total fees and maintained its system by that system. BNSF lacked

diligence in failing to previously bring this claim against the Town in relation to creating a separate classification system.

II.  *Town's Process for Assessing a Sewer and Stormwater Fee and Increasing the Railyard Fee in December of 2020.*

The Town has discretion to determine a sewer and stormwater fee with respect to property owners pursuant to the Illinois Municipal Code.  See 65 ILCS 5/11-139-2, 5/11-141-1, 5/11-150-1, 2; Town Code 98-266.  Further, the Town is a home rule municipality pursuant to the Illinois Constitution and the Illinois Municipal Code provisions on this subject do not have language that requires strict compliance and supersedes home rule authority. Ill. Const. 1970, art. VII, § 6(a); Green v. Village of Winnetka,  2019 IL App (1st) 182153, ¶71 (1st Dist. 2019).

The Town does not know why BNSF argues that it was not provided "notice of a hearing" or an "opportunity to present at a hearing" in its motion.  There is no hearing provided under the Illinois Municipal Code or the Town Code, because this is a matter within the sole discretion of the Town to set based on what it determines it needs to properly maintain a sewer and stormwater system.  See *Exhibit 2*, ¶21.  The amount collected by the Town is not part of the Town's general fund but is maintained in a separate fund pursuant to the Town code and is only used with respect to the services that the Town provides for water and sewer as well as maintenance of that system.  Even if the Town were to maintain more money in that account and have money in reserve, that is a decision of the Town Board in its legislative capacity of a home rule municipality as to how much the account should be funded and what it should have in reserve.  Green v. Village of Winnetka, 2019 IL App (1st) 182153, ¶71 (1st Dist. 2019).  The Town did place the ordinance on its agenda and provide the opportunity for public comment at the meeting, all in compliance with the Illinois Open Meetings Act.  See Agenda attached as *Exhibit 3*; 5 ILCS 120/2.01; 2.02; 2.06(g).

Turning specifically to the most recent rate increase applicable to BNSF, the Town had recently revised its Code by adding a section for property located outside the Town's municipal limits that was utilizing its system – specifically Hawthorne Racecourse in Stickney. The Town assessed that fee also by the acre and passed an ordinance in June of 2020 assessing that fee at $350 per acre. *Exhibit 2*, ¶ 18; Ordinance attached as *Exhibit 4.* The Town reached that fee, in part, by consulting with the Water Director and the Town's Engineer, Tim Geary. See *Exhibit 1*, ¶18-21; *Exhibit 2*, ¶17-18. Mr. Geary equated the Hawthorne Racecourse property with the old Western Electric property owned by the Town that utilized the City of Chicago sewer system. The City of Chicago, by ordinance, charges the Town a total fee of $90,000 for its use of the sewer system based on "235 connections." Mr. Geary than calculated that fee to be approximately $300 an acre. The Town then, in its sole discretion, determined that it would charge $350 an acre for the Hawthorne Racecourse property and enacted an ordinance reflecting that in June of 2020. *Exhibit 1,* ¶18-21.

The Town regularly reviews its sewer and water fee ordinances. *Exhibit 1*, ¶26; *Exhibit 2*, ¶19, 23. The Town then next turned its attention to reviewing the fee for railyards as they are also on a per acre basis and there have been several years, sometimes decades, that the rate has not been raised at all. *Exhibit 1*, ¶22, 24, *Exhibit 2*, ¶19. For example, from 1981 to 1997, the fee per acre for railyards remained at $6 per acre. *Exhibit 1,* ¶24. BNSF's property sits on over 250 acres and occupies approximately 7% of the Town's total land. *Exhibit 1,* ¶10. BNSF has, in general, been a poor corporate citizen. Even on a much lesser level, BNSF fails to do simple things like mow the grass surrounding its property. *Exhibit 2*, ¶12. With respect to sewer and stormwater, BNSF has been filling its property and significantly raising its elevation to more than two feet what it was before. *Exhibit 1,* ¶12. They also significantly increased the amount of

5

paving, which creates a higher coefficient of runoff of nearly 95% as opposed to 15 or 20% runoff by soil or aggregate where much of the water would seep into the ground. BNSF likely did this to prevent flooding on its own property. *Exhibit 1,* ¶12-14. Not only has this led to increased stormwater runoff from BNSF's property, but it has frequently led to a surcharge in the Town's system that floods the Town all along 31st street and Ogden that looks like a waterfall or river during times of increased rainfall, eventually leading to standing water in the yards of residents. *Exhibit 1,* ¶14, *Exhibit 2,* ¶10. Even when a surcharge does not occur, the increased runoff further degrades and strains the Town's system. *Exhibit 1,* ¶14. Thus, the Town was additionally particularly concerned with the strain to its system caused by railyards and the resulting flooding. A Google Earth visual inspection does not reveal any stormwater detention on the BNSF site. In order to protect surrounding property from BNSF discharge, several stormwater management improvements would need to be made by BNSF. *Exhibit 1,* ¶15-17.

To that end, the Town equated railyards as similar to the Hawthorne Racecourse property and enacted an ordinance also assessing a fee of $350 an acre for railyards in December of 2020. *Exhibit 1*, ¶22-25, *Exhibit 2,* ¶19. Portions of the Town's system are over 100 years old, with one large brick combined sewer dating back to 1911. Because of the age of the system, the system is a combined sewer system that also handles stormwater. *Exhibit 1*, ¶5-6. It also has limited capacity and has suffered significant degradation over the years. The Town's system is in need of substantial repairs. *Exhibit 1*, ¶7-8. The area also has had increased rainfall with the Illinois 2020 bulletin estimating an increase of 13% in the 100 year – 24 hour storm. *Exhibit 1,*

¶8.  The Town is also looking into revising the rates of certain other commercial and industrial sites in the Town based on increased rainfall and runoff.[2]  *Exhibit 1*, ¶26.

> III.   *No Irreparable Harm Has Been Established and Traditional Legal Remedies are Adequate.*

This case is about money for BNSF, not equity or "commerce."  BNSF indirectly admits this by several statements in its motion.  Most specifically – BNSF states that it would be willing to be put the amount of sewer fees claimed and due in escrow.  Moreover, while BNSF goes directly to a potential shut-off pursuant to the statutory notice provided by the Town, BNSF makes this logical leap without acknowledging that what led to the notice was its failure to pay.  BNSF could pay the amount in sewer fees due today and continue to litigate this case.  If the Court ultimately determines that the fee was improperly assessed and was too great, under § 1983 for example, compensatory damages or restitution would make BNSF fully whole.  Legal remedies are adequate, and there is no question that BNSF has the ability to pay the fees in a way that would not substantially impact its business, based on its representations with respect to escrow, so there is no irreparable injury or harm in doing so.

---

[2] At the status hearing on June 23, 2021, the Court inquired if the Town discussed the most recent increase in sewer fee with BNSF prior to enacting the ordinance.  Given the relationship between the two, the Town did not.  Additionally, Town counsel offers the following corrections: (1) more than one railroad has a railyard in the Town limits, there are four.  However, BNSF is by far the largest railyard. Because of this, Town counsel simply continues to forget there are actually four and apologizes for the error; (2) while there was a Town discussion regarding the fact that the sewer fee for BNSF was greater than 10% of the sewer fees collected by the Town but justified based on the amount of runoff, additional paving, and increased elevation – this specific figure was not utilized in calculated the new fee for BNSF.  In the interest of providing additional detail, the Town collected approximately $5 million in fees prior to the fee increases in June and December of 2020.  See, e.g. *Exhibit 5*.  Assuming a 100% collection rate of the fee increases, that would bring the total to approximately $6.5 million (the fee applicable to Hawthorne Racecourse adds an additional $450,000).  This would make the sewer fee collected from BNSF 15% of the total fees collected by the Town.

While BNSF attempts to argue that there are special exceptions based on the type of claims it makes, this is ultimately not accurate. The Court must rely on the foundational requirements and elements for the granting of an injunction. See Kansas City Southern R. Co. v. Borrowman, 2009 WL 2603113, *7 (C.D. Ill. 08/18/2009, Scott, J.)(*reconsideration granted in part at* 2009 WL 3188305) (denying preliminary injunction based on alleged violation of 4-R Act for an assessment that constitutes an "improper tax" with respect to a surface water control system by a drainage district on grounds of failure to demonstrate irreparable injury as the loss of money is not irreparable); Hohe v. Casey, 868 F.2d 69, 73 (3d Cir.1989) ("Constitutional harm is not necessarily synonymous with the irreparable harm necessary for issuance of a preliminary injunction."); See also Sampson v. Murray, 415 U.S. 61, 89–92, 94 S.Ct. 937, 952–54, 39 L.Ed.2d 166 (1974); Wisconsin Central Ltd. v. Public Service Commission, 95 F.3d 1359, 1369–70 (7th Cir.1996); Cunningham v. Adams, 808 F.2d 815, 822 (11th Cir.1987); Roberts v. Van Buren Public Sch., 731 F.2d 523, 526 (8th Cir.1984); Ciechon v. City of Chicago, 634 F.2d 1055, 1057 (7th Cir.1980)(all holding that there is no irreparable harm in alleged procedural due process violations where the injury is ultimately redressable through monetary compensation); See also Smart v. Board of Trustees of Univ. of Illinois, 34 F.3d 432, 435 (7th Cir.1994)(holding that there was no irreparable harm in First Amendment retaliation claim where the only injury would be the Plaintiff's expense of defending against the suit).

IV.     *There is No Likelihood of Success on the Merits.*

Because BNSF cannot establish irreparable harm or that traditional legal remedies are inadequate, the motion must fail on those grounds alone. However, BNSF also fails to establish a likelihood of success on the merits with respect to any of its counts.

A.   *ICCTA (Count I)*

The Interstate Commerce Commission Termination Act ("ICCTA"), passed in

1995, vested the United States Surface Transportation Board ("STB") with exclusive jurisdiction

over "transportation by rail carriers," replacing a predecessor Interstate Commerce Commission

and making it the policy of the federal government to minimize the need for regulatory control.

See § 49 U.S.C.A. 10101, *et seq.*; see also Burgoyne, LLC. v. Chicago Terminal R.R. Co., 2020

IL App (1st) 190098, at ¶ 20, *citing* Wedemeyer v. CSX Transportation, Inc., 850 F.3d 889 (7th

Cir. 2017) (The ICCTA was enacted "to abolish the [ICC] and transfer its regulatory authority

over the rail transportation system to the STB").  However, the ICCTA "expressly preempts only

those state laws that have the effect of managing or governing rail transportation, while allowing

application of laws having a more remote or incidental effect." Burgoyne, at ¶ 22 (internal

citations omitted).

Further, railroad attempts to bring a private cause of action under the ICCTA, as opposed

to pre-empting a claim brought against a railroad, have been denied by the Seventh Circuit.

Chessie Logistics Co. v. Krinos Holdings, Inc., 867 F.3d 852, 857-58 (7th Cir. 2017). In Chessie,

a railroad attempted to bring a private cause of action against an adjacent property under the

ICCTA. The Seventh Circuit found no such right existed and differentiated cases where the

ICCTA was used to pre-empt a claim against a railway. See Id. ("Chessie's theory is that claims

it might assert under state law to protect its property rights are preempted. … 49 U.S.C. §

10501(b) … is not as sweeping as Chessie contends … federal law preempts state-law efforts

against railroads to treat railroad rights-of-way as abandoned or lost through adverse possession

… Chessie offers no authority indicating that a railroad's state-law property rights … are pre-

empted.").

9

In this case, to the extent the railroad is challenging the creation of a separate classification of the railroad by the Town in its sewer fee ordinance, that claim is precluded for the reasons stated in Section 1 of this response brief. Further, the Town has explained the reason for the classification of BNSF separately – namely that it has a large amount of property in the Town and a lot of paved surfaces that lead to an increased runoff. With respect to the remainder of the claim under this Act, the primary issue is really the collection of a sewer fee, not the enforcement. The effect of collecting a fee based on the amount of runoff on the property is remote and incidental as it "does not impose limits on or restrict the movement of persons or property" and is only imposed so as to properly maintain the Town's sewer system and thus protect the public health safety and welfare. Rogers v. BNSF Railway Co., 2019 WL 5635180, *2 (N.D. Ill. Oct. 31, 2019) (Kennelly, J.); Adrian & Blissfield R. Co. v. Vill. of Blissfield, 550 F.3d 533, 541 (6th Cir. 2008)(holding that ICCTA did not pre-empt requirement that railroad maintain sidewalks along its property bisecting a Michigan town for pedestrian safety - "Although the costs of compliance with a state law could be high, they are incidental when they are subordinate outlays that all firms build into the cost of doing business … The fact that the statute may prevent the Railroad from maximizing its profits… does not render the statute unreasonably burdensome.") (internal citations omitted). Further, it is not unduly burdensome, and, indeed, is highly inequitable for BNSF to contend that it can contribute significantly to the Town's stormwater runoff by substantially raising its elevation and paving over large portions of its property, likely to reduce flooding on its own property, but then refusing to pay for the flooding of the Town and the tax and degradation on the Town's system as a result of the increased runoff. See Exhibit 1, ¶10-13. Contrary to BNSF's argument, not only can it control this runoff, it took affirmative steps to create the runoff. It should not be the duty of the Town to

10

cure a problem that BNSF created. In fact, if BNSF would have adequate detention so as to control the runoff, it could largely disconnect from the Town's system.

    B. *"4-R Act" (Count II)*

    To fall within the "4-R Act," it must first be determined to be a "tax." While the definition of the term "tax" within the Act is admittedly given an expansive reading (CSX Transp., Inc. v. Alabama Dept. of Revenue, U.S. 277, 284-285 (2011)), in this instance the sewer fee charged by the Town does not fall within the definition and is not subject to the Act.

    In this case, the fees are not placed in the Town's general fund and are part of a separate fund that only goes toward the Town's care and maintenance of the system as well as the provisions of services. See *Exhibit 2,* ¶21; Town Code 98-232. Further, again, the railroad has engaged in specific acts and there are specific aspects of BNSF's property that have increased the stress on the Town's system and require compensation. See Wheeling & Lake Erie R. Co. v. Pub. Util. Com'n of Com. of Pa., 141 F.3d 88, 96-97 (3rd Cir. 1998)(holding that an assessment for constructing a culvert that specifically benefited the railroad and did not go into a general fund but instead went into a separate special fund was not a "tax" within the meaning of the 4-R Act); Chicago and North Western Transp. Co. v. Webster County Bd. of Sup'rs, 71 F.3d 265, 267 (8th Cir. 1995)(holding that while the improved drainage would generally benefit the general public, it was directly related to building a culvert that would benefit the railroad); Green v. Village of Winnetka, 2019 IL App(1st) 182153, ¶51-56, 68-76 (1st Dist. 2019)(holding that stormwater utility fee assessed by the Village was a fee and not a tax). Thus, this is a fee, not a tax. However, even if this Court were to determine that this is a tax, it is not discriminatory. Applying the functional approach most recently applied by the Seventh Circuit in Kansas City Southern Ry. Co. v. Koeller, 653 F.3d 496, 508-509 (7th Cir. 2011), the Town has provided a

valid basis for the assessment of BNSF's property on a per acreage basis and for the amount it is assessed at given the characteristics of the property.  BNSF has not sufficiently alleged or provided evidence for purposes of this motion and under the likelihood of success standard, another commercial or industrial property that is similar to it in amount of runoff and tax on the system and is treated more favorably with respect to the sewer fee.  Id. at 510-511.

C.   §1983 Dormant Commerce Clause (Count III)

"State and local laws affecting commerce may be put into one of three categories." National Paint & Coatings Ass'n v. City of Chicago, 45 F. 3d 1124, 1131 (7th Cir. 1995). "The first category comprises laws that explicitly discriminate against interstate commerce," e.g., State X prohibits the sale of goods manufactured outside of State X. Id. This category is sometimes referred to as the "disparate treatment" category, and laws falling into this category are "per se unconstitutional." Id.

"The second category comprises laws that appear to be neutral among states but that bear more heavily on interstate commerce than local commerce," e.g., State X sets a limit of 55 feet for trucks when all other states have limit of 65 feet, making it so trucks from State X can travel freely between the states but trucks from all other states cannot travel freely within State X. Id. This category is sometimes referred to as the "disparate impact" category, and "when the effect is powerful, acting as an embargo on interstate commerce without hindering interstate sales, the Court treats it as equivalent" to a statute that is facially discriminatory. Id.

If, however, the challenged law has "only a mild disparate effect and potential neutral justifications," then the law is analyzed according to the Pike balancing test. Regan v. City of Hammond, Indiana, 934 F. 3d 700, 703 (7th Cir. 2018). Under the Pike balancing test, "if the law regulates even-handedly to further a legitimate local public interest, and the effect on interstate

commerce is merely incidental, the law will be upheld unless the burden on commerce is clearly excessive in relation to the putative local benefits." Pike v. Bruce Church, Inc., 397 U.S. 137, 142 (1970).

The "third category comprises laws that affect commerce without any reallocation among jurisdictions - that do not give local firms any competitive advantage over those located elsewhere." National Paint & Coatings Ass'n, 45 F. 3d at 1131. When a challenged statute falls into this third category, it is "examined solely to determine whether it has a rational basis," i.e., it is not subject to Pike balancing. Regan, 934 F. 3d at 703. In other words, Pike balancing is only triggered "when the challenged law discriminates against interstate commerce in its practical application." Park Pet Shop, Inc. v. City of Chicago, 872 F. 3d 495, 502 (7th Cir. 2017). In sum, "[n]o disparate treatment, no disparate impact, no problem under the dormant commerce clause." National Paint & Coatings Ass'n, 45 F. 3d at 1132.

In this case, there is no explicit discrimination against a railroad, as an out of state business, versus other types of businesses. Indeed, the Town has several other multinational corporations that are not railroads and subject to this particular per acre fee structure but do pay a sewer fee under the general category of "commercial and industrial" property. See Exhibit 2, ¶22. Further, there is an entirely separate category that pays the same fee as railyards. Nor does the Town's fee create a large disparate impact as it does not impose a heavier burden on interstate commerce than local commerce. Instead, if there is any disparate impact, it is minimal. Applying the Pike balancing test, the dormant commerce clause is not violated as it is rationally based on the amount of use of BNSF of the Town's system, the size of the system, and the specific characteristics of BNSF's site in relation to stormwater runoff. Further, it is being applied to properly maintain the system which benefits and protects the public health, safety and

welfare.  See Belt Railway Company of Chicago v. Welgarz Hotel III, L.L.C., 2020 WL
6894664 (N.D. Ill. 2020) (Slip Copy) (denying railroads claim that application of Illinois' noise
emission standards would violate the dormant commerce clause because enforcement of
regulation did not favor local business at expense of out-of-state business, thus rational-basis
review applied, and therefore noise standards easily satisfied dormant commerce clause because
justification for regulation was "to protect the public's general health and well-being and the
quality of the environment").

      V.     *Alternatively, if an Injunction is Entered, Bond Should be Required.*

Alternatively, should the Court grant BNSF's request for an injunction, the Town
requests that BNSF be required to post bond in compliance with and pursuant to Federal Rule of
Civil Procedure 65(c).  In keeping with the Seventh Circuit's instruction to "err on the high
side," the Town requests that BNSF post a bond equivalent to the difference between the fee they
were paying prior to the rate increase and the fee most recently passed by the Town for a six-
month period.  Mead Johnson & Co. v. Abbott Laboratories, Inc., 201 F.3d 883, 888 (7th Cir.
2000). That equates to approximately $500,000.  Current monthly fee of approximately $90,000
less the previous monthly fee of approximately $7,000 is $83,000.  $83,000 times 6 is $498,000.

      VI.    *The Balancing of Equities Favors the Town.*

The balancing of equities does not favor BNSF.  The Town has broad authority in areas
of local public health, safety, and welfare.  Properly maintaining a sewer system is central to that
mission.  According to the last Census, the Town is composed of economically disadvantaged
racially diverse residents – specifically the Town is 94% Latinx and African American with 85%
of households speaking a language other than English in the home and a per capita household
income of approximately half the national average.

See https://www.census.gov/quickfacts/fact/table/US,cicerotownillinois/PST045219.  BNSF, one

of the richest corporations in the world, now seeks to have an extraordinary remedy in this case

so it does not have to pay.  And BNSF seeks this extraordinary remedy despite creating this

problem by filling its property several feet above the ground,[3] which not only caused enormous

additional strain on the Town's system, but also created flooding in the Town.  See *Exhibit 2*,

¶11-17.  BNSF, the largest private property owner in the Town, likely did this so its own

property would not be flooded.  See *Exhibit 1,* ¶6, *Exhibit 2,* ¶12.  The Town and its residents

should not have to take it on the chin for the railroad.   "The Commerce Clause significantly

limits the ability of States and localities to regulate or otherwise burden the flow of interstate

commerce, but it does not elevate free trade above all other values."  United Haulers Ass'n, Inc.

v. Oneida-Herkimer Solid Waste Authority, 550 U.S. 330, 334 (2007)(*citing to* Maine v. Taylor,

477 U.S. 131, 151 (1986).)

WHEREFORE, the Defendant the TOWN OF CICERO, respectfully requests that

BNSF's motion be denied.

Respectfully submitted,
Defendant TOWN OF CICERO

By: */s/ Cynthia S. Grandfield*
    Cynthia S. Grandfield

K. Austin Zimmer
Cynthia S. Grandfield (ARDC No. 6277559)
Michael A. Albert
DEL GALDO LAW GROUP, LLC
(312) 222-7000 (t)
grandfield@dlglawgroup.com
*Please direct all mailings to:*
1441 S. Harlem Avenue
Berwyn, Illinois 60402

---

[3] Including filling so high that several hydrants can no longer be accessed, which likely further creates a fire hazard.