**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| BNSF Railway Company, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 21-cv-3072 |
| | ) | |
| Town of Cicero, Illinois, | ) | |
| | ) | |
| Defendant. | ) | |


**<u>PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR
SUMMARY JUDGMENT</u>**

# <u>TABLE OF CONTENTS</u>

<u>Page</u>

I.  STATEMENT ................................................................................................................1

    A.  Constitutional, Statutory, and Regulatory Background ..............................1

    B.  BNSF's Interstate Rail Operations...............................................................4

    C.  Cicero's Discrimination Against Interstate Rail Carriers ...........................4

II.  ARGUMENT ...............................................................................................................7

    A.  ICCTA Preempts the Sewer Rate Ordinance..............................................7

    B.  If the Sewer Rate Charge Is a Tax, Then It Is Preempted by the 4-R Act............10

    C.  The Sewer Rate Ordinance Violates the Dormant Commerce Clause .................11

    D.  A Declaratory Judgment and Permanent Injunction are Warranted ....................14

III.  CONCLUSION..........................................................................................................15

**TABLE OF AUTHORITIES**

**Page**

**CASES**

*Alabama Department of Revenue v. CSX Transportation, Inc.*, 575 U.S. 21 (2015) ..................11

*Alliance for Clean Coal v. Miller*, 44 F.3d 591 (7th Cir. 1995) ...................................................13

*American Textile Manufacturers Institute, Inc. v. Donovan*, 452 U.S. 490 (1981).....................10

*American Trucking Ass'n v. City of Los Angeles*, 559 F.3d 1046 (9th Cir. 2009)........................15

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) ................................................................10

*Ass'n of American Railroads v. South Coast Air Quality Management District*,
    622 F.3d 1094 (9th Cir. 2010) ......................................................................................3, 8, 9

*Atchison, Topeka & Santa Fe Railway v. Lennen*, 640 F.2d 255 (10th Cir. 1981).......................14

*BNSF Railway v. California Department of Tax & Fee Administration*,
    904 F.3d 755 (9th Cir. 2018) ...........................................................................................10

*BNSF Railway v. Tennessee Department of Revenue*, 800 F.3d 262 (6th Cir. 2015)...................14

*Brown-Forman Distillers Corp. v. New York State Liquor Authority*,
    476 U.S. 573 (1986)..........................................................................................................12

*Burlington Northern Railroad v. Bair*, 957 F.2d 599 (8th Cir. 1992) ...........................................14

*Burlington Northern Railroad v. City of Superior*, 932 F.2d 1185 (7th Cir. 1991).....................11

*Burlington Northern Railroad v. Oklahoma Tax Commission*,
    481 U.S. 454 (1987)............................................................................................................3

*C&A Carbone, Inc. v. Town of Clarkstown*, 511 U.S. 383 (1994) .........................................12, 13

*Camps Newfound/Owatonna, Inc. v. Town of Harrison*,
    520 U.S. 564 (1997)........................................................................................................9, 12

*Cavel International, Inc. v. Madigan*, 500 F.3d 551 (7th Cir. 2007).............................................12

*Chicago & Northwestern Transportation Co. v. Kalo Brick & Tile Co.*,
    450 U.S. 311 (1981)..........................................................................................................1, 2

*Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402 (1971) ......................................10

*Comptroller of Treasury of Maryland v. Wynne*, 575 U.S. 542 (2015)...........................................3

## TABLE OF AUTHORITIES
### (Continued)

**Page**

*Consolidated Rail Corp. v. Town of Hyde Park*, 47 F.3d 473 (2d Cir. 1995) ...............................14

*eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388 (2006)...........................................................14

*Ecolab Inc. v. Paolo*, 753 F. Supp. 1100 (E.D.N.Y. 1991).........................................................15

*Girl Scouts of Manitou Council v. Girl Scouts of United States*,
   549 F.3d 1079 (2008)..........................................................................................................14

*Government Suppliers Consolidated Services, Inc. v. Bayh*,
   975 F.2d 1267 (7th Cir. 1992) .................................................................................... *passim*

*Green Mountain Railroad v. Vermont*, 404 F.3d 638 (2d Cir. 2005) ..............................................3

*Guilbeau v. Pfizer Inc.*, 880 F.3d 304 (7th Cir. 2018) ...................................................................7

*Hunt v. Washington State Apple Advertising Commission*, 432 U.S. 333 (1977) ........................13

*Husky Ventures, Inc. v. B55 Investments, Ltd.*, 911 F.3d 1000 (10th Cir. 2018)..........................14

*Illinois Republican Party v. Pritzker*, 973 F.3d 760 (7th Cir. 2020) ............................................14

*Kansas City Southern Railway v. Koeller*, 653 F.3d 496 (7th Cir. 2011)............................3, 10, 11

*Kansas City Southern Railway v. Sny Island Levee Drainage District*,
   831 F.3d 892 (7th Cir. 2016) ...............................................................................................11

*Maine v. Taylor*, 477 U.S. 131 (1986) .........................................................................................12

*National Meat Ass'n v. Harris*, 565 U.S. 452 (2012) ....................................................................9

*National Paint & Coatings Ass'n v. City of Chicago*, 45 F.3d 1124 (7th Cir. 1995) ...............4, 12

*New York Susquehanna & Western Railway v. Jackson*,
   500 F.3d 238 (3d Cir. 2007)..............................................................................................3, 8

*Norfolk Southern Railway v. City of Alexandria*, 608 F.3d 150 (4th Cir. 2010) ................2, 3, 7, 8

*Oregon Coast Scenic Railroad v. Oregon Department of State Lands*,
   841 F.3d 1069 (9th Cir. 2016) ..............................................................................................7

*Oregon Waste Systems Inc. v. Department of Environmental Quality of
   State of Oregon*, 511 U.S. 93 (1994) ...............................................................................8, 12

**TABLE OF AUTHORITIES**
**(Continued)**

**Page**

*Pike v. Bruce Church, Inc.*, 397 U.S. 137 (1970) ........................................................12

*Preston v. Thompson*, 589 F.2d 300 (7th Cir. 1978)..................................................15

*South-Central Timber Development, Inc. v. Wunnicke*, 467 U.S. 82 (1984)....................................3

*Trailer Train Co. v. State Board of Equalization*, 697 F.2d 860 (9th Cir. 1983) ..........................14

*Union Pacific Railroad v. Chicago Transit Authority*,
    647 F.3d 675 (7th Cir. 2011) ..........................................................2, 14

*Union Pacific Railroad v. Wisconsin Department of Revenue*,
    940 F.3d 336 (7th Cir. 2019) ..........................................................11

*United States v. California*, 921 F.3d 865 (9th Cir. 2019)..........................................15

*United States v. Morrison*, 529 U.S. 598 (2000) ........................................................11

*United States v. Virginia*, 518 U.S. 515 (1996) ........................................................10

*Vermont. Railway v. Towne of Shelburne*, 287 F. Supp. 3d 493 (D. Vt. 2017),
    *aff'd*, 918 F.3d 82 (2d Cir. 2019)..........................................................9

*Wilson v. Illinois Southern Railway*, 263 U.S. 574 (1924)..........................................15


CONSTITUTION, STATUTES, AND RULE:

U.S. Const. Article I, § 8, cl. 3 ........................................................ *passim*

ICC Termination Act of 1995, Pub. L. No. 104-88, 109 Stat. 803 ........................ *passim*
    49 U.S.C. § 10101 ..........................................................15
    49 U.S.C. § 10102(9) ..........................................................2, 7
    49 U.S.C. § 10501(a) ..........................................................7
    49 U.S.C. § 10501(b) ..........................................................2, 9

Railroad Revitalization and Regulatory Reform Act of 1976,
    Pub. L. No. 94-210, 90 Stat. 31 ........................................................ *passim*
    49 U.S.C. § 11501(b)(4) ..........................................................3, 10, 11

28 U.S.C. § 2201(a) ..........................................................14

Federal Rule of Civil Procedure 56(a) ..........................................................7

**TABLE OF AUTHORITIES**
**(Continued)**

**Page**

Cicero Code of Ordinances:

§ 98-187(a)............................................................................................................8

§ 98-266(2).......................................................................................................8, 13

§ 98-266(3).......................................................................................................8, 13

§ 98-266(4).......................................................................................................5, 13


**OTHER AUTHORITIES**

*CSX Transportation, Inc.*, FD No. 34662, 2005 WL 1024490 (STB May 3, 2005)............2, 7, 8, 9

S. Rep. No. 104-176 (1995) ...............................................................................................2

Defendant Town of Cicero ("Cicero") has presented Plaintiff BNSF Railway Company ("BNSF") with a Hobson's choice: (1) submit to an exorbitant discriminatory sewer rate charge or (2) lose access to water and sewer service and cease all interstate rail transportation through Cicero, Illinois. Less than a year ago, Cicero adopted a new Ordinance requiring railroads—and *only* railroads—to pay $350 per acre per month for sewer use, causing BNSF's monthly bills to spike from $6,643 to $90,300. Plaintiff's Rule 56.1 Statement of Undisputed Facts ("SOF") ¶¶ 11–12, 33–34. No other commercial and industrial ("C&I") user in Cicero faced a sewer rate increase.

Then, to strong-arm BNSF into paying the new discriminatory rate, Cicero has imposed monthly late penalties of $18,060; threatened to shut off BNSF's water and sewer services, including by digging underground to remove BNSF's pipes; threatened to place a lien on BNSF's property; and threatened to force BNSF to vacate its railyard. SOF ¶¶ 37–39.

This open discrimination is forbidden. Federal law prohibits state and local discrimination against interstate rail carriers. The Ordinance and its enforcement mechanisms are preempted by the ICC Termination Act of 1995 ("ICCTA"), Pub. L. No. 104-88, 109 Stat. 803, and the Railroad Revitalization and Regulatory Reform Act of 1976 ("4-R Act"), Pub. L. No. 94-210, 90 Stat. 31, both of which proscribe local discrimination against railroads. The Ordinance also violates the Dormant Commerce Clause by singling out a key channel of interstate commerce for disfavored treatment. Because Cicero refuses to heed federal law, BNSF seeks relief from this Court.

## I.     STATEMENT

### A.     Constitutional, Statutory, and Regulatory Background

Railroads are the paradigm channels of interstate commerce. Because they span many jurisdictions and cannot easily relocate, they are vulnerable to discrimination. Recognizing that local discrimination threatens the national good, Congress has enacted a series of laws—"among the most pervasive and comprehensive of federal regulatory schemes," *Chicago & N.W. Transp.*

*Co. v. Kalo Brick & Tile Co.*, 450 U.S. 311, 318 (1981)—to govern railroads and shield them from such interference.  BNSF operates under the "nationally uniform system of economic regulation" for rail that Congress has adopted.  S. Rep. No. 104-176, at 6 (1995).

**The ICC Termination Act of 1995.**  ICCTA grants the federal Surface Transportation Board ("STB") "exclusive" jurisdiction over numerous aspects of rail facilities and operations, including "transportation."  49 U.S.C. § 10501(b); *Union Pac. R.R. v. Chi. Transit Auth.*, 647 F.3d 675, 678 (7th Cir. 2011).  "[T]ransportation" means any "yard, property, facility, instrumentality, or equipment of any kind related to the movement of … property … by rail" and "services related to that movement, including receipt, delivery, elevation, transfer in transit, … storage, handling, and interchange of … property."  49 U.S.C. § 10102(9).  "Congress's intent in the Act to preempt state and local regulation of railroad transportation" was "broad and sweeping."  *Union Pac.*, 647 F.3d at 678 & n.1 (collecting cases).  ICCTA provides, in relevant part, that

> The Jurisdiction of the [STB] over—(1) [the] transportation by rail carriers … ; and (2) the … operation … [of] tracks, or facilities … is exclusive.  Except as otherwise provided in [ICCTA's rail provisions], the remedies provided under [ICCTA] with respect to regulation of rail transportation are exclusive and preempt the remedies provided under Federal or State law.

49 U.S.C. § 10501(b).

Where the STB has jurisdiction, ICCTA preempts state and local regulations that "would have the effect of preventing or unreasonably interfering with railroad transportation," *CSX Transp., Inc.*, FD No. 34662, 2005 WL 1024490, at *3 (STB May 3, 2005), or that "discriminate against rail carriers," *Norfolk S. Ry. v. City of Alexandria*, 608 F.3d 150, 160 (4th Cir. 2010).[1] Local rules that affect matters within the STB's jurisdiction are preempted "unless they are rules

---

[1] ICCTA also categorically preempts "state or local regulation of matters directly regulated by the [STB]."  *CSX Transp.*, 2005 WL 1024490, at *2.  Because the STB does not directly regulate sewer charges or utility services, BNSF does not assert that strand of preemption here.

of general applicability that do not unreasonably burden railroad activity." *Ass'n of Am. R.R. v. S. Coast Air Quality Mgmt. Dist.*, 622 F.3d 1094, 1098 (9th Cir. 2010) (*AAR*). State and local regulations "must address state concerns generally, without targeting the railroad industry." *N.Y. Susquehanna & W. Ry. v. Jackson*, 500 F.3d 238, 254 (3d Cir. 2007). Laws that apply "exclusively and directly to railroad activity" are plainly preempted. *AAR*, 622 F.3d at 1098; *Norfolk S.*, 608 F.3d at 160 (holding that localities may not "discriminate against rail carriers"); *Green Mountain R.R. v. Vermont*, 404 F.3d 638, 643 (2d Cir. 2005) (explaining, in context of police powers, that "*non-discriminatory* regulations … would seem to withstand preemption" (emphasis added)).

**The 4-R Act.** The 4-R Act also prohibits state and local governments from improperly targeting railroads. Congress enacted the 4-R Act to, among other things, "further[] railroad financial stability" by "prohibit[ing] … discriminatory state taxation." *Burlington N. R.R. v. Okla. Tax Comm'n*, 481 U.S. 454, 457 (1987). As relevant here, the 4-R Act prohibits a "subdivision of a State" from "[i]mpos[ing] another tax that discriminates against a rail carrier." 49 U.S.C. § 11501(b)(4). A law that "target[s]" railroads for heavier taxation "discriminates" and is preempted by the 4-R Act. *Kan. City S. Ry. v. Koeller*, 653 F.3d 496, 510 (7th Cir. 2011).

**The "Dormant" Commerce Clause.** The Interstate Commerce Clause of the United States Constitution provides that "Congress shall have the [p]ower … [t]o regulate Commerce … among the several States." U.S. Const. art. I, § 8, cl. 3. "Although the Commerce Clause is by its text an affirmative grant of power to Congress to regulate interstate and foreign commerce, the Clause has long been recognized as a self-executing limitation on the power of the States to enact laws imposing substantial burdens on such commerce." *S.-Cent. Timber Dev., Inc. v. Wunnicke*, 467 U.S. 82, 87 (1984). This "negative command" is known as the "dormant Commerce Clause." *Comptroller of Treasury of Md. v. Wynne*, 575 U.S. 542, 549 (2015) (citation omitted). "[L]aws that explicitly discriminate against interstate commerce" or that "bear more heavily on interstate

commerce than on local commerce" are subject to invalidation under the Dormant Commerce Clause. *Nat'l Paint & Coatings Ass'n v. City of Chi.*, 45 F.3d 1124, 1131 (7th Cir. 1995); *Gov't Suppliers Consol. Servs., Inc. v. Bayh*, 975 F.2d 1267, 1279 (7th Cir. 1992).

### B. BNSF's Interstate Rail Operations

BNSF operates one of the largest freight railroad networks in North America. SOF ¶ 3. With approximately 32,500 route miles, BNSF serves 28 States in the western two-thirds of the United States, as well as portions of Canada and key Mexican gateways. *Id.* ¶ 3. Of particular relevance here, BNSF engages in intermodal shipping—the transfer of containerized freight from an origin point to a destination involving various modes of transportation. *Id.* ¶ 4.

BNSF's Cicero railyard serves as a major hub linking the Midwest to the Pacific Northwest for the intermodal shipment of goods and commodities. SOF ¶ 7. Freight passing through Cicero can originate in Asia, travel by ocean to the Pacific Northwest, and then by rail to the Midwest and beyond. *Id.* BNSF transports a variety of finished goods and products through its Cicero facility, including products found on the shelves of major retailers and in American homes. *Id.* ¶ 9. In 2020 alone, BNSF moved over 450,000 53-foot-long freight containers through its Cicero facility. *Id.* ¶ 8. Approximately 500 individuals work at BNSF's Cicero property to support intermodal services. *Id.* ¶ 43. These individuals lift containerized freight from trucks to rail cars and vice versa, maintain rail equipment, move freight, and validate the routing and interchange of rail cars. *Id.* All of this work must be done on site for the railyard to operate. *Id.* ¶ 47. Without access to water and sewer service, BNSF would be unable to operate its Cicero railyard. *Id.* ¶ 42.

### C. Cicero's Discrimination Against Interstate Rail Carriers

***The Sewer Rate Ordinance***. On February 3, 2021, BNSF received a $90,300 sewer bill for December 21, 2020 through January 19, 2021. SOF ¶ 33. BNSF initially believed the bill was an error, because that one bill exceeded what BNSF had paid for the entire previous year ($79,716).

*Id.* ¶ 34. In fact, without warning, Cicero had raised the mandatory sewer rate for rail property, and only rail property, days before the December billing period began. Sewer rates for other C&I properties in Cicero, on the other hand, are significantly lower and remain unchanged. *Id.* ¶ 21.

Cicero's decision to target railyards lacks justification. The only individuals involved in formulating the new rate, Water and Sewer Department Director Lido Manetti and Town Engineer Timothy Geary, confirmed that there was no reasoned basis to target railroads for the $350-per-acre rate. Neither witness explained why Cicero raised its rates on railroads but not on other C&I users within Cicero. SOF ¶ 21. Nor could either explain why railroads are the only users in Cicero charged by the acre. *Id.* ¶ 17. To calculate a new rate for railroads, Mr. Geary applied various hypothetical annual increases. Mr. Geary's calculations never exceeded the range of $50 per acre—*i.e.*, one-seventh of the rate Cicero actually imposed. SOF ¶ 16. Mr. Geary does not know how Cicero arrived at $350 per acre. *Id.* Mr. Manetti revealed that, notwithstanding Mr. Geary's lower calculations, Cicero simply applied the rate it recently imposed on Hawthorne Race Course ("Hawthorne")—a non-local user that, unlike BNSF, need not connect to Cicero's sewer system.[2]

Although Cicero's witnesses could not explain the $350 rate, they admitted what Cicero did *not* consider. Cicero did not consider, and does not know, the cost to provide sewer services to BNSF or the amount of runoff from BNSF's property. SOF ¶¶ 19–20. Nor does Cicero know how those factors compare to other C&I users. *Id.* ¶ 19. And Cicero conducted no studies. *Id.* ¶ 20. The closest thing to a study was Mr. Manetti "looking at" properties during a storm. *Id.* Mr. Manetti saw "quite a few" C&I properties have "a lot of water that runs off," and yet, railroads are the only users in Cicero charged per acre and subject to a December 2020 rate increase. *Id.* ¶ 18.

---

[2] The rate imposed on Hawthorne applies to "Commercial and industrial sewer service [by Cicero] for property located outside of the town municipal border." Cicero Code § 98-266(4). Hawthorne is the only such property. SOF ¶ 22.

After the arbitrary $350 rate was set, it was placed on the Cicero Board agenda for a vote. The meeting minutes confirm that the purpose of the Ordinance was to target railroads: "The purpose of this ordinance is to increase rates for railroad yards and rights-of-way …." SOF ¶ 28. Mr. Manetti does not recall *any* discussion of the Ordinance. *Id.* ¶ 26. Mr. Geary never discussed the rate with voting officials before the meeting. *Id.* And there are no written documents about the rate increase, except possibly one email chain, and Cicero has not produced any such documents. *Id.* ¶ 27. The Board meeting—during which the Board considered two bills, five resolutions, four ordinances, a permit, a report, and new business—lasted less than 15 minutes. *Id.* ¶ 29. Cicero then began billing BNSF $90,300 per month.

***Cicero's Enforcement Campaign***. After receiving its first $90,300 bill, BNSF contacted Cicero representatives to "amicably resolve [its] dispute with the Town" and to continue paying its previous rate while the parties negotiated. SOF ¶ 37. BNSF also sought information regarding the reasons for the sharp rate increase. *Id.* Cicero refused to acknowledge BNSF's concerns and, instead, asserted that the Ordinance was within Cicero's "powers under Illinois statute and the Illinois Municipal Code" and was valid based on its status as a "'home rule municipality'" with "additional powers." *Id.* ¶ 38. After detailing its supposed authority to charge the exorbitant rate, Cicero threatened to "issue a 60-day notice of water and sewer shutoff, which may include digging underground to remove pipes as well as the placement of a lien for the unpaid amount." *Id.* All the while, Cicero imposed monthly late penalties on BNSF of $18,060. SOF ¶ 39. Concerned about mounting penalties, BNSF asked if there would be a refund process to recover payments if it were later determined that BNSF overpaid. *Id.* ¶ 40. Cicero has never answered BNSF's questions. Instead, Cicero sent BNSF a blunt notice of its intent to shut off BNSF's sewer service in 60 days, whereupon BNSF's "property will have to be vacated" as a "hazard to health." *Id.*

Only after extensive efforts by counsel and this Court—briefing on BNSF's preliminary

injunction motion, document discovery, depositions, briefing on BNSF's motion for a protective order, orders from the Court, and multiple status conferences with the Court—did Cicero then decide that it would not shut off BNSF's water and sewer. SOF ¶ 41. Cicero agreed not to interfere with BNSF's sewer service, not to order BNSF to vacate its property, and not to accrue late fees and penalties on BNSF for 90 days. *Id.* That stipulation expires on October 26, 2021.

## II.   <u>ARGUMENT</u>

Summary judgment is proper if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). No material facts are in dispute. A federal statute's preemptive effect is a question of law. *See Guilbeau v. Pfizer Inc.*, 880 F.3d 304, 310 (7th Cir. 2018). Here, the Ordinance discriminates on its face, which is reason enough to hold it preempted. The discovery record only confirms its discrimination. The similar facts supporting BNSF's Dormant Commerce Clause claim—that the Ordinance discriminates against railroads, which are vital channels of interstate commerce—are also undisputed.

### A.   <u>ICCTA Preempts the Sewer Rate Ordinance</u>

ICCTA preempts Cicero's Ordinance because the Ordinance has "the effect of preventing or unreasonably interfering with railroad transportation," *CSX Transp.*, 2005 WL 1024490, at *3, and it "discriminate[s] against rail carriers," *Norfolk S.*, 608 F.3d at 160. Either of these grounds is sufficient to find preemption, and Cicero's Ordinance is a potent combination of both.

BNSF's rail services, including its facility in Cicero, "fall within the statutory grant of jurisdiction to the [STB]," under 49 U.S.C. § 10501(a) over (1) "transportation" (2) "by a rail carrier" (3) "as part of the interstate rail network." *Or. Coast Scenic R.R. v. Or. Dep't of State Lands*, 841 F.3d 1069, 1072–73 (9th Cir. 2016). BNSF's facility and operations in Cicero are "transportation" under ICCTA. 49 U.S.C. § 10102(9); SOF ¶¶ 3–5, 7–10, 48–50. Because the STB has jurisdiction, ICCTA prohibits state and local actions that "would have the effect of

preventing or unreasonably interfering with railroad transportation," *CSX Transp. Inc.*, 2005 WL 1024490, at *3, or that "discriminate against rail carriers," *Norfolk S.*, 608 F.3d at 160; *N.Y. Susquehanna*, 500 F.3d at 254 ("[F]or a state regulation to pass muster, it must address state concerns generally, without targeting the railroad industry.").

Evaluating discrimination under ICCTA can be as simple as "comparing the substance of the … regulations that apply to railroads with those that apply to similar industries …." *N.Y. Susquehanna*, 500 F.3d at 256; *see AAR*, 622 F.3d at 1098 (holding that state rules were preempted because they applied "exclusively and directly to railroad activity"). That comparison is easy here. The Ordinance establishes the starkest form of discrimination, singling out railroads for disfavored treatment among all other C&I users in Cicero. Where a statute's plain text imposes higher fees on a specific category of users, facial discrimination is "obvious." *See Or. Waste Sys. Inc. v. Dep't of Env't Quality of State of Or.*, 511 U.S. 93, 99 (1994). The Ordinance charges local C&I users based on use—$56.06 per month, plus $18.69 for each 1,000 cubic feet of water used above the first 3,000 cubic feet. Cicero Code § 98-266(2). Cicero targets railroads, on the other hand, for an unfavorable $350-per-acre rate. The discriminatory effects are plain. If BNSF paid what other C&I users in Cicero paid, its monthly bill would be about $150. SOF ¶ 13. While other users can reduce their water usage and, thus, their sewer fees, Cicero Code § 98-266(2), railroads are the only users that cannot affect their rates by changing consumption, *id.* § 98-266(3). If BNSF entirely eliminated its sewer system use, Cicero would still charge BNSF $90,300 per month.

That Cicero only recently decided to charge one other user, Hawthorne, $350 per acre is no justification. SOF ¶ 24. Hawthorne is not located in Cicero and need not connect to Cicero's sewer system. *See* Cicero Code § 98-187(a) (requiring buildings "located on property abutting on a public street, thoroughfare, parkway, alley, or portion thereof served by the town sewer system" to connect); SOF ¶¶ 23, 25. BNSF, by contrast, must connect. Cicero Code § 98-187(a). Mr.

Geary could not explain why BNSF should be charged Hawthorne's rate. SOF ¶ 25. Nor could Cicero's witnesses explain the basis for that rate. *Id.* ¶ 24. Regardless, Hawthorne's rate proves only that Cicero targets railroads and another non-local entity while favoring local users.

Cicero's enforcement campaign worsens the Ordinance's burden on rail transportation. The sheer magnitude of the rate increase and Cicero's enforcement efforts all confirm the discrimination. *See Vt. Ry. v. Towne of Shelburne*, 287 F. Supp. 3d 493, 500 (D. Vt. 2017) ("[S]evere penalties permitted by" a town ordinance "point[] toward discrimination against the Railway."), *aff'd*, 918 F.3d 82 (2d Cir. 2019). Cicero's enforcement efforts, *supra* Part I.C.2, "unreasonably burden railroad activity." *AAR*, 622 F.3d at 1098; *see CSX Transp.*, 2005 WL 1024490, at *3. It would "make a mockery" of ICCTA to treat Cicero's enforcement efforts, which exist only to effectuate the Ordinance's rates, as separate from the rates themselves. *See Nat'l Meat Ass'n v. Harris*, 565 U.S. 452, 464 (2012); *Bayh*, 975 F.2d at 1281 (holding, in Dormant Commerce Clause case, that provisions that "facilitate enforcement of" a challenged law must "fall with" that law). Cicero's enforcement efforts exist to impose the discriminatory rate and, thus, are preempted "remedies …with respect to regulation of rail transportation." 49 U.S.C. § 10501(b).

Because this case involves facial discrimination, ICCTA preempts the Ordinance as a matter of law, and there can be no material dispute of fact. *Cf. Camps Newfound/Owatonna, Inc. v. Town of Harrison*, 520 U.S. 564, 575–76 (1997) (explaining that where a statute distinguished between businesses serving local versus non-local clientele, it was "not necessary to look beyond the text of th[e] statute to determine that it discriminates"). Facts uncovered in discovery only confirm that the Ordinance is discriminatory. Cicero's witnesses confirmed that the rate was not based on any data, studies, or calculations bearing a relationship to BNSF's sewer system use. SOF ¶¶ 19–20. Cicero's witnesses could provide no reason for charging railroads differently from other C&I users. *Id.* ¶¶ 17, 21. And Cicero could not explain why it ignored Mr. Geary's

calculations of approximately $50-per-acre, and instead imposed a rate seven times that amount. *Id.* ¶ 16. The lack of a reasoned explanation confirms discrimination. *See Koeller*, 653 F.3d at 510 (holding that differential treatment without "sufficient justification" is discrimination).

Cicero cannot rationalize the Ordinance *post hoc*. It is bound by the Ordinance it passed, not some hypothetical ordinance that takes into account justifications purpose-built for litigation. *Cf. United States v. Virginia*, 518 U.S. 515, 533 (1996) (holding in equal protection case that the "justification must be genuine, not hypothesized or invented *post hoc* in response to litigation"); *Am. Textile Mfrs. Inst., Inc. v. Donovan*, 452 U.S. 490, 539 (1981) ("[P]ost hoc rationalizations … cannot serve as a sufficient predicate for agency action."); *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 419 (1971) (rejecting "litigation affidavits" from agency officials as "merely '*post hoc*' rationalizations"). No justification Cicero has floated during this litigation— such as paving, flooding, runoff, the age and condition of Cicero's sewer system, or increased rainfall in Illinois—is a factor in BNSF's rate. SOF ¶¶ 15–20. Because the Ordinance discriminates against railroad transportation on its face, ICCTA preempts it as a matter of law.

**B.**     **If the Sewer Rate Charge Is a Tax, Then It Is Preempted by the 4-R Act**

If the sewer rate is a "tax," then it violates the 4-R Act, which prohibits a locality from "[i]mpos[ing] another tax that discriminates against a rail carrier," 49 U.S.C. § 11501(b)(4). The Court need not decide if the sewer rate is a fee or a tax, because federal law preempts the Ordinance either way. *See BNSF Ry. v. Cal. Dep't of Tax & Fee Admin.*, 904 F.3d 755, 760 (9th Cir. 2018) (declining to decide if charge was a fee or a tax because the relevant statute was "preempted under the ICCTA even if it is a fee"). No reason exists to decide whether the charge is a fee or a tax because it does not matter to the outcome of this litigation and, thus, is immaterial. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) ("Only disputes over facts that might affect the

outcome of the suit … will properly preclude the entry of summary judgment."); SOF ¶ 30.[3]

Discrimination under the 4-R Act can be shown by comparing the railroad to other C&I taxpayers. *Ala. Dep't of Revenue v. CSX Transp., Inc.*, 575 U.S. 21, 28 (2015) ("[T]he category of 'similarly situated' (b)(4) comparison classes must include commercial and industrial taxpayers."). The Ordinance's plain terms treat BNSF differently from, and worse than, that comparison class. That Cicero targets railroad yards for an unfavorable rate "is enough to prove discrimination" under the 4-R Act. *Koeller*, 653 F.3d at 510; *Union Pac. R.R. v. Wisc. Dep't of Revenue*, 940 F.3d 336, 341 (7th Cir. 2019) (asking, in 4-R Act case, whether a tax "singles out railroads as part of a targeted and isolated group in violation of [49 U.S.C. § 11501(b)(4)]"); *Burlington N. R.R. v. City of Superior*, 932 F.2d 1185, 1187 (7th Cir. 1991) (railroad showed discrimination "simply by proving that [a] tax was imposed on an activity … in which only a railroad engages"). Cicero cannot show otherwise. *Kan. City S. Ry. v. Sny Island Levee Drainage Dist.*, 831 F.3d 892, 898 (7th Cir. 2016) (defendant must "offer a sufficient justification").

## C.    The Sewer Rate Ordinance Violates the Dormant Commerce Clause

The Ordinance also violates the Dormant Commerce Clause. The Dormant Commerce Clause is of particular relevance here because railroads are the very channels of interstate commerce. *Cf. United States v. Morrison*, 529 U.S. 598, 613 n.5 (2000) ("[C]hannels of interstate commerce" are "the interstate transportation routes through which persons and goods move"

---

[3] BNSF leads with its ICCTA claim because Cicero asserts that the charge is not a tax, and for simplicity, BNSF accepts that characterization here. But some contrary evidence exists. The charge would be a "tax" if it raises general revenues that support Cicero broadly, rather than being "tied to a particular benefit obtained by a specific taxpayer." *Koeller*, 653 F.3d at 507. Cicero did not consider BNSF's use of the sewer system, so Cicero cannot argue that BNSF's rate is "tied to [the] particular benefit," *id.*, of BNSF's sewer use. Moreover, Cicero's budget documents and a letter from Cicero's counsel indicate that in 2019 the sewer system operated at an approximately $1 million annual deficit—curiously similar to the amount Cicero now seeks to extract from BNSF annually. SOF ¶ 31. Mr. Manetti also testified that part of the $350 rate might go toward "offer[ing] every household $1,500" so they can put a "flood control" system in. *Id.* Both facts suggest that BNSF's extraordinarily high rate supports the public generally.

(quotation marks and citation omitted)).

The threshold question in a Dormant Commerce Clause case is whether the challenged law discriminates against interstate commerce "either on its face or in practical effect." *Maine v. Taylor*, 477 U.S. 131, 138 (1986) (quotation marks and citation omitted). "The 'critical consideration' in determining the appropriate analysis 'is the overall effect of the statute on both local and interstate activity.'" *Bayh*, 975 F.2d at 1277 (quoting *Brown-Forman Distillers Corp. v. N.Y. State Liquor Auth.*, 476 U.S. 573, 579 (1986)). Laws that discriminate against interstate commerce expressly "are treated as all but *per se* unconstitutional." *Nat'l Paint*, 45 F.3d at 1131. Laws that "bear more heavily on interstate commerce" are also subject to heightened scrutiny. *Id.* Lesser scrutiny applies only to a law that "regulates even-handedly to effectuate a legitimate local public interest, and [whose] effects on interstate commerce are only incidental." *Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142 (1970).

Nothing about Cicero's Ordinance is "even-handed[]." *Id.* In the context of the Dormant Commerce Clause, "discrimination" means "differential treatment of in-state and out-of-state economic interests that benefits the former and burdens the latter." *Or. Waste Sys., Inc.*, 511 U.S. at 99. "The Commerce Clause presumes a national market free from local legislation that discriminates in favor of local interests." *C&A Carbone, Inc. v. Town of Clarkstown*, 511 U.S. 383, 393 (1994). Thus, "[t]he clearest case of a state law that violates the commerce clause is a law that discriminates in favor of local firms." *Cavel Int'l, Inc. v. Madigan*, 500 F.3d 551, 554 (7th Cir. 2007). That local favoritism pervades the Ordinance. *See Camps Newfound/Owatonna*, 520 U.S. at 575–76 (holding that statute that "expressly distinguishes between entities that serve a principally interstate clientele and those that primarily serve an intrastate market" discriminates against interstate commerce).

Because of the role railroads play in our Nation's commerce, discrimination against interstate rail carriers *is* discrimination against interstate commerce. Railroad facilities in the Chicagoland area play a uniquely important role in interstate commerce. Chicago is the only place in North America where all of the Class I railroads meet. SOF ¶ 48. BNSF's Cicero railyard links numerous United States markets, frequently serving as a transfer point for foreign imports shipped across the Pacific, from which the freight can travel to endpoints around the Nation. *Id.* ¶ 7.

"Discrimination may take the form of 'raising the costs of doing business' for out-of-state entities, 'while leaving those of their [in-state] counterparts unaffected.'" *Bayh*, 975 F.2d at 1279 (quoting *Hunt v. Wash. State Apple Adver. Comm'n*, 432 U.S. 333, 351 (1977) (alteration in *Bayh*)). The Ordinance imposes the steep $350-per-acre charge on railroads, which are non-local in character, and properties outside of Cicero's borders, while favoring C&I users within Town borders. Cicero Code § 98-266(2)–(4). Because the Ordinance "discriminates against interstate commerce either on its face or in its practical effect, it is subject to the strictest scrutiny." *All. for Clean Coal v. Miller*, 44 F.3d 591, 595 (7th Cir. 1995) (quotation marks and citation omitted).

Because the Ordinance discriminates against the channels of interstate commerce overtly, Cicero must demonstrate "under rigorous scrutiny, that it has no other means to advance a legitimate local interest," *C&A Carbone*, 511 U.S. at 392, or that its interests "cannot be adequately served by nondiscriminatory alternatives," *Bayh*, 975 F.2d at 1279. But Cicero has offered no legitimate local interest for the sewer rate. To the extent that Cicero attempts to justify the sewer rate based on a need to raise additional money for sewer system upkeep, it must do so evenhandedly. And Cicero cannot justify the sewer rate now with reference to factors such as stormwater runoff, because the Ordinance does not account for such factors. *Supra* Part II.B. Simply put, Cicero cannot meet its burden of showing that "it has no other means to advance a legitimate local interest." *C&A Carbone*, 511 U.S. at 392.

### D.    A Declaratory Judgment and Permanent Injunction are Warranted

A declaratory judgment is proper where the controversy between the parties is "of sufficient immediacy and reality to warrant issuance of a declaratory judgment." *Bayh*, 975 F.2d at 1274 (citation omitted); 28 U.S.C. § 2201(a).   Such relief is authorized here.   Cicero has threatened to enforce its discriminatory Ordinance against BNSF, and, after October 26, 2021, will do so absent relief from this Court.   As long as the Ordinance is in effect, BNSF has every reason to expect that its sewer bills will remain hyperinflated, and that Cicero will threaten enforcement.

A permanent injunction is also warranted.   Such relief generally requires a showing of (1) irreparable harm, (2) the inadequacy of remedies at law, (3) that the balance of hardships favors the plaintiff, and (4) that an injunction is not against the public interest.   *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006).[4]   Unless enjoined, Cicero will injure BNSF through business disruption, loss of goodwill, impairment of its property rights, and continued violations of its Constitutional rights.   SOF ¶¶ 38–40.   Those harms are irreparable.   *See Girl Scouts of Manitou Council v. Girl Scouts of U.S.*, 549 F.3d 1079, 1090 (2008), *abrogated on other grounds, Ill. Republican Party v. Pritzker*, 973 F.3d 760 (7th Cir. 2020); *Husky Ventures, Inc. v. B55 Invs., Ltd.*, 911 F.3d 1000, 1012–13 (10th Cir. 2018) (harm to "business interests" such as loss of goodwill can be irreparable injury).   It is no answer for Cicero to say that it will not pursue enforcement if BNSF simply pays the discriminatory bills.   The Ordinance is unconstitutional because it violates the Dormant Commerce Clause and is preempted, *Union Pac.*, 647 F.3d at 678,

---

[4] BNSF's showing on the merits suffices to issue an injunction under the 4-R Act.   The "standard requirements for equitable relief need not be satisfied" because the 4-R Act "specifically authorizes a district court to grant injunctive relief to prevent a violation of the statute."   *E.g.*, *Trailer Train Co. v. State Bd. of Equalization*, 697 F.2d 860, 869 (9th Cir. 1983); *see BNSF Ry. v. Tenn. Dep't of Revenue*, 800 F.3d 262, 268 (6th Cir. 2015); *Consol. Rail Corp. v. Town of Hyde Park*, 47 F.3d 473, 479 (2d Cir. 1995); *Burlington N. R.R. v. Bair*, 957 F.2d 599, 603 (8th Cir. 1992); *Atchison, Topeka & Santa Fe Ry. v. Lennen*, 640 F.2d 255, 259–61 (10th Cir. 1981).

and injury due to forced submission to an unconstitutional law is itself irreparable harm, *see Am. Trucking Ass'n v. City of L.A.*, 559 F.3d 1046, 1058 (9th Cir. 2009). "The existence of a continuing constitutional violation constitutes proof of an irreparable harm, and its remedy certainly would serve the public interest." *Preston v. Thompson*, 589 F.2d 300, 303 n.3 (7th Cir. 1978).

No adequate remedy at law exists. Because Cicero seeks to enforce its Ordinance in the future, the only way to prevent Cicero from discriminating against BNSF is to enjoin Cicero from doing so. BNSF inquired whether there would be an avenue to obtain a refund if it overpaid, and Cicero pointed to none. SOF ¶ 40. Even such a damages mechanism would be an inadequate remedy, because BNSF would be required to sue on a monthly basis each time it received a discriminatory bill. "If a plaintiff can secure legal relief only through a multiplicity of lawsuits, plaintiff has suffered irreparable harm…." *Ecolab Inc. v. Paolo*, 753 F. Supp. 1100, 1110 (E.D.N.Y. 1991); *see Wilson v. Ill. S. Ry.*, 263 U.S. 574, 577 (1924).

The balance of hardships and the public interest also support an injunction. "[I]t would not be equitable or in the public's interest to allow the state … to violate the requirements of federal law." *See United States v. California*, 921 F.3d 865, 893–94 (9th Cir. 2019) (citation omitted). Restraining Cicero from discriminating against railroads would undoubtedly serve the public interest. Congress has already determined that a railroad's services are in the public interest. *See* 49 U.S.C. § 10101 (setting forth federal rail transportation policy). And proscribing Cicero's enforcement efforts would ensure the continued employment of hundreds of workers, allow the free flow of essential goods, protect our Nation's transportation infrastructure, and ensure the continued operation of a vital channel of interstate commerce. SOF ¶¶ 47–50. Permitting a single locality to hamper BNSF's intermodal transportation services would harm the public interest.

## III.    <u>CONCLUSION</u>

For the foregoing reasons, BNSF's motion for summary judgment should be granted.

Dated: October 7, 2021                          Respectfully submitted,

**BNSF RAILWAY COMPANY,**

By: _/s/ Renato Mariotti_

Renato Mariotti
Holly H. Campbell
THOMPSON COBURN LLP
55 East Monroe, 37th Floor
Chicago, Illinois 60603
312.346.7500
rmariotti@thompsoncoburn.com
hcampbell@thompsoncoburn.com

Sara L. Chamberlain
THOMPSON COBURN LLP
One US Bank Plaza
St. Louis, Missouri 63101
314.552.6000
schamberlain@thompsoncoburn.com

Benjamin J. Horwich (*pro hac vice*)
Rebecca L. Sciarrino (*pro hac vice*)
MUNGER, TOLLES & OLSON LLP
560 Mission Street, Twenty-Seventh Floor
San Francisco, California 94105
415.512.4000
ben.horwich@mto.com
rebecca.sciarrino@mto.com

***Attorneys for Plaintiff***

- 16 -

## <u>CERTIFICATE OF SERVICE</u>

I, Renato Mariotti, hereby certify that on October 7, 2021, I electronically filed the foregoing PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT with the Clerk of the Court, using the CM/ECF system, which sent notification of such filing to all counsel of record in this matter.

*/s/ Renato Mariotti*