# EXHIBIT A

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**

| | | |
|---|---|---|
| BNSF RAILWAY COMPANY | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 21-cv-03072 |
| | ) | |
| | ) | |
| TOWN OF CICERO, ILLINOIS | ) | |
| | ) | |
| Defendant. | ) | |

**DECLARATION OF GREGG ZODY**

I, Gregg Zody, declare under penalty of perjury the following:

1.      I am the General Director of Consumer Products, Intermodal Solutions, for BNSF Railway Company ("BNSF").  I submit this declaration in support of BNSF's Motion for Temporary Restraining Order and Preliminary Injunction.  I am over the age of 18, competent to testify, and make the following declaration based on my education, training, experience, professional qualifications, and my understanding of the matters herein based on my personal knowledge or my access to BNSF's business records.

2.      I have worked for BNSF for eighteen (18) years.  For the last three (3) years, I have worked in my current role as General Director of Consumer Products.  As General Director, Consumer Products, my responsibilities include leading a nationwide team that has a primary role of managing beneficial cargo owner ("BCO") relationships—i.e., relationships with the customers that own and pay for the freight being shipped.  I have served in several other Director roles at BNSF for over a decade, including as General Director, Industrial Products, where I served our mineral businesses unit; Director, UPS, where I served our UPS business; and Director,

Temperature Controlled Intermodal, where I served our customers requiring temperature-controlled shipping.

3.      From my years of experience working with BNSF, I am readily familiar with the operations of BNSF, including the services we provide and the products, industries, and customers we serve.

## Background on BNSF Railway Company and Intermodal Transport

4.      BNSF is headquartered in Fort Worth, Texas, and operates one of the largest freight railroad networks in North America. BNSF provides services as a common carrier by rail and is regulated by the Surface Transportation Board. BNSF serves 28 States in the western two-thirds of the United States, as well as portions of Canada and key Mexican gateways, with approximately 32,500 route miles. BNSF operates three transcontinental routes in the United States and has annual carrier operating revenues far in excess of $250 million, making it a Class I railroad under federal law. BNSF moves an average of 1,200 trains per day and carries more than 500 million tons of freight per year over these routes, serving as a key link between a number of major U.S. markets.

5.      Attached hereto as Exhibit 1 is a true and correct copy of a Fact Sheet prepared by BNSF containing a map of BNSF's rail lines and various facts about BNSF's services and history.

6.      BNSF serves thousands of customers and industries, many of whom are readily recognizable by the public. Our customers include major parcel carriers and some of the nation's largest retailers. BNSF thus helps to feed, clothe, supply, and power communities throughout the United States and the world, connecting local businesses and consumers with the global supply chain.

7.      BNSF's largest business segment by volume and revenue is intermodal.  On a per unit basis, intermodal accounted for 55 percent of our volume in 2020.  Intermodal shipping allows for the transfer of containerized freight from an origin point to a destination, and involves the joint provision of service by various types of transportation providers.  The containers used in intermodal transportation can be loaded to and from ships to trucks to rails.  For example, a container can originate on a ship, be transloaded into a 53-foot domestic container, and then transferred or drayed (that is, delivered by truck) to rail, which efficiently moves the container until it reaches a destination rail hub and is then delivered to its endpoint with another dray.  BNSF's principal intermodal service is providing the rail line haul portion in that chain of transit.

8.      BNSF's northern rail network, in particular, is critical to intermodal shipping.  The northern rail network serves the Pacific Northwest—including Seattle, Washington, Spokane, Washington, and Portland, Oregon—and the Minneapolis-St. Paul region.  *See* Ex. 1.  Shipments to and from the Pacific Northwest also reach Vancouver, British Columbia by way of a truck dray to and from BNSF's Seattle, Washington rail hub.

9.      BNSF has longstanding operations in Illinois.  BNSF operates four facilities in the greater Chicagoland area.  I understand that the dispute in this litigation involves BNSF's facility located at 5601 W. 26th Street in Cicero, Illinois.  BNSF's Cicero railyard serves as a critical juncture in BNSF's national operations, connecting the Midwest to the Pacific Northwest.  The Cicero railyard therefore frequently serves as the destination point for foreign imports shipped across the Pacific Ocean.  Upon arrival in Cicero, the freight can be distributed by truck in the greater Chicago area, or interchanged to another railroad to travel eastbound.  Freight shipped through our Cicero location can originate from anywhere in the world and be destined for a variety of locations, including the Pacific Northwest, the Midwest, the U.S. eastern seaboard, or beyond.

10.     Attached hereto as Exhibit 2 is a true and correct copy of a map of our Cicero railyard and rights of way.

**Products, Consumers, and Industries Served by BNSF's Cicero Railyard**

11.     BNSF transports a myriad of products using the Cicero railyard.  BNSF's customers include household names such as big box retailers and major parcel carriers.  Products shipped by BNSF can be found on the shelves of major retailers and in American homes.  The products carried by BNSF are crucial to businesses, health, and the economy.  For example, during the COVID-19 pandemic, BNSF began carrying large volumes of personal protective equipment through our Cicero location, such as hand sanitizer, medical equipment, and masks.  We continue to carry such equipment today.  We carry a large assortment of other finished goods through our Cicero facility.  Our Cicero facility also is along a major route for various parcel carriers, meaning that we carry the mail and packages that connect businesses and individuals to each other.

12.     Not only do we carry a wide variety of goods and products, we also carry them at enormous scale.  In 2020, our Cicero facility "lifted" over 450,000 containers of freight.  System wide, BNSF transported 5.2 million intermodal shipments in 2020.  To "lift" a container means to move a container either on or off a train.  Below is a chart documenting the number of container lifts at our Cicero facility on an annual basis dating back to 2010.



13.    To illustrate the quantity of goods moving through our Cicero railyard, each of the hundreds of thousands of containers lifted at the Cicero yard is fifty-three (53) feet long and, on average, contains cargo that weighs 35,000 to 40,000 pounds.

**Efficiency of BNSF's Intermodal Rail Service**

14.    BNSF moves goods and products more safely, more efficiently, and with significantly less fuel and emissions than trucks.  In 2020, the 450,000 containers lifted at our Cicero railyard travelled on one of BNSF's rail lines instead of our nation's congested highways.  Moving these heavy containers on rail lines means less wear and tear on our public infrastructure.  It also means less traffic congestion on our public highways, all the way from Chicago, to Minneapolis-St. Paul, to the Pacific Northwest.  And it means less fuel consumption, which supports sustainability.  BNSF can haul an entire ton of freight more than four hundred and seventy (470) miles on a single gallon of diesel fuel, which is three (3) to four (4) times more efficient than trucks.

15.     Intermodal rail is also highly efficient.  A single container can be moved as many as 800 miles per day in expedited service and 550 miles per day in standard domestic intermodal service on BNSF's tracks.  The Cicero railyard in particular handles large volumes of high-priority freight.  We process some international freight in Cicero, but primarily process domestic freight, which is prioritized for faster delivery.  In Cicero, we manage freight that moves at both expedited and standard delivery speed.  Even our standard intermodal delivery service is faster than other types of rail service, such as international, industrial, or coal.  As a result, customers rely on our Cicero railyard for time-efficient service.

16.     Attached hereto as Exhibit 3 is a true and correct copy of BNSF's 2021 Intermodal Guide, which provides reference information about BNSF's intermodal services.

**Effects of Water and Sewer Service Shutdown at the Cicero Facility**

17.     It is my understanding that the Town of Cicero, Illinois, is currently threatening to terminate water and sewer service to our Cicero facility on July 19, 2021.  As a result of this shut off, the Town of Cicero would also require BNSF to vacate the property.  Even if the Town itself did not require BNSF to vacate, BNSF would have to shut down its Cicero railyard.  Based on my understanding of rail operations, I do not believe our Cicero railyard could operate without water and sewer services.

18.     A closure of our Cicero facility would be catastrophic, not only for BNSF, but also for our customers and for other common carriers.  Rail service would be compromised because the Cicero railyard operations could not be shifted to another BNSF facility.  BNSF operates four (4) facilities in the Chicago metropolitan area, but none could absorb the volume of freight handled at our Cicero location in the event of a closure.  Each of these facilities, including our Cicero facility, is operating at capacity.  Any attempt by BNSF's other Chicago-area facilities to absorb the freight

handled at our Cicero location would further delay an already congested and busy rail network. Nor could these facilities expand to accommodate new traffic. Each has maximized its available space, and there would be no room for us to build additional rail lines or the infrastructure needed to support such expansion, such as additional parking spaces for trucks. And it would be difficult, if not impossible, for BNSF to replace the Cicero railyard itself. Cicero is in the heart of the Chicago metropolitan area—a critical juncture for freight shipping. Chicago has the busiest rail network in North America because it is the only location where all of the Class I railroads connect. Space is severely limited in the greater Chicago area, such that we could not replace the Cicero railyard.

19.     BNSF's business would also be harmed by a shutdown of the Cicero railyard. While it is unlikely that competitor railroads could take on *all* of the business that is processed through our Cicero facility, competitors could take *some* of that business. Meanwhile, it is likely that customers would be upset by BNSF's inability to provide service at its Cicero railyard. Therefore, BNSF is likely to face competitive harm in the event that our Cicero railyard is closed both in the form of lost customers and lost goodwill.

20.     Our customers, too, would be harmed in the event of a closure. As General Director, Consumer Products, I have detailed knowledge of the nature of BNSF's relationship with its customers, the concerns of BNSF's customers, and the competitive environment in which BNSF and other intermodal carriers operate. Without our Cicero railyard, our customers would need to resort to trucking to absorb our lost capacity. This would require our customers to hire hundreds of drivers—an all but impossible task. Our customers regularly report to me that there is a shortage of drivers in the trucking industry and that they do not know how they could meet their shipping needs without intermodal rail service.

21.     Beyond our customers, many members of the public would be harmed. Consumers far and wide rely on BNSF's rail services for shipment and delivery of the products and mail that they use in their businesses and personal lives. And each container that would be placed on the roads would further congest the highways and increase wear and tear on public infrastructure.

22.     Without our Cicero facility, interstate commerce would lose a critical junction between its ports in the Pacific Northwest and the Midwest—a junction which also connects to the East Coast by interchanging containerized freight onto other railroads.

23.     In short, shutting down our Cicero facility would harm BNSF, its customers, members of the general public, and interstate commerce.


I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed on this 9th day of June, 2021, in Fort Worth, Texas.


By: _____

Gregg Zody

EXHIBIT 1

# BNSF Railway

BNSF Railway is one of North America's leading freight transportation companies, with a rail network of 32,500 route miles in 28 states and three Canadian provinces. BNSF is one of the top transporters of the products and materials that help feed, clothe, supply and power communities throughout America and the world. BNSF moves those goods more safely and efficiently, on significantly less fuel, with fewer emissions than the all-highway alternative.

## Agricultural Products
- In 2020, BNSF hauled 1.1 million carloads of agricultural commodities
- BNSF moves enough grain to supply 900 million people with a year's supply of bread
- BNSF transports enough wheat flour in a year to bake more than 23 billion dozens of cookies

## Consumer Products
- In 2020, 5.2 million intermodal shipments (truck trailers or containers) were transported on BNSF's rail lines instead of on the nation's congested highways
- A new car or truck is loaded/unloaded onto a BNSF automobile train approximately every 11 seconds
- BNSF has 1.3 million feet of track in intermodal facilities alone. If spread end to end, it would be the length of 9 ½ Boston Marathons

## Industrial Products
- In 2020, BNSF hauled 3 million carloads of industrial products
- In 2020, BNSF moved more railcars of industrial products than the population of Kansas
- BNSF hauls enough asphalt to lay a single lane road two times around the equator
- In 2020, BNSF hauled 1.4 million coal shipments
- One shipment of coal can power 19 homes for an entire year

## BNSF Facts

| | |
|---|---|
| Length of network: | 32,500 |
| States in network: | 28 |
| Canadian provinces: | 3 |
| Employees: | ~34,000 |
| Headquarters: | Fort Worth, TX |
| Ports served: | 40+ |
| Intermodal facilities: | 25 |
| Average trains per day: | 1,200 |
| Locomotives: | ~8,000 |
| Capital investment (2020): | $3.1 billion |
| Bridges: | 13,000+ |
| Tunnels: | 89 |
| Grade crossings: | 25,000+ |
| Packages shipped on time during typical holiday season: | 70 million |
| Carloads shipped in 2020: | 9.4 million |
| Distance BNSF hauls 1 ton of freight on 1 gallon of diesel fuel: | ~500 miles |

## History

BNSF's history dates back 170 years to 1849, when the 12-mile Aurora Branch Railroad was founded in Illinois. Over the next several decades, many additional rail lines were built and eventually became part of what is today's BNSF Railway. Some of BNSF's predecessor railroads were Atchison, Topeka & Santa Fe; Burlington Northern; Chicago, Burlington & Quincy; Frisco; Great Northern; Northern Pacific and Spokane, Portland & Seattle.

BNSF was created Sept. 22, 1995, from the merger of Burlington Northern, Inc. (parent company of Burlington Northern Railroad) and Santa Fe Pacific Corporation (parent company of the Atchison, Topeka & Santa Fe Railway). On Feb. 12, 2010, BNSF became a subsidiary of Berkshire Hathaway, Inc.

**BNSF**
— BNSF
--- UP/SP Trackage Rights
— Handling Carrier
---- Haulage Agreement



January 2021

EXHIBIT 2



EXHIBIT 3

**BNSF INTERMODAL GUIDE** | **2021 EDITION**





# BE DIRECT AND GO WEST.

## Your Guide to Everything Intermodal:

A reference guide to help you get your shipments to their final destination faster with flexible options.

# BE DIRECT.

## BNSF CONNECTS THE WEST COAST TO ALL MAJOR INLAND MARKETS.



Welcome to BNSF's Intermodal Guide. We've designed it to help you connect your shipments to their final destination through BNSF's expansive rail network.

Our intermodal network is designed to transport 20- and 40-foot ocean containers as well as transloaded domestic containers to and from West Coast ports and major inland markets. It cuts transit time by as much as 3 ½ days, making it the most efficient option for direct vessel-to-rail transport.

Our capital investments play a key role in our ability to operate a safe and reliable network, and to make process and technology advances that raise the bar on efficiency, capacity and ease of use.

This guide will help you understand BNSF's intermodal shipping options and customizable transportation solutions. We hope it can also help you discover the shortest routes and the largest ports with the most infrastructure so that you can take benefit from the reliability of a well-connected supply chain.

We look forward to partnering with you

*Thomas A Williams*

Tom Williams
Group Vice President, Consumer Products
BNSF Railway





THE BENEFITS OF INTERMODAL — 6

THE INTERMODAL JOURNEY — 8

SERVICE OPTIONS — 20

CONNECTING TO KEY MARKETS — 22

TECHNOLOGY — 24

LOAD AND RIDE SOLUTIONS — 26

DEDICATED INTERMODAL TEAM — 28

INTERMODAL CALENDAR — 30

# BNSF INTERMODAL BY THE NUMBERS

**ALL** MAJOR WEST COAST PORTS SERVED

**25** INTERMODAL HUBS

**28** U.S. STATES IN NETWORK

**32,500** ROUTE MILES

**Ready for your shipment when you need to ship it**
- No reservation required.
- 24/7 operations.

**Efficient and sustainable**
- Eliminates highway congestion (each intermodal train carries the equivalent of 280 highway trucks).
- Reduces carbon emissions; a U.S. freight train can move one one ton of freight more than 470 miles on just one gallon of diesel fuel.

**Focused on our customers' needs—today and tomorrow**
- Continually expanding our service to reach key markets such as Northwest Ohio, Mexico, Pacific Northwest and Atlanta.

**Superior infrastructure allows for continuous flow of freight**
- Southern Transcon 98% double-tracked between Southern California and Chicago.
- Triple and quadruple tracks strategically placed along our highest-volume corridors.

*Curious about Intermodal Equipment? Scan me*










**BNSF** RAILWAY

7

---

# THE BENEFITS OF INTERMODAL

## WHAT IS INTERMODAL?

The term "intermodal" was coined in the 1960s as the use of standardized shipping containers increased in popularity. It refers to the movement of freight in containers or trailers using two or more modes of transportation—seamlessly integrating road, rail and water.

## WHY GO INTERMODAL?

**COST SAVINGS** — With its economies of scale, intermodal is typically less expensive than single-driver over-the-road transport.

**TIME EFFICIENCY** — Intermodal transit times are comparable to single-driver trucks, averaging about 550 miles per day.

**SUPPLY CHAIN DIVERSIFICATION** — Adding rail to your supply chain helps protect against delays in a single mode of transport.

**SUSTAINABILITY** — Rail is the most environmentally friendly mode of freight transportation and can significantly reduce your carbon footprint.

# STARTING YOUR JOURNEY

## INTERNATIONAL OR DOMESTIC?

Choose the right model for your freight.

**INTERNATIONAL INLAND POINT INTERMODAL (IPI)** takes advantage of density to major markets by moving freight inland intact in the inbound ocean container.

**DOMESTIC INTERMODAL** moves your shipments to markets via our partnerships with more than 100 of the industry's leading carrier partners.

## THE INTERMODAL CYCLE



### DOMESTIC/INTERNATIONAL

1. WAREHOUSE/VESSEL ORIGINATION
2. IN-GATE
3. LOADED
4. TRAIN DEPARTURE
5. TRAIN ARRIVAL
6. UNLOADED
7. OUT-GATE

### ON-DOCK INTERNATIONAL

1. STEAMSHIP ARRIVAL
2. LOADED
3. TRAIN DEPARTURE
4. TRAIN ARRIVAL
5. UNLOADED
6. OUT-GATE

## WHAT MOVES VIA INTERMODAL

A broad choice of service levels means more frequent train departures and more flexible, customized solutions to meet speed, cost and frequency requirements.



**20' and 40' Ocean Containers**

**53' Domestic Containers**

**28' and 53' Domestic Trailers**

**Temperature-Controlled Trailers and Containers**

**Flat Racks**

**Bulk Tank Equipment**





**Find your BNSF contact.**

*Scan me*

---

# THE WEST COAST DIFFERENCE

The West Coast ports offer great advantages to shippers importing cargo from Asia to the inland United States, minimizing ocean transit time and supply chain cycle time.

BNSF is the only railway to offer direct service between the West Coast and Atlanta and the Northwest Ohio Region. Together with our carrier partners, we can help you choose the best route for your imports via one of our many inland hubs.

- **Capacity**
- **Speed**
- **Sustainability**
- **Flexibility**
- **Trusted Reliability**
- **Advanced Technology**



U.S.

Asia

**Ready to learn more about the West Coast Advantage?**



*Scan me*



**THE INTERMODAL JOURNEY**

# FASTEST ROUTE FROM ASIA TO U.S. INLAND MARKETS

Importing goods through the U.S. West Coast means freight moving to inland markets arrives 50% faster than through any other gateway.

## OCEAN AND RAIL SCHEDULES

Check out frequency of fastest schedules to U.S. inland markets

- *Ocean Schedules*




*BNSF Domestic Service Schedules*

*Standard Container*



- *BNSF International Service Schedules*

*Expedited Container*

### WEST COAST PORTS

Scan to visit port websites.





**Map legend:**
- Port of Entry
- BNSF Intermodal Facility
- Ocean Transit Days

**Map labels:** East Coast Ports, CHICAGO, ST. PAUL, OMAHA, KANSAS CITY, MEMPHIS, DALLAS/FT. WORTH, HOUSTON, DENVER, SEATTLE/TACOMA, OAKLAND, LA/LONG BEACH, ASIA

**Transit days:** 12, 13, 28

# WHY CHOOSE INTERNATIONAL INTERMODAL?

Moving freight in ocean containers is the fastest, most efficient way to transport goods to inland markets – freight is lifted from an ocean vessel and loaded directly onto railcars – using fewer resources. And cargo remains intact to destination, with no handling from origin door to inland market destination. Choosing international intermodal means fewer touches, less damage, faster speed and lower cost.

And BNSF is the largest intermodal carrier in the world, with an intermodal network that connects the fastest, most direct ocean vessel services between Asian and North American markets.

Further, BNSF has the most expansive and comprehensive network to support multiple US export programs – providing round-trip economics, maximizing asset utilization, adding value to the supply chain, and streamlining the flow of goods and commodities around the globe.

**Our ocean carrier partners can provide seamless service from Asia to key North American markets.**

SCAN BELOW TO VIEW SAILING SCHEDULES.











Scan me

**Contact BNSF to learn more and get started.**

## THE INTERMODAL JOURNEY

# WHY CHOOSE BNSF DOMESTIC INTERMODAL?

BNSF is the largest and most advanced domestic intermodal provider in the world. When **speed, capacity and flexibility** are required to achieve a supply chain advantage, BNSF Domestic Intermodal provides the optionality needed to eliminate hours or even days between your shipment's origin and final destination.

- **Speed**: BNSF schedules are competitive with over-the-road transits. BNSF's Southern Transcon line allows shippers to take advantage of the fastest intermodal route between Southern California and the Midwest.

- **Capacity**: BNSF offers guaranteed capacity through the largest asset owners in North America and the largest intermodal network in the world. BNSF has invested more than $65B since 2000 to ensure our expanding capacity is the safest and most reliable of any Class I railroad.

- **Flexibility**: From a single package to a full truckload of your inventory, BNSF's carrier partners provide an array of services including Parcel, Less than Truckload, Full Truckload and Temperature-Controlled options.

**View Domestic Carrier Options** *Scan Me*

## BENEFITS OF DOMESTIC INTERMODAL



**Strategically located to meet your needs**
- Conveniently located in key markets, BNSF facilities are a short dray from your company's transload operation.
- Cost-saving co-location opportunities are available near most BNSF hubs.

**Unparalleled service options**
- Parcel – small packages or an individual shipment under 150 pounds. BNSF works with the world's leading parcel carriers.
- Less than Truckload (temperature-controlled and dry) – (LTL) less than truckload freight not requiring a full truckload. LTL shipments are usually arranged on pallets.
- Full Truckload (temperature-controlled and dry) – (FTL or TL) full truckload shipments are large enough to fill up an entire semi-truck trailer.



**The best and biggest carrier partners in the industry**
- The names you know and trust.
- Asset owners with the capacity to serve you today and tomorrow.

**Ready for your shipment when you need to ship it**
- No reservation required.
- 24/7 operations.

**Most efficient hubs in key markets**
- BNSF moved over 3 million domestic shipments in 2020, more than any other railroad in the world.
- We continue to expand existing hubs and introduce new facilities to meet growing demand in major markets.



**New technologies**
- Our capabilities expand every year with our investment in state-of-the-art equipment such as cantilevered rubber tire gantry cranes.
- We are committed to improving the customer experience and increasing efficiency simultaneously through technologies like automation and machine learning.




# THE BNSF INTERMODAL NETWORK

BNSF's extensive rail network connects with major ocean ports and inland hubs, helping you quickly reach key markets across the U.S. and major industrial and consumer markets in Mexico.

## STRENGTHENING BNSF'S INTERMODAL NETWORK

The BNSF Southern Transcon line, running between Los Angeles and Chicago, is the fastest intermodal route between Southern California and the Midwest — and one of the busiest in the world. Over the last five years, BNSF has made significant investments to maximize the Southern Transcon's safety, fluidity, capacity and reliability.

Expansion efforts also continue on BNSF's Northern Transcon route between Seattle and Chicago. In the Pacific Northwest, on the western end of the Northern Transcon, we are continuing our multi-year expansion efforts to double-track between Sandpoint, ID and Spokane, WA, which includes a second mainline across Lake Pend Oreille at Sandpoint, Idaho.





## EXPEDITED DOMESTIC

Ideal for **time-sensitive freight** such as parcel, promotional, temperature-controlled and direct-to-store shipments.

The fastest intermodal service in the industry with an average network speed over 800 miles/day.

## STANDARD DOMESTIC

Maximum value for shippers who prioritize **cost and capacity.**

Reach key markets with an average network speed of about 550 miles/day.

## INTERNATIONAL

Designed to transport **20- and 40-foot import boxes** to and from the West Coast ports and major inland markets.

Cuts transit time by as much as 3 1/2 days, depending on your service line.

Most efficient option for direct vessel-to-rail transport.







*Scan me*

**Find your BNSF contact.**

# CUSTOMIZED SERVICE OPTIONS

Because one size does not fit all supply chains, BNSF offers a variety of intermodal service options to meet your specific needs.

SERVICE OPTIONS

21

20

## CO-LOCATION BENEFITS

Co-location is locating your distribution center or warehouse within a BNSF Logistics Park adjacent to an intermodal hub. It provides streamlined supply chain solutions that connect manufacturers and retailers to their markets.

- Reduce drayage cost.
- Maximize truck turns.
- Minimize number of trucks and drivers needed.
- Strong developer partnerships.
- Decrease emissions and costs by cutting fuel consumption.
- Heavyweight capabilities.

### BNSF LOGISTICS PARKS

**Alliance Logistics Park, Logistics Park Chicago and Logistics Park Kansas City**

LOCATION COST SAVINGS EXAMPLE:
Site A: Logistics Park BNSF
Site B: 20 miles away
*Based on a hypothetical scenario with 5,000 annual inbound intermodal shipments*

By Locating at Logistics Park BNSF You'll Save:

- **$117 in drayage costs** per unit
- **$585,000 total annually** on inbound shipments to your distribution center
- **$1.17 in annual rent savings** per SF for a 500,000 SF distribution center facility

**Learn how co-locating near a rail served facility can reduce your supply chain costs.**



**Meet Jane!**





Find your BNSF contact.

*Scan me*

BNSF Intermodal Facility

Logistics Park BNSF

Site B

---

# BEST-IN-CLASS HUB FACILITIES

**LARGEST HUB NETWORK** of its kind.

**DIRECT ACCESS** to thousands of major distribution centers and warehouses across the U.S.

**AUTOMATED DRIVER CHECK-IN PROCESS** using advanced technology to facilitate in-gating and out-gating.

**RAILPASS PLATFORM** can integrate shipment details into trucking onboard computers for a faster, easier on-terminal experience.





# TECHNOLOGY




## ALWAYS INNOVATING

At BNSF, we're continually exploring how new tools and technologies can improve safety and reliability, increase efficiency and enhance your intermodal experience.

## HUB AUTOMATION

BNSF is constantly looking to streamline its hub processes to keep freight moving.

- Electronic logging device (ELD) integration for gateless entry.
- Piloting automated straddle carriers (Logistics Park Kansas City).
- Automated machine learning yard check system.

## ADVANCING SUPPLY CHAIN CONNECTIVITY

BNSF utilizes the most advanced integration solutions and technology to further align with the supply chain.

- API (application program interface) enables simpler and less costly data exchanges between parties while allowing for more real-time access of shipment tracking and billing.
- Geofence Notification Tool – BNSF customers can track a shipment using a geofence alert system. They receive a notification once a shipment passes through a designated location.
- Further advancing "Integrated Service Planning" will provide transparency to more effectively understand and meet customer needs via the exchange of critical data.



## MOBILE TOOLS

- On-the-go planning and real-time shipment data.
- Drivers can bypass multiple kiosk screens at our AGS-equipped sites.
- QR technology for fast entrance and exit.
- Send J1 digital receipts to a mobile device (no waiting for a printout).
- Gate notification feature highlights hub entrance and IoT location updates.

# LOAD PLANNING AND SECUREMENT

## KEEPING YOUR CARGO SAFE AND DAMAGE-FREE

BNSF's LARS team offers training on properly loading and securing both restricted and non-restricted commodities—at no cost to you. Other LARS services include on-site loading evaluations, complete ride quality monitoring programs and customized loading diagrams.

**LARS IN ACTION: BEST PRACTICES**



D.I.D. BAG WITH BUFFER PROTECTION

DIVIDER SHEETS

WOOD FLOOR BLOCKING

---

# LOAD AND RIDE SOLUTIONS (LARS)

BNSF is the industry leader in preventing cargo loss and damage. Whether you're using rail for the first time, introducing a new product line, or changing your load configurations from one mode of transportation to another, our LARS team can help.

**CARGO INCIDENT PREVENTION** — We'll work with you to prevent movement of unsafe loads, expedite load adjustments to improve unit velocity, and minimize cargo damage.

**RESTRICTED COMMODITY SHIPMENTS** — We can help ensure safe movement of restricted commodity shipments, and our OSHA Level A responders are prepared to handle unintentional releases of hazardous materials.

**RIDE QUALITY TESTING** — We monitor all shipments to promote safe and incident-free rail handling.

**IN-TRANSIT AND INTERMODAL FACILITY SECURITY** — BNSF's fully certified state law enforcement officers protect our network, while our security procedures and high-tech tools help your freight pass safely through our intermodal facilities.

For more information and general loading principles



Scan me



or call **1-800-333-4686.**

# PRIMARY BENEFICIAL CARGO OWNER (BCO) CONTACTS

*This team manages relationships with shippers and beneficial cargo owners.*

**General Director** – Gregg Zody: gregg.zody@bnsf.com
**West Director** – Tanner Vierra: tanner.vierra@BNSF.com, 817-352-7675
**East Director** – Taylor Harrington: taylor.harrington@bnsf.com, 817-867-6957
**Mexico Director** – Carlos Trevino: carlos.trevino@bnsf.com, 817-867-6827

1 **Southwest** – Alissa Murray: alissa.murray@bnsf.com, 949-220-4075
2 **Northwest** – Jace Thompson: jace.thompson@bnsf.com, 206-954-7013
3 **South Central** – Chase Arthur: charles.arthur@bnsf.com, 817-867-6228
4 **North Central** – Tyler Redding: tyler.redding@bnsf.com, 307-680-9309
5 **Central** – Shauna Stegner: shauna.stegner@bnsf.com, 817-235-6991
6 **Ohio Valley** – Sugarth Baskaran: sugarth.baskaran@bnsf.com, 909-496-0388
7 **Mid-Atlantic** – Bobby Strong: bobby.strong@bnsf.com, 913-313-9036
8 **Northeast** – Jeremy Young: jeremy.young@bnsf.com, 207-712-7524
9 **Southeast** – Christian Myslicki: christian.myslicki@bnsf.com, 662-347-7698
10 **North Mexico** – Victor Dominguez: victor.dominguez@bnsf.com, 0415-4877 3947
11 **Central Mexico** – Elisa Angles: elisa.angles@bnsf.com, 5344 253 4096
12 **Mexico City and South** – Laura Hernandez: laura.hernandez@bnsf.com, 52 55 5686-2543

# ECONOMIC DEVELOPMENT/CARRIER PARTNER CONTACTS

## ECONOMIC DEVELOPMENT

*This team leads facility development and site location.*

**Director, Co-Location Contact**
Cory Hutchings
cory.hutchings@bnsf.com
817-593-6917

**West Co-Location Manager**
Eric Goodman
eric.goodman@bnsf.com
913-551-4550

## INTERNATIONAL SALES

*This group manages relationships with international carriers.*

**CMA CGM, APL, Hyundai Merchant Marine**
Rusty Looney
kenneth.looney@bnsf.com
817-867-6489

**Maersk Line, ONE**
David Longsworth
david.longsworth@bnsf.com
817-867-6423

**Med Shipping, Evergreen, Hapag Lloyd**
Chris Grant
chris.grant@bnsf.com
817-867-0118

**Cosco Shipping, OOCL, Yang Ming**
Michelle Liu
chengsheng.liu@bnsf.com
817-867-6842

## DOMESTIC SALES

*This group manages relationships with domestic carriers.*

**Asset Based Carriers**
Terry Dupuy
terry.dupuy@bnsf.com
817-867-6567

**Intermodal Marketing Companies**
Laura Stevens
laura.stevens@bnsf.com
817-235-5731

**Third-Party Carriers**
Stephanie Remigio
stephanie.remigio@bnsf.com
817-867-6846

---

# WE'RE READY TO PARTNER WITH YOU.

At BNSF, we're here to guide you every step of the way on your intermodal journey.

- **24/7 customer support** via Message Us at BNSF.com or the TrackYour Shipment tool.
- **Dedicated team of intermodal specialists** including marketing, sales, service design, transportation, facilities and customer support.
- **Trucking and ocean carrier partners** work as a seamless support system.
- **Customized transportation and distribution solutions** to meet your specific needs.

Marketing

Sales

Facilities

Customer Support

Service Design

Load and Ride Solutions (LARS)

Transportation

Economic Development

## 2021

**INTERMODAL CALENDAR**

Holidays and key shipping periods (*It is important to note BNSF operates 24/7 including major holidays)

**JANUARY**

| S | M | T | W | T | F | S |
|---|---|---|---|---|---|---|
| | | | | | **1** | 2 |
| 3 | 4 | 5 | 6 | 7 | 8 | 9 |
| 10 | 11 | 12 | 13 | 14 | 15 | 16 |
| 17 | 18 | 19 | 20 | 21 | 22 | 23 |
| 24 | 25 | 26 | 27 | 28 | 29 | 30 |
| 31 | | | | | | |

**FEBRUARY**

| S | M | T | W | T | F | S |
|---|---|---|---|---|---|---|
| | 1 | 2 | 3 | 4 | 5 | 6 |
| 7 | 8 | 9 | 10 | 11 | **12** | 13 |
| 14 | 15 | 16 | 17 | 18 | 19 | 20 |
| 21 | 22 | 23 | 24 | 25 | 26 | 27 |
| 28 | | | | | | |

**MARCH**

| S | M | T | W | T | F | S |
|---|---|---|---|---|---|---|
| | 1 | 2 | 3 | 4 | 5 | 6 |
| 7 | 8 | 9 | 10 | 11 | 12 | 13 |
| 14 | 15 | 16 | 17 | 18 | 19 | 20 |
| 21 | 22 | 23 | 24 | 25 | 26 | 27 |
| 28 | 29 | 30 | 31 | | | |

**APRIL**

| S | M | T | W | T | F | S |
|---|---|---|---|---|---|---|
| | | | | 1 | **2** | 3 |
| **4** | 5 | 6 | 7 | 8 | 9 | 10 |
| 11 | 12 | 13 | 14 | 15 | 16 | 17 |
| 18 | 19 | 20 | 21 | 22 | 23 | 24 |
| 25 | 26 | 27 | 28 | 29 | 30 | |

**MAY**

| S | M | T | W | T | F | S |
|---|---|---|---|---|---|---|
| | | | | | | 1 |
| 2 | 3 | 4 | 5 | 6 | 7 | 8 |
| 9 | 10 | 11 | 12 | 13 | 14 | 15 |
| 16 | 17 | 18 | 19 | 20 | 21 | 22 |
| 23 | 24 | 25 | 26 | 27 | 28 | 29 |
| 30 | 31 | | | | | |

**JUNE**

| S | M | T | W | T | F | S |
|---|---|---|---|---|---|---|
| | | 1 | 2 | 3 | 4 | 5 |
| 6 | 7 | 8 | 9 | 10 | 11 | 12 |
| 13 | 14 | 15 | 16 | 17 | 18 | 19 |
| 20 | 21 | 22 | 23 | 24 | 25 | 26 |
| 27 | 28 | 29 | 30 | | | |

**JULY**

| S | M | T | W | T | F | S |
|---|---|---|---|---|---|---|
| | | | | 1 | 2 | 3 |
| **4** | 5 | 6 | 7 | 8 | 9 | 10 |
| 11 | 12 | 13 | 14 | 15 | 16 | 17 |
| 18 | 19 | 20 | 21 | 22 | 23 | 24 |
| 25 | 26 | 27 | 28 | 29 | 30 | 31 |

**AUGUST**

| S | M | T | W | T | F | S |
|---|---|---|---|---|---|---|
| 1 | 2 | 3 | 4 | 5 | 6 | 7 |
| 8 | 9 | 10 | 11 | 12 | 13 | 14 |
| 15 | 16 | 17 | 18 | 19 | 20 | 21 |
| 22 | 23 | 24 | 25 | 26 | 27 | 28 |
| 29 | 30 | 31 | | | | |

**SEPTEMBER**

| S | M | T | W | T | F | S |
|---|---|---|---|---|---|---|
| | | | 1 | 2 | 3 | 4 |
| 5 | **6** | 7 | 8 | 9 | 10 | 11 |
| 12 | 13 | 14 | 15 | 16 | 17 | 18 |
| 19 | 20 | 21 | 22 | 23 | 24 | 25 |
| 26 | 27 | 28 | 29 | 30 | | |

**OCTOBER**

| S | M | T | W | T | F | S |
|---|---|---|---|---|---|---|
| | | | | | 1 | 2 |
| **3** | **4** | **5** | **6** | **7** | 8 | 9 |
| 10 | **11** | 12 | 13 | 14 | 15 | 16 |
| 17 | 18 | 19 | 20 | 21 | 22 | 23 |
| 24 | 25 | 26 | 27 | 28 | 29 | 30 |
| 31 | | | | | | |

**NOVEMBER**

| S | M | T | W | T | F | S |
|---|---|---|---|---|---|---|
| | 1 | 2 | 3 | 4 | 5 | 6 |
| 7 | 8 | 9 | 10 | **11** | 12 | 13 |
| 14 | 15 | 16 | 17 | 18 | 19 | 20 |
| 21 | 22 | 23 | 24 | **25** | **26** | 27 |
| 28 | **29** | 30 | | | | |

**DECEMBER**

| S | M | T | W | T | F | S |
|---|---|---|---|---|---|---|
| | | | 1 | 2 | 3 | 4 |
| 5 | 6 | 7 | 8 | 9 | 10 | 11 |
| 12 | 13 | 14 | 15 | 16 | 17 | 18 |
| 19 | 20 | 21 | 22 | 23 | **24** | **25** |
| 26 | 27 | 28 | 29 | 30 | **31** | |



**JANUARY**

**1** New Year's Day

**FEBRUARY**

**12** Lunar New Year*

*Lunar New Year is celebrated across Asia with various length of vacation days for different countries. Manufacturing is generally halted for two weeks after Lunar New Year.*

**APRIL**

**2** Good Friday

**4** Easter

**JULY**

**4** Independence Day

**SEPTEMBER**

**6** Labor Day

**OCTOBER**

**1-7** National Golden Week*

**11** Columbus Day

*October 1st is China's National Day holiday. The 7-day holiday from Oct. 1st to 7th is called 'Golden Week', during which offices are closed and some manufacturing are halted.*

**NOVEMBER**

**11** Veterans' Day

**25** Thanksgiving

**26** Black Friday

**29** Cyber Monday

**DECEMBER**

**25** Christmas Day

**31** New Year's Eve

# BE DIRECT AND
## GO WEST.

**BNSF** RAILWAY

bnsf.com

# EXHIBIT B

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| BNSF RAILWAY COMPANY | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) No. 21-cv-03072 |
| | ) |
| | ) |
| TOWN OF CICERO, ILLINOIS | ) |
| | ) |
| Defendant. | ) |

## DECLARATION OF BROOKE L. GAEDE

I, Brooke L. Gaede, declare under penalty of perjury the following:

1.      I am a Senior General Attorney I at BNSF Railway Company ("BNSF"). I submit this declaration in support of BNSF's motion for summary judgment. I am over the age of 18, competent to testify, and make the following declaration based on my education, training, experience, professional qualifications, and my understanding of the matters herein based on my personal knowledge or my access to BNSF's business records.

2.      I have worked in my current role as Senior General Attorney I at BNSF for three (3) years.

3.      Attached hereto as Exhibit 1 are true and correct copies of property deeds demonstrating that BNSF owns the railyard located at 5601 West 26th Street in Cicero, Illinois. I retrieved these records from the electronic systems that BNSF uses to maintain these records in the ordinary course of business.

4.      Attached hereto as Exhibit 2 is an excerpt of BNSF's Chicago Subdivision Track Chart demonstrating that the rail lines at BNSF's railyard in Cicero, Illinois, are connected to

interstate tracks.  I retrieved this record from the electronic systems that BNSF uses to maintain this record in the ordinary course of business.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed on this 7th day of October, 2021, in Fort Worth, Texas.

By:_____

Brooke L. Gaede

EXHIBIT 1

WARRANTY DEED—Statutory Form.     Form No. 18     Printed and for sale by The Chicago Legal News Co.

963

# This Indenture Witnesseth, that the Grantors

_Pattie A. Clay and Brutus J. Clay, her husband_

of the _Richmond_ in the County of _Madison_

and State of _Kentucky_ for and in consideration of the sum of $ _29 558 43/100_

_Twenty nine thousand five hundred & fifty eight & 43/100_ Dollars, in hand paid,

Convey— and Warrant— to _Charles J. Connell_

of the _City of Chicago_ County of _Cook_ and State

of _Illinois_ the following described Real Estate, to-wit:

_The South East quarter of the South East quarter of Section Twenty nine (29) Township Thirty nine (39) North, Range Thirteen (13) East of the Third Principal Meridian (Excepting therefrom the two and one half (2½) acres of ground heretofore conveyed therefrom, to the Chicago, Burlington and Quincy Rail Road Company, for its right of way) Containing thirty eight & 45/100 acres, inclusive of the area embraced in Ogden Avenue, as now in use._

situated in the _____ of _____ in the County of _Cook_

in the State of _Illinois_ hereby releasing and waiving all rights under and by virtue

of the Homestead Exemption Laws of this State.

_Subject to all taxes levied after the Calendar year A.D. 1885, and all unpaid assessments, if any, under which the improvements have not been made._

Dated, This _Twenty eighth_ day of _April_ A. D. 1886.

_Pattie A. Clay_ [SEAL]

_Brutus J. Clay_ [SEAL]

[SEAL]

[SEAL]

[SEAL]

BNSF00001



BNSF00002

WARRANTY DEED—Statutory Form.    Form No. 18.    Printed and for sale by The Chicago Legal News Co.

963

# This Indenture Witnesseth, that the Grantors

*Pattie A. Clay and Brutus J. Clay, her husband*

of the *Richmond* in the County of *Madison*

and State of *Kentucky* for and in consideration of the sum of $29 558.43/100

*Twenty nine thousand five hundred & fifty eight & 43/100* Dollars, in hand paid,

Convey and Warrant to *Charles J. Connell*

of the *City of Chicago*, County of *Cook* and State

of *Illinois* the following described Real Estate, to-wit:

*The South East quarter of the South East quarter of Section Twenty nine (29) Township Thirty nine (39) North, Range Thirteen (13) East of the Third Principal Meridian (Excepting therefrom the two and one half (2½) acres of ground heretofore conveyed therefrom, to the Chicago, Burlington and Quincy Rail Road Company, for its right of way) containing thirty eight & 45/100 acres, inclusive of the area embraced in Ogden Avenue, as now in use.*

situated in the _____ of _____ in the County of *Cook*

in the State of *Illinois* hereby releasing and waiving all rights under and by virtue

of the Homestead Exemption Laws of this State.

*Subject to all taxes levied after the Calendar year A.D. 1885, and all unpaid assessments, if any, under which the improvements have not been made.*

Dated, This *Twenty eighth* day of *April* A. D. 1886

*Pattie A. Clay* [SEAL]

*Brutus J. Clay* [SEAL]

[SEAL]

[SEAL]

[SEAL]

BNSF00003



BNSF00004

WARRANTY DEED.

961-A

# This Indenture Witnesseth, that the Grantors

George M. Bogue and Catharine M. Bogue his wife.

of the Village of Hyde Park — in the County of Cook — and State of Illinois — for and in consideration of the sum of $32800 00/100 Thirty two thousand eight hundred — Dollars, in hand paid,

Convey— and Warrant—to

Charles E. Perkins, Trustee.

of the City of Burlington — County of Des Moines — and State of Iowa — the following described Real Estate, to-wit:—

All that part of the West half of the West half of the South West quarter of Section Twenty eight (28) Township Thirty nine (39) North Range Thirteen (13) East of the Third Principal Meridian lying South of the Chicago Burlington and Quincy Rail Road. Containing Twenty one and one third (21 1/3) acres, more or less, excepting however Ogden Avenue as now laid out and used over said premises.—

situated in the _____ of _____ in the County of Cook, in the State of Illinois, hereby releasing and waiving all rights under and by virtue of the Homestead Exemption Laws of this State.

Subject to all taxes levied after the year 18 85 and all unpaid assessments, if any, under which the improvements have not been made, all of which are assumed by the purchaser as a part of the consideration of the sale.

Dated, this Twenty seventh day of July — A. D. 18 86.

Geo M. Bogue (Seal)

Catharine M. Bogue (Seal)

(Seal)

(Seal)

BNSF00005



# 1925 WARRANTY DEED.

Charles F. Perkins
TO
Smith

Bogue & Hoyt,
REAL ESTATE AGENCY,
S. W. COR. DEARBORN AND MONROE STREETS,
CHICAGO, ILL.
Room 1, Second Floor.
W. P. Dunn & Co., Printers, 37 Washington St.

STATE OF ILLINOIS,
COOK COUNTY.

Document No. 739,670

This Instrument was filed for record in the Recorder's Office of Cook County, aforesaid, on the ___ day of ___ A.D. 18__, at ___ o'clock ___ M. and recorded in Book 1935 of ___ on Page ___

Recorder.

BNSF00006

258-8

WARRANTY DEED.—Long Form.    Form No. 17.    Printed and for Sale by the Chicago Legal News Co., 161 & 163 Fifth Ave.

# This Indenture,

Made this *Fourteenth (14th)* day of *April* in the year of our Lord One Thousand Eight Hundred and Seventy *Nine* BETWEEN *Charles M. Henderson and Emily Henderson, his wife* of the *City of Chicago* in the County of *Cook* and State of *Illinois* party of the first part, and *Albert J. Averell*

of the *City of Chicago* in the County of *Cook* and State of *Illinois* party of the second part.

**Witnesseth,** That the said party of the first part, for and in consideration of the sum of *Ten Thousand Three Hundred and Thirty ($10,330.00)* Dollars in hand paid by the said party of the second part, the receipt whereof is hereby acknowledged, and the said party of the second part forever released and discharged therefrom, have granted, bargained, sold, remised, released, conveyed, aliened, and confirmed, and by these presents do grant, bargain, sell, remise, release, convey, alien, and confirm, unto the said party of the second part, and to *his* heirs and assigns FOREVER, all the following described lot , piece , or parcel of land, situated in the County of *Cook and Town of Cicero* and State of *Illinois* and known and described as follows, to wit:

*An undivided one Seventh (1/7) of the South West Quarter (1/4) of Section Twenty Eight (28), Township Thirty Nine (39), North Range Thirteen (13), East of Third (3) Principal Meridian, excepting that portion occupied by the Chicago Burlington and Quincy Rail Road, also excepting that portion of the West Half (1/2) of the West Half (1/2) of said South West Quarter (1/4) lying South of said Chicago Burlington and Quincy Rail Road, Said One Seventh (1/7) Containing Nineteen 67/100 (19 67/100) Acres*

**Together with all and singular** the hereditaments and appurtenances thereunto belonging, or in anywise appertaining, and the reversion and reversions, remainder and remainders, rents, issues, and profits thereof; and all the estate, right, title, interest, claim, or demand whatsoever, of the said party of the first part, either in law or equity, of, in, and to the above bargained premises, with the hereditaments and appurtenances: **To Have and to Hold** the said premises above bargained and described, with the appurtenances, unto the said party of the second part, *his* heirs and assigns, FOREVER.

**And the said** *Charles M. Henderson* party of the first part, for *himself and for his* heirs, executors, and administrators, do covenant, grant, bargain, and agree, to and with the said party of the second part, *his* heirs and assigns, that at the time of the ensealing and delivery of these presents, *he is* well seized of the premises above conveyed, as of a good, sure, perfect, absolute, and indefeasible estate of inheritance in law, in fee simple, and ha good right, full power, and lawful authority to grant, bargain, sell, and convey the same in manner and form aforesaid, and that the same are free and clear from all former and other grants, bargains, sales, liens, taxes, assessments, and encumbrances, of what kind or nature soever: and the above bargained premises, in the quiet and peaceable possession of the said party of the second part, *his* heirs and assigns, against all and every other person or persons lawfully claiming or to claim the whole or any part thereof, the said party of the first part shall and will **Warrant and Forever Defend.**

**And** the said party of the first part hereby expressly waive and release any and all right, benefit, privilege, advantage, and exemption, under or by virtue of any and all Statutes of the State of Illinois, providing for the exemption of homesteads from sale on execution or otherwise.

**In Witness Whereof,** the said party of the first part *have* hereunto set *their* hands and seals the day and year first above written.

**Signed, Sealed, and Delivered, in the Presence of**

*Charles M. Henderson*   (Seal.)
*Emily Henderson*   (Seal.)
   (Seal.)
   (Seal.)

BNSF00007

**State of** Illinois
COUNTY OF Cook } ss.

I, Julius Stietz a Notary Public in and for the said County, in the State aforesaid, **Do hereby Certify,** that Charles M. Henderson, and Emily Henderson, his wife, who are personally known to me to be the same persons whose names are subscribed to the foregoing Instrument, appeared before me this day in person, and acknowledged that they signed, sealed, and delivered the said Instrument as their free and voluntary act, for the uses and purposes therein set forth, including the release and waiver of the right of homestead.

**Given** under my hand and Notarial seal, this Fifteenth day of April A.D. 1879.

Julius Stietz
Notary Public

NE 1/4 SW 1/4 24-39-13
Except C.B.&Q.R.R. right of way
" W 1/2 W 1/2 SW 1/4 South of R.R.

# WARRANTY DEED.

958 B LONG FORM.

Copy 1779 B 70921

Charles M. Henderson
& Emily Henderson his wife
To
Albert J. Averell

State of Illinois, Cook COUNTY. } ss. No. 218163

This Instrument was filed for record in the Recorder's Office of Cook County aforesaid, on the 15 day of April A. D. 1879, at 3 o'clock P.M., and recorded in Book 881 of Records on page 616

Jesse W. Brockway
Recorder.

Don't Publish

A. J. AVERELL,
REAL ESTATE BROKER,
No. 127 DEARBORN STREET,
ROOM 5. CHICAGO.

Don't Publish
10

Printed and for Sale by the Chicago Legal News Co

BNSF00008

958-B

WARRANTY DEED.—Long Form.                Form No. 17.            Printed and for Sale by the Chicago Legal News Co., 151 & 163 Fifth Ave.

**This Indenture,** Made this _Fourteenth (14th)_ day of _April_ in the year of our Lord One Thousand Eight Hundred and Seventy _Nine_ BETWEEN _Charles M. Henderson and Emily Henderson, his wife_ of the _City of Chicago_ in the County of _Cook_ and State of _Illinois_ party of the first part, and _Albert J. Averell_ of the _City of Chicago_ in the County of _Cook_ and State of _Illinois_ party of the second part.

**Witnesseth,** That the said party of the first part, for and in consideration of the sum of _Ten Thousand Three Hundred and Thirty ($10,330.00)_ Dollars in hand paid by the said party of the second part, the receipt whereof is hereby acknowledged, and the said party of the second part forever released and discharged therefrom, have granted, bargained, sold, remised, released, conveyed, aliened, and confirmed, and by these presents do grant, bargain, sell, remise, release, convey, alien, and confirm, unto the said party of the second part, and to _his_ heirs and assigns FOREVER, all the following described lot , piece , or parcel of land, situated in the County of _Cook and town of Lisle_ and State of _Illinois_ and known and described as follows, to wit :

_An undivided one Seventh (1/7) of the South West Quarter (1/4) of Section Twenty Eight (28), Township Thirty Nine (39), North Range Thirteen (13), East of Third (3) Principal Meridian, excepting that portion occupied by the Chicago Burlington and Quincy Rail Road, also excepting that portion of the West Half (1/2) of the West Half (1/2) of said South West Quarter (1/4) lying South of said Chicago Burlington and Quincy Rail Road, Said One Seventh (1/7) Containing Nineteen (19 77/100) Acres_

**Together with all and singular** the hereditaments and appurtenances thereunto belonging, or in anywise appertaining, and the reversion and reversions, remainder and remainders, rents, issues, and profits thereof; and all the estate, right, title, interest, claim, or demand whatsoever, of the said party of the first part, either in law or equity, of, in, and to the above bargained premises, with the hereditaments and appurtenances: **To Have and to Hold** the said premises above bargained and described, with the appurtenances, unto the said party of the second part, _his_ heirs and assigns, FOREVER.

**And the said** _Charles M. Henderson_ party of the first part, for _himself and for his_ heirs, executors, and administrators, do covenant, grant, bargain, and agree, to and with the said party of the second part, _his_ heirs and assigns, that at the time of the ensealing and delivery of these presents, _he is_ well seized of the premises above conveyed, as of a good, sure, perfect, absolute, and indefeasible estate of inheritance in law, in fee simple, and ha s good right, full power, and lawful authority to grant, bargain, sell, and convey the same in manner and form aforesaid, and that the same are free and clear from all former and other grants, bargains, sales, liens, taxes, assessments, and encumbrances, of what kind or nature soever: and the above bargained premises, in the quiet and peaceable possession of the said party of the second part, _his_ heirs and assigns, against all and every other person or persons lawfully claiming or to claim the whole or any part thereof, the said party of the first part shall and will **Warrant and Forever Defend.**

**And** the said party of the first part hereby expressly waive and release any and all right, benefit, privilege, advantage, and exemption, under or by virtue of any and all Statutes of the State of Illinois, providing for the exemption of homesteads from sale on execution or otherwise.

**In Witness Whereof,** the said party of the first part _have_ hereunto set _their_ hands and seal s the day and year first above written.

**Signed, Sealed, and Delivered, in the Presence of**

_Charles M. Henderson_ (Seal.)

_Emily Henderson_ (Seal.)

(Seal.)

(Seal.)

BNSF00009

BNSF00010

GEORGE E. COLE®
LEGAL FORMS

NO. 801
OCTOBER, 1967

**WARRANTY DEED**

Statutory (ILLINOIS)

(Corporation to Corporation)

STATE OF ILLINOIS
REAL ESTATE TRANSFER TAX
JUL 26 78
1 9 9 9 . 0 0

JUL 26 1978

(The Above Space For Recorder's Use Only)

THE GRANTOR___The Ceco Corporation          24553372

a corporation created and existing under and by virtue of the laws of the State of ___Delaware___
and duly authorized to transact business in the State of ___Illinois___, for and in consideration
of ___Ten and no/100 ($10.00)------------------------------DOLLARS,
and other good and valuable consideration------------------------------

in hand paid, and pursuant to authority given by the Board of ___Directors___ of said corporation
CONVEY S___ and WARRANT S___ to ___Burlington Northern Inc.___
*at 176 East Fifth Street,
a corporation organized and existing under and by virtue of the laws of the State of ___Delaware___
having its principal office in the ___City___ of ___St. Paul___ County of ___Ramsey___
and State of ___Minnesota___ the following described Real Estate situated in the County of
___Cook___ and State of Illinois, to wit:

See Exhibit A attached hereto.

Subject to: General taxes for 1977 (2nd installment) and
subsequent years; rights of the municipality, State of Illinois,
the public and adjoining owners in and to said vacated street;
and rights of the public or quasi-public utilities, if any, in
said vacated street for maintenance therein of poles, conduits,
sewers, etc.

STATE OF ILLINOIS
REAL ESTATE TRANSFER TAX
JUL 26 78
DEPT. OF 1 5 0 4 . 0 0
REVENUE
JUL 26 1978

In Witness Whereof, said Grantor has caused its corporate seal to be hereto affixed, and has caused its name
to be signed to these presents by its ___Chairman of the Board___ and attested by its
___Secretary, this ___18th___ day of ___July___, 19 78.

The Ceco Corporation
(NAME OF CORPORATION)

BY ___Elmer T. Gustafson___          Chairman of the Board

ATTEST ___Richard L. Cline___          SECRETARY

State of Illinois, County of ___Cook___ ss.    I, the undersigned, a Notary Public, in and for the
County and State aforesaid, DO HEREBY CERTIFY that ___Elmer T. Gustafson___
personally known to me to be the ___Chairman of the Board___ of the ___The Ceco Corporation,___
a Delaware
corporation, and ___Richard L. Cline___ personally known to me to be
the ___Secretary of said corporation, and personally known
to me to be the same persons whose names are subscribed to the foregoing instru-
ment, appeared before me this day in person and severally acknowledged that as
such ___Chairman of the Board___ and ___Secretary, they signed
and delivered the said instrument as ___Chairman___ and
Secretary of said corporation, and caused the corporate seal of said corporation
to be affixed thereto, pursuant to authority, given by the Board of ___Directors___
of said corporation as their free and voluntary act, and as the free and voluntary
act and deed of said corporation, for the uses and purposes therein set forth.
Given under my hand and official seal, this ___25th___ day of ___July___, 19 78.

Commission expires ___August 27,___ 19 79    ___Victoria J. Wright___
NOTARY PUBLIC

This instrument was prepared by: Gerald Greenfield, Jenner & Block,
One IBM Plaza, Chicago, Illinois

MAIL TO:
R.E. SKOV, Regional Counsel
Burlington Northern Inc.
547 W. Jackson Blvd
Chicago, Ill. 60606
(City, State and Zip)

OR    RECORDER'S OFFICE BOX NO. _____

APPROX. AREA 823,029 #

ADDRESS OF PROPERTY:
5601 West 26th Street

Cicero, Illinois
THE ABOVE ADDRESS IS FOR STATISTICAL PURPOSES
ONLY AND IS NOT A PART OF THIS DEED.
SEND SUBSEQUENT TAX BILLS TO:
Grantee
(Name)
176 East Fifth Street
(Address)
St. Paul, Minnesota

DOCUMENT NUMBER    24553372

BNSF00011

BN
5033    CICERO    COOK    ILL.    FORM 60077 2-74
File    Station    County    State    Remarks
78-843    MAPS    9    V. S /    P-1124
A.F.E.    Property Management    Engineering    Purchase No.

EXHIBIT A

DESCRIPTION OF THE "REAL ESTATE"

Beginning at the point of intersection of the South line of West
26th Street and the West line of South 56th Avenue extended; thence
Southerly along the West line of South 56th Avenue, extended South
356.14 feet; thence Southwesterly to a point 627.54 feet Southerly
from the South line of West 26th Street, measured along a line
parallel to and 600 feet Westerly of the Westerly line of South 56th
Avenue extended; thence continuing Southwesterly to a point on the
East line of South 58th Avenue extended, said point being 958.24 feet
Southerly of the South line of 26th Street, measured along said East
line of South 58th Avenue; thence North along the East line of South
58th Avenue to the South line of 26th Street; thence Easterly along
the South line of 26th Street to the point of beginning, containing
19 acres more or less, all in the Northeast quarter of the Southeast
quarter of Section 29, Township 39 North, Range 13 East of the Third
Principal Meridian, Town of Cicero, County of Cook, State of Illinois:

also

All of Lots 1 through 12, both inclusive, and all of that part of
Lots 13 through 16, both inclusive, lying North of a straight line
which is a projection Southwestwardly of a straight line extending
from a point 627.54 feet Southerly from the South line of West 26th
Street, measured along a line parallel with and 600 feet Westerly of
the Westerly line of South 56th Avenue extended, in the Town of
Cicero, and extending then Southwestwardly through a point in the
East line of South 58th Avenue extended, in said Town of Cicero, pro-
duced South 958.24 feet from the South line of said West 26th Street;
said Lots 1 through 12 and 13 through 16 being in D.M. Fredericksen's
Subdivision of Block 8 in Clyde First Division, being a subdivision
of the West half of the Southeast quarter of Section 29, Township
39 North, Range 13 East of the Third Principal Meridian (except the
Southwest quarter of the West half of the Southeast quarter of said
Section), County of Cook, State of Illinois:

also

All that part of the West 1/2 of vacated South 58th Avenue lying
South of the North line of Lot 8 in D.M. Fredericksen's Subdivision
of Block 8 aforesaid, produced Eastwardly, and lying North of the
straight line last hereinabove described as a projection Southwest-
wardly from the East line of South 58th Avenue, produced South, in
the Town of Cicero.

BNSF00012

EXHIBIT 2

BNSF00013



**RAILWAY**

# Track Chart
# Chicago Subdivision

Chicago, IL to Montgomery, IL

MP 0.0 to MP 41.0

*See each page for latest revised date.*

Forward all corrections and changes to
BNSF Outlook address
*ENGRMASTERDATAMGMT@BNSF.COM*

BNSF System Maintenance and Planning

*Chicago Subdivision*

02/12/2001

BNSF00014

...\fsm-chicago.dgn

BNSF Railway Company



# TRACK CHART FEATURE LEGEND

## NOTES

### BRIDGES
THE MILEPOST LOCATION OF A BRIDGE IS THE LOW MILEPOST END OF THE BRIDGE.

### CURVES
AN "*" AFTER THE CURVE NUMBER INDICATES THE CURVE IS COMPOUND.
PLEASE REFER TO ADDITIONAL RESOURCES FOR FULL CURVE CHARACTERISTICS.
TRACK SIDE (LEFT OR RIGHT) FOR CURVE IS ACCORDING TO INC MP DIRECTION.

### GRADE
GRADE IS SHOWN PERIODICALLY WHERE THE GRADE CHANGES ARE TOO NUMEROUS
OVER SHORT DISTANCES TO CLEARLY SHOW.
GRADE IS TYPICALLY DISPLAYED FOR LOWEST-NUMBERED MAIN ON THE PAGE.

### MILEPOST
ALPHA-CHARACTER MILEPOSTS INDICATE DUPLICATION OF NUMBERS WITHIN A SUB OR
MAIN 1 HAS DIFFERENT ALIGNMENT THAN MAIN 2.

### TRACK
MAIN LINES ARE SHOWN WITH A BOLD LINE.
TRACK NUMBERS MAY NOT BE AVAILABLE FOR ALL TRACKS.
TRACK NUMBERS MARKED WITH AN "*" ARE UNKNOWN.

———————  BNSF CONTROLS TRAIN MOVEMENT

++++++  FOREIGN RR OTHER THAN BNSF CONTROLS TRAIN MOVEMENT

– – – – –  INDUSTRY CONTROLS TRAIN MOVEMENT

### RAIL
WELDED RAIL IS SHOWN WITH A BOLD LINE. BOLTED RAIL IS SHOWN WITH A THIN LINE.

### TIES
CONCRETE TIES ARE SHOWN WITH A BOLD LINE. TIMBER TIES ARE SHOWN WITH A THIN
LINE.

### SCALE
HORIZONTAL: 2"=1 MILE (1 MILE MAY NOT EQUAL 5280')  VERTICAL: NONE

### DETAIL PAGES
DETAIL SCHEMATIC (TEAM) PAGES CONTAIN SEPARATE LEGEND FOR TRACK OWNERSHIP
AND MAINTENANCE INFORMATION. REFER TO THOSE PAGES FOR APPLICABLE LEGEND
DEFINITIONS.

## TRACK CHART USAGE
THIS TRACK CHART IS TO BE USED FOR REFERENCE ONLY.

BNSF00015

BNSF00016

# Track Chart Abbreviations

## Track and Signal

| | |
|---|---|
| ABD | ACOUSTIC BEARING DETECTOR |
| ABS | AUTOMATIC BLOCK SIGNAL SYSTEM |
| AEI | AUTOMATIC EQUIPMENT IDENTIFICATION DETECTOR |
| ATS | AUTOMATIC TRAIN STOPS |
| BFD | BROKEN FLANGE DETECTOR |
| BR SIG | BRIDGE SIGNAL |
| CANT SIG | CANTILEVER SIGNAL |
| CTC | CENTRALIZED TRAFFIC CONTROL |
| DED | DRAGGING EQUIPMENT DETECTOR |
| DED LTD | DRAGGING EQUIP & SHIFTED LOAD W/ TOP DETECTOR |
| F | FREIGHT (SPEED) |
| F/G | FLASHING SIGNAL WITH AUTOMATIC GATES |
| FL | FLASHING SIGNAL |
| HBD | HOT BEARING DETECTOR |
| HWD | HIGH WATER DETECTOR |
| I TOWER | INTERLOCKING TOWER |
| INTLK | INTERLOCKING |
| LS | LINE SEGMENT |
| MP | MILEPOST |
| NO | NUMBER |
| OCS | OCCUPANCY CONTROL SYSTEM |
| OH | OVERHEAD |
| OOS | OUT OF SERVICE |
| P | PASSENGER (SPEED) |
| RES LIM | RESTRICTED LIMITS |
| RL | RAIL LUBRICATOR |
| S SW | SPRING SWITCH |
| SBC | SHOULDER BALLAST CLEANING |
| SIGS | SIGNALS |
| SLD | SHIFTED LOAD DETECTOR |
| SLTD | SHIFTED LOAD WITH TOP DETECTOR |
| TO | TURNOUT |
| TRK | TRACK |
| TWC | TRACK WARRANT CONTROL |
| UC | UNDERCUT |
| WLD | WHEEL IMPACT LOAD DETECTOR |
| YL | YARD LIMIT |

## Miscellaneous

| | |
|---|---|
| AVE | AVENUE |
| BLVD | BOULEVARD |
| CO | COUNTY |
| CONN | CONNECTION |
| CONST | CONSTRUCTED |
| CR | CREEK OR CRUSHED ROCK |
| DBL | DOUBLE |
| DIV | DIVISION |
| DR | DRIVE |
| E | EAST |
| EL | ELEVATION |
| FL T P | FLOOD LIGHT POLE |
| FL T T | FLOOD LIGHT TOWER |
| FRT | FREIGHT |
| GR | AT GRADE |
| HO | HOUSE |
| HWY | HIGHWAY |
| IND | INDUSTRY |
| JCT | JUNCTION |
| JT | JOINT |
| LT | LEFT |
| MAX | MAXIMUM |
| MIN | MINIMUM |
| MTCE | MAINTENANCE |
| NO | NORTH |
| OH | OVERHEAD |
| PED | PEDESTRIAN |
| PK | PARKWAY |
| PO | POWER |
| PSGR | PASSENGER |
| PUB | PUBLIC |
| PVT | PRIVATE |
| RD | ROAD |
| RIV | RIVER |
| RR | RAILROAD |
| RT | RIGHT |
| RW | RIGHT OF WAY |
| RWY | RAILWAY |
| SEC | SECTION |
| SO | SOUTH |
| ST | STREET |
| STA | STATION |
| SUB | SUBDIVISION |
| TPL | TRIPLE |
| UP | UNDERPASS |
| W | WEST |
| XBUCKS | CROSSBUCKS |
| XING | CROSSING |
| YD | YARD |

## Bridges

| | |
|---|---|
| BASC | BASCULE |
| BD | BALLAST DECK |
| BDPT | BALLAST DECK PILE TRESTLE - TIMBER |
| BM | BEAM SPAN |
| BPT | BALLAST DECK TIMBER TRESTLE |
| BR | BRIDGE |
| CA | CONCRETE ARCH |
| CEBM | BEAM SPAN CONCRETE ENCASED |
| CIP | CAST IRON PIPE |
| CP | CONCRETE PIPE |
| CUL | CULVERT |
| DBOX | PRESTRESSED DOUBLE CELL CONCRETE BOX GIRDER |
| DBXS | PRESTRESSED THRU VOID, DBL CELL, CONC. BOX GIRDER, SLOPED CURBS |
| DPCT | DECK PLATE CONNECTED TRUSS |
| DPCT | DECK TRUSS PIN CONNECTED |
| DPG | DECK PLATE GIRDER |
| DPLG | DECK PLATE LATTICE GIRDER |
| DRT | DECK RIVETED TRUSS |
| DS | SWING SPAN |
| EGR | MISC. POST-TENSIONED CONCRETE GIRDER |
| EXT | EXTENSION |
| LS | LIFT SPAN |
| MA | MASONRY ARCH |
| MGR | MISC. CONCRETE GIRDER |
| OD | OPEN DECK |
| OPT | OPEN DECK TIMBER TRESTLE |
| PCT | PRESTRESSED CONCRETE TRESTLE SLAB |
| PGR | PRESTRESSED MISC. CONCRETE GIRDER |
| PPCT | PONY TRUSS PIN CONNECTED |
| PRT | PONY RIVETED TRUSS |
| PTT | PONY TRUSS TIMBER |
| RAIL | RAIL STRINGER |
| RCT | REINFORCED CONCRETE TRESTLE |
| SA | STEEL ARCH |
| SBG | STEEL BOX GIRDER |
| SBOX | PRESTRESSED SINGLE CELL CONCRETE BEAM OR GIRDER |
| SGR | MISC. STEEL GIRDER |
| STEE | PRESTRESSED THRU VOIDED CONCRETE SUPER TEE GIRDER |
| TDBX | THRU VOID, DBL CELL, PRES. CONC. BEAM OR GIRDER |
| TDBX | PRESTRESSED THRU VOID, DBL. CELL, CONC. BOX GIRDER |
| TEE | PRESTRESSED CONCRETE TEE GIRDER |
| THT | THRU TIMBER TRUSS |
| TIM | MISC. TIMBER SPAN |
| TPCT | THRU PLATE CONNECTED TRUSS |
| TPG | THRU PLATE GIRDER |
| TPLG | THRU PLATE LATTICE GIRDER |
| TRT | THRU RIVETED TRUSS |
| TSBX | PRESTRESSED THRU VOID, SINGLE CELL, CONC. BEAM OR GIRDER |
| VTEE | PRESTRESSED THRU VOIDED CONCRETE TEE GIRDER |
| WWX | NO WALKWAY |
| WWL | WALKWAY LEFT SIDE WHEN VIEWING FROM LOW MP END OF BRIDGE |
| WWR | WALKWAY RIGHT SIDE WHEN VIEWING FROM LOW MP END OF BRIDGE |
| WWB | WALKWAY BOTH SIDES |

## Culverts

| | |
|---|---|
| BXC | CONCRETE BOX |
| BXC2 | CONCRETE DOUBLE BOX |
| BXC3 | CONCRETE TRIPLE BOX |
| BXCM | CONCRETE MULTI-OPENING BOX |
| BXM | MASONRY BOX |
| BXM2 | MASONRY DOUBLE BOX |
| BXMM | MASONRY MULTI-OPENING BOX |
| BXT | TIMBER BOX |
| BXT2 | TIMBER DOUBLE BOX |
| BXTM | TIMBER MULTI-OPENING BOX |
| CAPA | CORRUGATED ARCH PIPE, ALUMINUM |
| CAPS | CORRUGATED ARCH PIPE, STEEL |
| CIP | CAST IRON PIPE |
| CP | CONCRETE PIPE |
| CPA | CORRUGATED PIPE, ALUMINUM |
| CPP | CORRUGATED PIPE, PLASTIC |
| CPS | CORRUGATED PIPE, STEEL |
| EPC | ELLIPTICAL PIPE, CONCRETE |
| MP | MASONRY PIPE |
| PAC | CONCRETE ARCH PIPE |
| PL | CLAY TILE PIPE |
| PP | PLASTIC PIPE, SMOOTH WALL |
| PS | STEEL PIPE, SMOOTH WALL |
| PSAP | STRUCTURAL STEEL ARCH PLATE PIPE |
| PSP | STRUCTURAL STEEL PLATE PIPE |
| PV | VITREOUS PIPE, SMOOTH WALL |

# EXHIBIT C

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**

| | | |
|---|---|---|
| BNSF Railway Company | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 21-cv-3072 |
| | ) | |
| | ) | |
| Town of Cicero, Illinois | ) | |
| | ) | |
| Defendant. | ) | |

## DECLARATION OF RENATO MARIOTTI

I, Renato Mariotti, declare as follows:

1.     I am an attorney duly admitted to practice before this Court.  I am a partner in the law firm of Thompson Coburn LLP, counsel of record for Plaintiff BNSF Railway Company in the above-captioned matter.  I have personal knowledge of the facts set forth herein, except as to those stated on information and belief, and as to those, I am informed and believe them to be true. If called as a witness, I could and would competently testify to the matters stated herein.  I make this declaration in support of Plaintiff's Motion for Temporary Restraining Order and Preliminary Injunction.

2.     Upon information and belief and publicly-available information, on December 8, 2020, the Town of Cicero's ("Cicero") Board of Trustees amended Section 98-266 of Cicero's Code of Ordinances (the "Sewer Rate Ordinance") to increase sewer rates applicable to railroad yards and rights-of-way.  A copy of Section 98-266 of Cicero's Code of Ordinances obtained from https://library.municode.com/il/cicero/codes/code_of_ordinances is attached hereto as Exhibit 1.

3.     Minutes and Agendas for Cicero's Board meetings are posted on Cicero's website and are publicly available at https://thetownofcicero.com/town-board-meetings/.  I obtained the

Agenda and Minutes from the December 8, 2020 Board meeting during which the Board approved the new Sewer Rate Ordinance from Cicero's website. A true and correct copy of the December 8, 2020 Board Meeting Agenda obtained from Cicero's website is attached hereto as Exhibit 2. A true and correct copy of the December 8, 2020 Board Meeting Minutes obtained from Cicero's website is attached hereto as Exhibit 3.

4.      Upon information and belief, Cicero did not conduct any investigation, study, or analysis to support the December 2020 increased sewer rate charged to railroad yards.

5.      Upon information and belief, Cicero did not attempt to notify or otherwise inform BNSF of its proposal to increase sewer rates for railroad yards nor did it hold any public hearings, accept comments, or provide any other meaningful opportunity for BNSF to express its concerns prior to adoption of the rate increase. *See* Ex. 3.

6.      Upon information and belief, BNSF reached out to Cicero in February 2021 regarding the Sewer Rate Ordinance, and when BNSF did not hear back from Cicero within a reasonable period, BNSF engaged my law firm to assist with communications and negotiations with Cicero regarding the Sewer Rate Ordinance. Beginning on March 15, 2021, BNSF, though its counsel, attempted to negotiate with Cicero and sought information from Cicero to enable BNSF to understand the justification for the sizable and discriminatory rate increase. These attempts included multiple telephone conferences between BNSF's counsel, Cicero's counsel, and other Cicero officials. Despite these repeated communications, Cicero has not provided information regarding increased sewer system costs it incurred, or BNSF's sewer usage compared to other users in Cicero, which prompted BNSF to conduct its own investigation of the matter.

7.      On May 10, 2021, I emailed Cicero's attorneys and asked whether there is a refund process in place to prevent the accrual of late fees/penalties and recover payments if it is later

determined that BNSF overpaid.  Having received no response, I sent an additional email to Cicero's attorneys on May 17, 2021 to follow up on my inquiry.  True and correct copies of my May 10, 2021 and May 17, 2021 emails are attached hereto as Exhibit 4.

8.      On May 19, 2021 at 6:06 p.m., I received a 60-day notice of termination directed to BNSF, demanding immediate payment of $395,450.88 or sewer service at BNSF's railyard "WILL BE SHUT OFF, DISCONTINUED, AND DISCONNECTED (SIXTY) 60 DAYS FROM MAY 20, 2021."  The notice further threatened that "IF THE TOTAL BILL IS NOT PAID AND THE SEWER IS DISCONTINUED AND DISCONNECTED, THE PROPERTY WILL BECOME A HEALTH DEPARTMENT PROBLEM" and "WILL HAVE TO BE VACATED." A true and correct copy of the May 19, 2021 correspondence and the attached 60-day notice of termination is attached hereto as Exhibit 5.

9.      I emailed a copy of the Complaint to counsel for Defendant on June 9, 2021, and counsel agreed to accept service on behalf of Cicero and execute a waiver of service.  Prior to filing BNSF's Motion for Temporary Restraining Order and Preliminary Injunction, I advised Cicero's counsel of BNSF's intention to file the Motion for Temporary Restraining Order and Preliminary Injunction.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on June 9, 2021 in Chicago, Illinois.

_____
        Renato Mariotti

EXHIBIT 1

Sec. 98-266. - Adjustments; Amounts; Penalty for Late Payment.

There shall be established rates and charges for the use and service of the sewer system of the town as follows:

(1) Residential service. The bimonthly rate for residential service per residential dwelling unit shall be $26.59. Charges for residential sewer service shall be made bimonthly. All bills shall be payable within ten days after rendition thereof. All bills not paid within ten days of the date of billing shall have a penalty charge of ten percent added thereto. When the tenth day of any month shall be a Sunday or legal holiday, such bills for service shall be paid on the next succeeding secular day without penalty.

(2) Commercial and industrial service. Rates for commercial and industrial service for all water consumed, shall be $56.06, minimum charge per month, for an allowance of 3,000 cubic feet per month. For each additional 1,000 cubic feet per month there shall be a charge of $18.69. Charges for commercial and industrial sewer service shall be made monthly based upon the rates set out in this subsection. All bills for such service shall be rendered as of the first of each month following the month for which sewer service has been rendered and shall be payable within ten days after rendition thereof. All bills not paid within 25 days of the date of billing shall have a penalty charge of 20 percent added thereto. When the 25th day of any month shall be a Sunday or a legal holiday, such bills for service shall be paid on the next succeeding secular day without penalty.

(3) Railroad yards and rights-of-way. Railroads shall be charged for the use and service of the sewer system at the rate of $350.00 per month per acre of railroad yard and right-of-way. Charges for sewer service shall be made monthly based upon the rates set out in this subsection. All bills for such service shall be rendered as of the first of each month following the month for which sewer service has been rendered and shall be payable within ten days after rendition thereof. All bills not paid within 25 days of the date of billing shall have a penalty charge of 20 percent added thereto. When the 25th day of any month shall be a Sunday or a legal holiday, such bill for service shall be paid on the next succeeding secular day without penalty.

(4) Commercial and industrial sewer service for property located outside of the town municipal border. Commercial and industrial property located outside the town municipal border shall be charged for the use of the sewer system at the rate of $350.00 per month per acre of property serviced by town sewers. The town will issue a monthly bill for the calculated sewer service fee amount. All bills for such service shall be rendered as of the first of each month following the month for which sewer service has been rendered and shall be payable within ten days after rendition thereof. All bills not paid within 25 days of the date of billing shall have a penalty charge of 20 percent added thereto. When the 25th day of any month shall be a Sunday or a legal holiday, such bill for service shall be paid on the next succeeding secular

day without penalty. This rate structure is applicable to the uses ongoing on the date of adoption, any material renovation of the site, building or expanded uses, such as table or slot gaming, will result in the town amending the rates.

(5) Reduction for senior citizens. For residential property owners 62 years of age and older, the monthly fee shall be reduced by 35 percent. To qualify for the reduction, the senior citizen must reside at the property for which the reduction is sought and provide proof of age and ownership on a form as required by the water department.

(6) Reduction for persons with disabilities. For residential property owners who are disabled, the monthly fee shall be reduced by 35 percent. For purposes of this section, "disabled" shall mean, in accordance with 42 U.S.C. § 1382c, a person who is unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months. The physical or mental impairment must be of such severity that the person is both unable to engage in his or her previous work and unable to engage in any other kind of gainful employment. To qualify for the reduction the disabled person must reside at the property for which the reduction is sought and provide proof of his or her disability and ownership on a form as required by the water department.

(7) Adjustments. Notwithstanding the foregoing, customers may seek adjustments to their sewer bills in accordance with the provisions of Section 98-269 of this Code.

(8) This rate structure is applicable to the uses ongoing on the date of adoption, any material renovation of the site, building or expanded uses, such as table or slot gaming, will result in the town amending the rates.

(Ord. of 12-27-1950, § 1; Code 1958, § 29-34; Ord. No. 2-74, 1-7-1974; Ord. No. 11-81, 6-9-1981; Ord. No. 49-89, § 1, 5-9-1989; Ord. No. 1-91, § 1, 1-7-1991; Ord. No. 52-97, § 1, 5-13-1997; Ord. No. 87-03, § 1, 5-13-2003; Ord. No. 177-03, § 1, 8-26-2003; Ord. No. 146-07, § 3.01, 12-11-2007; Ord. No. 92-09, § 3.01, 12-22-2009; Ord. No. 47-10, § 3.02, 5-11-2010; Ord. No. 8-11, § 3.02, 2-22-2011; Ord. No. 37-20, § 3.00, 6-9-2020; Ord. No. 72-20, § 3.00, 12-8-2020)

EXHIBIT 2

# A G E N D A

MEETING OF THE PRESIDENT &
BOARD OF TRUSTEES OF THE TOWN OF CICERO
IL., COUNCIL CHAMBERS, CICERO TOWN HALL

## *TUESDAY, DECEMBER 8, 2020 - 10:00 AM*

THE PRESIDENT AND BOARD OF TRUSTEES WELCOME YOU AS OBSERVERS TO THIS PUBLIC MEETING.  YOU ARE REMINDED THIS MEETING IS FOR THE DELIBERATIONS OF THE PRESIDENT & BOARD OF TRUSTEES IN CONTRAST TO A PUBLIC HEARING WHERE MEMBERS OF THE TOWN OF CICERO ARE ENCOURAGED TO PARTICIPATE.  UNLESS INVITED BY THE PRESIDENT TO SPEAK, OBSERVERS ARE REQUESTED NOT TO INTERRUPT THE MEETING IN ORDER THAT THE CONCERNS OF THE TOWN OF CICERO MAY BE ATTENDED TO EFFICIENTLY.  IF YOU ARE RECOGNIZED BY THE PRESIDENT TO SPEAK, PLEASE APPROACH THE PODIUM, ANNOUNCE YOUR NAME & ADDRESS AND DIRECT YOUR REMARKS TO THE PRESIDENT AND BOARD OF TRUSTEES:

**All members of the public wishing to listen to the Town Board Meeting may dial: 1-503-300-6863, when prompted dial access code 345116. At the time of "Citizen Comments" you will be able to punch 5\* to speak when prompted to.**

1. *Roll Call - 10:00 A.M.*

2. *Pledge of Allegiance to the Flag*

3. *Approve minutes of the previous meetings*

4. *Approval of Bills*

A) List of Bills-Warrant# 23, Manual Checks & Online Payments

B) Payroll

5. *Permit*

A) Renteria

6. *Report*

A) Collector's Office Report & Revenue Summary

7. *Ordinances*

A) An Ordinance Amending Chapter 98, Section 98-266 Of The Code Of Ordinances Of The Town Of Cicero, Illinois, Regarding Sewer Rates For The Town Of Cicero, County Of Cook, State Of Illinois

B) An Ordinance Amending Chapter 82, Section 82-398 Of The Code Of Ordinances Of The Town Of Cicero, Illinois Regarding The Regulation Of Pets For The Town Of Cicero, County Of Cook,

1

State Of Illinois

8. ***Ordinance - Land Use***

A) An Ordinance Denying A Parking Variance For The Property Commonly Known As 2901 South 49th Avenue, Cicero, Illinois

B) An Ordinance Granting A Parking Variance For The Property Commonly Known As 5132 West 26th Street, Cicero, Illinois

9. ***Resolutions***

A) A Resolution Authorizing And Approving The Settlement Of Litigation And The Execution Of A Certain Settlement Agreement In The Case Charlie Newberry V. Lido Manetti, Jr. And Town Of Cicero, For The Town Of Cicero, County Of Cook, State Of Illinois

B) A Resolution Authorizing And Approving The Settlement Of Litigation And The Execution Of A Certain Settlement Agreement In The Case Frank Duffek V. Town Of Cicero For The Town Of Cicero, County Of Cook, State Of Illinois

C) A Resolution Authorizing And Approving The Settlement Of Litigation And The Execution Of A Certain Settlement Agreement In The Case Laura Gonzales V. Town Of Cicero, Et Al., For The Town Of Cicero, County Of Cook, State Of Illinois

D) A Resolution Appointment Certain Individuals To Specified Positions, Boards, Commissions And / Or Committees Within The Town Of Cicero For The Town Of Cicero, County Of Cook, State Of Illinois

E) A Resolution Appointment Certain Members Of The Board Of Trustees Of The Town Of Cicero To Specific Committees For The Town Of Cicero, County Of Cook, State Of Illinois

10. ***New Business***

A) Motion To Concur With / Accept The Recommendation Given By The Town Attorney Not To Release Closed Session Minutes Based On Reasons Set Forth In Their Memorandum

11. ***Citizen Comments (3 minute limit)***

12. ***Adjournment***

EXHIBIT 3

# PROCEEDINGS OF THE BOARD OF TRUSTEES OF THE TOWN OF CICERO

The Board of Trustees of the Town of Cicero met Tuesday, December 8, 2020 at 10:00 A.M., in the Town Hall Council Chambers, Town of Cicero.

On roll call there were present:
President:     Dominick
Trustees:      Cava, Cundari, Garcia, Porod, Reitz, Virruso.
Via Conference Call: Trustee Banks
Absent:        Town Clerk Punzo-Arias - Excused

Thereupon, President Dominick declared a quorum present and the meeting duly convened and requested that all present in attendance stand and join in the Pledge of Allegiance to the Flag and a moment of silence in memory of Pearl Harbor and the recent passing of Former Senator Martin Sandoval and Charlie Hernandez Junior, son of Former Democratic Committeeman Charlie Hernandez.

On motion of Trustee Cava seconded by Trustee Garcia, the minutes of the Regular Meeting held Tuesday, November 24, 2020 at 10:00 o'clock A.M., were approved, the reading being dispensed with, each member having received a copy.

## *APPROVAL OF BILLS*

**(179-20)**
On motion of Trustee Virruso seconded by Trustee Cava, the list of bills itemized in Warrant #23, dated December 3, 2020, in the total amount of $3,670,389.20, the list of manual checks dated November 19 thru December 3, in the total amount of $57,732.50, and the list of online payments dated November 20 thru December 3, in the total amount of $0.00, were accepted, placed on file and approved for payment; action taken by the following vote:
Ayes:  Banks, Cava, Cundari, Garcia, Porod, Reitz, Virruso.
Nays:  None.

****

1

**(180-20)**

On motion of Trustee Garcia seconded by Trustee Cava, payroll (*Estimated Corporate $1,534,471.07 & Library $28,450.68*) was approved for the active employees listed on the printout dated 12-03-20; action taken by the following vote:

Ayes:  Banks, Cava, Cundari, Garcia, Porod, Reitz, Virruso.

Nays:  None.

## *PERMIT*

**(181-20)**

On motion of Trustee Banks seconded by Trustee Porod, the Birthday Parade request submitted by resident Rebecca Renteria was rejected and sent back to the Clerk's office for further information.

## *REPORT*

**(182-20)**

On motion of Trustee Virruso seconded by Trustee Cava, the Collector's Office Report (*$2,300,766.24*) and the Revenue Summary Report (*$821,294.62*) for the month of November/2020, submitted by Fran Reitz, Collector, was accepted and placed on file; action taken by the following vote:

Ayes:  Banks, Cava, Cundari, Garcia, Porod, Reitz, Virruso.

Nays:  None.

## *ORDINANCES*

**("O" 72-20)**

On motion of Trustee Virruso seconded by Trustee Cava, the Ordinance amending Chapter 98, entitled "Utilities", Section 98-266, entitled "Adjustments; Amounts; Penalty For Late Payment" of the Code of Ordinances of the Town of Cicero, Illinois regarding sewer rates, was accepted, placed on file and approved for passage by the following vote:

Ayes:  Banks, Cava, Cundari, Garcia, Porod, Reitz, Virruso.

Nays:  None.

*(Purpose of Ordinance)*

*(The purpose of this ordinance is to increase rates for railroad yards and rights-of-way to ensure the proper operation and maintenance of the combined waterworks and sewage system.)*

Section 98-266: Adjustments; Amounts; Penalty for Late Payment.

There shall be established rates and charges for the use and service of the sewer system of the Town as follows:

(1)     *Residential Service.* The bimonthly rate for residential service per residential dwelling unit shall be $26.59. Charges for residential sewer service shall be made bimonthly. All bills shall be payable within ten days after rendition thereof. All bills not paid within ten days of the date of billing shall have a penalty charge of ten percent added thereto. When the tenth day of any month shall be a Sunday or legal holiday, such bills for service shall be paid on the next succeeding secular day without penalty.

(2)     *Commercial and Industrial Service.* Rates for commercial and industrial service for all water consumed, shall be $56.06, minimum charge per month, for an allowance of 3,000 cubic feet per month. For each additional 1,000 cubic feet per month there shall be a charge of $18.69. Charges for commercial and industrial sewer service shall be made monthly based upon the rates set out in this Subsection. All bills for such service shall be rendered as of the first of each month following the month for which sewer service has been rendered and shall be payable within ten days after rendition thereof. All bills not paid within 25 days of the date of billing shall have a penalty charge of 20 percent added thereto. When the 25th day of any month shall be a Sunday or a legal holiday, such bills for service shall be paid on the next succeeding secular day without penalty.

(3)     *Railroad Yards and Rights-of-Way.* Railroads shall be charged for the use and service of the sewer system at the rate of ~~$27.42~~ $350.00 per month per acre of railroad yard and right-of-way. Charges for sewer service shall be made monthly based upon the rates set out in this Subsection. All bills for such service shall be rendered as of the first of each month following the month for which sewer service has been rendered and shall be payable within ten days after rendition thereof. All bills not paid within 25 days of the date of billing shall have a penalty charge of 20 percent added thereto. When the 25th day of any month shall be a Sunday or a legal holiday, such bill for service shall be paid on the next succeeding secular day without penalty.

(4)     *Commercial and Industrial Sewer Service for Property Located Outside of the Town Municipal Border.* Commercial and industrial property located outside the Town municipal border shall be charged for the use of the sewer system at the rate of $350.00 per month per acre of property serviced by Town sewers. The Town will issue a monthly bill for the calculated sewer service fee amount. All bills for such service shall be rendered as of the first of each month following the month for which sewer service has been rendered and shall be payable within ten days after rendition thereof. All bills not paid within 25 days of the date of billing shall have a penalty charge of 20 percent added thereto. When the 25th day of any month shall be a Sunday or a legal holiday, such bill for service shall be paid on the next succeeding secular day without penalty. This rate structure is applicable to the uses ongoing on the date of adoption, any material renovation of the site, building or expanded uses, such as table or slot gaming, will result in the Town amending the rates.

(5)     *Reduction for Senior Citizens.* For residential property owners 62 years of age and older, the monthly fee shall be reduced by 35 percent. To qualify for the reduction, the senior citizen must reside at the property for which the reduction is sought and provide proof of age and ownership on a form as required by the Water Department.

(6)     *Reduction for Persons with Disabilities.* For residential property owners who are disabled, the monthly fee shall be reduced by 35 percent. For purposes of this Section, "disabled" shall mean, in accordance with 42 U.S.C. § 1382c, a person who is unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months. The physical or mental impairment must be of such severity that the person is both unable to engage in his or her previous work and unable to engage in any other kind of gainful employment. To qualify for the reduction the disabled person must reside at the property for which the reduction is sought and provide proof of his or her disability and ownership on a form as required by the Water Department.

(7)     *Adjustments.* Notwithstanding the foregoing, customers may seek adjustments to their sewer bills in accordance with the provisions of Section 98-269 of this Code.

(8)     This rate structure is applicable to the uses ongoing on the date of adoption, any material renovation of the site, building or expanded uses, such as table or slot gaming, will result in the Town amending the rates.

****

**("O" 73-20)**

On motion of Trustee Reitz seconded by Trustee Porod, the Ordinance amending Chapter 82, entitled "Streets, Sidewalks and Other Public Places", Section 82-398, entitled "Dog Park" of the Code of Ordinances of the Town of Cicero, Illinois regarding the regulation of pets, was accepted, placed on file and approved for passage by the following vote:

Ayes: Banks, Cava, Cundari, Garcia, Porod, Reitz, Virruso.
Nays: None.

*(Purpose of Ordinance)*

*(The purpose of this ordinance is to allow children under the age of eighteen (18) to enter all areas of the dog park if accompanied by an adult.)*

Section 82-398: Dog park.

(c)    General rules relating to dog parks.

    (1)    Owners shall keep their dogs on a leash at all times in a dog park, except as allowed in leash free areas.

    (2)    Owners shall keep their dog(s) on a leash when entering or exiting a leash free area.

    (3)    No person under the age of eighteen (18) is allowed in a leash free area, unless they are accompanied by an adult.

    (4)    All persons entering a dog park shall be owners accompanying at least one (1) dog.

    (5)    No owner shall accompany or handle more than two (2) dogs within a dog park.

    (6)    No more than two (2) owners shall be allowed to accompany one (1) dog in a dog park.

    (7)    Owners shall not leave their dog(s) unattended in a dog park.

    (8)    No person shall bring into or possess any food or beverage in a dog park. This provision shall not be construed to prohibit the possession of dog food or dog treats in a dog park.

    (9)    Owners are responsible for the care of their dog(s) while in any dog park, including, but not limited to, disposing of its waste.

    (10)    Owners are responsible for any and all damage or injury to any person, dog or property caused by their dog(s).

    (11)    While in leash free areas, owners shall have a leash in their hands at all times.

    (12)    Owners shall be within view of their dog(s) and within voice control of their dog(s) at all times.

    (13)    Owners shall not allow their dog(s) to jump dog park fences. Ingress and egress shall only be through the designated gateways of a dog park.

    (14)    Owners shall not use choke or pinch collars on dog(s) in a leash free area.

****

**("O" 74-20)**

On motion of Trustee Virruso seconded by Trustee Cava, the Ordinance denying a parking variance for the operation of a church at 2901 South 49th Avenue, was accepted, placed on file and approved for passage by the following vote:

Ayes: Banks, Cava, Cundari, Garcia, Porod, Reitz, Virruso.

Nays: None.

**\*\*\*\***

**("O" 75-20)**

On motion of Trustee Garcia seconded by Trustee Cava, the Ordinance granting a parking variance for the operation of an auto repair store at 5132 West 26th Street, was accepted, placed on file and approved for passage by the following vote:

Ayes: Banks, Cava, Cundari, Garcia, Porod, Reitz, Virruso.

Nays: None.

# *RESOLUTIONS*

**("R" 135-20)**

On motion of Trustee Virruso seconded by Trustee Porod, the Resolution authorizing and approving the settlement of litigation and the execution of a settlement agreement between Charlie Newberry v. Lido Manetti, Jr., and the Town of Cicero *(Case No 2018 L 007014),* was accepted, placed on file and approved for adoption by the following vote:

Ayes: Banks, Cava, Cundari, Garcia, Porod, Reitz, Virruso.

Nays: None.

**\*\*\*\***

**("R" 136-20)**

On motion of Trustee Cava seconded by Trustee Garcia, the Resolution authorizing and approving the settlement of litigation and the execution of a settlement agreement between Frank Duffek v. Town of Cicero *(Case No 2019 WC 025068),* was accepted, placed on file and approved for adoption by the following vote:

Ayes: Banks, Cava, Cundari, Garcia, Porod, Reitz, Virruso.

Nays: None.

**\*\*\*\***

**("R" 137-20)**

On motion of Trustee Garcia seconded by Trustee Cava, the Resolution authorizing and approving the settlement of litigation and the execution of a settlement agreement between Laura Gonzalez v. Town of Cicero, Et Al., *(Case No 2020 CV 00012),* was accepted, placed on file and approved for adoption by the following vote:

Ayes: Banks, Cava, Cundari, Garcia, Porod, Reitz, Virruso.

Nays: None.

****

**("R" 126-20)**

On motion of Trustee Virruso seconded by Trustee Cava, the Resolution appointing certain individuals to specified positions, boards, commissions and/or committees within the Town of Cicero expiring at 11:59 PM on April 30, 2021, was accepted, placed on file and approved for adoption by the following vote:

Ayes: Banks, Cava, Cundari, Garcia, Porod, Reitz, Virruso.

Nays: None.

ANIMAL WELFARE BOARD

Alice Couch, Liaqueni Guzman, Kelly Graham, Gerri Owczarek, Frances Nowak, Mary Ellen Jelic, Lorraine Walsh

CULTURAL AFFAIRS / HISTORIC SITES COMMISSION

Francesca Cundari, Malika Manouzi, Nicole Pontillo, Jessi Weber, Rosemary Konz, Kathy Konopasek, Valia Maniadakis, Gina Prendergast, Tonya Elliot, Nicole Seno Chlada

BOARD OF HEALTH

Laura Bertone, Elvira Hunter, Michele Maniglia, Christopher Banks, William Ostler, Gretchen Aviles, Maria Vargas, Vlasta Mangia, Nikki Parrish

HOUSING BOARD

Maureen Carroll, Lido Manetti, Dominick Buscemi, Isabel Aguilar

HOUSING AND REAL ESTATE BOARD (FORMERLY BUILDING & BLIGHT COMMISSION)

George Owczarek, Alan Neal, Dawn Czarkowski, Brian Dominick, Mary Durkee, Rick Carlson, Anna Benedick, Wolf Iklov, Joe Florio, Christina Reitz, Lisa Musial, Tom Eukovich, Sr., Robert Porod, Jr., John Walsh, Wayne Wente

MENTAL HEALTH BOARD

Nicole Chlada, Kelly Giovanelli, Maria Punzo-Arias, Whitney Delong, Joe Virruso, Elizabeth Lopez, Mary Hernandez

BOARD OF FIRE & POLICE COMMISSIONERS

Dominic Cannova, Rolando Hernandez, Rich Malicki, Lenny Rutka, Larry Polk – To Be Determined (President)

POLICE PENSION BOARD

Nino Scimone, Jerry Chlada

FIRE PENSION BOARD

Dominick Buscemi, Eric Pagni

SENIOR COMMISSION (SENIOR ADVISORY BOARD)

Diana Dominick, Larry Dominick, Ryan Chlada, Dennis Raleigh, Fran Reitz, Bob Porod

BOARD OF WATER COMMISSIONERS

Tony Castellano, John Deganutti, Jacyclen Napelaneo, Lilly Ayala, Michelle Mastalerz, Gerardo Solis, Sue Banks, Jeanine Thomas

YOUTH COMMISSION (YOUTH SERVICES BOARD)
Marie Moreno, Patricia Sturdevant, To Be Determined, Isabel Aguilar, Lisa Giannakopoulos

ZONING BOARD (ZONING BOARD OF APPEALS)
Jose Alvarez, Lenny Cannata Jr., Jessica Jaramillo (Chair), Stephanie Vargas-Nava, Ruth Ortega, Cynthia Salvino, Karyn Ferzi

911 BOARD (EMERGENCY TELEPHONE SYSTEM BOARD)
Stephanie Vargas-Nava, Eric Pagni, Darula Raleigh, Dominick Brucceri, Nick Jelic, Rosemarie Esposito (Secretary), Michael Tillman (Chairman), Dominic Schullo

PRESIDENT'S OFFICE OF LITERACY
Mary Gallegos (Program Liaison), Arlene Hernandez, Ada Candelaria (Chairman/Lead Coordinator), Elaine Pasek, Ismael Vargas Jr., Eric Ferzi

SENIOR ADVISORY COMMITTEE
Joseph Virrue, John Micialko, Antonia Sawyer, Josephine Kraut, Frank Kraut, Mary Gray, Jack Petracek, Javier Bonafacia, Alma Marbio, Socorro Gonzalez, Richard Bielawa, Mary Ann Bielawa, Mary Petracek, Antonia Brisone, Celia Rangel, Joan Devereux

SAFETY COMMITTEE
2 Trustees, Safety Director, Superintendent of Police, Fire Chief

ROOSEVELT ROAD ADVISORY COMMITTEE
Barbara Harris – Town Resident, Lucy Schmidt – Business Owner, Louis Guido – Staff Member, Merrie Neal - Staff Member, Craig Pasek – Committee Liaison, Dominic Gatto – Business Owner

GRAFFITI TASK FORCE
Larry Dominick – *Ex officio* member, Ismael Vargas - Ex officio member (service without compensation), Derek Dominick – Public Works representative, Jorge Rueda – Community Development Block Grant Program representative, To Be Determined – Police Department representative, Bonis Centeno – Community member, Pam Pila - Community member, Don Mangis – Community member, Lori Pila – Community member, Doris Tenbrock – Community member, Gene Talsma - Community member

VACANT BUILDING APPEALS COMMITTEE
Donna Pavloski, Rich Sova, Julio Aguirre

IDENTITY THEFT COMMITTEE
Amy Bancroft, Randy Teibinger, Danielle Santos

LOCAL BUSINESS ASSISTANCE COMMITTEE
Paulie DiMenna, Jim Baker, Ben Barber, John Papagelos, James Terrazino Sr., Jeff Davis, Dan Sarapian, Craig Pasek (Liaison), Charlie Hernandez (Honorary member)

DISABILITY ADVISORY BOARD
Fran Reita, Rocio Perez, Laura Gonzales, Terry Peterson, Jose Canoyer, Director of the Office for People with Disabilities, Ex officio member

ACCIDENT REVIEW BOARD
Luis Gutierrez (Chair), Designee of Police Chief, Department Head of Applicable Department

## DEPARTMENT HEADS

| | |
|---|---|
| Town Attorney | Del Galdo Law Group, LLC |
| Business License Director (License Officer) | Ismael Vargas |
| Community Development Director | Jorge Rueda |
| Commissioner (Superintendent) of Public Works | Sam Jelic |
| Data Processing Manager (Manager of Information Services) | Amanda Wolff |
| Electrical Foreman | Nick Telitz |
| Fire Chief | Dominick Buscemi |
| Deputy Fire Marshal | Eric Pagni |
| 911 Coordinator (Emergency Alarm Administrator) | To Be Determined |
| Director of Health (Commissioner of Public Health) | Sue Grazzini |
| Human Resources Director | Sarah Kuaper |
| Superintendent of Maintenance (Director of Maintenance) | James Wood |
| Municipal Complex Facilities Manager | To Be Determined |
| Mental Health Director | Maureen Carroll |
| Parking Enforcement Supervisor/Officer | To Be Determined |
| Superintendent of Police | Jerry Chlada, Jr |
| Sign Department Supervisor/Town Sealer | Nick Jelic |
| Director of Special Events | Patti Sturdevant |
| Director of Senior Services | Ryan Ohlada |
| Deputy Director of Senior Services | Jim Terracino Jr |
| Director of Senior Activities (Dpty Dir of Senior Srvc) | Diana Dominick |
| Community Center Director | Patti Sturdevant |
| Supervisor of Water Department (Superintendent of Water) | Lido Manetti |
| Youth Commission Director (Director of Youth Services) | Patti Sturdevant |
| Project Director(s) | To Be Determined |
| Director of People with Disabilities | Ryan Chlada |
| Deputy Liquor Commissioner | Cindy Dembowski |
| Building Commissioner | Tom Tomschin |
| Director of the Office of Administrative Hearings | Karyn Porod |
| Director of Vehicle Towing and Storage Department | Barrett Marlar |
| Office Manager of Vehicle Towing and Storage Department | Mary Rita Ryan |
| Purchasing Agent | Mary Lou Schvach |
| Safety Director | Jeffry Pesek |
| Director of Rat Control | Christopher Wasicki |
| Commissioner of Fleet Maintenance | Dan Wolff |
| Chief Inspector (Inspections Department) | To Be Determined |

## TOWN APPOINTED POSITIONS

| | |
|---|---|
| Chief Animal Control Warden | Erika Rosas |
| Revenue Director | Ismael Vargas |
| Cellular Telephone Coordinator | Ryan Chlada |
| | Dominick Buscemi |
| Director of Delinquent Accounts | To Be Determined |
| Director of Translation Services | Diana Dominick |
| Civilian Hearing Officer | Anthony Bertuca |
| Collection Clerk | To Be Determined |
| Collection Clerk | Elizabeth Lopez |

| | |
|---|---|
| Collection Clerk | To Be Determined |
| 457 Plan Trustee | Sarah Kasper |
| Director of Financial Affairs / Chief Financial Officer | To Be Determined |
| Director of the Special Investigation Division | To Be Determined |
| Enterprise Zone Administrator | Craig Pesek |
| Executive Director of PSO Building | Ryan Chlada |
| (and/or such other persons as designated by the Town President) | |
| Hearing Officer | Anthony Bertuca |
| Hearing Officer to Hear Personnel Appeals | To Be Determined |
| Hearing Officer to Hear Liquor License Matters | Richard Pellegrino, Ltd. |
| IMRF Agent | Sarah Kasper |
| Ethics Officer | Michael J. Kasper |
| Plan Review Specialist | SAFEbuilt Illinois, LLC |
| Plumbing Inspector | Tony Caruso |
| TIF Administrator | Craig Pesek |
| TIF Administrator | Daniel Schultz |
| First Deputy Superintendent of Police | Luis Gutierrez |
| Deputy Superintendent of Police - Detectives | Francisco Diaz |
| Deputy Superintendent of Police – Traffic | To Be Determined |
| Deputy Superintendent of Police - Administration | Tom Boyle |
| Assistant Deputy Superintendent of Gang Crimes Unit | Francisco Diaz |
| Assistant Deputy Superintendent of Administration | Dominic Schullo |
| Deputy Superintendent of Patrol | Vincent Acevez |
| Assistant Deputy Superintendent of Patrol | Nino Scimone |
| Watch Commanders | Rhonda Kosensaky |
| Watch Commanders | Matt Ramirez |
| Watch Commanders | Chris Wojtowicz |
| Watch Commanders | To Be Determined |
| Watch Commanders | To Be Determined |
| Water Commanders | To Be Determined |
| Captains – 1st Shirft | Dave Leuzzi |
| Captains – 2nd Shift | Eddie Lopez |
| Captains – 3rd Shift | Mike Skrabazz |
| Director of the Community Service Officers | Serge Rocher |
| First Deputy Superintendent of Community Service Officers | Oscar Clay |
| Deputy Superintendent of Community Service Officers | Christopher Tomascino |
| Deputy Superintendent of Community Service Officers | Ricardo Pina |
| Deputy Superintendent of Community Service Officers (Nights) | Armando Grajeda |
| Executive Community Service Officer | To Be Determined |
| Corporal of Community Service Officers | Bob Smith |
| Corporal of Community Service Officers | Eduardo Munoz |
| Corporal of Community Service Officers | Chuck Herrig |
| Corporal of Community Service Officers | Marcos Andrade |
| Corporal of Community Service Officers | Vacant |
| Corporal of Community Service Officers | Vacant |
| Director of the TIF Task Force | To Be Determined |
| First Deputy Superintendent of the TIF Task Force | To Be Determined |
| Corporal of the TIF Task Force | To Be Determined |
| Building Maintenance Supervisor of the Cicero Senior Center | James Terracino, Jr. |
| Community Center Deputy Director | Lisa Gianakopoulos |
| Ambassadors for Senior Citizens | To Be Determined |
| Immigration Supervisor | Arcadio Z. Delgado |

| | |
|---|---|
| Assistant Fire Chief | Tim Rolewicz |
| Assistant Fire Chief | Pat DeChicio |
| Assistant Fire Chief | Tom Santoro |
| Assistant Fire Chief | Jeffrey Penakoffer |
| Director of Police Records | Rose Marie Esposito |
| Assistant Fire Chief of Administration | To Be Determined |
| Assistant Fire Chief of Fire Prevention | Harry Baiz |
| Assistant Fire Chief of Maintenance | John Miller |
| Elevator Inspector | Urban Elevator Service, LLC |
| Fire Inspector | Harry Ruta |
| Fire Inspector | To Be Determined |
| Director of Programs and Recreation | Jeffry Pesek |
| Director of Training and Education | Patrick McGee |
| Crime Victims Assistance Director | To Be Determined |
| Emergency Response Coordinator | To Be Determined |
| Inspector (Inspections Department) | To Be Determined |
| Inspector (Inspections Department) | To Be Determined |
| Chaplaincy Program Coordinator | Ismael Vargas |
| Shelter Supervisor | To Be Determined |
| Community Outreach Coordinator | Eddie Lopez |
| Office of Professional Standards - Chief Administrator | Paul Dembowski |
| Office of Professional Standards - Investigator | James Kozak |

*****

("E" 127-20)

   On motion of Trustee Virruso seconded by Trustee Garcia, the Resolution appointing certain Members of the Board of Trustees of the Town of Cicero to specific committees for the Town, was accepted, placed on file and approved for adoption by the following vote:
Ayes:  Banks, Cava, Cundari, Garcia, Porod, Reitz, Virruso.
Nays:  None.

TRUSTEE COMMITTEE APPOINTMENTS THROUGH APRIL 30, 2020

FINANCE COMMITTEE
Joseph Virruso    (C)
Victor Garcia     (M)
Fran Reitz        (M)

LICENSES, HEALTH & WELFARE COMMITTEE
Larry Banks       (C)
Joseph Virruso    (M)
Emilio Cundari    (M)

PUBLIC WORKS, BLDGS. & GROUNDS COMMITTEE
John Cava         (C)
Joseph Virruso    (M)
Bob Porod         (M)

ORDINANCE COMMITTEE
Fran Reitz        (C)
Joseph Virruso    (M)
John Cava         (M)

WATER,LIGHTING,UTILITIES & AIR POLLUTION COMMITTEE
Joseph Virruso    (C)
Larry Banks       (M)
Emilio Cundari    (M)

ANTI-GANG COMMITTEE
Fran Reitz        (C)
John Cava         (M)
Larry Banks       (M)

10

ECONOMIC DEVELOPMENT & NEIGHBORHOOD
CONSERVATION COMMITTEE
Bob Porod              (C)
Fran Reitz            (M)
Emilio Cundari        (M)

INSURANCE COMMITTEE
Joseph Virruso        (C)
Victor Garcia         (M)
Bob Porod             (M)
Larry Banks           (M)

FIRE & POLICE COMMITTEE
Fran Reitz            (C)
John Cava             (M)
Victor Garcia         (M)

ADMINISTRATIVE COMMITTEE
Joseph Virruso        (C)
John Cava             (M)
Fran Reitz            (M)

COMMITTEE OF THE WHOLE
Larry Dominick        (C)
Joseph Virruso        (M)
John Cava             (M)
Fran Reitz            (M)
Bob Porod             (M)
Maria Punzo-Arias (Clerk)
Emilio Cundari        (M)
Victor Garcia         (M)
Larry Banks           (M)

RULES COMMITTEE
Emilio Cundari        (C)
Fran Reitz            (M)
Victor Garcia         (M)

INFRASTRUCTURE COMMITTEE
Emilio Cundari        (C)
John Cava             (M)
Maria Punzo-Arias     (M)
Joseph Virruso        (M)

## NEW BUSINESS

(188-20)

On motion of Trustee Cava seconded by Trustee Virruso, the Board concurred with/accept the recommendation given by the Town Attorney not to release closed session minutes based on reasons set forth in their memorandum; action taken by the following vote:

Ayes: Banks, Cava, Cundari, Garcia, Porod, Reitz, Virruso.
Nays: None.

**** 

President Dominick opened the meeting to the public for their comments.

No Public Comments.

On motion of Trustee Virruso seconded by Trustee Garcia, the board then stood adjourned at 10:14 A.M. to meet on Tuesday, December 22, 2020 at 10:00 A.M., in the Town Hall, Town of Cicero.

MARIA A. PUNZO-ARIAS, TOWN CLERK

EXHIBIT 4

| | |
|---|---|
| **From:** | Mariotti, Renato |
| **Sent:** | Monday, May 17, 2021 2:22 PM |
| **To:** | delgaldo@dlglawgroup.com |
| **Cc:** | grandfield@dlglawgroup.com; Cullerton, John J. |
| **Subject:** | RE: BNSF |

I'm writing to follow up regarding my email, below.

**Renato Mariotti**
rmariotti@thompsoncoburn.com
P: 312.580.5056
F: 312.580.2201
M: 312.622.6804

**Thompson Coburn LLP**
55 East Monroe Street
37th Floor
Chicago, IL 60603
www.thompsoncoburn.com

**From:** Mariotti, Renato
**Sent:** Monday, May 10, 2021 4:01 PM
**To:** 'delgaldo@dlglawgroup.com' <delgaldo@dlglawgroup.com>
**Cc:** 'grandfield@dlglawgroup.com' <grandfield@dlglawgroup.com>; Cullerton, John J. <JCullerton@thompsoncoburn.com>
**Subject:** BNSF

Michael,

BNSF is still assessing the increased sewer rate on its property and the acreage issue that you raised with John. If BNSF pays the current amount that the Town billed, in order to avoid the accumulation of penalties while we look into this issue, is there a refund process in place to recover payments if it is later determined that BNSF overpaid? And if so, can you point us to that process?

**Renato Mariotti**
rmariotti@thompsoncoburn.com
P: 312.580.5056
F: 312.580.2201
M: 312.622.6804

**Thompson Coburn LLP**
55 East Monroe Street
37th Floor
Chicago, IL 60603
www.thompsoncoburn.com

EXHIBIT 5

| | |
|---|---|
| **From:** | Cynthia Grandfield <grandfield@dlglawgroup.com> |
| **Sent:** | Wednesday, May 19, 2021 6:06 PM |
| **To:** | Mariotti, Renato |
| **Cc:** | delgaldo@dlglawgroup.com; Cullerton, John J. |
| **Subject:** | Re: BNSF |
| **Attachments:** | BNSF 60-day notice 05.19.21.pdf |

**RECEIVED FROM EXTERNAL SENDER - USE CAUTION**

Dear Renato:

Please see attached 60-day notice of disconnection and demand for immediate payment. I am sending to you as you represent BNSF. If there is someone else in BNSF that we need to send this to or you want us to send this to, please let me know.

Sincerely and thanks,

--*Cynthia*

Cynthia S. Grandfield, Senior Counsel
Del Galdo Law Group, LLC
grandfield@dlglawgroup.com
**note new phone number please**
(312) 222-7000 ext. 205

The information contained in this transmission may contain privileged and confidential information. It is intended only for the use of the person(s) named above. If you are not the intended recipient, you are hereby notified that any review, dissemination, distribution or duplication of this communication is strictly prohibited. If you are not the intended recipient, please contact the sender by reply email and destroy all copies of the original message. Unintended transmission does not constitute waiver of the attorney-client privilege or any other privilege. Unless expressly stated in this email, nothing in this message should be construed as a digital or electronic signature. To reply to our email administrator directly, please send an email to info@dlglawgroup.com

On Mon, May 17, 2021 at 2:21 PM Mariotti, Renato <rmariotti@thompsoncoburn.com> wrote:

I'm writing to follow up regarding my email, below.

1

**Renato Mariotti**
rmariotti@thompsoncoburn.com
P: 312.580.5056
F: 312.580.2201
M: 312.622.6804

**Thompson Coburn LLP**
55 East Monroe Street
37th Floor
Chicago, IL 60603
www.thompsoncoburn.com

---

**From:** Mariotti, Renato
**Sent:** Monday, May 10, 2021 4:01 PM
**To:** 'delgaldo@dlglawgroup.com' <delgaldo@dlglawgroup.com>
**Cc:** 'grandfield@dlglawgroup.com' <grandfield@dlglawgroup.com>; Cullerton, John J. <JCullerton@thompsoncoburn.com>
**Subject:** BNSF


Michael,


BNSF is still assessing the increased sewer rate on its property and the acreage issue that you raised with John. If BNSF pays the current amount that the Town billed, in order to avoid the accumulation of penalties while we look into this issue, is there a refund process in place to recover payments if it is later determined that BNSF overpaid? And if so, can you point us to that process?


**Renato Mariotti**
rmariotti@thompsoncoburn.com
P: 312.580.5056
F: 312.580.2201
M: 312.622.6804

**Thompson Coburn LLP**
55 East Monroe Street
37th Floor
Chicago, IL 60603
www.thompsoncoburn.com

---

CONFIDENTIALITY NOTE: This message and any attachments are from a law firm. They are solely for the use of the intended recipient and may contain privileged, confidential or other legally protected information. If you are not the intended recipient, please destroy all copies without reading or disclosing their contents and notify the sender of the error by reply e-mail.

**50609290 1672**
**ACCOUNT NUMBER**



**$395,450.88**
**AMOUNT DUE**

**Town Of Cicero**
**Bureau of Water & Sewerage**
**4949 W. Cermak Road**
**Cicero , IL. 60804**
**(708 )656- 3600**

# IMPORTANT INFORMATION

**TO WHOM IT MAY CONCERN:**

OWNER AND ALL OCCUPANTS AT **5601 W. 26th Street,** CICERO, IL

YOU ARE HEREBY ADVISED THAT THE SEWER BILL CONTINUES TO REMAIN UNPAID, AND THE BOARD OF WATER COMMISSIONERS OF THE TOWN OF CICERO HEREBY ORDER THAT THE SEWER SERVICE AT 5601 W. 26th STREET, CICERO, ILLINOIS, WILL BE SHUT OFF, DISCONTINUED, AND DISCONNECTED (SIXTY) 60 DAYS FROM MAY 20, 2021.

IF THE TOTAL BILL IS NOT PAID AND THE SEWER IS DISCONTINUED AND DISCONNECTED, THE PROPERTY WILL BECOME A HEALTH DEPARTMENT PROBLEM, BECAUSE HAVING NO SEWER IS A HAZARD TO HEALTH. THEREFORE, THE PROPERTY WILL HAVE TO BE VACATED.

PAYMENT IS DUE IMMEDIATELY.

## PAYABLE MONEY ORDER, CREDIT CARD OR CERTIFIED CHECK

CICERO WATER DEPARTMENT

# EXHIBIT D

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| BNSF RAILWAY COMPANY | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 21-cv-03072 |
| | ) | |
| | ) | |
| TOWN OF CICERO, ILLINOIS | ) | |
| | ) | |
| Defendant. | ) | |

## <u>DECLARATION OF RAKIYA TASIU</u>

I, Rakiya Tasiu, declare under penalty of perjury the following:

1.       I am the Manager of Environmental Operations for BNSF Railway Company ("BNSF").  I submit this declaration in support of BNSF's Motion for Temporary Restraining Order and Preliminary Injunction.  I am over the age of 18, competent to testify, and make the following declaration based on my education, training, experience, professional qualifications, and my understanding of the matters herein based on my personal knowledge or my access to records kept by my employer, Plaintiff BNSF Railway Company ("BNSF"), in the ordinary course of business.

2.       I have worked in my current role as Manager of Environmental Operations at BNSF for three and a half (3.5) years.  In this role, I oversee the Environmental Operations for the BNSF region that includes Illinois and Iowa.  I manage BNSF's environmental regulatory compliance, including by ensuring proper permitting at the local, state, and federal level.  In total, I have worked for BNSF for eight (8) years.  Prior to my current role, I worked for BNSF as a Hub Manager, which involved running an intermodal railyard by, among other things, planning traffic and other logistical matters for the trains to depart.  I also worked as a Train Master, which involved planning

train traffic and managing crews.

3. As part of my role managing environmental operations, I am directly familiar with BNSF's use and treatment of water.

4. I consulted BNSF's business records to determine the volume of water used by BNSF's Cicero location in 2020. The chart below includes line items for the six meters that measure water inflow to BNSF's Cicero location (lines I1-I6), and reflects water inflow at those locations for the period of December 18, 2019 through December 21, 2020. The total annual water inflow volume at our Cicero facility during that period was 93,052 cubic feet. That means, on average, our Cicero facility used 7,754 cubic feet of water per month in 2020 (93,052 / 12 = ~7,754.33).

**Calculation of Annual Volume by Meter**

| Meter Code | Serial No. or Account No. | Days Active | Multiplier | Unit | First Reading | First Read Date | Last Reading | Last Read Date | | Meter Annual Volume |
|---|---|---|---|---|---|---|---|---|---|---|
| I1 | 50506480 | 365 | 1 | cu.ft. | 76,083 | 12/18/19 | 77,076 | 12/21/20 | = | 7,347 |
| I2 | 50506930 | 365 | 1 | cu.ft. | 11,848 | 12/18/19 | 11,984 | 12/21/20 | = | 1,006 |
| I3 | 50507134 | 365 | 1 | cu.ft. | 1,308 | 12/18/19 | 1,409 | 12/21/20 | = | 747 |
| I4 | 50507135 | 365 | 1 | cu.ft. | 13,464 | 12/18/19 | 14,192 | 12/21/20 | = | 5,386 |
| I5 | 50609320 | 365 | 1 | cu.ft. | 143,122 | 12/23/19 | 147,516 | 12/24/20 | = | 32,688 |
| I6 | 50609330 | 365 | 1 | cu.ft. | 203,525 | 12/23/19 | 209,692 | 12/24/20 | = | 45,878 |
| Q1 | Discharge Meter | 365 | 1 | gal | 0 | 01/01/20 | 10,809,822 | 12/31/20 | = | 10,809,822 |

5. I understand that the Town of Cicero imposes a sewer rate for other commercial and industrial users of $56.06 minimum charge per month, for an allowance of 3,000 cubic feet, and $18.69 for each additional 1,000 cubic feet of water used. Based on BNSF's average monthly

use of 7,754 cubic feet in 2020, if BNSF were charged using the rate for other commercial and industrial service, its average monthly bill would be less than $150.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed on this 9 th day of June, 2021 in Chicago, Illinois.

By: _____
Rakiya Tasiu

- 3 -

# EXHIBIT E

Page 1

1        UNITED STATES DISTRICT COURT

2      FOR THE NORTHERN DISTRICT OF ILLINOIS

3             EASTERN DIVISION

4

5  BNSF RAILWAY COMPANY,          )

6                   Plaintiff,    )

7      vs.                        )  No. 21-cv-3072

8  TOWN OF CICERO, ILLINOIS,      )

9                   Defendant.    )

10

11      The videotaped deposition of LIDO MANETTI,

12  called by the Plaintiff for examination, taken

13  pursuant to the Federal Rules of Civil Procedure of

14  the United States District Courts pertaining to the

15  taking of depositions, taken before Daniel M.

16  Priscu, a Certified Shorthand Reporter of the state

17  of Illinois, at 55 E. Monroe Street, 37th Floor,

18  Chicago, Illinois, on the 29th day of June, A.D.

19  2021, at 9:59 a.m.

20

21

22

23

24

Page 18

1     A     As far as back as I know, going back to

2  the 80's, they always charge per acreage on

3  railroad.

4     Q     Do you know why that started?

5     A     That was before my time.  I don't know.

6     Q     Looking at paragraph three, the ordinance

7  charges the railroads a rate per acre.

8     A     Correct.

9     Q     Why are railroads charged per acre?

10     A     Well, what I do know is that the railroads

11  with the acreage fee is there because they  the

12  water service -- I mean our sewer system more than a

13  residential house.  They're wide open.  Some places

14  have higher grades.  Some is all concrete now.

15          Residential houses, a lot of them have an

16  ordinance they have to follow.  They have to have so

17  much grass and everything.  They can't be all

18  concrete in their yards.  And that's always been on

19  the books because of how much more they can dump

20  into our system.

21     Q     So you mentioned, you talked about

22  residential service.  Why are railroads treated

23  different than, let's say, a shopping mall that has

24  a large parking lot?

Page 19

```
 1      A    This has always been the way it is.  We
 2  are looking at changing ordinances and other aspects
 3  of other large properties.
 4           This has all come it light now, so we've
 5  been looking at it.
 6      Q    Okay.  But as you sit here today, do you
 7  know of an explanation as to why, for example, a
 8  shopping mall with a large parking lot would have it
 9  to be charged at a lower rate than a railroad?
10           MS. GRANDFIELD:  I'm just going to object
11  to the extent it's an incomplete hypothetical and
12  lacks foundation.
13           Go ahead and answer to the extent you can.
14           THE WITNESS:  Can you start over?
15           MR. MARIOTTI:  Yes.  Let me repeat.
16           And your objection can stand to my
17  question, but I'll repeat the question.
18  BY MR. MARIOTTI:
19      Q    Are you aware of any -- are you aware of
20  why -- let me strike that question.
21           Why are properties like shopping malls
22  treated differently than railroads?  Do you know
23  why?
24           MS. GRANDFIELD:  Same objection as before.
```

1          THE WITNESS:  I don't know why.  I know

2     this has always been the way they billed it when I

3     came into the office of the Water Department.

4     BY MR. MARIOTTI:

5          Q    Okay.  What about, for example, a factory,

6     do you know why factories are charged at a lower

7     rate than railroads?

8          MS. GRANDFIELD:  Objection, lack of

9     foundation, incomplete hypothetical.

10          THE WITNESS:  You know, that's kind of --

11     I don't understand.  It isn't all true.

12     BY MR. MARIOTTI:

13          Q    Okay.

14          A    Because we have commercial properties that

15     have a small area of land, and their sewer bill for

16     a month is about 10 percent of what the railroad is,

17     but they have, like, 10 or 11 acres, and the

18     railroad has a couple hundred acres.  So, I mean, I

19     can't say they are all being charged more.

20          Q    Okay.  Why are factories charged by usage

21     instead of acreage?

22          A    That's how it was when I came in, and the

23     Town kept it the same way, but we are looking at

24     changing some ordinances.

```
                                              Page 22

 1       Q    And so exactly how was that considered by

 2   you?

 3       A    There's a greater taxing -- well, I won't

 4   use "taxing," but there's a greater -- more water

 5   jumps into our system because of the railroad than

 6   on a normal house.

 7            If you stand by the railroad yard, see the

 8   water running off because it's all been raised a

 9   couple feet over the last ten years, and you can see

10   the water just -- water falling off in certain

11   areas.

12       Q    So you made reference to how Amazon

13   handles their property, right, at the MWRD?

14       A    Yes.

15       Q    There are a lot of other commercial and

16   industrial properties in Cicero; is that fair to

17   say?

18       A    Yes.

19       Q    And do you know how whether or not they

20   have issues regarding runoff?

21       A    I would say some do, and we're looking

22   into that right now.

23       Q    But they're currently charged based on

24   usage and not acreage, correct?
```

Page 23

1    A    Correct.

2    Q    Even though they have runoff issues?

3         MS. GRANDFIELD:  Objection, lack of

4    foundation.

5    BY MR. MARIOTTI:

6    Q    You can answer, unless --

7         MS. GRANDFIELD:  Yes, unless I tell you

8    not to answer, Lido.

9         THE WITNESS:  So what was the question?

10   I'm so sorry.

11        MR. MARIOTTI:  That may be part of the

12   point here.

13   BY MR. MARIOTTI:

14   Q    So the properties that have runoff issues

15   are still charged based on usage and not acreage,

16   correct?

17   A    Currently.

18        MS. GRANDFIELD:  Objection, lack of

19   foundation.

20   BY MR. MARIOTTI:

21   Q    And have you done any study to determine

22   whether or not certain properties have runoff

23   issues?

24   A    You mean an official study or a visual?

Page 24

1      Q    Well, let me step back and ask it this

2    way.

3           What steps have you taken to determine

4    whether properties on Cicero have runoff issues?

5      A    During bad storms, we've been going out to

6    them, looking at them, seeing what's going on in

7    different areas, see what's happening.  We've done

8    that.  We haven't done an engineering study.

9      Q    Do you have anything in writing that

10   memorializes your visual look at these properties?

11     A    No.

12     Q    And what properties have you looked at?

13     A    Well, I looked at Waste Management on 39th

14   and Laramie.  I looked at Kropp Forge, I believe it

15   is, on 12th and 54th Avenue.  I've looked at other

16   properties on 54th Avenue off of Roosevelt at 13th

17   Street, the railroad yards.  What's the other one?

18   Oh, man, I don't know the name of it.  It's on 32nd

19   and Central.  It's a big company over there.  We've

20   looked at them also that have a lot of pavement.

21           I've looked on Cicero Avenue by Hawthorne

22   Works, as well as by the Target, Home Depot, in

23   those areas.

24           The Target and Home Depot, they have --

Page 26

1    Q    Runoff issues.

2    A    Runoff issues?  Yes.  I just mentioned

3  quite a few that I looked at that have a lot of

4  water that runs off.

5    Q    So all those ones that you mentioned a

6  moment ago, they all have runoff issues?

7    A    Yes.

8    Q    But currently of all of them, the only one

9  that's charged based on acreage is the railroad; is

10  that correct?

11    A    No.  We also have the Hawthorne Racetrack.

12    Q    So those two are charged by acreage?

13  Everyone else is not; is that correct?

14    A    Currently.

15    Q    Is BNSF the only railroad in Cicero?

16    A    No.

17    Q    Who are the other railroads in Cicero?

18    A    I don't know the names.  There's, like,

19  three other railroads that get billed for the same

20  ordinance acreage.  And then CTA.

21    Q    The CTA is not billed this way, right?

22    A    So far.

23    Q    Well, why not?

24    A    It was never billed like that when I came

Page 28

1      Q    Very small, right?

2      A    Yes.

3      Q    Less than 1 acre?

4      A    No, it's more than 1 acre.  I don't know

5   the size, though.

6      Q    But they each have rail yards, as well?

7      A    They have railroad tracks.  The one I

8   don't know if it has a yard, and the yards are much,

9   much smaller, like, maybe two or three tracks,

10  that's it, in a certain area, and then it goes all

11  back into one track.

12     Q    What part of Cicero is that in, those

13  tracks?

14     A    The south.

15     Q    The south end?

16     A    Yes.  If you're going down -- did you ever

17  go to the racetrack?

18     Q    Sure.  I've been to Cicero before, quite a

19  few times.

20     A    There's the tracks that are right by where

21  Sportsman's Racetrack used to be, right there, and

22  that's one of them.

23     Q    Have you ever measured the amount of

24  runoff that any property has had in Cicero?

Page 29

1        A     I just visually looked at them.

2        Q     How does runoff impact the cost to

3    maintain the sewer system?

4        A     Well, what happens is the more water that

5    runs off, sometimes the flow rates get much greater

6    inside of them.  Also, what happens is -- I think

7    I'm confusing myself with this.  How much does

8    the -- I know with the runoff how it taxis the

9    system.  It goes through the pipes a lot quicker.

10   What was --

11       Q     Yes, that was my question is how the

12   runoff impacts the cost to maintain the system.

13       A     To maintain it, that's part of it, yes.

14       Q     Okay.  Is there any other part?

15       A     Well, we have to look now about possibly

16   changing the way we do the viaduct now and

17   everything because we're having such a great runoff

18   over that area.  So we're going to have to start

19   looking at new ways to divert the rain or change

20   some sewer systems in that area.

21       Q     And do you know, as you sit here today,

22   how much water runoff there is from BNSF's property?

23       A     No.

24       Q     I take it that Cicero has never measured

Page 30

1    or calculated that runoff; is that right?

2         A    When I was here, no.

3         Q    And has Cicero ever compared the runoff

4    from one property to another in the town, the amount

5    of runoff?

6         A    Without visually seeing, yes.  Is that

7    what you're asking?

8         Q    Yes, just through visual.

9         A    Just through visual, yes.

10        Q    Are you familiar with the term

11   "impermeable surfaces"?

12        A    Well, you have the surfaces that allow

13   water to drain through, and then you have the

14   surfaces that, like, if you drop water here, it's

15   going to run off onto my shoes, but if we put it in

16   the plant, it's just going to suck in and not make a

17   big splash.

18        Q    So has Cicero ever calculated the amount

19   of impermeable surfaces on different properties

20   within the Town of Cicero?

21        A    Not to my knowledge, but when they do new

22   construction, I don't know if the Building

23   Department does it, but we do have an outside

24   service company that reviews all built new building

Page 34

1       A     Yes.

2       Q     Why not for other users?

3       A     Because we already had one with acreage,

4   and this is acreage, that we haven't adjusted the

5   railroad rates in a long time.

6       Q     And why didn't you adjust the commercial

7   and industrial service rate at the same time?

8       A     The current time wasn't -- I didn't think

9   it was necessary.

10      Q     Why not?

11      A     I thought they're struggling, going

12  through this pandemic at the current time, and I

13  thought that we'll be looking at that at another

14  time.  And I thought currently since we already had

15  one that we were charging for acreage, we should

16  look at all acreage at the same time.

17      Q     So you say we should look at all acreage

18  at the same time.

19            Is there anyone else being charged per

20  acre other than the railroads?

21      A     Yes.

22      Q     Who?

23      A     Hawthorne Racetrack.

24      Q     And so, essentially, this change impacted

Page 35

1 the railroads, but did it impact Hawthorne

2 Racetrack?

3     A    Yes.  Hawthorne Racetrack was -- I don't

4 know the date it was passed, but they did the same

5 type of an ordinance for Hawthorne Racetrack back, I

6 think, in June, July of 2020, one of those board

7 meetings, one of those full board meetings.  I'm not

8 sure of the exact one.

9     Q    So the first move was to increase the fee

10 for Hawthorne Racetrack.  Why Hawthorne --

11     A    Well, not to increase the tax.  They

12 charged them a fee, because we've never charged them

13 a fee, and we found out that they've been dumping

14 into our sewer system.

15     Q    Okay.  And then you made a decision to

16 increase the rate on railroads, as well?

17     A    Yes.

18     Q    And why railroads and no one else?

19     A    Well, because we're doing acreage at the

20 current time.  We're doing properties, not

21 railroads, acreage properties.

22     Q    Why would you only look at acreage

23 properties and not at other properties?

24         MS. GRANDFIELD:  Objection, asked and

Page 36

1    answered.

2         THE WITNESS:  We looked at the acreage

3    properties.  I suggested we look at them because we

4    already put the ordinance in with Hawthorne.

5    BY MR. MARIOTTI:

6         Q     And why not charge commercial industrial

7    service by acreage?

8         A     We were over that.  We never charged them

9    that way.  When I came into the job, that's the way

10   it was.  We never charged them that, but we are

11   looking into it now.

12        Q     So that's just the way you've always done

13   it?

14        A     That's the way it's always been done.

15        Q     And you mentioned that others, like in

16   commercial and residential service, had hardships

17   due to the pandemic.  Was it your view that the

18   railroad did not?

19        A     No.

20        Q     It was your view that they didn't have

21   hardship?

22        A     I didn't have either yes or no on that

23   railroad.

24        Q     Then why decline to raise the rate on

Page 38

1      Q     And do you believe that there was an

2   increase in flooding prior to the enactment of this

3   fee increase?

4      A     Well, it's been increased over the last

5   ten years with the railroad.  We do get a huge

6   runoff there now.  I mean, it's something you should

7   see.  And the water comes off like -- literally like

8   a waterfall off their property.

9            Their property has been raised

10  approximately 3 feet, and they put sewers in because

11  it used to be all dirt with the tracks.  Now they

12  put all those trucks -- they store all the trucks,

13  and everything is concrete, so it all dumps into our

14  sewer system.  And it starts filling it up, and then

15  we get surcharge, and we get too much water in our

16  system.

17     Q     So this has been an issue for about ten

18  years?

19     A     Yes.

20     Q     But you didn't raise the rates until --

21     A     We might have raised them in the past.

22     Q     But this was an increase of over 12 times

23  what the previous rate was; is that right?

24     A     Yes, I guess.

Page 39

1      Q    Why such a large increase?

2      A    I don't know.

3      Q    Did you suggest that?

4      A    I don't recall who suggested it.

5      Q    But you said you had conversations with

6   Mr. Geary?

7      A    Yes.

8      Q    And what was the substance of those

9   conversations?

10     A    Just about looking into everything with

11  water runoff.  We weren't just talking about this.

12  We're going to be looking into everything.

13     Q    But you discussed the need to increase the

14  fees for railroads with Mr. Geary?

15     A    Minor, yes.

16     Q    What did you guys talk about?

17     A    It was about eight months ago.  I don't

18  recall the whole conversation.

19     Q    But what do you recall?

20     A    I don't know, just talking about the rates

21  and how much water we get, how much flooding we're

22  getting from them.

23     Q    Just to be clear, you have no text

24  messages regarding this rate increase?

Page 40

1        A    No.

2        Q    You never sent e-mails regarding this rate

3    increase?

4        A    I might have been on one, but I don't send

5    e-mails.

6        Q    And so you don't use e-mail at all?  Is

7    that your testimony?

8        A    Very, very rare.

9        Q    And the e-mail chain you're on, who else

10   is on it?

11       A    I would have to look at e-mails.  I'm

12   assuming Courtney and Tim.

13       Q    Courtney is the attorney you mentioned

14   earlier?

15       A    Yes.

16       Q    Anything, any documents in writing

17   regarding this rate increase before it happened

18   other than that e-mail chain that we just talked

19   about?

20       A    No.  That's all I can recall.

21       Q    Do you remember who came up with the idea

22   of increasing the rate on railroads?  Was that you?

23       A    I mentioned it.

24       Q    Okay.  And who did you mention it to?

Page 41

1    A    I probably mentioned it to our attorney.

2 I mentioned to them that we have to look into the

3 possibility to make an adjustment on the rates.

4    Q    And I don't want to ask you anything

5 further about that conversation.

6         Did you raise the idea with anyone else?

7    A    Tim Geary I know I spoke to.

8    Q    And was there anyone else in Cicero who

9 was pushing for an increase of sewer rates for

10 railroads?

11    A    I don't think anybody was really pushing.

12 None that I know of.

13    Q    Did you ever speak to any members of the

14 Board of Trustees about this increase to sewer rates

15 on railroads?

16    A    Prior or after?

17    Q    Prior.

18    A    Prior?  Not to my knowledge.

19    Q    How did the Board get information related

20 to this increase?

21    A    They get it on their Board Agenda.  And

22 then I'm at all the meetings.  If anyone has

23 questions, they would call for me to come up and

24 answer them.

Page 42

```
1        Q     Did anyone have questions during the
2    meeting?
3        A     No one called me up.
4        Q     Was there any discussion of this ordinance
5    at the meeting?
6        A     I really don't recall.  It may have been
7    minor.  I don't know.
8        Q     Very minimal?
9        A     Yes.  If it was, it would be in the
10   minutes, I would assume.
11       Q     But nothing that you remember?
12       A     No, sir.
13       Q     And since that time, since the ordinance
14   was passed, have you had discussions with the Board
15   about this rate increase?
16       A     Not with the Board, but one Board member I
17   mentioned that I have to go to a deposition about
18   this.
19       Q     And what Board member was that?
20       A     Joe Virruso.
21       Q     And what was Joe's response?
22       A     Good luck.
23       Q     And did you and Joe talk about anything
24   else related to this rate increase?
```

Page 44

1    Q    Now, was there some reason why Joe

2   Virrusso was the one who made the motion for this

3   particular ordinance?

4    A    Not to my knowledge, no.

5    Q    You never discussed it with him

6   beforehand?

7    A    No.  I talked to him after about this, not

8   before.

9    Q    Do you know what Joe Virruso's role was

10   with this particular ordinance other than what you

11   see here in front of you?

12    A    Nothing else.

13    Q    Prior to this rate increase, when was the

14   last time that Cicero raised sewer rates on

15   railroads?

16    A    I couldn't answer that.  I don't know.

17    Q    If you go to page 3.

18    A    Yes.

19    Q    You can see that on paragraph 3 it says

20   that, "Railroads shall be charged for the use and

21   service of the sewer system at the rate of" -- and

22   then it used to be $27.42 per month that's crossed

23   off, and then it was changed to 350.

24         Do you know how the $27.42 rate was

Page 45

1    calculated?

2         A    I do not.

3         Q    Do you know what the basis for that rate

4    was?

5         A    No, I don't.

6         Q    Do you know how long that rate had been in

7    effect?

8         A    No, sir.

9         Q    Has it been in effect the entire time

10   you've been at the Water Department?

11        A    To the best of my knowledge.

12        Q    And under this ordinance, the rate then

13   increased to $350 per acre; is that right?

14        A    Yes.

15        Q    And what is the basis for the $350 per

16   acre rate?

17        A    We're charging $350 for the other -- for

18   Hawthorne Racetrack, and I don't know if that's the

19   whole basis, but was part of my decision.

20        Q    And what was the basis for charging

21   Hawthorne Racetrack $350 per acre?

22        A    I don't know the whole basis.  I know they

23   have never paid us for sewer water usage.  It's been

24   there forever, and they've been utilizing our sewer

Page 46

1    system, and we haven't been paid.

2        Q    So Hawthorne, was this essentially you

3    charged them $350 to catch up for past payments you

4    never charged?

5        A    No, we didn't necessarily do it to past to

6    catch up.  We did it because that area is another

7    area that's a little bit prone to flooding.

8        Q    And who came up with this $350 figure?

9    That was you?

10       A    I don't remember.

11       Q    What does this $350 per acre rate take

12   into account?

13       A    I don't understand how to answer.

14       Q    What specifically did you take into

15   account in calculating this number?

16       A    When I was going over it, I was looking at

17   how much the taxing is on our service.  We are

18   going to have more water going into our system.

19   We're going to have to -- we do a program where we

20   put money out for families to get flood control, so

21   we're going to have to start catching up on that.

22            And that's part of what we look at.  We

23   offer every household $1,500 so they can put a flood

24   control system in.  It won't pay for it, but it will

Page 47

1    be a part of it for them.

2         Q    Other than what you've seen with your

3    eyes, visually looking around the town, was there

4    any other information that you took into account in

5    calculating this $350 per acre rate?

6         A    No, sir.

7         Q    Are there any specific costs that are

8    factored into this rate?

9         A    Upkeep of our sewer system.  The monies

10   that we get from sewers gets put into our sewer fund

11   and helps us try to keep repairing systems.

12              Like, after this big huge rain alone, we

13   have, like, five washouts that we've noticed that

14   we've got to dig up and repair.  We started doing

15   that today.  I mean, that's part of it.  It all goes

16   to the repair and upkeep.

17        Q    To be clear, though, are there any

18   specific costs that you calculated and factored into

19   this $350 rate?

20              MS. GRANDFIELD:  Objection to the extent

21   asked and answered.  Go ahead.

22              THE WITNESS:  Yes.  I don't

23   specifically -- no, I think when we do this, we're

24   thinking of all the different workers we need, the

Page 50

1    Q    And then you talked about contemplating

2   other work that you might do in the future.

3         What work would that be?

4    A    I really would like to do something by the

5   Austin viaduct because we have such horrific

6   flooding there.

7    Q    There's no specific plan to do that at

8   this time?

9    A    There's nothing in writing, but it's

10  tossing around now.

11   Q    Prior to increasing this rate, did Cicero

12  conduct any studies regarding the impact that

13  different users have on the sewer system?

14   A    Besides visually looking at it, no.

15   Q    And just to be clear, no other work was

16  done to determine the impact that different users

17  have on the sewer system other than this visual

18  inspection you've talked about?

19   A    Yes.

20   Q    Does Cicero measure each customer's use of

21  the sewer system?

22   A    No.

23   Q    Did you receive any communications from

24  Town officials or Members of the Board regarding

Page 51

```
 1    looking at the impact on the sewer system?
 2         A     No.
 3         Q     Do you know how much --
 4         A     I've had, like, someone say, Hey, listen,
 5    so and so got water, is there some way we can help
 6    them, send a guy out there to rod out their sewer,
 7    that kind of --
 8         Q     Sure.
 9         A     Yes.  Something like that, yes, I've had
10    officials call me up and say, Listen, my next door
11    neighbor, she had a lot of water, could we please
12    send out your rodding crew, the water is not going
13    down today.  And we would send them out there, or
14    they had a company come out that camera'ed  their
15    line, and they put a camera in, and they found that
16    there's a collapse, like, in the street area, by the
17    curb, or something, that kind of talk, yes.
18         Q     Do you know how much it costs to provide
19    sewer services for BNSF?
20         A     No.  I wouldn't know.
21         Q     Do you know -- so you don't know whether
22    the costs to provide sewer services to BNSF's Cicero
23    property is more than the $90,300 it's charged per
24    month?
```

Page 58

```
 1   notice given to BNSF of that to the best of your

 2   knowledge?

 3        A    No, I wouldn't know if they notified them.

 4        Q    So I'm going to go back now to this first

 5   exhibit I handed you, which is the ordinance.

 6        A    Yes.

 7        Q    So at the bottom of the first page, this

 8   is Exhibit 1, on the bottom of the first page,

 9   there's a category of rates for commericial and

10   industrial sewer service for property located

11   outside of the Town municipal border.

12             Why does Cicero have a separate rate for

13   commercial and industrial sewer service for property

14   located outside of the Town municipal border?

15        A    Because they use our sewer system.

16        Q    Why not charge them the same rate that you

17   charge people for commercial industrial service?

18        A    Because commercial industrial services

19   rates reflect upon water usage and consumption, and

20   they don't use our water.  They get water from

21   Stickney.

22        Q    Okay.  Does BNSF use your water?

23        A    Yes.

24        Q    This $350 per acre rate for the commercial
```

1   industrial sewer service for property located

2   outside of the Town border, what is that based on,

3   this $350 rate for, I guess, Hawthorne?

4         A    What do you mean?

5         Q    What was that rate based on, again?

6         A    It's based on their monthly usage for

7   using our sewer.

8         Q    And did you calculate that in some way?

9         A    We didn't do, like, a study with -- an

10  engineering study, no.

11        Q    Did you calculate costs?

12        A    I'm not sure if it was all calculated with

13  costs.

14        Q    Who would know?

15        A    I don't know.

16        Q    Does anyone other than Hawthorne Racetrack

17  pay the rate in number four?

18        A    No.

19        Q    And do you know the cost to Cicero for

20  providing sewer service to Hawthorne?

21        A    No.

22        Q    Does Hawthorne put more or less of a

23  burden on Cicero's sewer system than BNSF?

24        A    Less.  Well, that's my opinion.

# EXHIBIT F

Page 1

1          IN THE UNITED STATES DISTRICT COURT

2             NORTHERN DISTRICT OF ILLINOIS

3

4    BNSF Railway Company,        )

5                   Plaintiff,    )

6              vs.                ) No. 21-cv-3072

7    Town of Cicero, Illinois,    )

8                   Defendant.    )

9

10          The videotaped deposition of TIMOTHY

11   P. GEARY, called as a witness for examination,

12   taken pursuant to the Federal Rules of Civil

13   Procedure of the United States District Courts

14   pertaining to the taking of depositions, taken

15   before ANDREA L. KIM, a Certified Shorthand

16   Reporter of said state, CSR No. 84-3722, at Suite

17   A, 545 Plainfield Road, Willowbrook, Illinois, on

18   the 2nd day of July, A.D. 2021, at 1:28 p.m.

19

20

21

22

23

24

Page 10

1    A.   I collected some documents, produced
2 an affidavit --
3    Q.   Okay.  Did you --
4    A.   -- over the last few days.
5    Q.   Sure.  Did you speak with anyone?
6    A.   My attorney.
7    Q.   Okay.  And I am not going to ask you
8 anything about your conversations with your
9 attorney.
10        Did you bring any documents with you
11 today?
12    A.   I did not.
13    Q.   Okay.  What is your highest level of
14 education?
15    A.   College graduate.
16    Q.   Okay.  And what was -- what was your
17 major?
18    A.   I got a bachelor of science in civil
19 engineering.
20    Q.   Okay.  And where did you receive your
21 degree from?
22    A.   Bradley University.
23    Q.   Okay.  And do you have any other
24 professional licenses or certifications?

Page 11

1    A.   I do not.
2    Q.   What is your current occupation?
3    A.   I am a civil engineer for Novotny
4 Engineering.
5    Q.   Okay.  And just so I understand, what
6 is -- how long have you been a civil engineer for
7 Novotny Engineering?
8    A.   38 years.
9    Q.   Wow, that's quite some time.
10    A.   I'm a lot older now.
11    Q.   Have you had any other roles in
12 Novotny Engineering?
13    A.   No.
14    Q.   And how long have you been employed at
15 Novotny, the whole 38 years?
16    A.   38 years, yes.
17    Q.   Okay.  What are your responsibilities
18 in your role at Novotny Engineering?
19    A.   Well, right now I am president of the
20 company, but I represent municipal clients, a
21 number of municipal clients including the Town of
22 Cicero.
23    Q.   Okay.  And do you have a specific role
24 with the Town of Cicero?

Page 12

1    A.   I represent them on day-to-day civil
2 engineering matters.
3    Q.   Are you the town engineer for the Town
4 of Cicero?
5    A.   I am called the town engineer.  I am
6 not sure if I am officially appointed the town
7 engineer but I show up.
8    Q.   And how long have you been called the
9 town engineer?
10    A.   Well, I have been there for providing
11 services for 24 years.
12    Q.   And what portion of your time is spent
13 working as town engineer for Cicero versus your
14 other roles that you have?
15    A.   I would say 25 plus percent.
16    Q.   Okay.  And do you have a similar role
17 for any other municipalities?
18    A.   I do.
19    Q.   What municipalities are those?
20    A.   City of Burbank, Village of Stickney,
21 and some park districts, sanitary districts.
22    Q.   Okay.  Are you familiar with the rates
23 that Cicero charges for use and service of its
24 sewer system?

Page 13

1    A.   I am.
2    Q.   Okay.  How are you familiar with those
3 rates, sir?
4    A.   Just reading the ordinances.
5    Q.   Okay.  Who determines the rates that
6 Cicero charges for use of the services?
7    A.   I do not know.
8    Q.   Okay.  Do you have any role in that
9 process, sir?
10    A.   I have not up until recently.
11    Q.   And when you say recently, what do
12 you -- how long of a time are we talking about?
13    A.   That would have been 2020.
14    Q.   Okay.  And what was your role in the
15 rate setting process in 2020?
16    A.   I was asked to assist them, provide a
17 rate for Hawthorne Racecourse for the property
18 that resides in the Village of Stickney that
19 drains to the Town of Cicero sewers.
20    Q.   Okay.  And did the town -- was that
21 the first time that the town asked you for your
22 input in setting a rate?
23    A.   Yes.
24    Q.   Did anyone explain to you why they

4 (Pages 10 - 13)

Page 14

1 were asking for your input in this instance?
2     A.    Well, the property drains to the Town
3 of Cicero.  It's the Town of Cicero sewers.  So
4 they wanted to capture a fee for use of the
5 town's sewer.
6     Q.    And who specifically from the Town of
7 Cicero approached you to -- for assistance?
8     A.    The town attorney's office.
9     Q.    Okay.  And what exactly were you asked
10 to do?
11     A.    Well, we will looking at some method
12 to create a new subsection for an out-of-town
13 user of the town's sewer system.
14     Q.    And did they ask you to recommend a
15 rate?
16     A.    They asked me to look at it and see if
17 they could calculate some sort of rate based on
18 whatever resources I had.
19     Q.    Okay.  And did you, in fact, expend
20 effort to do so?
21     A.    I did.
22     Q.    And what exactly did you do?
23     A.    Well, I was aware that the Town of
24 Cicero is charged a similar rate by the City of

Page 15

1 Chicago for a property in Cicero that drains to
2 Chicago, the former -- former Western Electric
3 property.  So I was aware that the Town of Cicero
4 receives a bill from Chicago for use of their
5 sewers.
6     Q.    Okay.  And so given that you had that
7 awareness, what, if anything, did you do with
8 that information?
9     A.    Well, I was looking to see if we could
10 use that rate to ballpark a rate for the
11 Hawthorne Racecourse.
12     Q.    Okay.  And did you, in fact, do so?
13 Did you in fact do so, sir?
14     A.    I did so.
15     Q.    And how did you do that?
16     A.    Well, I knew the -- what the -- get a
17 copy of the Chicago invoice to the Town of Cicero
18 for their rate and discovered they charged by
19 some sort of connection -- sewer connection
20 calculation.  So I knew the amount, and I took
21 that total amount and came up with a rate per
22 acre to match in a similar format to the railroad
23 section of the sewer rate fee in the town
24 ordinance.

Page 16

1     Q.    So can you explain to me the -- you
2 said something about a connection and how they
3 were charged by connection.
4         What do you mean by that?
5     A.    Yeah, Chicago they don't -- their
6 out-of-service -- out-of-town rate user rate is
7 based on number of connections and the number --
8 and the diameter of the connection.
9     Q.    Okay.  And what does that mean exactly
10 when you say connections in this context?
11     A.    I am not sure how their -- the code
12 obviously mean a connection to their system, but
13 it was very -- it wasn't clear how they came up
14 with the rates or the amounts.
15     Q.    Okay.  So just to be clear based on
16 what you are saying, is your understanding of the
17 Chicago code that regardless of the acreage that
18 the property was that was connected to the
19 Chicago sewer system, there would be a similar
20 connection fee depending on the number of
21 connections?
22     MS. GRANDFIELD:  Objection -- objection,
23 incomplete hypothetical.
24     MR. MARIOTTI:  It's not a hypothetical.  I

Page 17

1 am asking him his understanding of the ordinance
2 that he relied on.
3     MR. BIRD:  I just wanted to make sure that
4 the objection was noted.
5     MS. GRANDFIELD:  Yeah --
6 BY THE WITNESS:
7     A.    If you could repeat the question.
8 BY MR. MARIOTTI:
9     Q.    Yes, of course.
10         So is your understanding of the
11 Chicago ordinance that regardless of the acreage
12 of the property that is being connected to the
13 Chicago sewer system, the charge is by the number
14 of connections?
15     A.    Number and size of the connection.
16     Q.    Okay.  And when you say size of the
17 connection, what does that mean?
18     A.    The size -- diameter of the pipe.
19     Q.    Understood.  Why didn't -- why didn't
20 you set rates for the Town of Cicero based on the
21 number of connections and the size of the pipe?
22     A.    I did not understand the Chicago
23 method.  That method of how they came up with
24 their rates for connections or pipe size, nor do

5 (Pages 14 - 17)

Page 18

1 I understand their -- how they calculated their
2 bill for the Town of Cicero.
3    Q.   Okay.  You mentioned that there are
4 certain users -- railroads that are charged by
5 acreage, and the Hawthorne Racetrack is also
6 charged based on acreage; is that right?
7    A.   That's correct.
8    Q.   Why -- why did you decide to charge
9 the Hawthorne Racetrack based on acreage?
10   A.   We were going to base the charge using
11 the same format as the railroad subsection of
12 that ordinance, the sewer fee ordinance.  One, we
13 don't know how many connections Hawthorne has to
14 our sewer at that time.
15   Q.   Okay.  But there are some users who
16 are out not charged based on acreage, correct?
17   A.   That's correct.
18   Q.   In fact, all other commercial users
19 are charged on a different method.
20        Is that fair to say?
21   MS. GRANDFIELD:  Objection, vague.
22 BY THE WITNESS:
23   A.   That's my under -- that's my
24 understanding?

Page 19

1 BY MR. MARIOTTI:
2    Q.   Why didn't you charge the Hawthorne
3 Racetrack using the method that other commercial
4 users are charged?
5    A.   Well, based -- one, the other method
6 for residential and commercial property is based
7 on water consumption.  The Town of Cicero does
8 not sell water to Hawthorne Racecourse.  The
9 Village of Stickney sells water.  So we do not
10 know how much water they consume.
11   Q.   Okay.  Do you know why railroads are
12 not charged based on water consumption?
13   A.   I do not.
14   Q.   Okay.  Did you have any role in making
15 the decision to charge railroads based on acreage
16 versus water consumption?
17   A.   I did not.
18   Q.   Okay.  Can you help me understand how
19 you determined the exact number that you charged
20 the Hawthorne Racetrack?
21   A.   The number -- I came up with an
22 estimate based on the Chicago bill to Town of
23 Cicero for the former Western Electric property.
24 The portion that drains to -- there's sewers

Page 20

1 owned by that property on Cermak Road.  That fee
2 divided by the acreage divided by 12 months
3 annual fee divided by acreage by 12 months.
4    Q.   Why is Chicago a good comparable city
5 to use for Cicero?
6    A.   I didn't say it was a good comp.  It's
7 all I had.  It was a starting point.
8    Q.   Would it have been possible to use
9 other suburb as a comp?
10   A.   For an out-of-town?
11   Q.   Uh-huh.
12   A.   Possibly.
13   Q.   But you didn't look to see --
14   A.   No, I did not.
15   Q.   Okay.  So moving back to the railroad
16 rate for a moment.
17        At some point last year were you
18 approached regarding a change in the railroad
19 rates?
20   A.   Yes.
21   Q.   Who approached you?
22   A.   I am not quite sure.  The legal
23 department.  I don't know who actually did.
24   Q.   Okay.  And when you say "the legal

Page 21

1 department," are you referring to the Del Galdo
2 law firm?
3    A.   I am.
4    Q.   Okay.  And what, if anything, did you
5 do as a result of that conversation with them?
6    A.   I requested some information from the
7 clerk's office regarding history of the current
8 water or sewer rates for the railroad.  I talked
9 to the water department director to ask him about
10 billing the railroad.
11   Q.   Okay.  And what did you determine from
12 that research that you conducted?
13   A.   In regarding?
14   Q.   The railroad rates.  You know, you
15 said you were looking at, for example, historical
16 rates and so forth.
17   A.   Yeah, there is just a history of
18 starting at $6 and it worked its way up to $27
19 over a number of years.
20   Q.   Okay.  And -- well, what did you do
21 next once you determined sort of what the
22 railroad had been charged in the past?
23   A.   I just looked at it and applied
24 some -- some I don't want to say cost-of-living

6 (Pages 18 - 21)

Page 22

1 rate but rate increases, annual rate increases,
2 if it were to be increased annually.
3    Q.   Okay.  Had it been increased annually?
4    A.   No.
5    Q.   When was the last time the railroad
6 rate had been increased?
7    A.   I am not sure.
8    Q.   Okay.  So what did you use as your
9 starting point in determining the annual
10 increases?
11    A.   I had a chart.  I believe I matched up
12 the rate with the date of the ordinance and
13 applied various rates of annual increases.
14    Q.   So at the time that you were doing
15 that, did you know the last time that the
16 railroad rate had increased?
17    A.   Probably, yes.
18    Q.   Okay.  As you sit here today, can you
19 ballpark when that was?
20    A.   Again, I could guess.
21    Q.   Okay.  And you said that you -- you
22 tried to recreate annual increases.  Is that
23 essentially what you said?
24    A.   Yeah, I think my recollection is that

Page 23

1 I had the rate when it was increased, and I just
2 applied an annual increase to bring it to 2020 --
3    Q.   Okay.
4    A.   -- at different percentage rates.
5    Q.   Okay.  Why did you do that?
6    A.   Well, to just again as a starting
7 point to look at see if the rate had been
8 increased 6 percent, 5 percent, a nominal percent
9 to see what it would be today.
10    Q.   Do you know whether the costs to the
11 Town of Cicero have gone up over that time
12 period?
13    A.   Pardon me?
14    Q.   Do you know whether the Town of
15 Cicero's costs --
16    A.   I am not aware of their costs.
17    Q.   Okay.  Do you know whether or not the
18 sewer usage of the railroad property in question,
19 BNSF railroad property in question went up during
20 that time period?
21    A.   I'm not aware of that.
22    Q.   Okay.  Do you know whether or not
23 BNSF's water usage has gone up during that time
24 period?

Page 24

1    A.   I am not aware of that.
2    Q.   You said that you had -- you
3 calculated an annual rate increase.
4         Do you know what the percentage
5 increase was?
6    A.   No, I don't.  I recall that it got up
7 to the $50 an acre range.
8    Q.   And you said that -- I think you
9 testified a moment ago that it was sort of
10 recreating a yearly increase?
11    A.   Annual yeah.
12    Q.   Annual.  Are the town's rates usually
13 increased annually?
14    A.   Not that I know of.
15    Q.   Okay.  Why then would you recreate a
16 yearly increase?
17    A.   Again, as a starting point just for
18 discussion of what the rate might be if it were
19 to be increased annually at a set percentage.
20    Q.   Why would the railroad -- why would
21 the sewer rates for a railroad be charged -- be
22 increased by the same percentage each year?
23    A.   The increase of the rate is totally up
24 to the town, the Town of Cicero.

Page 25

1    Q.   Okay.  But it's not -- it's not in
2 relation to costs, for example?
3    A.   I am not sure how they calculate the
4 rate.
5    Q.   And do you know where the money that's
6 collected for sewer services goes?
7    A.   I do not.
8    Q.   Are you familiar with Cicero's
9 residential flood control program?
10    A.   Yes.
11    Q.   What is that?
12    A.   They have a program to install
13 backflow preventers.
14    Q.   How exactly does that program work?
15    A.   I am not sure of the exact operation.
16    Q.   How is it funded?
17    A.   I am not sure.
18    Q.   I am going to now show you an exhibit
19 I am going to ask the court reporter to mark this
20 as Exhibit 1, and I am handing copies to opposing
21 counsel.
22
23
24

7 (Pages 22 - 25)

Page 26

1    (WHEREUPON, a certain document
2    was marked Geary Deposition
3    Exhibit No. 1, for
4    identification, as of 7/2/21.)
5  BY THE WITNESS:
6    A.   There's two here.  Is this one?
7  BY MR. MARIOTTI:
8    Q.   Thank you.  Take your time to look at
9  it, and let me know whenever you are ready.
10   A.   Yeah, I have seen this before.
11   Q.   Okay.  Do recognize this exhibit, sir?
12   A.   I sure do.
13   Q.   What is it?
14   A.   It's the town's sewer fee ordinance.
15   Q.   Okay.  And I note here that there are
16 different categories of users that are listed
17 here:  Residential service, commercial, and
18 industrial service, railroad yards and
19 rights-of-way, and there's this category
20 commercial and industrial sewer service for
21 property located outside the town municipal
22 border.
23      Do you see those categories, sir?
24   A.   Yes.

Page 27

1    Q.   Okay.  Why does Cicero have a separate
2  sewer rate for railroads?
3    MS. GRANDFIELD:  Objection, asked and
4  answered.
5  BY THE WITNESS:
6    A.   I do not know.
7  BY MR. MARIOTTI:
8    Q.   Okay.  Do you know how long Cicero has
9  had a separate sewer rate for railroads?
10   A.   I do not know.
11   Q.   Do you know how Cicero calculates the
12 acreage of railroad yards and rights-of-way?
13   A.   I don't know how Cicero calculates the
14 acreage for previous billings.
15   Q.   Okay.  And do you know who made the
16 decision to charge railroads by acre?
17   A.   I do.  Well, the town board --
18   Q.   Okay.
19   A.   -- ultimately.
20   Q.   Now, in paragraph 2 there's the rate
21 for commercial and industrial properties within
22 Cicero.
23      As we already discussed, that rate is
24 calculated by the amount of water consumed?

Page 28

1    A.   That's correct.
2    Q.   Why aren't the other commercial and
3  industrial properties charged by acreage?
4    A.   Can you repeat your question?
5    Q.   Sure.  Why aren't other commercial and
6  industrial properties within Cicero charged by
7  acreage?
8    A.   I am not sure.
9    Q.   Do you know who made that decision?
10   A.   I do not.
11   Q.   Okay.  Do you know why railroads
12 aren't charged by water consumption?
13   A.   I do not.
14   Q.   Okay.  Are you familiar with the
15 concept of runoff from a property?
16   A.   I am.
17   Q.   Okay.  What is that?
18   A.   Runoff is rainwater that falls on a
19 property then runs off, either off the property
20 or to a drainage structure.
21   Q.   Does that have any impact on the
22 Cicero sewer system?
23   A.   Absolutely.
24   Q.   And what impact is that, sir?

Page 29

1    A.   Amount of runoff goes through their
2  combined sewer system.  The sewer system can't
3  handle it.  It leads to flooding and all the
4  problems with flooding that go along with it.
5    Q.   Has that been a particular issue for
6  Cicero versus other municipalities?
7    A.   It's a -- it is an issue with Cicero
8  and most older communities.
9    Q.   And what, if anything, has Cicero done
10 to address that issue?
11   A.   Well, we abide by the MWRD Water
12 Management Ordinance requiring stormwater
13 management for new development.
14   Q.   Does Cicero or yourself measure the
15 runoff coming from specific properties?
16   A.   We do not.
17   Q.   Okay.  So is it fair to say that you
18 don't know how any specific properties runoff
19 impacts the cost to maintain the Cicero sewer
20 system?
21   A.   I could not assign a dollar value to
22 it.
23   Q.   Do all properties within Cicero create
24 runoff?

8 (Pages 26 - 29)

Page 30

1    A.   They do.
2    Q.   Do you know whether Cicero has ever
3  measured runoff from any properties?
4    A.   I am not aware.
5    Q.   Okay.  Are you familiar with the term
6  impermeable surface?
7    A.   I am.
8    Q.   What is that?
9    A.   Well, engineering terms usually it's
10 called impervious.  It's anything hardscape
11 pavement, asphalt, concrete, anything that
12 doesn't allow water to drain through.
13   Q.   Is gravel permeable or impermeable?
14   A.   Mostly permeable depending.  It can
15 vary.
16   Q.   To your knowledge, can paved surfaces
17 retain water -- can paved surfaces retain water?
18   A.   Generally the standard is runoff for
19 pavement is 95 percent.  So 5 percent is
20 retained.
21   Q.   Has Cicero ever calculated the amount
22 of impermeable or paved surface at BNSF's
23 property?
24   A.   Not that I am aware of.

Page 31

1    Q.   And are there any other non-railroad
2  properties within Cicero that have paved or
3  impermeable surfaces?
4    A.   Yes.
5    Q.   Do any particular properties come to
6  mind?
7    A.   Every commercial -- every property has
8  some degree of impermeable pavement -- not every
9  or just virtually every.
10   Q.   If we can -- I will show you another
11 exhibit number which I will ask the court
12 reporter to mark as Exhibit 2, and I am also
13 handing copies to opposing counsel.
14        (WHEREUPON, a certain document
15        was marked Geary Deposition
16        Exhibit No. 2, for
17        identification, as of 7/2/21.)
18   MR. BIRD:  Counsel, is there a particular
19 provision on this that you want to focus his
20 attention on or do you want him to read the whole
21 document?
22   MR. MARIOTTI:  Yeah, I am going to --
23 unfortunately, I am going to walk through --
24   MR. BIRD:  That's fine.  I didn't know if it

Page 32

1  was going to be one or two provisions or the
2  whole document.
3    MR. MARIOTTI:  Yeah, no problem.  I'm going
4  to look at a few different provisions.
5    MR. BIRD:  Sorry to interrupt.
6    MR. MARIOTTI:  Oh, not at all.  I appreciate
7  your courtesy.
8  BY MR. MARIOTTI:
9    Q.   All right.  Do you recognize this
10 exhibit, sir?
11   A.   I recognize it as a town ordinance.
12 It's the first time I have actually seen the
13 ordinance.
14   Q.   Are you familiar with the ordinance
15 though?
16   A.   In general.
17   Q.   Okay.  And how are you familiar with
18 it, sir?
19   A.   It's a town ordinance in a town
20 ordinance format.
21   Q.   Were you involved with creating this
22 ordinance in any way?
23   A.   I was not.
24   Q.   All right.  So at the bottom of page 2

Page 33

1  it says that the purpose of the ordinance is to
2  increase rates for railroad yards and
3  rights-of-way to ensure the proper operation and
4  maintenance of the combined waterworks and sewer
5  system.
6        Do you know what the total cost to
7  Cicero for the operation and maintenance of the
8  combined waterworks and sewer system is on a
9  monthly basis?
10   A.   I do not.
11   Q.   Okay.  If you look at the -- if you
12 look at the bottom -- it's the first page of the
13 ordinance, but it's -- it's labeled at the bottom
14 TOC 208.  Okay.  I just want to make sure you and
15 I are looking at the same thing.  There's a
16 number (2) and it says that it's to ensure also
17 that they can provide for an adequate
18 depreciation fund.
19        Do you see that, sir?
20   A.   I do.
21   Q.   Okay.  What is the depreciation fund
22 referred to here?
23   A.   I do not know.
24   Q.   Okay.  And then after that, it says to

9 (Pages 30 - 33)

Page 34

1  pay the principal of and interest upon all
2  revenue bonds issued under Division 139 of
3  Article 11 of the Illinois Municipal Code.
4      Do you see that?
5  A.  I do.
6  Q.  Do you know whether Cicero has issued
7  revenue bonds under Division 139 of Article 11?
8  A.  I do not.
9  Q.  Okay.  And then the paragraph goes on
10 to say that the Town President and the Board of
11 Trustees of the Town have determined that it's
12 necessary to raise the sewer rates within the
13 Town for railroad yards and rights-of-way.
14      Do you know how it was determined that
15 it was necessary to raise those sewer rates
16 within the town for railroad yards and
17 right-of-way at that time?
18 A.  I do not.
19 Q.  Now it appears on the face of the
20 document that the sewer rates for other sewer
21 users were not changed.
22      Do you know why that was the case?
23 A.  I do not.
24 Q.  Okay.  Do you know how the idea of

Page 35

1  raising sewer rates on railroads first came up?
2  A.  I do not.
3  Q.  You don't know whose idea it was?
4  A.  The recent --
5  Q.  Rate increase.
6  A.  Yeah, I mean, part of the -- asking me
7  to recalculate the rates in 2020.
8  Q.  Do you know if there's a particular
9  person at the town came up with that idea?
10 A.  I do not know who that -- if there was
11 a particular person.
12 Q.  Okay.  Do you know if anyone in
13 particular supported this increase in --
14 increasing sewer rates for railroads?
15 A.  I do not.
16 Q.  You mentioned that you spoke to town
17 attorneys regarding this idea.
18      Other than those attorneys, who else
19 did you speak with about the idea of increasing
20 sewer rates on railroads?
21 A.  Water department director Mr. Lido
22 Manetti.
23 Q.  And how often do you speak to
24 Mr. Manetti?

Page 36

1  A.  A few times a week.
2  Q.  What do you usually speak about?  What
3  do you usually speak about?
4  A.  Many things.  Have you met
5  Mr. Manetti?  Yeah, many things.
6  Q.  I understand.
7      Did you ever speak with Mr. Manetti
8  about the increase in sewer rates on railroads?
9  A.  Yes.
10 Q.  When was that do you recall?
11 A.  I don't recall.
12 Q.  And what did you discuss with
13 Mr. Manetti specifically?
14 A.  Well, we were -- at the time we were
15 looking at historical railroad rates trying to
16 get information from the clerk's office, trying
17 to get their billing -- how they bill the
18 railroad.
19 Q.  Okay.  And did he ask you for any
20 specific information?
21 A.  He did not.
22 Q.  Okay.  And did you -- so did you ask
23 him for any data or information?
24 A.  Yeah, I was looking for their bills, a

Page 37

1  copy of their bills to the railroad.
2  Q.  Did you receive that from him?
3  A.  I did not.
4  Q.  Okay.  Did you have any other
5  discussions with him other than the request for
6  information?
7  A.  No.
8  Q.  Did you discuss the rate with him?
9  A.  The rate, yeah, I did, yeah.
10 Q.  And what were your discussions
11 regarding the rate itself?
12 A.  Yeah, just how to calculate it or --
13 Q.  What was Mr. Manetti's view regarding
14 how it should be calculated?
15 A.  Well, he was doing his own
16 calculations too, quite a bit of ciphering going
17 on there in the office.
18 Q.  What were his calculations?
19 A.  He was using a similar approach.
20 Q.  And what was his approach
21 specifically?
22 A.  At that time it's just rate increases,
23 percentage.
24 Q.  Did he just want to use the rate that

10 (Pages 34 - 37)

Page 38

1 had been provided to -- or been charged to
2 Hawthorne Racetrack?
3    A.  I don't recall exactly how he was
4 calculating it.
5    Q.  In fact, the rate that is charged to
6 railroads is currently identical to the rate
7 that's charged to Hawthorne rail track?
8    A.  It is.
9    Q.  Is there some reason for that?
10   A.  I am not sure.
11   Q.  Okay.  You had mentioned earlier that
12 you had performed a calculation of yearly
13 increases and arrived at a rate.
14       Is it a coincidence that that happens
15 to be the same rate that Hawthorne rail track is
16 charged?
17   A.  The $350?
18   Q.  Yeah.
19   A.  Coincidence?
20   Q.  Yeah.
21   A.  Maybe.
22   Q.  Okay.  You don't know as you sit here
23 today?
24   A.  No.

Page 39

1    Q.  Is it accurate to say that Mr. Manetti
2 suggested that you charge the same rate to the
3 railroad that was being charged to Hawthorne rail
4 track -- racetrack?
5    A.  I am not sure what Mr. Manetti
6 discussed about charging what rate.
7    Q.  Okay.  Did anyone suggest to you that
8 the railroad should be charged the same rate as
9 Hawthorne Racetrack?
10   A.  Yes -- well, not the same rate, the
11 same method.
12   Q.  Okay.  And who made that suggestion?
13   A.  The legal department.
14   Q.  I see.  Okay.  Okay.
15       Are you familiar with Cicero's board
16 of trustees?
17   A.  I am.
18   Q.  Did you ever speak to any members of
19 the board of trustees about this increase of
20 sewer rates and railroads?
21   A.  I did not.
22   Q.  Did you ever speak to the town
23 president about the rate increase --
24   A.  I did not.

Page 40

1    Q.  Was BNSF discussed in any of your
2 conversations about the sewer rate increase?
3    A.  Did I have discussions with BNSF?
4    Q.  I'm sorry.  No, was the topic of BNSF
5 discussed in any of your conversations about the
6 sewer rate increase?
7    A.  With whom?
8    Q.  With anyone.  Did the topic of BNSF
9 ever come up?
10   A.  With town officials?
11   Q.  Yes.
12   A.  No.
13   Q.  Okay.  So the discussions with the
14 town were all about railroads more generally?
15   A.  Regarding?
16   Q.  Regarding the rate increase on
17 railroads.  It was just about railroads
18 generally, not about BNSF?
19   A.  It was all railroads were -- this
20 ordinance affects all railroads.
21   Q.  But it's fair to say the only railroad
22 with significant acreage within the Town of
23 Cicero is BNSF.
24       Is that fair to say?

Page 41

1    A.  No, the Canadian National Belt
2 railroads have significant right-of-way, not as
3 much as Burlington Northern Santa Fe, but they do
4 have significant.
5    Q.  Okay.  So if we -- I wanted to turn
6 now to the -- it says page 3 at the bottom of
7 this exhibit, but it's really the fourth page of
8 the exhibit because there's a cover page.
9    A.  Right.
10   Q.  It's TOC 210 at the bottom.  Do you
11 see that, sir?
12   A.  Right, I do.
13   Q.  So in paragraph 3 at the bottom of the
14 page, there is a rate of $27.42 per month per
15 acre and it's crossed out and it is then charged
16 to $350 per acre.
17       Do you see that?
18   A.  Yes.
19   Q.  That's a twelvefold increase,
20 something like that?
21   A.  Yeah.
22   Q.  And what was the -- what exactly is
23 the basis for a twelvefold increase in the rate?
24   A.  I do not know.

11 (Pages 38 - 41)

Page 42

1    Q.   Okay.  Was that your idea?
2    A.   No, it was not.
3    Q.   What exactly was your recommendation
4  to the town then?
5    A.   I really did not give any
6  recommendation for the railroad rate other than
7  then present a number of calculations based on
8  the annual increase we already discussed.
9    Q.   Any of your calculations approach $350
10  per month?
11    A.   No.
12    Q.   Do you recall what the -- in the
13  ballpark range what your calculations arrived at?
14    A.   In the $50 range.
15    Q.   Do you know who came up with the $350
16  per acre rate?
17    A.   I believe it was the town board passed
18  the $350.
19    Q.   You don't know if anyone made a
20  recommendation to them for the $350 rate?
21    A.   I do not.
22    Q.   Okay.  Do you know what the $350 per
23  acre rate takes into account?
24    A.   I do not.

Page 43

1    Q.   Do you know what information was used
2  to come up with the $350 per acre rate?
3    A.   I do not.
4    Q.   Okay.  Do you know if there were any
5  costs to Cicero that were calculated or factored
6  into that $350 rate?
7    A.   I do not.
8    Q.   Okay.  To your knowledge, has BNSF
9  ever changed the amount of permeable surface at
10  its property?
11    A.   I suspect they have, yes.
12    Q.   But you don't know for sure one way --
13    A.   I do not, no.
14    Q.   Okay.  To your knowledge, has BNSF
15  ever raised the elevation of its property?
16    A.   I suspect they have.
17    Q.   But you don't know one way or the
18  other?
19    A.   I know in a certain area they have.
20    Q.   Okay.  But you are not sure of any
21  specifics?
22    A.   No, I have seen some photo bearing
23  fire hydrants.  We have done some excavation
24  there recently to repair town water main and

Page 44

1  noticed fill.  There was quite a bit of fill in
2  that area.
3    Q.   When was that excavation done?
4    A.   When was that done?  That was done
5  right over the winter, early January I think.  I
6  am not sure.  Recently, last five months.
7    Q.   Okay.  I am going to turn to the next
8  page of this exhibit.  It's marked page 4 at the
9  bottom.  It also say TOC 211.  I just want to
10  make sure I am on the same page as you.
11    A.   Right.
12    Q.   There's a section at the top labeled
13  No. 4 and so forth, and then -- oh, and actually
14  I should say there's a sentence that goes from
15  the last page to this page.  It essentially says
16  there's a penalty charge of 20 percent added to
17  bills that are not paid within 25 days.
18        Do you see that?
19    A.   I do.
20    Q.   Do you know how Cicero determined that
21  20 percent figure?
22    A.   I do not.
23    Q.   Okay.  Were you present at the board
24  meeting when this ordinance was passed?

Page 45

1    A.   I was not.
2    Q.   Okay.  Prior to this rate increase,
3  were any studies or work conducted regarding the
4  impact that different users have on the Cicero
5  sewer system?
6    A.   Not that I am aware of.
7    Q.   Okay.  Well, to be clear, do you know
8  how much it costs to provide sewer services for
9  BNSF's Chicago -- Cicero property?
10    A.   One more time, please.
11    Q.   I'm sorry.  Do you know how much it
12  costs to provide sewer services for BNSF's Cicero
13  property?
14    A.   I do not.
15    Q.   Okay.  Do you know the percentage of
16  Cicero's total cost to maintain and provide sewer
17  services that could be attributed to BNSF?
18    A.   I do not.
19    Q.   Okay.  Do you know approximately how
20  much in total Cicero collects from sewer charges
21  on a monthly basis?
22    A.   I do not.
23    Q.   Okay.  I am going to move on from this
24  exhibit.  We will go to a different one, and I am

12 (Pages 42 - 45)

1 this rate increase?

2    A.   I do not.

3    Q.   Okay.  Do you know anything about

4 other communications between the Town of Cicero

5 and BNSF?

6    A.   We have had discussions with them

7 about -- well, we had a water main repair on

8 their property.  They have had complaints about

9 the bridge drainage leaking on to their property.

10 So this is the last two years.  We have had

11 complaints about them maintaining the Austin

12 viaduct lighting, pedestrian lighting.

13    Q.   Okay.  You mentioned earlier that you

14 assisted in the calculation of a rate for

15 Hawthorne Racetrack?

16    A.   I did.

17    Q.   Is any other user charged by that rate

18 other than Hawthorne Racetrack?

19    A.   The $350 an acre?

20    Q.   Yeah.

21    A.   The railroad is now.

22    Q.   Now it is.  But other than those --

23 putting aside railroads --

24    A.   That's why we are here, right.

1    Q.   Indeed.  Putting aside railroads, I

2 mean in that category of users --

3    A.   Oh, I see --

4    Q.   -- does anyone else fall in that

5 category other than the Hawthorne Racetrack?

6    A.   No, not currently.

7    Q.   Okay.  And what is the cost to Cicero

8 for providing sewer services to Hawthorne?

9    A.   I don't have the cost.

10    Q.   Does Hawthorne put more or less of a

11 burden on Cicero's sewer system than BNSF?

12    A.   It's a smaller property.

13    Q.   Okay.  So you assume that it's lower?

14    A.   It's lower.  It's probably about a

15 third size of the railroad.

16    Q.   Okay.  Just to be clear, you are

17 basing that merely off the size.  You don't have

18 any other data to draw that conclusion, correct?

19    A.   Correct.

20    Q.   Besides BNSF, what other commercial or

21 industrial business has the largest amount of

22 property in Cicero?

23    A.   I can't rank them for you, but they do

24 have some large parcels.  Amazon has a parcel

1 for -- 16th Street and Laramie.  There's large

2 shopping centers along Cicero Avenue.

3    Q.   Do you know the sewer rate charged to

4 the shopping centers?

5    A.   I know what the ordinance is.  I don't

6 know their dollar amount.

7    Q.   Do you know whether the shopping

8 centers put more or less of a burden on Cicero's

9 sewer system than BNSF?

10    A.   It's purely a linear equation of

11 runoff.

12    Q.   Does -- shopping centers have paved

13 shopping -- excuse me -- parking lots?

14    A.   They do.

15    Q.   Have you compared the size of those

16 parking lots?

17    A.   I have not.

18    Q.   Okay.  Have you compared, for example,

19 the size of Amazon's facility --

20    A.   I have not.

21    Q.   -- to BNSF?

22       And Amazon's facility is charged at

23 the same rate as the -- as other residential

24 commercial users, not the railroad, right?  Is

1 that fair to say?

2    A.   That's correct.

3    Q.   Do you know what property in Cicero

4 has the largest impact on Cicero's sewer system?

5    A.   By area it would be the railroad

6 Burlington Northern Santa Fe.

7    Q.   And that's based solely on the size of

8 the parcel?

9    A.   That's correct.

10    Q.   After this rate increase took place,

11 has there been any study after the rate increase

12 of the usage of the sewer system?

13    A.   There has not.

14    Q.   Okay.  Has anyone asked you to provide

15 reasons for charging railroads differently from

16 non-railroads after the ordinance has been

17 passed?

18    A.   No.

19    Q.   Okay.  Do you know anything about

20 discussions between BNSF and the town after the

21 rate was increased?

22    A.   Yes.

23    Q.   Okay.  And what do you know about

24 that?

14 (Pages 50 - 53)

Page 58

1    A.   I have not.
2    Q.   Any data that you have or documents
3  related to that?
4    A.   I do not.
5    Q.   Okay.  Have those flooding issues been
6  raised with BNSF to your knowledge?
7    A.   Not that I am aware of, not by me.
8    Q.   Now there's a statement here -- a
9  sentence here that says:  The coefficient of
10  runoff on a paved surface as well as stress on
11  the system created by an increased runoff.
12      What does that phrase mean to you?
13    A.   Yeah, the more runoff increases the
14  flow of the -- in the sewer pipe, increases the
15  stress is the word they used on the pipe.
16    Q.   Okay.  So essentially additional
17  runoff is -- increases stress on the sewer
18  system.  Is that essentially the point?
19    A.   Yeah, the more flow, the more stress.
20    Q.   Okay.  And to be clear, I believe you
21  have testified to this.  I want to be clear.  You
22  have no data or documents regarding the amount of
23  runoff coming from the BNSF property?
24    A.   I do not.

Page 59

1    Q.   Okay.  You have never conducted any
2  study of the runoff?
3    A.   I have not.
4    Q.   And you are not aware of the amount of
5  runoff coming from the BNSF property?
6    A.   Not at this time.
7    Q.   You have no data comparing the amount
8  of runoff from the BNSF property to other
9  properties within the Town of Cicero, correct?
10    A.   I have no official data of that.
11    Q.   Okay.  It says here after this:
12  BNSF's lack of compliance with the standards set
13  forth by the MWRD.
14      What are the standards set forth by
15  the MWRD that are referred to here?
16    A.   I assume they are referring to their
17  current Watershed Management Ordinance.
18    Q.   What is that?
19    A.   MWRD took over jurisdiction of
20  stormwater management and -- by state statute.
21  In 2014 they passed their Watershed Management
22  Ordinance requiring certain stormwater management
23  improvements for development.
24    Q.   And it says here that the BNSF has a

Page 60

1  lack of compliance with standards set forth by
2  the MWRD.
3      Are you familiar with that at all?
4    A.   Am I familiar?
5    Q.   With the lack of compliance by BNSF.
6    A.   I am familiar with their lack of
7  stormwater management.
8    Q.   And can you explain to me what you
9  mean by that, sir?
10    A.   The storm water management is
11  stormwater detention.  By current MWRD ordinance,
12  certain volumes -- calculated volumes must be
13  stored on the development with an allowable
14  release rate into the storm -- or combined sewer
15  in this case.
16    Q.   And that has not been done by BNSF to
17  your knowledge?
18    A.   That has not been done by BNSF to our
19  knowledge.
20    Q.   And how do you know one way or
21  another?
22    A.   Well, by a visual check of just using
23  Google Earth, I do not see any stormwater
24  detention.

Page 61

1    Q.   So it's through your -- it's through
2  observing photographs on Google Earth, the
3  website?
4    A.   Yeah, and I have been in their yard a
5  number of times.  I suspect they do not have any
6  stormwater management.
7    Q.   It's fair to say you don't know for
8  sure?
9    A.   Correct.
10    Q.   Okay.  Then this document also makes
11  reference to the condition and age of the town's
12  system generally.
13      What is the condition of the town's
14  system generally?  We will start with that.
15    A.   Average to below average.  It's a very
16  old system.
17    Q.   What is the age of the system?
18  Perhaps I should have started there.
19    A.   There's some sewers that are over 100
20  years old.  Some of the newer sewers -- I was
21  going to do this -- are probably 80 years old,
22  very old.
23    Q.   Got it.  For the record, you are
24  putting up air quotes.

16 (Pages 58 - 61)

Page 74

1 specifically that it has several paved or
2 impervious surfaces, it has a large amount of
3 stormwater runoff that flows into the Town's
4 combined sewer system.
5          Now, to be clear, as you sit here
6 today, you don't know the amount of stormwater
7 runoff that has come off the BNSF property,
8 correct?
9     A.  I do not.
10     Q.  Okay.  And you don't know how that --
11 the runoff from the BNSF rail yard compares to
12 the runoff from other properties such as Amazon
13 or the shopping centers, correct?
14     A.  It can be calculated, but I do not
15 know it at this time.
16     Q.  Okay.  Is it fair to say you did not
17 know it prior to the rate increase to BNSF?
18     A.  That's fair to say.
19     Q.  Okay.  Okay.  Give me one second.  And
20 then you say -- it says here in paragraph 12:
21 Sometime in the past, BNSF railroad has paved
22 over a significant portion of its property that
23 was previously assumed to be soil or aggregate.
24 Their properties thereof were also filled which

Page 75

1 raised the elevation of the property
2 approximately 2 feet at the location in the photo
3 attached as Exhibit B, where only the blue top of
4 a buried fire hydrant can be seen due to the
5 increased elevation.  It is comprehensible that
6 BNSF railroad filled their property to prevent
7 on-site flooding of their yard.  If this was the
8 case, the raised paved elevation of their yard
9 would now force the stormwater downstream
10 resulting in negative flooding impacts to lower
11 elevation areas.
12          So were you aware that BNSF had paved
13 over a portion of its property prior to the rate
14 increase?
15     A.  Yes.
16     Q.  Okay.  Did that factor into the rate
17 increase in some way?
18     A.  To the rate increase?
19     Q.  Uh-huh.
20     A.  It contributes to the amount of runoff
21 that goes into the storm -- into their sewers.
22 So by definition of a rate increase, it increases
23 the load.  So it would be a factor.
24     Q.  And do you know how that factor was

Page 76

1 considered?
2     A.  No, it wasn't computed as a
3 calculation.
4     Q.  It says here that the railroad had
5 paved over a portion of the property that was
6 quote previously assumed to be soil or aggregate.
7          Did anyone at the Town of Cicero
8 assume that the BNSF railroad property was soil
9 or aggregate on a particular day?
10     A.  I can't speak for the Town of Cicero.
11     Q.  Okay.  Well, you are --
12     A.  Myself or --
13     Q.  Yeah --
14     A.  Yeah, I assume that -- I do not
15 have -- I assume it was unpaved --
16     Q.  Okay.
17     A.  -- before it became an intermodal
18 transportation there.
19     Q.  When did you learn that it was paved?
20     A.  I do not know.
21     Q.  Do you know how much of the property
22 is paved?
23     A.  A majority.
24     Q.  How do you know that?

Page 77

1     A.  I have been on the site a number of
2 times via Google Earth, of course.
3     Q.  In other words, it's a website,
4 correct, that we are talking about?
5     A.  Right.
6     Q.  So on the next page at the top of the
7 page in paragraph 12 you say:  It is
8 comprehensible that BNSF railroad filled their
9 property to prevent on-site flooding of their
10 yard.
11          What does it meaning to the
12 comprehensible in this context?
13     A.  Since it became an intermodal yard,
14 the need to have pavement that isn't flooding
15 would seem to be beneficial for their operations.
16     Q.  So is this a presumption on your part?
17     A.  It is a presumption, yes.
18     Q.  Okay.  It's fair to say you don't know
19 why the property was filled?
20     A.  That is fair to say.
21     Q.  Okay.  And then you say:  If this was
22 the case, the raised paved elevation of their
23 yard would now force the stormwater downstream
24 resulting in negative flooding impacts to lower

20 (Pages 74 - 77)

# EXHIBIT G

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS**

BNSF RAILWAY COMPANY )
)
      Plaintiff, )
)
v. )     No. 21-cv-03072
)
)
TOWN OF CICERO, ILLINOIS )
)
      Defendant. )

**<u>DECLARATION OF JAMES TAYLOR</u>**

I, James Taylor, declare under penalty of perjury the following:

1.     I am the Manager of Environmental Efficiency for BNSF Railway Company ("BNSF"). I submit this declaration in support of BNSF's Motion for Temporary Restraining Order and Preliminary Injunction. I am over the age of 18, competent to testify, and make the following declaration based on my education, training, experience, professional qualifications, and my understanding of the matters herein based on my personal knowledge or my access to records kept by (or at the direction of) my employer, Plaintiff BNSF Railway Company ("BNSF"), in the ordinary course of business.

2.     I have worked in my current role as Manager of Environmental Efficiency for five (5) years. As part of my duties as Manager of Environmental Efficiency, I have access to BNSF's archived utility bills. Specifically, I manage and interface with our outside vendor, ProKarma, Inc., which is responsible for tracking and maintaining records of BNSF's various utility bills and payments.

3.     Under the contract between BNSF and ProKarma, ProKarma receives BNSF's utility bills, which ProKarma makes available to BNSF using a web interface. ProKarma archives

images of BNSF's bills and inputs information from the bills—such as the bill date, amount, and coverage period—into a template. This process enables BNSF to track various metrics, such as cost of utility usage over time. Using this system, I have access to BNSF's archived utility bills, as well as records of bills and payments over time.

4.     Attached hereto as Exhibit 1 are true and correct copies of bills from the Town of Cicero Bureau of Water & Sewer for sewer service dating from January 17, 2020 until December 21, 2020, which I downloaded from the ProKarma software on May 26, 2021. As these bills show, the Town of Cicero charged BNSF $6,643.04 per month for sewer services throughout 2020.

5.     Attached hereto as Exhibit 2 is a chart that accurately documents the bill amounts from the Town of Cicero Bureau of Water & Sewer for sewer service dating from January 2018 until December 2020. I downloaded the data from which this chart was created from the ProKarma software on June 3, 2021. This spreadsheet reflects that $6,643.04 was the standard monthly rate charged by the Town of Cicero for BNSF's use of sewer services through the end of 2020.

6.     Exhibit 2 also tracks BNSF's payment history for the Town of Cicero storm sewer account. As shown in Exhibit 2, BNSF paid its sewer bills to the Town of Cicero in full in the years preceding the 2021 rate increase.

7.     Attached hereto as Exhibit 3 are true and correct copies of bills and statements from the Town of Cicero Bureau of Water & Sewer for sewer service covering service periods from December 21, 2020 onward, which I retrieved from the ProKarma system on May 26 and 27, 2021, and June 9, 2021. These bills demonstrate that from December 21, 2020 onward, the bills from Cicero's Bureau of Water & Sewer suddenly rose sharply from the regular $6,643.04 per month to $90,300.00 per month. On February 3, 2021, BNSF received its first $90,300.00 sewer bill, which covered service from December 21, 2020 through January 19, 2021. This amount exceeded

- 2 -

all of the previous year's bills from the Cicero Bureau of Water & Sewer combined. BNSF's next payment is due on June 21, 2021.

8.        Given the drastic increase, BNSF initially believed that the sewer bill received on February 3, 2021 was in error.  Based on its position that the $90,300.00-per-month rate is unlawful, BNSF has continued to pay the Town of Cicero its old rate of $6,643.04 per month instead of the new rate of $90,300.00 per month.  Attached hereto as Exhibit 4 is a chart showing that BNSF has continued to make monthly payments of $6,643.04 to the Town of Cicero on its sewer account.  I downloaded the data from which this chart was created on June 8, 2021.

9.        The Town of Cicero imposes a twenty (20) percent late penalty on users.  Cicero first imposed such a late penalty, totaling $18,060, on February 23, 2021.  *See* Ex. 3 (account summary statement showing imposition of late fee).

I declare under penalty of perjury of the laws of the United States that the foregoing is true and correct.

Executed on this ___ of June, 2021, in _Ft Worth_, Texas.

By:_____
        James Taylor

EXHIBIT 1

BUREAU OF WATER & SEWER
TOWN OF CICERO
4949 W CERMAK RD
CICERO ILLINOIS 60804

**MONTHLY**

5601 W 26TH ST

BILLING DUE DATE   3/18/20        1672

ACCT #   50609290

| ODE | AMOUNT |
|-----|--------|
| SC  | 6643 04 |

| AFTER | NOW DUE |
|-------|---------|
| 3/18/20 | 6643 04 |
| 7971 65 | |

PAYMENTS ARE DUE IN
OFFICE BY 8PM DUE DATE

---

FIRST CLASS
US POSTAGE PAID
PERMIT 139
Berwyn Illinois 60402
PRESORTED

**RETURN SERVICE REQUESTED**

50609290        1672
5601 W 26TH ST

SERVICE FROM
1/17/20 TO  2/18/20
CONSUMPTION CUBIC FEET
CONSUMPTION PERIOD/READINGS

BNSF RAILWAY SITE#205023
C/O PROKARMA, INC -BSF 112
P O BOX 2410
OMAHA, NE 68103-2410

| NOW DUE | AFTER | PAY |
|---------|-------|-----|
| 6643 04 | 3/18/20 | 7971 65 |

PAYMENTS DUE IN OFFICE BY 8PM
ON DUE DATE

DETAIN THIS PORTION FOR YOUR RECORDS

## BILLING CODES

| | |
|---|---|
| WC | CURRENT WATER CHARGE |
| SC | CURRENT SEWER CHARGE |
| PW | PREVIOUS WATER BALANCE |
| PS | PREVIOUS SEWER BALANCE |

## LATE PAYMENT

All bills not paid within ten (10) days of date of billing shall have a penalty charge of twenty percent (20%) added thereto

## NON-PAYMENT SHUT-OFF OF WATER

There will be a $100.00 standard service charge for water shut-off due to non-payment

## NSF

An additional fee of $30.00 will be charged for all checks returned NSF

## MAKE CHECK PAYABLE TO
## BUREAU OF WATER AND SEWERAGE

## REGULATIONS

DO NOT SUSPECT your meter. It is accurate

All water passing through a meter will be charged for whether used or wasted. No deductions will be made due to leaks

To eliminate water, sewerage and garbage charges while property is vacant you must have the water shut off at the buffalo box by the water department

Failure to receive a water service bill is not an excuse for non-payment

Protect your meter from frost to avoid a frozen meter fee

Keep your meter accessible so it can be read and checked when necessary

TELEPHONE (708) 656-3600
MONDAY THROUGH THURSDAY      8:00 am — 8:00 pm
Phone in your meter reading Ext 229 (Voicemail Only)

C

**BUREAU OF WATER & SEWER**
TOWN OF CICERO
4949 W CERMAK RD
CICERO ILLINOIS 60804

5601 W 26TH ST
BILLING DUE DATE  4/20/20
ACCT #  50609290        1672

| ODE | AMOUNT |
|---|---|
| SC | 6643 04 |

| NOW DUE |
|---|
| 6643 04 |

| AFTER |
|---|
| 4/20/20 |
| 7971 65 |

PAYMENTS ARE DUE IN
OFFICE BY 8PM DUE DATE

RETURN THIS STUB WITH YOUR PAYMENT

---

FIRST CLASS
US POSTAGE PAID
PERMIT 139
Berwyn Illinois 60402
PRESORTED

RETURN SERVICE REQUESTED

50609290   1672
5601 W 26TH ST

SERVICE FROM
2/18/20 TO  3/19/20
CONSUMPTION CUBIC FEET
CONSUMPTION PERIOD/READINGS

BNSF RAILWAY SITE#205023
C/O PROKARMA, INC -BSF 112
P O BOX 2410
OMAHA, NE 68103-2410

| NOW DUE | AFTER | PAY |
|---|---|---|
| 6643 04 | 4/20/20 | 7971 65 |

PAYMENTS DUE IN OFFICE BY 8PM
ON DUE DATE

RETAIN THIS PORTION FOR YOUR RECORDS

## BILLING CODES

WC    CURRENT WATER CHARGE
SC    CURRENT SEWER CHARGE
PW    PREVIOUS WATER BALANCE
PS    PREVIOUS SEWER BALANCE

## LATE PAYMENT

All bills not paid within ten (10) days of date of billing shall have a penalty charge of twenty percent (20%) added thereto

## NON-PAYMENT SHUT-OFF OF WATER

There will be a $100.00 standard service charge for water shut off due to non-payment

## NSF

An additional fee of $30.00 will be charged for all checks returned NSF

MAKE CHECK PAYABLE TO
**BUREAU OF WATER AND SEWERAGE**

## REGULATIONS

DO NOT SUSPECT your meter  it is accurate

All water passing through a meter will be charged for whether used or wasted  No deductions will be made due to leaks

To eliminate water  sewerage and garbage charges while property is vacant you must have the water shut off at the buffalo box by the water department

Failure to receive a water service bill is not an excuse for non-payment.

Protect your meter from frost to avoid a frozen meter fee

Keep your meter accessible so it can be read and checked when necessary

TELEPHONE (708) 656-3600

MONDAY THROUGH THURSDAY      8 00 am — 8 00 pm

Phone in your meter reading  Ext 229 (Voicemail Only)

FIRST CLASS
US POSTAGE PAID
PERMIT 139
Berwyn Illinois 60402
PRESORTED

RETURN SERVICE REQUESTED

50609290    1672
5601 W 26TH ST

SERVICE FROM
3/23/20 TC  4/21/20

CONSUMPTION CUBIC FEET

CONSUMPTION PERIOD/READINGS

BNSF RAILWAY SITE#205023
C/O PROKARMA, INC -BSF 112
P O BOX 2410
OMAHA, NE 68103-2410

| NOW DUE | AFTER | PAY |
| --- | --- | --- |
| 6643 04 | 5/20/20 | 7971 65 |

PAYMENTS DUE IN OFFICE BY 8PM
ON DUE DATE

RETAIN THIS PORTION FOR YOUR RECORDS

---

BUREAU OF WATER & SEWER
TOWN OF CICERO
4949 W CERMAK RD
CICERO ILLINOIS 60804          MONTHLY

5601 W 26TH ST

BILLING DUE DATE.  5/20/20      1672

ACCT #  50609290

| ODE | AMOUNT |
| --- | --- |
| SL | 6643 04 |

| NOW DUE |
| --- |
| 6643 04 |

| AFTER | |
| --- | --- |
| 5/20/20 | 7971 65 |

PAYMENTS ARE DUE IN
OFFICE BY 8PM DUE DATE

RETURN THIS STUB WITH YOUR PAYMENT

## BILLING CODES

WC CURRENT WATER CHARGE
SC CURRENT SEWER CHARGE
PW PREVIOUS WATER BALANCE
PS PREVIOUS SEWER BALANCE

## LATE PAYMENT

All bills not paid within ten (10) days of date of billing shall have a penalty charge of twenty percent (20%) added thereto

## NON-PAYMENT SHUT-OFF OF WATER

There will be a $100 00 standard service charge for water shut-off due to non payment

## NSF

An additional fee of $30 00 will be charged for all checks returned NSF

## MAKE CHECK PAYABLE TO
## BUREAU OF WATER AND SEWERAGE

## REGULATIONS

DO NOT SUSPECT your meter - it is accurate
All water passing through a meter will be charged for whether used or wasted No deductions will be made due to leaks
To eliminate water sewerage and garbage charges while property is vacant you must have the water shut off at the buffalo box by the water department
Failure to receive a water service bill is not an excuse for non-payment
Protect your meter from frost to avoid a frozen meter fee
Keep your meter accessible so it can be read and checked when necessary

TELEPHONE (708) 656-3600
MONDAY THROUGH THURSDAY      8 00 am — 8 00 pm
Phone in your meter reading  Ext 229 (Voicemail Only)

c

BUREAU OF WATER & SEWER
TOWN OF CICERO
4949 W. CERMAK RD.
CICERO, ILLINOIS 60804

**MONTHLY**

5601 W 26TH ST

BILLING DUE DATE: 6/18/20     1672

ACCT #: 50609290

| CODE | AMOUNT |
|------|--------|
| SC | 6643.04 |

| AFTER | NOW DUE |
|-------|---------|
| 6/18/20 | 6643.04 |
| 7971.65 | |

ONLINE PAYMENTS NOW
AVAILABLE

RETURN THIS STUB WITH YOUR PAYMENT

---

US POSTAGE PAID
PERMIT 139
Berwyn, Illinois 60402
PRESORTED

**RETURN SERVICE REQUESTED**

50609290     1672
5601 W 26TH ST

SERVICE FROM:
4/17/20 TO   5/18/20

CONSUMPTION CUBIC FEET

CONSUMPTION PERIOD/READINGS

BNSF RAILWAY SITE#205023
C/O PROKARMA, INC.-BSF 112
P. O. BOX 2410
OMAHA, NE 68103-2410

| NOW DUE | AFTER | PAY |
|---------|-------|-----|
| 6643.04 | 6/18/20 | 7971.65 |

GO TO THETOWNOFCICERO.COM
WATER DEPARTMENT PAGE

RETAIN THIS PORTION FOR YOUR RECORDS

## BILLING CODES

WC    CURRENT WATER CHARGE
SC    CURRENT SEWER CHARGE
PW    PREVIOUS WATER BALANCE
PS    PREVIOUS SEWER BALANCE

### LATE PAYMENT

All bills not paid within ten (10) days of date of billing shall have a penalty charge of twenty percent (20%) added thereto.

### NON-PAYMENT SHUT-OFF OF WATER

There will be a $100.00 standard service charge for water shut-off due to non-payment.

### NSF

An additional fee of $30.00 will be charged for all checks returned NSF.

MAKE CHECK PAYABLE TO:
**BUREAU OF WATER AND SEWERAGE**

## REGULATIONS

DO NOT SUSPECT your meter - it is accurate.
**All water passing through a meter will be charged for whether used or wasted. No deductions will be made due to leaks.**
To eliminate water, sewerage and garbage charges while property is vacant, you must have the water shut off at the buffalo box by the water department.
Failure to receive a water service bill is not an excuse for non-payment.
Protect your meter from frost to avoid a frozen meter fee.
Keep your meter accessible so it can be read and checked when necessary.

TELEPHONE (708) 656-3600
MONDAY THROUGH THURSDAY       8:00 am — 8:00 pm
Phone in your meter reading, Ext 229 (Voicemail Only)

BUREAU OF WATER & SEWER
TOWN OF CICERO
4949 W. CERMAK RD.
CICERO, ILLINOIS 60804

**MONTHLY**

5601 W 26TH ST

BILLING DUE DATE: 7/20/20      1672

ACCT #: 50609290

| CODE | AMOUNT |
|------|--------|
| SC | 6643.04 |

| AFTER | NOW DUE |
|-------|---------|
| 7/20/20 | 6643.04 |
| 7971.65 | |

ONLINE PAYMENTS NOW
AVAILABLE

RETURN THIS STUB WITH YOUR PAYMENT

---

FIRST CLASS
US POSTAGE PAID
PERMIT 139
Berwyn, Illinois 60402
PRESORTED

**RETURN SERVICE REQUESTED**

50609290      1672
5601 W 26TH ST

SERVICE FROM:
5/18/20 TO 6/19/20

CONSUMPTION CUBIC FEET

CONSUMPTION PERIOD/READINGS

BNSF RAILWAY SITE#205023
C/O PROKARMA, INC.-BSF 112
P.O. BOX 2410
OMAHA, NE 68103-2410

| NOW DUE | AFTER | PAY |
|---------|-------|-----|
| 6643.04 | 7/20/20 | 7971.65 |

GO TO THETOWNOFCICERO.COM
WATER DEPARTMENT PAGE

RETAIN THIS PORTION FOR YOUR RECORDS

## BILLING CODES

WC CURRENT WATER CHARGE
SC CURRENT SEWER CHARGE
PW PREVIOUS WATER BALANCE
PS PREVIOUS SEWER BALANCE

## LATE PAYMENT

All bills not paid within ten (10) days of date of billing shall have a penalty charge of twenty percent (20%) added thereto.

## NON-PAYMENT SHUT-OFF OF WATER

There will be a $100.00 standard service charge for water shut-off due to non-payment.

## NSF

An additional fee of $30.00 will be charged for all checks returned NSF.

MAKE CHECK PAYABLE TO:
**BUREAU OF WATER AND SEWERAGE**

## REGULATIONS

DO NOT SUSPECT your meter - it is accurate.
**All water passing through a meter will be charged for whether used or wasted. No deductions will be made due to leaks.**
To eliminate water, sewerage and garbage charges while property is vacant, you must have the water shut off at the buffalo box by the water department.
Failure to receive a water service bill is not an excuse for non-payment.
Protect your meter from frost to avoid a frozen meter fee.
Keep your meter accessible so it can be read and checked when necessary.

TELEPHONE (708) 656-3600
MONDAY THROUGH THURSDAY     8:00 am — 8:00 pm
Phone in your meter reading. Ext 229 (Voicemail Only)

BUREAU OF WATER & SEWER    MONTHLY
TOWN OF CICERO
4949 W CERMAK RD
CICERO ILLINOIS 60804

5601 W 26TH ST

BILLING DUE DATE  8/19/20    1672

ACCT #  50609290

| CODE | AMOUNT |
|------|--------|
| SL | 6643 04 |

| AFTER | NOW DUE |
|-------|---------|
| 8/19/20 | 6643 04 |
| 7971 65 | |

ONLINE PAYMENTS NOW
AVAILABLE

RETURN THIS STUB WITH YOUR PAYMENT

---

FIRST CLASS
US POSTAGE PAID
PERMIT 139
Berwyn Illinois 60402
PRESORTED

RETURN SERVICE REQUESTED

50609290    1672
5601 W 26TH ST

SERVICE FROM  6/19/20 TO  7/20/20

CONSUMPTION CUBIC FEET

CONSUMPTION PERIOD/READINGS

BNSF RAILWAY SITE#205023
C/O PROKARMA, INC -BSF 112
P O BOX 2410
OMAHA, NE 68103-2410

| NOW DUE | AFTER | PAY |
|---------|-------|-----|
| 6643 04 | 8/19/20 | 7971 65 |

GO TO THETOWNOFCICERO COM
WATER DEPARTMENT PAGE

RETAIN THIS PORTION FOR YOUR RECORDS

## BILLING CODES

| WC | CURRENT WATER CHARGE |
|----|----------------------|
| SC | CURRENT SEWER CHARGE |
| PW | PREVIOUS WATER BALANCE |
| PS | PREVIOUS SEWER BALANCE |

## LATE PAYMENT

All bills not paid within ten (10) days of date of billing shall have a penalty charge of twenty percent (20%) added thereto

## NON-PAYMENT SHUT-OFF OF WATER

There will be a $100.00 standard service charge for water shut-off due to non-payment

## NSF

An additional fee of $30.00 will be charged for all checks returned NSF

MAKE CHECK PAYABLE TO
**BUREAU OF WATER AND SEWERAGE**

---

## REGULATIONS

DO NOT SUSPECT your meter - it is accurate

**All water passing through a meter will be charged for whether used or wasted. No deductions will be made due to leaks.**

To eliminate water, sewerage and garbage charges while property is vacant you must have the water shut off at the buffalo box by the water department

Failure to receive a water service bill is not an excuse for non-payment

Protect your meter from frost to avoid a frozen meter fee

Keep your meter accessible so it can be read and checked when necessary

TELEPHONE (708) 656-3600
MONDAY THROUGH THURSDAY     8:00 am — 8:00 pm
Phone in your meter reading  Ext 229 (Voicemail Only)

BUREAU OF WATER & SEWER  **MONTHLY**
TOWN OF CICERO
4949 W CERMAK RD
CICERO, ILLINOIS 60804

5601 W 26TH ST
BILLING DUE DATE   9/21/20        1672
ACCT # 50609290

| CODE | AMOUNT |
| --- | --- |
| SC | 6643.04 |

| AFTER | NOW DUE |
| --- | --- |
| 9/21/20 | 6643.04 |
| 7971 65 | |

ONLINE PAYMENTS NOW
AVAILABLE

RETURN THIS STUB WITH YOUR PAYMENT

---

FIRST CLASS
US POSTAGE PAID
PERMIT 139
Berwyn, Illinois 60402
PRESORTED
**RETURN SERVICE REQUESTED**

50609290    1672
5601 W 26TH ST

SERVICE FROM
7/20/20 TO 8/21/20
CONSUMPTION CUBIC FEET
CONSUMPTION PERIOD/READINGS

BNSF RAILWAY SITE#205023
C/O PROKARMA, INC -BSF 112
P O BOX 2410
OMAHA, NE 68103-2410

| NOW DUE | AFTER | PAY |
| --- | --- | --- |
| 6643.04 | 9/21/20 | 7971 65 |

GO TO THETOWNOFCICERO.COM
WATER DEPARTMENT PAGE

RETAIN THIS PORTION FOR YOUR RECORDS

## BILLING CODES

WC  CURRENT WATER CHARGE
SC  CURRENT SEWER CHARGE
PW  PREVIOUS WATER BALANCE
PS  PREVIOUS SEWER BALANCE

## LATE PAYMENT

All bills not paid within ten (10) days of date of billing shall have a penalty charge of twenty percent (20%) added thereto

## NON-PAYMENT SHUT-OFF OF WATER

There will be a $100.00 standard service charge for water shut-off due to non-payment.

## NSF

An additional fee of $30.00 will be charged for all checks returned NSF

MAKE CHECK PAYABLE TO:
**BUREAU OF WATER AND SEWERAGE**

## REGULATIONS

DO NOT SUSPECT your meter - it is accurate
**All water passing through a meter will be charged for whether used or wasted. No deductions will be made due to leaks.**
To eliminate water, sewerage and garbage charges while property is vacant, you must have the water shut off at the buffalo box by the water department.
Failure to receive a water service bill is not an excuse for non-payment.
Protect your meter from frost to avoid a frozen meter fee
Keep your meter accessible so it can be read and checked when necessary

TELEPHONE (708) 656-3600
MONDAY THROUGH THURSDAY   8:00 am — 8:00 pm
Phone in your meter reading Ext 229 (Voicemail Only)

BUREAU OF WATER & SEWER
TOWN OF CICERO
4949 W CERMAK RD
CICERO ILLINOIS 60804

**MONTHLY** 5060P290 1672
5601 W 26TH ST

BILLING DUE DATE 10/21/20 1672

ACCT # 5060P290

| CODE | AMOUNT |
|------|--------|
| SC | 6643 04 |

| AFTER | |
|-------|--|
| 10/21/20 | |
| 7971 65 | |

ONLINE PAYMENTS NOW
AVAILABLE

RETAIN THIS STUB WITH YOUR PAYMENT

---

FIRST CLASS
US POSTAGE PAID
PERMIT 139
Berwyn Illinois 60402
PRESORTED

**RETURN SERVICE REQUESTED**

5060P290 1672
5601 W 26TH ST

SERVICE FROM
8/21/20 TO 9/19/20

CONSUMPTION CUBIC FEET
CONSUMPTION PERIOD/READINGS

BNSF RAILWAY SITE#205023
C/O PROKARMA, INC -BSF 112
P O BOX 2410
OMAHA, NE 68103-2410

| NOW DUE | AFTER | PAY |
|---------|-------|-----|
| 6643 04 | 10/21/20 | 7971 65 |

GO TO THETOWNOFCICERO COM
WATER DEPARTMENT PAGE

RETAIN THIS PORTION FOR YOUR RECORDS

## BILLING CODES

WC    CURRENT WATER CHARGE
SC     CURRENT SEWER CHARGE
PW    PREVIOUS WATER BALANCE
PS     PREVIOUS SEWER BALANCE

## LATE PAYMENT

All bills not paid within ten (10) days of date of billing shall have a penalty charge of twenty percent (20%) added thereto

## NON-PAYMENT SHUT-OFF OF WATER

There will be a $100 00 standard service charge for water shut-off due to non-payment

## NSF

An additional fee of $30 00 will be charged for all checks returned NSF

## MAKE CHECK PAYABLE TO
## BUREAU OF WATER AND SEWERAGE

---

## REGULATIONS

DO NOT SUSPECT your meter - it is accurate

All water passing through a meter will be charged for whether used or wasted. No deductions will be made due to leaks.

To eliminate water, sewerage and garbage charges while property is vacant, you must have the water shut off at the buffalo box by the water department.

Failure to receive a water service bill is not an excuse for non-payment

Protect your meter from frost to avoid a frozen meter fee

Keep your meter accessible so it can be read and checked when necessary

TELEPHONE (708) 656-3600
MONDAY THROUGH THURSDAY    8 00 am — 8 00 pm
Phone in your meter reading Ext 229 (Voicemail Only)

BUREAU OF WATER & SEWER
TOWN OF CICERO
4949 W CERMAK RD.
CICERO, ILLINOIS 60804

**MONTHLY**

5601 W 26TH ST

BILLING DUE DATE: 11/18/20    1672

ACCT #: 50609290

FIRST CLASS
US POSTAGE PAID
PERMIT 139
Berwyn, Illinois 60402
PRESORTED
**RETURN SERVICE REQUESTED**

50609290    1672
5601 W 26TH ST

SERVICE FROM:
9/19/20 TO 10/20/20

CONSUMPTION CUBIC FEET

CONSUMPTION PERIOD/READINGS

| CODE | AMOUNT |
|------|--------|
| SC | 6643.04 |

BNSF RAILWAY SITE#205023
C/O PROKARMA, INC.-BSF 112
P.O. BOX 2410
OMAHA, NE 68103-2410

| NOW DUE | AFTER | PAY |
|---------|-------|-----|
| 6643.04 | 11/18/20 | 7971.65 |

GO TO THETOWNOFCICERO.COM
WATER DEPARTMENT PAGE

RETAIN THIS PORTION FOR YOUR RECORDS

| AFTER | NOW DUE |
|-------|---------|
| 11/18/20 | 6643.04 |
| 7971.65 | |

ONLINE PAYMENTS NOW
AVAILABLE

RETURN THIS STUB WITH YOUR PAYMENT

## BILLING CODES

WC  CURRENT WATER CHARGE
SC  CURRENT SEWER CHARGE
PW  PREVIOUS WATER BALANCE
PS  PREVIOUS SEWER BALANCE

### LATE PAYMENT

All bills not paid within ten (10) days of date of billing shall have a penalty charge of twenty percent (20%) added thereto.

### NON-PAYMENT SHUT-OFF OF WATER

There will be a $100.00 standard service charge for water shut-off due to non-payment.

### NSF

An additional fee of $30.00 will be charged for all checks returned NSF.

MAKE CHECK PAYABLE TO:
**BUREAU OF WATER AND SEWERAGE**

## REGULATIONS

DO NOT SUSPECT your meter - it is accurate.
**All water passing through a meter will be charged for whether used or wasted. No deductions will be made due to leaks.**
To eliminate water, sewerage and garbage charges while property is vacant, you must have the water shut off at the buffalo box by the water department.
Failure to receive a water service bill is not an excuse for non-payment.
Protect your meter from frost to avoid a frozen meter fee.
Keep your meter accessible so it can be read and checked when necessary.

TELEPHONE (708) 656-3600
MONDAY THROUGH THURSDAY    8:00 am — 8:00 pm
Phone in your meter reading. Ext 229 (Voicemail Only)

**BUREAU OF WATER & SEWER**
**TOWN OF CICERO**
4949 W. CERMAK RD.
CICERO, ILLINOIS 60804

**MONTHLY**

5601 W 26TH ST

BILLING DUE DATE: 12/21/20          1672

ACCT #: 50609290

| CODE | | AMOUNT |
|------|---|--------|
| SC | | 6643.04 |

| AFTER | NOW DUE |
|-------|---------|
| 12/21/20 | 6643.04 |
| 7971.65 | |

ONLINE PAYMENTS NOW
AVAILABLE

RETURN THIS STUB WITH YOUR PAYMENT

---

FIRST CLASS
US POSTAGE PAID
PERMIT 139
Berwyn, Illinois 60402
PRESORTED

**RETURN SERVICE REQUESTED**

50609290     1672
5601 W 26TH ST

SERVICE FROM:
10/20/20 TO 11/19/20

CONSUMPTION CUBIC FEET

CONSUMPTION PERIOD/READINGS

BNSF RAILWAY SITE#205023
C/O PROKARMA, INC.-BSF 112
P.O. BOX 2410
OMAHA, NE 68103-2410

| NOW DUE | AFTER | PAY |
|---------|-------|-----|
| 6643.04 | 12/21/20 | 7971.65 |

GO TO THETOWNOFCICERO.COM
WATER DEPARTMENT PAGE

RETAIN THIS PORTION FOR YOUR RECORDS

## BILLING CODES

WC    CURRENT WATER CHARGE
SC    CURRENT SEWER CHARGE
PW    PREVIOUS WATER BALANCE
PS    PREVIOUS SEWER BALANCE

### LATE PAYMENT

All bills not paid within ten (10) days of date of
billing shall have a penalty charge of twenty
percent (20%) added thereto.

**NON-PAYMENT SHUT-OFF OF WATER**
There will be a $100.00 standard service charge for
water shut-off due to non-payment.

**NSF**
An additional fee of $30.00 will be charged for all
checks returned NSF.

MAKE CHECK PAYABLE TO:
**BUREAU OF WATER AND SEWERAGE**

## REGULATIONS

DO NOT SUSPECT your meter - it is accurate.
**All water passing through a meter will be charged for whether used or
wasted. No deductions will be made due to leaks.**
To eliminate water, sewerage and garbage charges while property is vacant,
you must have the water shut off at the buffalo box by the water department.
Failure to receive a water service bill is not an excuse for non-payment.
Protect your meter from frost to avoid a frozen meter fee.
Keep your meter accessible so it can be read and checked when necessary.

TELEPHONE (708) 656-3600
MONDAY THROUGH THURSDAY    8:00 am — 8:00 pm
Phone in your meter reading. Ext 229 (Voicemail Only)

FIRST CLASS
US POSTAGE PAID
PERMIT 139
Berwyn, Illinois 60402
PRESORTED

**RETURN SERVICE REQUESTED**

50609290    1672
5601 W 26TH ST

SERVICE FROM:
11/19/20 TO 12/21/20

CONSUMPTION CUBIC FEET
CONSUMPTION PERIOD/READINGS

BNSF RAILWAY SITE#205023
C/O PROKARMA, INC.-BSF 112
P.O. BOX 2410
OMAHA, NE 68103-2410

| NOW DUE | AFTER | PAY |
|---|---|---|
| 6643.04 | 1/20/21 | 7971.65 |

GO TO THETOWNOFCICERO.COM
WATER DEPARTMENT PAGE

RETAIN THIS PORTION FOR YOUR RECORDS

---

BUREAU OF WATER & SEWER
TOWN OF CICERO
4949 W. CERMAK RD.
CICERO, ILLINOIS 60804

**MONTHLY** 1672

5601 W 26TH ST
BILLING DUE DATE: 1/20/21

ACCT #: 50609290

| CODE | AMOUNT |
|---|---|
| SC | 6643.04 |

| NOW DUE |
|---|
| 6643.04 |

| AFTER |
|---|
| 1/20/21 |
| 7971.65 |

ONLINE PAYMENTS NOW
AVAILABLE

RETAIN THIS STUB WITH YOUR PAYMENT

## REGULATIONS

DO NOT SUSPECT your meter - it is accurate.

**All water passing through a meter will be charged for whether used or wasted. No deductions will be made due to leaks.**

To eliminate water, sewerage and garbage charges while property is vacant, you must have the water shut off at the buffalo box by the water department.

Failure to receive a water service bill is not an excuse for non-payment.

Protect your meter from frost to avoid a frozen meter fee.

Keep your meter accessible so it can be read and checked when necessary.

TELEPHONE (708) 656-3600

MONDAY THROUGH THURSDAY     8:00 am — 8:00 pm

Phone in your meter reading. Ext 229 (Voicemail Only)

## BILLING CODES

WC    CURRENT WATER CHARGE
SC    CURRENT SEWER CHARGE
PW    PREVIOUS WATER BALANCE
PS    PREVIOUS SEWER BALANCE

### LATE PAYMENT

All bills not paid within ten (10) days of date of billing shall have a penalty charge of twenty percent (20%) added thereto.

### NON-PAYMENT SHUT-OFF OF WATER

There will be a $100.00 standard service charge for water shut-off due to non-payment.

### NSF

An additional fee of $30.00 will be charged for all checks returned NSF.

MAKE CHECK PAYABLE TO:
**BUREAU OF WATER AND SEWERAGE**

EXHIBIT 2

| Date of Bill | Sum of Bill Amount | Sum of Pay Amount |
|---|---|---|
| **2018** | **79716.48** | **79716.48** |
| 1/17/2018 | 6643.04 | 6643.04 |
| 2/16/2018 | 6643.04 | 6643.04 |
| 3/16/2018 | 6643.04 | 6643.04 |
| 4/17/2018 | 6643.04 | 6643.04 |
| 5/18/2018 | 6643.04 | 6643.04 |
| 6/22/2018 | 6643.04 | 6643.04 |
| 7/17/2018 | 6643.04 | 6643.04 |
| 8/17/2018 | 6643.04 | 6643.04 |
| 9/18/2018 | 6643.04 | 6643.04 |
| 10/19/2018 | 6643.04 | 6643.04 |
| 11/16/2018 | 6643.04 | 6643.04 |
| 12/17/2018 | 6643.04 | 6643.04 |
| **2019** | **79716.48** | **79716.48** |
| 1/18/2019 | 6643.04 | 6643.04 |
| 2/18/2019 | 6643.04 | 6643.04 |
| 3/19/2019 | 6643.04 | 6643.04 |
| 4/17/2019 | 6643.04 | 6643.04 |
| 5/16/2019 | 6643.04 | 6643.04 |
| 6/17/2019 | 6643.04 | 6643.04 |
| 7/18/2019 | 6643.04 | 6643.04 |
| 8/19/2019 | 6643.04 | 6643.04 |
| 9/17/2019 | 6643.04 | 6643.04 |
| 10/16/2019 | 6643.04 | 6643.04 |
| 11/16/2019 | 6643.04 | 6643.04 |
| 12/18/2019 | 6643.04 | 6643.04 |
| **2020** | **79716.48** | **79716.48** |
| 1/17/2020 | 6643.04 | 6643.04 |
| 2/18/2020 | 6643.04 | 6643.04 |
| 3/19/2020 | 6643.04 | 6643.04 |
| 4/21/2020 | 6643.04 | 6643.04 |
| 5/18/2020 | 6643.04 | 6643.04 |
| 6/19/2020 | 6643.04 | 6643.04 |
| 7/20/2020 | 6643.04 | 6643.04 |
| 8/21/2020 | 6643.04 | 6643.04 |
| 9/19/2020 | 6643.04 | 6643.04 |
| 10/20/2020 | 6643.04 | 6643.04 |
| 11/19/2020 | 6643.04 | 6643.04 |
| 12/21/2020 | 6643.04 | 6643.04 |

EXHIBIT 3

BUREAU OF WATER & SEWER
TOWN OF CICERO
4949 W CERMAK RD.
CICERO, ILLINOIS 60804

**MONTHLY**

5601 W 26TH ST

BILLING DUE DATE: 2/18/21    1,672

ACCT #: 50609290

| CODE | AMOUNT |
|------|--------|
| SC | 90300.00 |

| AFTER | NOW DUE |
|-------|---------|
| 2/18/21 | 90300.00 |
| 108360.00 | |

ONLINE PAYMENTS NOW
AVAILABLE

RETURN THIS STUB WITH YOUR PAYMENT

---

FIRST CLASS
US POSTAGE PAID
PERMIT 139
Berwyn, Illinois 60402
PRESORTED

RETURN SERVICE REQUESTED

50609290    1672
5601 W 26TH ST

SERVICE FROM:
12/21/20 TO 1/19/21

CONSUMPTION CUBIC FEET
CONSUMPTION PERIOD/READINGS

BNSF RAILWAY SITE#205023
C/O PROKARMA, INC.-BSF 112
P.O. BOX 2410
OMAHA, NE 68103-2410

| NOW DUE | AFTER | PAY |
|---------|-------|-----|
| 90300.00 | 2/18/21 | 108360.00 |

GO TO THETOWNOFCICERO.COM
WATER DEPARTMENT PAGE

RETAIN THIS PORTION FOR YOUR RECORDS

## BILLING CODES

WC   CURRENT WATER CHARGE
SC   CURRENT SEWER CHARGE
PW   PREVIOUS WATER BALANCE
PS   PREVIOUS SEWER BALANCE

## LATE PAYMENT

All bills not paid within ten (10) days of date of billing shall have a penalty charge of twenty percent (20%) added thereto.

## NON-PAYMENT SHUT-OFF OF WATER

There will be a $100.00 standard service charge for water shut-off due to non-payment.

## NSF

An additional fee of $30.00 will be charged for all checks returned NSF.

MAKE CHECK PAYABLE TO:
**BUREAU OF WATER AND SEWERAGE**

## REGULATIONS

DO NOT SUSPECT your meter - it is accurate.
**All water passing through a meter will be charged for whether used or wasted. No deductions will be made due to leaks.**
To eliminate water, sewerage and garbage charges while property is vacant, you must have the water shut off at the buffalo box by the water department.
Failure to receive a water service bill is not an excuse for non-payment.
Protect your meter from frost to avoid a frozen meter fee.
Keep your meter accessible so it can be read and checked when necessary.

TELEPHONE (708) 656-3600
MONDAY THROUGH THURSDAY   8:00 am — 8:00 pm
Phone in your meter reading. Ext 229 (Voicemail Only)

```
03/09/2021  11:09    7086565801         TOWN OF CICERO              PAGE  01/01
Account Summary                                                      UT7300A1
Transaction Inquiry                                                  UT7010S1

Account#:   50609290      1672          Current Balance  . :   192,016.96
Name   . : BURLINGTON NORTHERN RR
Address : 5601 W 26TH ST

Type options, press Enter.                              Reset:
  5=Detail    6=Reprint Bill    7=Reverse    11=Mtr Hist    16=Other Charges
                                                            More:   +
Opt  Type          Date        Amount       Posted    Due Date    Balance
 __  Bill        2/25/2021    90300.00     3/02/2021   3/18/2021   192016.96
 __  Payment     2/18/2021     6643.04-    2/23/2021              101716.96
 __  Penalty     2/23/2021    18060.00     2/23/2021              108360.00
 __  Bill        1/28/2021    90300.00     1/28/2021   2/18/2021   90300.00
 __  Payment     1/20/2021     6643.04-    1/20/2021                    .00
 __  Bill       12/30/2020     6643.04    12/30/2020   1/20/2021    6643.04
 __  Payment    12/16/2020     6643.04-   12/16/2020                    .00
 __  Bill       11/30/2020     6643.04    12/01/2020  12/21/2020    6643.04
 __  Payment    11/17/2020     6643.04-   11/17/2020                    .00
 __  Bill       10/29/2020     6643.04    10/29/2020  11/18/2020    6643.04
                                                                 More...
F3=Exit  F5=Refresh  F6=Add Adjust  F7=Event History  F22=More Keys
```

**TOWN OF CICERO**
BUREAU OF WATER & SEWERAGE
4949 WEST CERMAK ROAD
CICERO, ILLINOIS 60804

TOWN OF CICERO **MONTHLY**
4949 W. CERMAK RD.
CICERO, Illinois 60804

5856 W 31ST ST
ILLING DUE DATE: 5/20/21
CCT #: 50507134    1245

| ODE | AMOUNT |
|-----|--------|
| WC | 135.28 |
| SC | 56.06 |

| AFTER | NOW DUE |
|-------|---------|
| 5/20/21 | 191.34 |
| 229.61 | |

ONLINE PAYMENTS NOW
AVAILABLE

RETURN THIS STUB WITH YOUR PAYMENT

50507134    1245

FIRST CLASS
US POSTAGE PAID
PERMIT 139
Berwyn, Illinois 60402
PRESORTED

**RETURN SERVICE REQUESTED**

SERVICE FROM: 3/19/21 TO 4/20/21
CONSUMPTION CUBIC FEET    7 A
CONSUMPTION PERIOD/READINGS
   1423      1430

BNSF RAILWAY SITE#IL-CIC FAC
C/O PROKARMA, INC-BSF 112
P.O. BOX 2410
OMAHA, NE 68103-2410

| NOW DUE | AFTER | PAY |
|---------|-------|-----|
| 191.34 | 5/20/21 | 229.61 |

GO TO THETOWNOFCICERO.COM
WATER DEPARTMENT PAGE

RETAIN THIS PORTION FOR YOUR RECORDS

---

BUREAU OF WATER & SEWER **MONTHLY**
TOWN OF CICERO
4949 W. CERMAK RD.
CICERO, ILLINOIS 60804

29TH ST & 60TH CT
ILLING DUE DATE: 5/20/21
CCT #: 50506930    1200

| DE | AMOUNT |
|-----|--------|
| WC | 135.28 |
| SC | 56.06 |

| AFTER | NOW DUE |
|-------|---------|
| 5/20/21 | 191.34 |
| 229.61 | |

ONLINE PAYMENTS NOW
AVAILABLE

RETURN THIS STUB WITH YOUR PAYMENT

50506930    1200
29TH ST & 60TH CT

FIRST CLASS
US POSTAGE PAID
PERMIT 139
Berwyn, Illinois 60402
PRESORTED

**RETURN SERVICE REQUESTED**

SERVICE FROM: 3/19/21 TO 4/20/21
CONSUMPTION CUBIC FEET    10 E
CONSUMPTION PERIOD/READINGS
   12014      12024

BSNF RAILWAY SITE#IL-CIC-FAC
C/O PROKARMA, INC-BSF 112
P.O BOX 2410
OMAHA, NE 68103-2410

| NOW DUE | AFTER | PAY |
|---------|-------|-----|
| 191.34 | 5/20/21 | 229.61 |

GO TO THETOWNOFCICERO.COM
WATER DEPARTMENT PAGE

RETAIN THIS PORTION FOR YOUR RECORDS



TOWN OF CICERO
4949 W. CERMAK RD.
CICERO, ILLINOIS 60804

5601 W 26TH ST

BILLING DUE DATE: 5/20/21

ACCT #: 50506480          1116

| CODE | AMOUNT |
|------|--------|
| WC | 432.90 |
| SC | 119.61 |

5601 W 26TH ST

US POSTAGE PAID
PERMIT 139
Berwyn, Illinois 60402
PRESORTED

RETURN SERVICE REQUESTED

SERVICE FROM: 3/19/21 TO 4/20/21

CONSUMPTION CUBIC FEET    64  A

CONSUMPTION PERIOD/READINGS
77248        77312

BNSF RAILWAY SITE#205023
C/O PROKARMA, INC.—BSF 112
P.O. BOX 2410
OMAHA, NE 68103-2410

| AFTER | NOW DUE |
|-------|---------|
| 5/20/21 | 552.51 |
| 663.01 | |

| NOW DUE | AFTER | PAY |
|---------|-------|-----|
| 552.51 | 5/20/21 | 663.01 |

ONLINE PAYMENTS NOW
AVAILABLE

GO TO THETOWNOFCICERO.COM
WATER DEPARTMENT PAGE

RETURN THIS STUB WITH YOUR PAYMENT          RETAIN THIS PORTION FOR YOUR RECORDS

BUREAU OF WATER & SEWER
TOWN OF CICERO
4949 W. CERMAK RD.
CICERO, ILLINOIS 60804

MONTHLY

HOUSE #10 52ND AVE

BILLING DUE DATE: 5/20/21

ACCT #: 50609330          1675

| DE | AMOUNT |
|----|--------|
| WC | 135.28 |
| SC | 56.06 |

50609330          1675
HOUSE #10 52ND AVE

FIRST CLASS
US POSTAGE PAID
PERMIT 139
Berwyn, Illinois 60402
PRESORTED

RETURN SERVICE REQUESTED

SERVICE FROM: 3/24/21 TO 4/23/21

CONSUMPTION CUBIC FEET          A

CONSUMPTION PERIOD/READINGS

BNSF RAILWAY SITE#IL-CIC-FAC
C/O PROKARMA, INC.—BSF 112
P.O. BOX 2410
OMAHA, NE 68103-2410

| AFTER | NOW DUE |
|-------|---------|
| 5/20/21 | 191.34 |
| 229.61 | |

| NOW DUE | AFTER | PAY |
|---------|-------|-----|
| 191.34 | 5/20/21 | 229.61 |

ONLINE PAYMENTS NOW
AVAILABLE

GO TO THETOWNOFCICERO.COM
WATER DEPARTMENT PAGE

RETURN THIS STUB WITH YOUR PAYMENT          RETAIN THIS PORTION FOR YOUR RECORDS

TOWN OF CICERO
4949 W. CERMAK RD.
CICERO, ILLINOIS 60804

**MONTHLY**

S LARAMIE AVE VIADUC

S LARAMIE AVE VIADUC

PERMIT 139
Berwyn, Illinois 60402

**RETURN SERVICE REQUESTED**

LLING DUE DATE: 5/20/21

CCT #: 50609320        1674

| ODE | AMOUNT |
|-----|--------|
| WC | 3246.72 |
| SC | 897.11 |

SERVICE FROM: 3/24/21 TO 4/23/21

CONSUMPTION CUBIC FEET       480   A

CONSUMPTION PERIOD/READINGS

237        717

BNSF RAILWAY SITE#IL-CIC-FAC
C/O PROKARMA , INC. -BSF 112
P. O. BOX 2410
OMAHA, NE 68103-2410

| AFTER | NOW DUE | | NOW DUE | AFTER | PAY |
|-------|---------|--|---------|-------|-----|
| 5/20/21 | 4143.83 | | 4143.83 | 5/20/21 | 4972.59 |
| 4972.59 | | | | | |

ONLINE PAYMENTS NOW
AVAILABLE

GO TO THETOWNOFCICERO.COM
WATER DEPARTMENT PAGE

RETURN THIS STUB WITH YOUR PAYMENT          RETAIN THIS PORTION FOR YOUR RECORDS

---

BUREAU OF WATER & SEWER
TOWN OF CICERO
4949 W. CERMAK RD.
CICERO, ILLINOIS 60804

**MONTHLY**

50609290        1672
5601 W 26TH ST

FIRST CLASS
US POSTAGE PAID
PERMIT 139
Berwyn, Illinois 60402
PRESORTED

**RETURN SERVICE REQUESTED**

5601 W 26TH ST

LLING DUE DATE: 5/20/21

CCT #: 50609290        1672

| ODE | AMOUNT |
|-----|--------|
| SC | 90300.00 |

SERVICE FROM: 3/21/21 TO 4/20/21

CONSUMPTION CUBIC FEET

CONSUMPTION PERIOD/READINGS

BNSF RAILWAY SITE#205023
C/O PROKARMA, INC. -BSF 112
P. O. BOX 2410
OMAHA, NE 68103-2410

| | PS | 305150.88 |
|--|----|-----------|

| AFTER | NOW DUE | | NOW DUE | AFTER | PAY |
|-------|---------|--|---------|-------|-----|
| 5/20/21 | 395450.88 | | 395450.88 | 5/20/21 | 413510.88 |
| 413510.88 | | | | | |

ONLINE PAYMENTS NOW
AVAILABLE

GO TO THETOWNOFCICERO.COM
WATER DEPARTMENT PAGE

RETURN THIS STUB WITH YOUR PAYMENT          RETAIN THIS PORTION FOR YOUR RECORDS

06/02/2021  15:07   7065565801          TOWN OF CICERO         PAGE   01/01



TOWN OF CICERO
4949 W. CERMAK RD.
CICERO, ILLINOIS 60804          **MONTHLY**

5601 W 26TH ST
BILLING DUE DATE:   6/21/21
ACCT #:   50609290        1672

| CODE | AMOUNT |
|------|--------|
| SC   | 90300.00 |

PS                        406867.84

| AFTER | NOW DUE |
|-------|---------|
| 6/21/21 | 497167.84 |
| 515227.84 | |

ONLINE PAYMENTS NOW
AVAILABLE

RETURN THIS STUB WITH YOUR PAYMENT

---

50609290    1672
5601 W 26TH ST

FIRST CLASS
US POSTAGE PAID
PERMIT 139
Berwyn, Illinois 60402
PRESORTED

SERVICE FROM:                    RETURN SERVICE REQUESTED
4/20/21 TO 5/20/21
CONSUMPTION CUBIC FEET
CONSUMPTION PERIOD READINGS

**FINAL NOTICE**
**WATER SHUT OFF**

BNSF RAILWAY SITE#205023
C/O PROKARMA, INC. -BSF 112
P.O. BOX 2410
OMAHA, NE 68103-2410

| NOW DUE | AFTER | PAY |
|---------|-------|-----|
| 497167.84 | 6/21/21 | 515227.84 |

GO TO THETOWNOFCICERO.COM
WATER DEPARTMENT PAGE

RETAIN THIS PORTION FOR YOUR RECORDS

---

BUREAU OF WATER & SEWER
TOWN OF CICERO
4949 W, CERMAK RD.
CICERO, ILLINOIS 60804          **MONTHLY**

5856 W 31ST ST
BILLING DUE DATE:   6/21/21
ACCT #:   50507135        1246

| CODE | AMOUNT |
|------|--------|
| WC   | 2928.81 |
| SC   | 809.27 |

PW                        7256.42
PS                        2005.06

| AFTER | NOW DUE |
|-------|---------|
| 6/21/21 | 12999.56 |
| 13747.17 | |

ONLINE PAYMENTS NOW
AVAILABLE

RETURN THIS STUB WITH YOUR PAYMENT

---

50507135    1246
5856 W 31ST ST

FIRST CLASS
US POSTAGE PAID
PERMIT 139
Berwyn, Illinois 60402
PRESORTED

SERVICE FROM:                    RETURN SERVICE REQUESTED
4/20/21 TO 5/20/21
CONSUMPTION CUBIC FEET
CONSUMPTION PERIOD READINGS

**FINAL NOTICE**
**WATER SHUT OFF**

BNSF RAILWAY SITE#IL-CIC-FAC
C/O PROKARMA, INC-BSF 112
P.O. BOX 2410
OMAHA, NE 68103-2410

| NOW DUE | AFTER | PAY |
|---------|-------|-----|
| 12999.56 | 6/21/21 | 13747.17 |

GO TO THETOWNOFCICERO.COM
WATER DEPARTMENT PAGE

RETAIN THIS PORTION FOR YOUR RECORDS

EXHIBIT 4

| Account Number | Vendor Name | Service Period | Payment Amount | Payment Type |
|---|---|---|---|---|
| 50609290 | Town of Cicero, IL | 12/21/2020-01/19/2021 | $6,643.04 | E-Check |
| 50609290 | Town of Cicero, IL | 01/19/2021-02/19/2021 | $6,643.04 | E-Check |
| 50609290 | Town of Cicero, IL | 02/20/2021-03/21/2021 | $6,643.04 | Check |
| 50609290 | Town of Cicero, IL | 03/21/2021-04/20/2021 | $6,643.04 | Check |

# EXHIBIT H

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS**

| | | |
|---|---|---|
| BNSF Railway Company | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 21-cv-3072 |
| | ) | |
| | ) | |
| Town of Cicero, Illinois | ) | |
| | ) | |
| Defendant. | ) | |

**<u>DECLARATION OF BROOKE L. GAEDE</u>**

I, Brooke L. Gaede, declare as follows:

1. I am a Senior General Attorney I at BNSF Railway Company ("BNSF"). I submit this declaration in support of BNSF's Motion for Temporary Restraining Order and Preliminary Injunction. I am over the age of 18, competent to testify, and make the following declaration based on my education, training, experience, professional qualifications, and my understanding of the matters herein based on my personal knowledge or my access to BNSF's business records.

2. I have worked in my current role as Senior General Attorney I at BNSF for three (3) years.

3. After BNSF received the first $90,300 sewer bill from the Town of Cicero, I sent a letter to Cicero President Larry Dominick regarding Cicero's amended sewer rate ordinance and offering to "amicably resolve this dispute with the Town" and to continue paying BNSF's prior rate as the sides negotiated. A true and correct copy of my February 18, 2021 Letter to Larry Dominick is attached hereto as <u>Exhibit 1</u>.

4.      On March 16, 2021, I received an email response to my letter to Cicero President Larry Dominick from Cicero's attorney, Cynthia Grandfield.   A true and correct copy of the March 16, 2021 Email is attached hereto as Exhibit 2.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on June 9, 2021.

_____

Brooke L. Gaede

EXHIBIT 1



**Brooke L. Gaede**
*Senior General Attorney I*

**BNSF Railway Company**
2500 Lou Menk Drive AOB-3
Fort Worth, Texas 76131-2828
817-352-2369

brooke.gaede@bnsf.com

<u>**Sent Via E-Mail Only (larry@thetownofcicero.com)**</u>

February 18, 2021

Mr. Larry Dominick
Office of the President
Town of Cicero
4949 W. Cermak Road, 3rd Floor
Cicero, Illinois 60804

RE:     **Bureau of Water & Sewer Invoice for $90,300.00**

Dear Town President Dominick:

I am writing to you regarding the attached invoice for the period December 21, 2020 to January 19, 2021 sent to BNSF Railway Company (BNSF) for account number 50609290 1672.  The invoice seeks payment of $90,300.00 per month.  BNSF's prior invoices associated with the same property totaled $6,643.04 per month (or $79,716.48 per year).  The invoice is a shocking increase of nearly 1400% over BNSF's prior invoices.

Upon receipt of the attached invoice totaling more than BNSF typically pays in one year, it was assumed that an error had been made.  However, upon investigating the basis for the invoice, it appears that the Town amended its Utilities Ordinance in December 2020 to increase the rate charged to BNSF from $27.42 per acre to $350.00 per acre.  BNSF contends that the Town's actions are arbitrary and capricious, discriminatory, without adequate notice, without adequate basis in law, and contrary to other federal and state law.

BNSF would prefer to amicably resolve this dispute with the Town if possible.  While the dispute is pending, BNSF is willing to continue paying $6,643.04 per month until such time as the parties have reached a mutually acceptable agreement or until this matter is resolved in court.  Please contact me or Peter Skosey to confirm whether the Town is willing to discuss an amicable resolution to this matter.

Sincerely,

Brooke L. Gaede
Senior General Attorney I

cc:     Peter Skosey (peter.skosey@bnsf.com)
        Cynthia Updyke (cupdyke@thetownofcicero.com)
        Ray Hanania (rhanania@thetownofcicero.com)

EXHIBIT 2

| | |
|---|---|
| **From:** | Cynthia Grandfield <grandfield@dlglawgroup.com> |
| **Sent:** | Tuesday, March 16, 2021 7:23 PM |
| **To:** | Gaede, Brooke L |
| **Cc:** | Skosey, Peter |
| **Subject:** | BNSF Overdue Water and Sewer Invoice - Town of Cicero |

## EXTERNAL EMAIL

Dear Mr. Gaede:

My law firm represents the Town of Cicero. We are in receipt of your letter dated February 18, 2021 regarding BNSF's refusal to pay. I am unclear why this letter was directed to the Town President or Ms. Updyke. Please direct any further correspondence towards me via email. I have cc'd Mr. Skosey on this letter because you reference him in your letter.

The Town's revision of its ordinance was within its powers under Illinois statute and the Illinois Municipal Code. Further, even if it was not specifically identified as a power in the Illinois Municipal Code, the Town, as one of the largest municipalities in Illinois, is what is referred to a "home rule municipality" in the State of Illinois that confers upon it additional powers.

Your letter's claims that this is "contrary to other federal and state law" is inaccurate. Further, your letter's reference to "arbitrary and capricious" has no relevance to any legal standard I can identify.

Lastly, there is no "pending dispute" to "work towards resolution." There is no provision under the law that permits you to dispute your bills in this manner and simply not pay the bulk of it. BNSF was sent an invoice and the Town expects payment of the full amount plus a 20% percent penalty for failure to pay by close of business on March 26, 2021. If payment is not received, we will issue a 60-day notice of water and sewer shut off, which may include digging underground to remove pipes as well as the placement of a lien for the unpaid amount. *See* Town Code 98-61; 98-266; 98-267; 98-268; 65 ILCS 5/11-141-7.

Sincerely and thanks,

*--Cynthia*

Cynthia S. Grandfield, Senior Counsel
Del Galdo Law Group, LLC
grandfield@dlglawgroup.com
**note new phone number please**
(312) 222-7000 ext. 205
The information contained in this transmission may contain privileged and confidential information. It is intended only for the use of the person(s) named above. If you are not the intended recipient, you are hereby notified that any review, dissemination, distribution or duplication of this communication is strictly prohibited. If you are not the intended recipient, please contact the sender by reply email and destroy all copies of the original message. Unintended transmission does not constitute waiver of the attorney-client privilege or any other privilege. Unless expressly stated in this email, nothing in this message should be construed as a digital or electronic signature. To reply to our email administrator directly, please send an email to info@dlglawgroup.com

# EXHIBIT I

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS**

BNSF RAILWAY COMPANY                )
                                                            )
                    Plaintiff,                         )
                                                            )
v.                                                          )          No.  21-cv-03072
                                                            )
                                                            )
TOWN OF CICERO, ILLINOIS        )
                                                            )
                    Defendant.                      )

**<u>DECLARATION OF CHUCK BURRISS</u>**

I, Chuck Burriss, declare under penalty of perjury the following:

1.        I am a General Director, Hub and Transportation for BNSF Railway Company ("BNSF") in Chicago.  I submit this declaration in support of BNSF's Motion for Temporary Restraining Order and Preliminary Injunction.  I am over the age of 18, competent to testify, and make the following declaration based on my education, training, experience, professional qualifications, and my understanding of the matters herein based on my personal knowledge or my access to BNSF's business records.

2.        I have worked for BNSF for thirty-two (32) years.  At BNSF I have held various roles including Director of System Hub Operations, Director of Southeast Hub Operations, and my current role as General Director, Hub and Transportation.  I have served in my present role for BNSF in Chicago since 2008.  As General Director, Hub and Transportation, I provide strategic direction and coordination for BNSF's intermodal facilities, including all four of BNSF's greater Chicagoland area facilities, one of which is the railyard located at 5601 West 26th Street in Cicero, Illinois.

3.      From my thirty-two (32) years of experience working with BNSF, I am familiar with the operations of BNSF generally.  From my most recent thirteen (13) years as General Director, Hub and Transportation, I am readily familiar with the operations of BNSF's Chicago area facilities, including the railyard located in Cicero, Illinois.

4.      It is my understanding that the Town of Cicero is currently threatening to terminate water and sewer service to our Cicero facility on July 19, 2021.  As a result of this shut off, the Town of Cicero would also require BNSF to vacate the property.  If these threats were to materialize, the results would be devastating for BNSF's business, employees, customers, and interstate freight transit.  If the water and sewer service were terminated, and/or BNSF was forced to vacate the property, normal rail operations at the railyard would be curtailed.

5.      BNSF needs water for cleaning and upkeep of equipment at the railyard.  For example, we use water to clean and maintain our hostlers and lift equipment, which are used to move intermodal containers around the facility.  That cleaning is important to maintain this equipment as well as to provide safe operations.  We also require water to clean vehicle windows and the interior walkways of locomotives (which is critical to visibility and safety).  The railroad also operates locomotive service tracks, which require water to clean and maintain locomotives.

6.      Even more important than our equipment, the employees who work for us require water for their most basic needs and for their safety as railyard employees.  Obviously, we could not reasonably operate our railyard without sanitary facilities for our employees.  Our facility also includes employee break rooms, which have sinks and ice makers for employee use.  Moreover, BNSF maintains employee showers and eye washing stations at the railyard, which are necessary safety measures given the nature of railyard operations.  The showers enable employees to remove any skin irritants or other elements they might encounter on the job.  The eye washing facilities

- 2 -

allow employees to flush their eyes in the event that any irritants or particulate matter gets into their eyes. Although our employees wear eye-safety glasses, dust or other irritants can sometimes get past these safety glasses, so the availability of working eye washes (which require running water) is critical.

7.      Access to water and sewer is also important to our fire safety planning and fire suppression measures we have in place as a precautionary measure, including ceiling sprinkler systems and fire hydrants located on the property.

8.      Without employees, operations at the Cicero railyard could not continue. Approximately five hundred (500) BNSF employees work at the Cicero facility, along with service contractors who also work on site. These individuals support intermodal rail service and maintain our lift equipment, rail cars, and locomotives, among other functions. The functions performed by these on-premises employees are critical to our operations. Our railyard simply could not operate without them on site. Because they work on site, if the facility were to close down, these employees will not be able to continue in their current jobs.

9.      Intermodal rail service depends on employees to move containerized freight to and from rail cars and trucks to carry freight to various destinations. Approximately two hundred (200) of the BNSF employees who work at the Cicero railyard support intermodal rail service by lifting containerized freight from trucks to rail cars and vice versa. This entire process involves on-site employees operating manual equipment. On average, these employees lift nearly 40,000 containers per month at our Cicero railyard and, thus, are responsible for moving high volumes of freight. Indeed, BNSF's railyard in Cicero is our seventh largest intermodal facility in terms of container volume.

10.     Employees also must be on site for us to provide interchange service for intermodal traffic.  Interchange refers to the movement of freight from one rail carrier to another rail carrier.  For example, freight could travel to our Cicero railyard from as far as Seattle, Washington, on a BNSF rail line and then interchange to an eastern railroad for final delivery in New Jersey or New York.  The interchange process allows customers to ship freight in a single movement using more than one railroad.  The interchange process requires employees to be staffed at the Cicero railyard to inspect and maintain railcars, switch cars, move freight within the yard and to and from interchange locations, and validate that the correct cars are interchanged.

11.     We also need on-site employees to manage manifest rail services.  "Manifest" traffic refers to a mix of freight that is collected from a variety of origins, brought to a railyard for classification (i.e., sorting of railcars) and then organized into larger blocks to form trains to travel to additional classification yards or to their ultimate destination.  Manifest traffic may also be interchanged to other rail carriers.  As with other interchange traffic, on-site employees must inspect and maintain rail equipment, move freight within the yard into the correct blocks or trains, and validate that the cars are routed to the correct locations.

12.     In my role as General Director, Hub and Transportation, I work with all four of our Chicago facilities and am directly familiar with their operations and capacity.  In the event of a Cicero railyard shutdown, it would be impossible for our other Chicago facilities to absorb the freight handled in Cicero.  Our other Chicago facilities lack the capacity for us to divert the Cicero railyard's volume to another facility.

13.     In addition to the fact that our Cicero facility would be shut down, it is my understanding that the Town of Cicero has threatened to dig up our pipes as part of its termination process.  The pipes run under dozens of rail tracks on the west end of the facility.  Those rail tracks

- 4 -

are critical to railyard operations, and their destruction would render the yard completely inoperable. Any property ruined or damaged during the process of pipe deconstruction, including those railroad tracks as well as roads, building foundations, and parking lots, would have to be reconstructed in order for the railyard to resume normal operations. This process would likely be time-consuming and resource-intensive, and would delay our ability to resume business even after the resolution of the dispute over the sewer charge.

14. Accordingly, the Town of Cicero's plan to shut off our water and sewer services would result in significant amounts of interstate rail traffic being stopped, particularly from the Pacific Northwest, where a significant volume of traffic through Cicero originates. Cutting off our water and sewer services and forcing employees to vacate would hamper our ability to provide rail service, and would leave hundreds of employees without work. Digging underground to remove pipes would cause property damage that would require significant time and money to repair. The Town of Cicero's sewer termination efforts would cause harm that would be felt locally by BNSF and its employees, by the many customers who rely on us to ship their goods and products, and across the country in the communities and markets we serve.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed on this _9_th day of June, 2021, in _Elwood_, Illinois.

By: _Chuck Burriss_

Chuck Burriss

# EXHIBIT J

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| BNSF RAILWAY COMPANY | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 21-cv-03072 |
| | ) | |
| | ) | |
| TOWN OF CICERO, ILLINOIS | ) | |
| | ) | |
| Defendant. | ) | |

## <u>DECLARATION OF REBECCA L. SCIARRINO</u>

I, Rebecca L. Sciarrino, declare under penalty of perjury the following:

1.      I am an attorney at the firm of Munger, Tolles & Olson LLP, counsel of record for BNSF Railway Company ("BNSF") in the above-captioned action.  I am admitted *pro hac vice* before this Court.  I submit this declaration in support of BNSF's Motion for Summary Judgment. I am over the age of 18, competent to testify, and make the following declaration based on my personal knowledge of the matters herein.

2.      Attached hereto as Exhibit 1 is a true and correct copy of an Excerpt from the 2019 Comprehensive Annual Financial Report of the Town of Cicero, Illinois, with the Bates stamp TOC000256.  Counsel for Defendant Town of Cicero ("Cicero") served this document via email on counsel for BNSF on June 30, 2021.

3.      Attached hereto as Exhibit 2 is a true and correct copy of a letter, dated September 3, 2021, from counsel for Cicero, which was emailed to counsel for BNSF on September 3, 2021, and was filed on the docket as an attachment to a status report.  *See* ECF No. 48-2.

4.      Attached hereto as Exhibit 3 is a stipulation dated July 28, 2021, which the parties filed with the Court that day.  *See* ECF No. 39.

5.      Attached hereto as Exhibit 4 is BNSF's Complaint for Declaratory Judgment and Injunctive Relief, which BNSF filed with the Court on June 8, 2021.  *See* ECF No. 1.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed on this 6th day of October, 2021, in San Francisco, California.

By:_____

Rebecca L. Sciarrino

# EXHIBIT 1

## Waterworks & Sewerage



The Town of Cicero owns and operates its own water system without any encumbrances, which supplies Lake Michigan water purchased through the City of Chicago. The Town is responsible for collection of sewage and delivery to major interceptors of the Metropolitan Water Reclamation District of Greater Chicago (formerly the Metropolitan Sanitary District of Greater Chicago) which treats the effluent.

**The Water Division** pumps an average of 6.20 MGD (million gallons per day) into the water distribution system. The distribution system consists of 116 miles of water mains, 94 miles of combined sanitary and storm sewers, and 1,183 fire hydrants. There are approximately 18,500 service connections, which are metered and billed monthly. Water Division personnel are responsible for monthly billing of residential and commercial accounts, maintenance of two pumping stations, chemical feeding, building and ground maintenance, water sampling, water meter installation and repair, handling customer complaint calls, water meter reading and service disconnections.

### Table 24

### Water-Sewer Enterprise Fund

### Net Position as Pct of Expenses

| | Expenses | Unrestricted Net Position | UNP as Pct of Expenses |
|---|---|---|---|
| 2010 | 12,969,240 | 3,461,115 | 2.74% |
| 2011 | 15,667,227 | 256,056 | 1.63% |
| 2012 | 17,143,236 | 283,679 | 1.65% |
| 2013 | 17,911,481 | -965,904 | -5.39% |
| 2014 | 18,260,068 | -425,202 | -2.33% |
| 2015 | 17,996,041 | 2,124,789 | 11.80% |
| 2016 | 20,279,059 | 2,988,872 | 14.74% |
| 2017 | 20,609,653 | -4,058,510 | -19.69% |
| 2018 | 21,417,545 | -4,253,222 | -19.86% |
| 2019 | 22,335,638 | -5,346,981 | -23.94% |

### Water and Sewer Unrestricted Net Assets

One of the determining factors of financial health is the net assets of a fund. Net assets are comprised of three categories 1) assets invested in capital assets – net of related debt – these assets are not liquid and are assets of a fixed nature such as water mains; 2) restricted net assets – are assets that must be used for a specific purpose; and 3) unrestricted assets used for water and sewer operations.

The Unrestricted net position of the Waterworks & Sewerage Utility show a balance of negative $5,346,981 at year-end 2019 due to net OPEB liabilities relating to post-employment health benefits.

The Town has implemented multi-year rate increases to keep pace with the Town's provider, the City of Chicago.

**\*As of FY2017 net position restated in accordance with GASB 75 to account for non-current Net OPEB liabilities of $11.9 million in FY2019.**

TOC000256

# EXHIBIT 2



**DEL GALDO LAW GROUP, LLC**

*Attorneys & Counselors*

September 3, 2021

*VIA EMAIL*
Mr. Renato Mariotti
Thompson Coburn
55 East Monroe Street, 37th Floor
Chicago, IL 60603

Dear Mr. Mariotti:

### I. *Response to Asserted Bases for Summary Judgment*

The Town of Cicero runs a combined sewer system, which means that its system is both a sanitary sewer and collects stormwater runoff. BNSF's primary basis for contending that they are subject to discrimination is that railroads and railyards are placed in a separate category and charged on a per acre basis with respect to sewer fee assessment under the Town's ordinance. As BNSF is likely aware, the Town has had this per acre charge in place since at least 1958. Further, the Town must place the funds received from the fees in a separate account, as opposed to the general fund, and the account is audited each year. The account is only used for the running of the Town's water and sewer system in the Town and is not used for general purposes. In the audited year of 2019, that fund was running at an over $1M deficit.

As you are aware, BNSF's intermodal property is approximately 258 acres. At that size, it takes up approximately 7% of the Town's total acreage. However, even though BNSF's property is elevated and has a high percentage of impermeable surfaces, BNSF was only previously paying approximately 1.5% of the total Town collection for sewer. Even with the rate increase, BNSF would only be paying approximately 12% of the total sewer fee collection, despite the large amounts of stormwater runoff that come from BNSF's site and into the Town's system.

With respect to the Complaint brought by BNSF, the Town does not believe that is legally sufficient for you to allege that the ordinance is "facially discriminatory" because a railyard is placed in a separate category under the ordinance. First, it is simply factually inaccurate to suggest that BNSF is being singled out as there is another category under the ordinance that is also charged at the same rate as BNSF on a per acreage basis. See Town Ord. 98-266(4). But, beyond that, "singling out" is insufficient to make out a claim under any cause of action alleged by BNSF.

Under the ICCTA, the collection of a sewer fee, even one that BNSF believes is too high or more than other businesses, does not "regulate rail transportation" so as for preemption to apply. See 49 U.S.C. §10501(g). Under the "4-R Act," again whether BNSF feels the amount collected is too high or not, the fee is collected for the maintenance of a system so that the Town can provide a service and is kept in a separate fund. While not the exact same definition, the Illinois Supreme Court already held sixty years ago that a sewer fee was not a tax. So, again, the question of whether the tax was discriminatory or not under the "4-R Act" would not even be reached with respect to the count. See 49 U.S.C. § 11501(b)(4); Kansas City Southern Railway Company, et al. v. Sny Island Levee Drainage Dist., 831 F.3d 892, 898 (7th Cir. 2016); Alabama Dept. of Revenue v. CSX Transp., Inc., 575 U.S. 21, 26-30 (2015). If it was, simply stating that BNSF was "singled out" has already been held insufficient in another Circuit when another railroad attempted to raise that criterion. In addition, with respect to both the ICCTA claim and the "4-R Act" claim, because the separate category has been in effect for so long, we believe that the doctrine of laches may bar claims under these acts entirely.

Lastly, with respect to the § 1983 dormant Commerce Clause claim, again alleging that the ordinance is "facially discriminatory" does not meet the criteria for determining a violation of the dormant Commerce Clause. This is the only count in BNSF's complaint that provides for fee-shifting, and we believe that it is the most tenuous. Indeed, the Town has many multi-national companies within Town limits beyond just railroads, including Amazon, Citgo, and Bimbo Bakeries. At absolute best, you would be applying a rational basis test, which is the lowest possible standard of review and highly unlikely to lead to the ordinance being declared invalid. See,e.g., National Paint & Coatings Ass'n v. City of Chicago, 45 F. 3d 1124, 1131 (7th Cir. 1995). In addition, there is a legitimate debate as to if the "dormant" Commerce Clause should even exist as it is not in the text of the Constitution and the authority to regulate commerce was given to Congress, not the courts. Further still, the Town believes it should not be subject to any dormant Commerce Clause claim as it is a market participant that is providing a sewer service and, even it was subject to the dormant Commerce Clause, as this separate category applicable to railroads has been in existence since the 50s, the Town believes that the statute of limitations bars the claim.

## II. Discovery Needs

In BNSF's Rule 26 Voluntary Disclosures, BNSF begins with a "Preliminary Statement" that contains multiple boilerplate objections and reservations to the Disclosures. For example, one "Preliminary Statement" says:

> BNSF does not, and will not, provide herein any information or documents protected from disclosure by the attorney-client

privilege, the attorney work-product doctrine, privacy rights, applicable regulatory privileges, or any other privilege or immunity. BNSF does not, by providing the information set forth herein, waive any privileges or protections that may be related to any information or documents within the information provided, including, but not limited to, the attorney-client privilege, attorney work-product doctrine, protections for trade secrets and commercially sensitive confidential information, and the right of privacy, all of which are expressly claimed and reserved.

Boilerplate objections are not permitted even in response to Rule 33 interrogatories or in response to Rule 34 requests for production from an opposing party. There is simply no word, phrase, or sentence in Rule 26 or any of the Committee Comments that would allow or provide for this as part of voluntary disclosures. I am particularly unclear as to how a trade secret or privileged information is related to Rule 26 Disclosures. For example, does BNSF intend to use a trade secret in support of its claims and/or summary judgment motion but not produce it? Please withdraw all such "preliminary statements" and provide all necessary supplements to the Disclosures within the next 7 days.

Additionally, BNSF has chosen to refer to categories of documents that are in its possession or control, but not produce those documents. One such category are documents previously attached to BNSF's motion for a TRO. However, there are other documents referenced that would only be in the possession or control of BNSF and have not previously been produced. Specifically, BNSF refers to: "Documents maintained in BNSF's ordinary course of business that reflect BNSF's ownership of a railyard in Cicero, Illinois" and "Documents maintained in BNSF's ordinary course of business that reflect that BNSF's property is used for interstate railway purposes." Please provide a copy of any such documents that fall into these categories that will be utilized in any summary judgment motion brought by BNSF within the next 14 days.

With respect to witnesses, the Town would like the deposition of the following individuals: (1) Chuck Burriss, General Director, Hub and Transportation for BNSF and (2) Rakia Tasiu, Manager of Environmental Operations for BNSF. Mr. Burriss should be prepared to answer questions about his training, experience and qualifications generally, his disclosed subject matter of "the ways in which BNSF's Cicero railyard relies on running water and sewer services in order to remain in operation" and his statement in paragraphs 6, 7, and 13 of his affidavit attached to the TRO motion. Ms. Tasiu should be prepared to answer questions on her training, experience and qualifications generally, her disclosed subject matter of "volume of water used by BNSF" and how this relates to use of the Town's sewer system and her statement in paragraph 3 of her affidavit attached to

3

the TRO motion. As Mr. Burriss and Ms. Tasiu are in the Chicagoland area and you specified that the Town's witnesses be deposed in person, the Town will anticipate that these witnesses will also be presented in person for their depositions. We also would like a 30(b)(6) witness designee for the single topic of "BNSF's utilization of the Town's sewer system." If this witness is not local, we will agree to conduct this deposition via video conference. We anticipate each deposition will take 2 hours or less and can be accomplished in 30 days.

Lastly, the Town requested Rule 26a disclosures in an attempt to avoid making a Rule 56(d) motion upon receipt of BNSF's motion for summary judgment. However, the Town reserves the right to make such a motion if BNSF objects to the above-identified discovery or if unanticipated arguments are made or facts are presented in BNSF's motion.

*III. Status of Settlement*

The Town thinks that it would be beneficial for the parties to attempt to resolve this claim. This case has the potential to go on for several years and go from the District Court to the Seventh Circuit (and maybe even further due to the "dormant" Commerce Clause and "4-R Act" issues raised). Further, as this involves a charge by the government for a service, the Town would likely not be the only government entity interested in the outcome. The <u>Koeller</u> case that BNSF cites to in its pleadings went on for several years. It went from the district court to the Seventh Circuit on two separate occasions. And, at the end, even with that railroad having once successfully challenged what was deemed a "tax" under the "4-R Act," the parcel was subject to a substantially higher assessment that was upheld by the Seventh Circuit over the railroad's protestations in 2016. <u>See, e.g.,</u> <u>Kansas City Southern Railway Company, et al. v. Sny Island Levee Drainage Dist.</u>, 831 F.3d 892 (7th Cir. 2016). This was after 6 years of litigation, 2 appeals, and retention of multiple experts. Similarly, even if the particular provision at issue were to be struck down by the Court, the Town would still be able to revise its ordinance and the way that sewer fees are calculated. Given the large amount of land owned by BNSF and the portion of the land that has an impermeable surface without retention, no amount of litigation will change the fact that BNSF is liable for a substantial sewer fee.

Sincerely,
DEL GALDO LAW GROUP, LLC

*/s/ Cynthia S. Grandfield*
Cynthia S. Grandfield

# EXHIBIT 3

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS**

| | | |
|---|---|---|
| BNSF RAILWAY COMPANY | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No.  21-cv-03072 |
| | ) | |
| | ) | |
| TOWN OF CICERO, ILLINOIS | ) | |
| | ) | |
| Defendant. | ) | |

**<u>STIPULATION</u>**

Plaintiff BNSF Railway Company ("BNSF") and Defendant Town of Cicero, Illinois

("Cicero") hereby STIPULATE AND AGREE that Defendant Cicero, its agents, employees,

representatives, independent contractors, attorneys, and all other persons acting in concert or

participation with Defendant Cicero will refrain from taking any of the following actions for the

next 90 days:

      a.   Imposing or taking any action to enforce the sewer rate charge or late fees or

          penalties, as provided in Cicero Code of Ordinances § 98-266(3) (enacted

          December 8, 2020), on BNSF or its railyard;

      b.   Suspending, stopping, shutting off, terminating or otherwise interfering with the

          water supply or water service to BNSF's railyard by reason of non-payment of the

          sewer rate charge or late fees or penalties provided in Cicero Code of Ordinances

          § 98-266(3) (enacted December 8, 2020);

      c.   Suspending, stopping, shutting off, terminating or otherwise interfering with sewer

          service to BNSF's railyard or any connections from BNSF's railyard to the sewer

by reason of non-payment of the sewer rate charge or late fees or penalties provided in Cicero Code of Ordinances § 98-266(3) (enacted December 8, 2020);

d.  Requiring or ordering BNSF to vacate the property by reason of non-payment of the sewer rate charge or late fees or penalties provided in Cicero Code of Ordinances § 98-266(3) (enacted December 8, 2020);

e.  Placing or foreclosing on any liens upon BNSF's railyard or any other property owned by BNSF by reason of non-payment of the sewer rate charge or late fees or penalties provided in Cicero Code of Ordinances § 98-266(3) (enacted December 8, 2020);

f.  Accrual of any late fees or penalties against BNSF by reason of non-payment of the sewer rate charge provided in Cicero Code of Ordinances § 98-266(3) (enacted December 8, 2020) from the date of filing of the lawsuit through the end date of this stipulation;

g.  Attempting to collect any payment from BNSF, including any payment or penalty amount from December 8, 2020 to present, pursuant to Cicero Code of Ordinances § 98-266(3) (enacted December 8, 2020).

Dated: July 28, 2021

By:  _/s/ Renato Mariotti_

Renato Mariotti
Holly H. Campbell
THOMPSON COBURN LLP
55 East Monroe, 37th Floor
Chicago, Illinois 60603
312.346.7500
rmariotti@thompsoncoburn.com
hcampbell@thompsoncoburn.com

By:  _/s/ Cynthia S. Grandfield_

K. Austin Zimmer
Cynthia S. Grandfield
Michael A. Albert
DEL GALDO LAW GROUP, LLC
(312) 222-7000 (t)
1441 S. Harlem Avenue
Berwyn, Illinois 60402
zimmer@dlglawgroup.com
grandfield@dlglawgroup.com

Sara L. Chamberlain
THOMPSON COBURN LLP
One US Bank Plaza
St. Louis, Missouri 63101
314.552.6000
schamberlain@thompsoncoburn.com

Benjamin J. Horwich (*pro hac vice*)
Rebecca L. Sciarrino (*pro hac vice*)
MUNGER, TOLLES & OLSON LLP
560 Mission Street, Twenty-Seventh Floor
San Francisco, California 94105
415.512.4000
ben.horwich@mto.com
rebecca.sciarrino@mto.com

*Attorneys for Plaintiff*

albert@dlglawgroup.com

*Attorneys for Defendant*

# EXHIBIT 4

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**

| | | |
|---|---|---|
| BNSF Railway Company, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. |
| | ) | |
| | ) | |
| Town of Cicero, Illinois, | ) | |
| | ) | |
| Defendant. | ) | |

## COMPLAINT FOR DECLARATORY JUDGMENT AND INJUNCTIVE RELIEF

Plaintiff BNSF Railway Company ("BNSF") files this Complaint for Declaratory Judgment and Injunctive Relief against Defendant the Town of Cicero, Illinois ("Cicero") and in support thereof states:

## INTRODUCTION

1. Cicero recently adopted a new ordinance governing sewer rates that targets BNSF and constitute discrimination in violation of federal law. The new ordinance (the "Sewer Rate Ordinance" or "Ordinance") requires railroads—and *only* railroads—to pay an exorbitant $350.00-per-acre charge for monthly sewer use. The Ordinance resulted in a 1250% increase over BNSF's previous sewer bills, which spiked from $6,643 per month to $90,300 per month. Meanwhile, the Ordinance charges other local commercial and industrial users based on their actual water usage and has not similarly increased their sewer bills.

2. The discriminatory nature of the sewer rate charge is obvious when the exorbitant fee charged to BNSF is compared to the fee charged to comparable businesses. While BNSF is charged by the acre, other commercial and industrial businesses in Cicero, including Citgo, ExxonMobil, Walmart, and the Cicero Marketplace, pay $56.06 per month for an allowance of

3,000 cubic feet, and pay a mere $18.69 for each additional 1,000 cubic feet of water used, irrespective of their acreage or the characteristics of their land. If BNSF were charged at the rate applicable to other commercial and industrial properties within Cicero, BNSF would pay approximately $150 per month based on its average monthly water use of approximately 7,755 cubic feet—a tiny fraction of the $90,300 per month imposed by Cicero.

3.      The Ordinance's massive increase in sewer charges singles out BNSF for discriminatory treatment and is not justified by any study or data. The rate imposed by Cicero does not take into account BNSF's actual water use or the volume of flow to Cicero's sewer, and BNSF cannot reduce the charge by reducing its water use.

4.      Cicero imposed this increase without providing any reasonable notice to BNSF and without holding any public hearing or providing any other opportunity for BNSF to be heard. When it first saw that its bill was $90,300 instead of the usual $6,643, BNSF presumed that there had been an error. Once BNSF learned about the increase, and raised this matter to the Town President, Cicero threatened to "issue a 60-day notice of water and sewer shut off, which may include digging underground to remove pipes as well as the placement of the lien for the unpaid amount" unless payment was made.

5.      Cicero has since escalated its efforts to enforce this discriminatory rate against BNSF. After BNSF inquired about whether there is a refund process to recover payments if the rate is later deemed unlawful, Cicero's only response was to issue a 60-day notice of termination, demanding immediate payment of $395,450.88 and stating that sewer service at BNSF's railyard otherwise "WILL BE SHUT OFF, DISCONTINUED, AND DISCONNECTED (SIXTY) 60 DAYS FROM MAY 20, 2021"—i.e., on July 19, 2021. The notice further threatened that "IF THE TOTAL BILL IS NOT PAID AND THE SEWER IS DISCONTINUED AND

DISCONNECTED, THE PROPERTY WILL BECOME A HEALTH DEPARTMENT PROBLEM" and "WILL HAVE TO BE VACATED."

6.      In addition to Cicero's threatened action, which would force BNSF to shut its railyard and would seriously impair a major interstate transportation hub, BNSF faces a continuing "penalty charge" of 20 percent of each monthly bill, to be imposed by Cicero 25 days after each bill is due.

7.      Accordingly, BNSF asks this Court to restrain Cicero from imposing and enforcing exorbitant and discriminatory sewer rates upon BNSF for its railyard property, including by terminating or otherwise interfering with water or sewer service to BNSF's railyard, or by requiring BNSF to vacate its property.  BNSF further seeks a declaration that the Sewer Rate Ordinance is illegal and unenforceable on its face and as applied to BNSF.

## JURISDICTION AND VENUE

8.      Cicero purports to designate the sewer rate as a "fee."  To the extent the sewer rate is considered to be a fee, and is not considered to be a tax, then jurisdiction is proper under 28 U.S.C. § 1331 because BNSF's allegations raise federal questions under the laws of the United States and raise substantial questions of federal law, including whether federal law preempts the sewer rate.  In those circumstances, jurisdiction is also proper under 28 U.S.C. § 1343.

9.      To the extent the sewer rate is considered to be a tax, then jurisdiction is proper under the Railroad Revitalization and Regulatory Reform Act of 1976, § 306, Pub. L. No. 94-210, 90 Stat. 54 (now codified in relevant part as amended at 49 U.S.C. § 11501) (the "4-R Act").  The 4-R Act confers jurisdiction on federal courts to "prevent a violation" of its provisions notwithstanding the Tax Injunction Act, 28 U.S.C. § 1341, which generally prohibits federal courts

from enjoining the collection of state taxes when a plain, speedy and effective remedy may be had in state court. 49 U.S.C. § 11501(c).

10. Jurisdiction is also proper under 28 U.S.C. § 1332(a)(1) because BNSF and Cicero are citizens of different States and the amount in controversy exceeds $75,000.

11. Venue is proper in this Court under 28 U.S.C. § 1391(b) because Defendant Cicero resides in this judicial district, BNSF's property in Cicero is located in this judicial district, and a substantial part of the events giving rise to BNSF's claims occurred within this district.

12. This Court has the authority to enter a declaratory judgment and to provide preliminary and permanent injunctive relief pursuant to Rules 57 and 65 of the Federal Rules of Civil Procedure, and 28 U.S.C. §§ 2201 and 2202.

13. This Court has personal jurisdiction over Defendant Cicero because it is domiciled in Illinois.

## PARTIES

14. BNSF Railway Company is a Delaware corporation with its principal place of business in Fort Worth, Texas. BNSF is engaged in interstate commerce as a common carrier by railroad and owns and operates a railyard and rights of way within Cicero.

15. Cicero is an incorporated town located in Cook County, Illinois.

## FACTS

16. BNSF operates one of the largest freight railroad networks in North America. BNSF provides services as a common carrier by rail and is regulated by the Surface Transportation Board.

17. BNSF owns and operates an intermodal rail and maintenance yard at 5601 W. 26th Street in Cicero, Illinois. Intermodal shipping allows for the transfer of containerized freight from

an origin point to a destination and involves the joint provision of service by various types of transportation providers. For example, a freight container can arrive on a ship, the cargo can be transloaded into a standard 53-foot container to be carried by truck, and then that container can be transferred to rail, which efficiently moves the container to a rail hub (like the Cicero railyard). The containerized freight may then ultimately be delivered to its destination with another leg of transport by truck or rail.

18.    BNSF's Cicero railyard serves as a major transportation hub that links the Midwest with the Pacific Northwest and plays a vital role in the interstate transportation of a wide variety of goods and commodities. The Cicero railyard also frequently serves as the destination point for foreign imports shipped across the Pacific Ocean, which are shipped to the Pacific Northwest, then travel by rail through the Cicero railyard to points in the Midwest, Eastern Seaboard, and beyond. Amtrak and Metra trains also pass through the railyard on a daily basis.

19.    The Cicero railyard employs hundreds of individuals, including residents of Cicero and the surrounding area.

20.    Cicero owns and operates a combined storm/sanitary sewer system located within the Metropolitan Water Reclamation District of Greater Chicago.

**Cicero's Sewer Rate Ordinance**

21.    The Sewer Rate Ordinance, set forth in Section 98-266 of Cicero's Code of Ordinances, and reproduced as Exhibit A to this Complaint, currently establishes differential sewer rates for the following categories of properties:

(1) Residential;

(2) Commercial and industrial;

(3) Railroad yards and rights-of-way; and

(4) Commercial and industrial outside the Town's border.

22.     The Sewer Rate Ordinance imposes a 20 percent penalty charge for non-residential sewer bills not paid within 25 days of the date of billing.

23.     Pursuant to Section 98-187 of Cicero's Code of Ordinances, all properties abutting a public street, thoroughfare, parkway, or alley must be connected to Cicero's sewer system. BNSF is thus required to connect to Cicero's sewer system.

**Cicero Adopts Changes to its Sewer Rate Ordinance Targeting BNSF**

24.     In December 2020, Cicero's Board of Trustees amended the Sewer Rate Ordinance. The Board adopted Ordinance No. 72-20, which amended Subsection (3) of the Sewer Rate Ordinance to significantly and exclusively increase the sewer rates charged to railroads for properties used as railyards. The Sewer Rate Ordinance singles out railyards for special, discriminatory treatment both in the method and rate of assessment.

25.     The stated purpose of the revision was "to increase rates for railroad yards and rights-of-way to ensure the proper operation and maintenance of the combined waterworks and sewage system." Cicero, however, did not provide any notice or opportunity for BNSF or the public to ask questions. Nor did Cicero publish any explanatory study, investigation, or analysis, before adopting the rate increase.

26.     Under the amended Sewer Rate Ordinance, the sewer rate charged to railyards jumped dramatically from $27.42 to $350.00 per month per acre. As a result of the adoption of Ordinance No. 72-20, and a comparatively modest apparent increase in the acreage Cicero used to calculate BNSF's bill, BNSF's monthly sewer bill for the railyard skyrocketed from $6,643.04 to $90,300, an increase of 1250%. In contrast, sewer rates charged by Cicero for residential, commercial and industrial service within Cicero remained unchanged.

27.     Sewer rates are assessed against railyards on a per-acre basis regardless of water consumption or actual sewer use.  In contrast, sewer rates for local commercial and industrial service are based on monthly water consumption ($56.06 for the first 3,000 cubic feet and $18.69 for each additional 1,000 cubic feet).  Residential sewer rates are assessed per residential dwelling unit at a bimonthly rate of $26.59.

28.     Because the sewer rate charged to railyards is assessed on a per acre basis regardless of actual water use or the volume of flow to Cicero's sewer, BNSF cannot reduce the amount charged by reducing its water consumption or adopting other measures that would avoid or reduce use of or contributions to Cicero's sewer system.  Cicero ordinances require BNSF to connect its railyard to Cicero's sewer system.  *See* Cicero Code of Ordinances § 98-187(a).  Moreover, unlike other commercial and industrial businesses, BNSF cannot avoid this discriminatory charge by relocating its railyard and associated infrastructure to another municipality or unincorporated area.

29.     If BNSF were charged at the rate applicable to other industrial or commercial properties, BNSF would pay approximately $150 per month based on its average monthly water use of approximately 7,755 cubic feet—a tiny fraction of the $90,300 per month currently demanded by Cicero.

**BNSF Attempts to Work Towards a Resolution with Cicero, and Cicero
Responds by Threatening to Disconnect BNSF's Access to Water and Sewer Service**

30.     Cicero did not inform BNSF of its proposal to single out railyards for the significant rate increase, nor did Cicero host any public hearing.  Cicero also did not provide any meaningful opportunity for BNSF (or any other members of the public) to ask questions or offer comment on the proposed ordinance prior to adoption.

31.     In fact, the only notice of the proposed Sewer Rate Ordinance was the Agenda for the Board's December 8, 2020 meeting which disclosed only that a vote would be taken on "An

Ordinance Amending Chapter 98, Section 98-266 Of The Code Of Ordinances Of The Town Of Cicero, Illinois, Regarding Sewer Rates For The Town Of Cicero, County of Cook, State Of Illinois." Upon information and belief, no further description of the proposed ordinance or proposed ordinance text was made available to the public prior to the meeting.

32. The December 8, 2020 Board meeting also did not provide an opportunity for BNSF or any interested citizens to ask questions or voice concerns about the basis for the sewer rate change. Any questions to be asked at the Board meeting must be submitted to the Town attorney in writing at least 72 hours in advance of the meeting. The Agenda for the December 8, 2020 Board meeting specifically discouraged public participation and reminded members of the public that the meeting was *not* a public hearing. Cicero Code of Ordinances Section 2-66 also specifies that any questions by citizens are relegated to a "public participation period" *after* consideration and action on all Board business.

33. The first "notice" BNSF received of Cicero's exorbitant rate increase was the $90,300 bill it received in February 2021. Because the bill received for a single month of service was more than the sewer bills BNSF paid for the entire previous year ($79,716), BNSF initially believed the bill was an error.

34. After becoming aware of Cicero's adoption of the arbitrary fee increase applicable only to railyards, BNSF contacted Cicero President Larry Dominick to express its concerns that the increase Cicero adopted was arbitrary and capricious, discriminatory, lacked an adequate basis in law, and was contrary to federal and state law. BNSF further expressed concern that Cicero had not notified BNSF of its intention to so significantly increase its sewer rates or otherwise offered BNSF a reasonable opportunity to express its concerns.

35.     Cicero responded by refusing to acknowledge any of BNSF's concerns and threatened to terminate BNSF's water and sewer service unless full payment with penalties was made.  As set forth in a March 16, 2021 email from Cicero's attorney: "Lastly, there is no 'pending dispute' to 'work towards resolution.' There is no provision under the law that permits you to dispute your bills in this manner and simply not pay the bulk of it.  BNSF was sent an invoice and the Town expects payment of the full amount plus a 20% penalty for failure to pay by close of business on March 26, 2021.  If payment is not received, we will issue a 60-day notice of water and sewer shut off, which may include digging underground to remove pipes as well as the placement of a lien for the unpaid amount."

36.     Despite Cicero's threats, BNSF, though its counsel, continued to attempt to engage with Cicero and sought information from Cicero to enable BNSF to understand the justification for the sizable and discriminatory rate increase.  These attempts included multiple telephone conferences between BNSF's counsel, Cicero's counsel, and other Cicero officials.  Despite these repeated communications, Cicero failed to provide requested information.

37.     Because Cicero has attempted to impose an $18,060 late penalty charge per month in addition to the increased rate, BNSF sought to avoid the accumulation of penalties while BNSF investigated and disputed the rate increase.  BNSF therefore asked Cicero if there is a refund process in place to recover payments if it is later determined that BNSF overpaid.

38.     Cicero responded nine days later, on May 19, 2021.  But Cicero did not identify a refund process.  Cicero instead transmitted a 60-day notice of termination, demanding immediate payment of all amounts it claims are due ($395,450.88) and stating that sewer service at BNSF's railyard otherwise "WILL BE SHUT OFF, DISCONTINUED, AND DISCONNECTED (SIXTY) 60 DAYS FROM MAY 20, 2021."  The notice further threatened that "IF THE TOTAL BILL IS

NOT PAID AND THE SEWER IS DISCONTINUED AND DISCONNECTED, THE PROPERTY WILL BECOME A HEALTH DEPARTMENT PROBLEM" and "WILL HAVE TO BE VACATED."

39.     BNSF will suffer immediate, irreparable injury, loss, and damage if Cicero continues to impose and enforce the discriminatory sewer rate, including by disconnecting BNSF's sewer service, terminating BNSF's access to water and sewer services, taking action to excavate piping and structures on or connected to BNSF's property, or otherwise requiring BNSF to vacate its railyard property.  Access to and use of water and sewer services is required for proper and safe operations at BNSF's Cicero railyard, including the provision of adequate sanitation facilities to hundreds of workers on site.  Termination of BNSF's access to water and sewer service would cause a shutdown of the railyard and render a major transportation hub inoperable.  Such action would significantly disrupt rail and intermodal service, severely impact interstate commerce, and harm BNSF, its customers, and its employees.  BNSF would face competitive harm through business lost to competitors and goodwill lost due to inability to meet customer needs.  Customers would be harmed by delays and shortfalls in service.  And BNSF's employees would be harmed by being unable to work at the railyard.

40.     BNSF also will suffer irreparable injury if BNSF pays the discriminatory rate because Cicero has not offered any process for BNSF to recoup funds in the likely event that the Sewer Rate Ordinance is declared unlawful.

**Cicero Has Offered No Justification for Its Discriminatory Sewer Charge**

41.     In adopting revisions to the Sewer Rate Ordinance, the Board did not undertake any study, investigation, or analysis to quantify or measure volume of use or flow to Cicero's sewer facilities by or from railyards.  The Board did not undertake any study, investigation, or analysis

to determine the nature of the use or flow to Cicero's sewer facilities. Nor did it undertake any study, investigation, or analysis of the costs or burdens of providing sewer service to railyards. In fact, the Sewer Rate Ordinance amendment was approved along with multiple other ordinances, permit requests, resolutions, reports, and other Town matters during a Tuesday morning Board meeting that lasted less than 15 minutes.

42.     Cicero has not attempted to explain the disparate sewer rate charged to railyard properties by identifying any difference between railyards and other commercial and industrial properties within Cicero. Cicero's Sewer Rate Ordinance, on its face, singles out and discriminates against BNSF by establishing a separate rate category specifically designed to target and burden the railyard property with a significantly higher rate, without any justification.

## COUNT I
## Preemption Under the ICC Termination Act

43.     BNSF repeats and re-alleges the allegations set forth in the previous paragraphs of this Complaint as if fully set forth herein.

44.     Congress enacted the ICC Termination Act of 1995 ("ICCTA"), Pub. L. No. 104-88, 109 Stat. 803 (codified as amended at 49 U.S.C. § 10101 *et seq.*), to abolish the Interstate Commerce Commission and create its successor agency, the Surface Transportation Board ("STB").

45.     ICCTA vests exclusive jurisdiction in the STB over "transportation by rail carriers . . . with respect to rates, classifications, rules . . . , practices, routes, services, and facilities of such carriers" and over "the construction, acquisition, operation, abandonment, or discontinuance of [tracks] or facilities." 49 U.S.C. § 10501(b). BNSF's facility and operations in Cicero fall under ICCTA's broad definition of "transportation," which includes a "property, facility, instrumentality, or equipment of any kind related to the movement of … property … by rail" and "services related

to that movement, including receipt, delivery, elevation, transfer in transit, … storage, handling, and interchange of … property." 49 U.S.C. § 10102(9).

46.     ICCTA preempts all state and local laws that have the effect of managing or governing rail transportation.  As relevant here, a local regulation is preempted by ICCTA if it "would have the effect of preventing or unreasonably interfering with railroad transportation." *Union Pacific R. Co. v. Chicago Transit Authority*, 647 F.3d 675, 679 (7th Cir. 2011) (quoting *CSX Transp., Inc.*, FD 34662, 2005 WL 1024490, at \*3 (STB served May 3, 2005)).  Under that standard, federal courts and the STB have concluded that state and local regulation is permissible only if the regulations do not discriminate against or unreasonably burden railroads.  *CSX Transp.*, 2005 WL 1024490, at \*4; *see Adrian & Blissfield R. Co. v. Village of Blissfield*, 550 F.3d 533, 541 (6th Cir. 2008); *N.Y. Susquehanna & W. Ry. v. Jackson*, 500 F.3d 238, 252 (3d Cir. 2007); *Green Mountain R.R. v. Vermont*, 404 F.3d 638, 642 (2d Cir. 2005).  But "for a state regulation to pass muster, it must address state concerns generally, without targeting the railroad industry."  *N.Y. Susquehanna*, 500 F.3d at 254.

47.     The sewer rate charge impermissibly regulates railroad transportation because it discriminates against railroads.  The plain text of the Sewer Rate Ordinance singles out and targets railroads for a rate that is higher than the rate paid by other commercial and industrial properties located within Cicero.  Accordingly, the Sewer Rate Ordinance impermissibly interferes with railroad transportation by discriminating against transportation by rail.  Thus, the Sewer Rate Ordinance is preempted under 49 U.S.C. § 10501(b).

## COUNT II
### Violation of Railroad Revitalization and Regulatory Reform Act of 1976

48.     BNSF repeats and re-alleges the allegations set forth in the previous paragraphs of this Complaint as if fully set forth herein.

49.    The Railroad Revitalization and Regulatory Reform Act of 1976, Pub. L. No. 94-210, 90 Stat. 31 (now codified as amended in scattered sections of Title 49), was enacted to, *inter alia*, further the financial stability of the railway system of the United States.  Congress recognized that one threat to the economic viability of the railway system was States' discriminatory taxation of railroads and rail activity.  "[R]ailroads are easy prey for State and local tax assessors in that they are nonvoting, often nonresident, targets for local taxation, who cannot easily remove themselves from the locality."  *Dep't of Revenue of Or. v. ACF Indus., Inc.*, 510 U.S. 332, 336 (1994) (internal quotation marks and citation omitted).  To remove the "temptation to excessively tax" railroads "to subsidize general welfare spending," the 4-R Act prohibits state and local tax schemes that discriminate against railroads.  *W. Air Lines, Inc. v. Bd. of Equalization of S.D.*, 480 U.S. 123, 131 (1987).  Such schemes are diverse, and thus "the nomenclature provided to the [state] charge at issue is not material" to the question whether the charge is a tax in substance under federal law.  *Valero Terrestrial Corp. v. Caffrey*, 205 F.3d 130, 134 (4th Cir. 2000).  Instead, courts consider whether the charge raises revenue to support the general public welfare (making it a tax), or instead is "tied to a particular benefit obtained by a specific taxpayer" (making it a fee).  *Kansas City S. Ry. Co. v. Koeller*, 653 F.3d 496, 507 (7th Cir. 2011).

50.    As relevant here, under 49 U.S.C. § 11501(b) a State "may not" impose certain discriminatory property taxes or "[i]mpose another tax that discriminates against a rail carrier."  The forbidden taxes include "taxes on rail transportation property and to other taxes if they discriminate against a rail carrier," and a tax that "is imposed on an activity in which only a railroad or railroads engage … is prima facie discriminatory" under the statute.  *Burlington N. R.R. v. City of Superior*, 932 F.2d 1185, 1186, 1187 (7th Cir. 1991).  "[A] showing that the railroads have been

- 13 -

targeted [for taxation] is enough to prove discrimination" under the 4-R Act. *Koeller*, 653 F.3d at 510.

51.    For purposes of this count only, and without prejudice to BNSF's alternative claim, the sewer rate charge is in substance "another tax" within the meaning of 49 U.S.C. § 11501(b)(4).

52.    The sewer rate charge impermissibly discriminates against railroads vis-à-vis other local commercial and industrial payers because the plain text of the Sewer Rate Ordinance singles out and targets railroad yards and rights-of-way, which are owned only by railroads, for differential and worse treatment than other similarly-situated property.

53.    There is no adequate justification for the discriminatory treatment of railroads under the Sewer Rate Ordinance.

54.    The Sewer Rate Ordinance thus discriminates against common carriers by railroad, including BNSF, in violation of the 4-R Act.  Therefore, the Sewer Rate Ordinance as applied to BNSF should be declared to be invalid and unenforceable.

### COUNT III
### Violation of Dormant Commerce Clause as Deprivation of Rights, Privileges, or Immunities Under 42 U.S.C. § 1983

55.    BNSF repeats and re-alleges the allegations set forth in the previous paragraphs of this Complaint as if fully set forth herein.

56.    The Interstate Commerce Clause of the U.S. Constitution provides that "the Congress shall have the power . . . to regulate Commerce . . . among the several States."  U.S. Const. art. I, § 8, cl. 3.  The promotion and protection of interstate commerce is a central function of the Federal Government, and the Interstate Commerce Clause recognizes that the free flow of goods and materials throughout the nation is essential to the national economy.  "Although the Commerce Clause is by its text an affirmative grant of power to Congress to regulate interstate

- 14 -

and foreign commerce," the Supreme Court has explained it also "has long been recognized as a self-executing limitation on the power of the States to enact laws imposing substantial burdens on such commerce." *South-Central Timber Dev., Inc. v. Wunnicke*, 467 U.S. 82, 87 (1984). This is sometimes called the "Dormant" Commerce Clause.

57. State and local laws or regulations that discriminate against or impermissibly interfere with interstate commerce violate the Dormant Commerce Clause and are invalid. In particular, "laws that explicitly discriminate against interstate commerce" or "bear more heavily on interstate commerce than on local commerce" are subject to invalidation under the Dormant Commerce Clause. *Nat'l Paint & Coatings Ass'n v. City of Chicago*, 45 F.3d 1124, 1131 (7th Cir. 1995).

58. The Dormant Commerce Clause forbids the Sewer Rate Ordinance's discriminatory application to railroads (and to BNSF in particular). Because railroads are overwhelmingly channels of *inter*state commerce—and because the operations of BNSF's railyard in Cicero are almost entirely concerned with *inter*state commerce—the Sewer Rate Ordinance's specific application to railroads is facially discriminatory against interstate commerce. At the very least, the Sewer Rate Ordinance's special charge on railroads has the practical effect of discriminating against interstate commerce. The charge represents an attempt by Cicero to disproportionately shift the costs and expenses of maintaining, operating, and improving the sewer system and other Town infrastructure to a key channel of interstate commerce, so as to benefit local interests at the expense of interstate commerce.

59. A State law that regulates a person in violation of the Dormant Commerce Clause deprives that person of "rights, privileges, or immunities secured by the Constitution" within the meaning of 42 U.S.C. § 1983. *Dennis v. Higgins*, 498 U.S. 439 (1991). The Sewer Rate Ordinance

violates the Dormant Commerce Clause and impermissibly deprives BNSF of rights, privileges and immunities secured to it by the Constitution.

60.     Under 42 U.S.C. § 1988(b), BNSF is entitled to recover a reasonable attorney's fee in this case.

<div align="center">

**PRAYER FOR RELIEF**

</div>

WHEREFORE, BNSF respectfully requests that this Court enter judgment against the Town of Cicero including:

A.  Issuance of a Temporary Restraining Order, Preliminary Injunction, and Permanent Injunction preventing the Town from enforcing the Sewer Rate Ordinance;

B.  Issuance of a judgment and order declaring that the Sewer Rate Ordinance is invalid and unenforceable as applied to railyards and rights of way, including those owned or operated by BNSF;

C.  Issuance of a judgment and order awarding BNSF costs and expenses in this action, including reasonable attorneys', accountants', and experts' fees, under any applicable statute or rule; and

D.  Granting such other and further relief as the Court deems just and proper.

<div align="center">

**JURY DEMAND**

</div>

Plaintiff BNSF Railway Company demands a trial by jury on all claims so triable.

Dated: June 8, 2021

**BNSF RAILWAY COMPANY,**

By:  _/s/ Renato Mariotti_

Renato Mariotti
Holly H. Campbell
THOMPSON COBURN LLP
55 East Monroe, 37th Floor
Chicago, Illinois 60603
312.346.7500
rmariotti@thompsoncoburn.com
hcampbell@thompsoncoburn.com

Sara L. Chamberlain
THOMPSON COBURN LLP
One US Bank Plaza
St. Louis, Missouri 63101
314.552.6000
schamberlain@thompsoncoburn.com

Benjamin J. Horwich (*pro hac vice* motion
forthcoming)
Teresa A. Reed Dippo (*pro hac vice* motion
forthcoming)
Rebecca L. Sciarrino (*pro hac vice* motion
forthcoming)
MUNGER, TOLLES & OLSON LLP
560 Mission Street, Twenty-Seventh Floor
San Francisco, California 94105
415.512.4000
ben.horwich@mto.com
teresa.reeddippo@mto.com
rebecca.sciarrino@mto.com

*Attorneys for Plaintiff*