1            IN THE UNITED STATES DISTRICT COURT
        FOR THE NORTHERN DISTRICT OF ILLINOIS
2                     EASTERN DIVISION

3   BNSF RAILWAY COMPANY,              )
                                       )
4                   Plaintiff,         )
                                       )  Case No. 21 CV 3072
5   -vs-                               )
                                       )  Chicago, Illinois
6   TOWN OF CICERO, ILLINOIS,          )  November 10th, 2021
                                       )  4:40 p.m.
7                   Defendant.         )

8            TRANSCRIPT OF PROCEEDINGS - Motion
        BEFORE THE HONORABLE STEVEN C. SEEGER
9
    TELEPHONIC APPEARANCES:
10
    For the Plaintiff:     THOMPSON COBURN LLP
11                         BY:  MR. RENATO T. MARIOTTI
                           55 East Monroe Street
12                         37th Floor
                           Chicago, IL  60603
13

14  For the Defendant:     DEL GALDO LAW GROUP, LLC
                           BY:  MS. CYNTHIA S. GRANDFIELD
15                         1441 South Harlem Avenue
                           Berwyn, IL  60402
16

17

18

19

20

21

22  Court Reporter:        AMY M. SPEE, CSR, RPR, CRR
                           Federal Official Court Reporter
23                         United States District Court
                           219 South Dearborn Street, Room 2318A
24                         Chicago, IL  60604
                           Telephone:  (312) 818-6531
25                         amy_spee@ilnd.uscourts.gov

1    (Proceedings heard via telephone:)

2         THE CLERK:  21 CV 3072, BNSF Railway Company versus

3    Town of Cicero.

4         THE COURT:  Good afternoon, everyone.  It's

5    Judge Seeger.

6         Let's get everyone's appearances on the record, if

7    you would, please.  Let's start with counsel for the

8    plaintiff.

9         MR. MARIOTTI:  Good afternoon, Your Honor.

10         Renato Mariotti, from Thompson Coburn, on behalf of

11    the plaintiff, BNSF Railway Company.

12         My co-counsel, Ben Horwich, won't be able to be here

13    because he's in transit today, but he has been on prior -- on

14    our prior -- prior calls.

15         THE COURT:  Yep.  Got it.  Okay.  Good afternoon to

16    you, Mr. Mariotti.

17         And, Defense Counsel, please.

18         MS. GRANDFIELD:  Good afternoon, Your Honor.

19         This is Cynthia Grandfield on behalf of Defendant

20    Town of Cicero.  And it's just me today.  My co-counsel is in

21    a deposition.

22         THE COURT:  Totally fine.  All right.  Good afternoon

23    to you, Ms. Grandfield.

24         Well, thank you, everyone, for jumping on the call

25    today.  Let me start by apologizing for the delay today.  I

1    know you folks had planned on having an earlier hearing with

2    me today and had planned accordingly, and I pushed it back,

3    and I was even a little late to join the pushback time.

4         By way of explanation but not excuse, I slotted you

5    folks in today even though I -- for 3:30 even though I had a

6    full calendar because I wanted to hear from you.  And I had a

7    sentencing that was earlier this afternoon.  It went longer

8    than I think anyone had expected.  I sentenced someone to over

9    a hundred months in federal prison for selling heroin, and

10   it's not something I do lightly as a judge.  It's something I

11   put a lot of thought into.

12        And when I sentence someone to federal prison, my

13   approach is, I've just got to get this right and it's going to

14   take as much time as it takes.

15        So I'm sorry that you had to wait the time.  If it's

16   any small consolation, you know, when you sentence someone to

17   months and months in prison, in federal court, that's a lot of

18   time, too, right?  So I appreciate the professionalism of

19   everyone on the call here in this civil case and other civil

20   cases for indulging me if I need to take whatever time is

21   necessary before I deprive someone of their liberties.  So

22   thank you in advance for your -- not in advance.  Thank you in

23   retrospect here for your patience for the delayed time today.

24        MR. MARIOTTI:  Not an issue, Your Honor.  Thank you.

25        MS. GRANDFIELD:  Yes, thank you.

1      THE COURT:  And I know your time is valuable, and I

2  never want to spend it.  So thank you.

3      Folks, we are here for a hearing.  I have looked at

4  the docket.  I'm obviously well familiar with the case from

5  our preceding discussions a couple of months ago.  You know, I

6  remember the lay of the land, obviously, and I know that there

7  was a -- the punch line is, there was a motion for a TRO and a

8  preliminary injunction back in June.  You folks hammered out a

9  90-day stipulation to preserve the *status quo*.  That expired,

10  give or take, around October 26th, and the parties have not

11  been able to agree on continuing the terms of that

12  stipulation.  So as BNSF sees it, we're back to square one.

13  Everything has sprung back to life.

14      I want to talk to you folks about it.  Before you get

15  into any argument, though, I just want to make sure that I

16  understand the lay of the land, meaning what the *status quo*

17  is.

18      I'd like to hear from each of you first on what is

19  the *status quo*?  Is there currently a threat or a plan to cut

20  off the water or impose a lien?

21      I want to hear from the town's counsel.

22      Ms. Grandfield, what is the town's plan -- so I

23  usually hear from the movants first.

24      Mr. Mariotti, I'd like to hear from you.  What is

25  your understanding of the *status quo*.

1          MR. MARIOTTI:  Well, we have offered to stipulate --

2    extend the stipulation for any period of time that the town is

3    willing to do that.  And so we're willing to agree to, you

4    know, extend it by a week, a month, a day, whatever they're

5    willing to agree to, and they've refused to do so.

6          And so given that they threatened to tear up the

7    pipes and shut off our water and evict us from the property

8    beforehand and on -- literally less than 24 hours before a

9    hearing was scheduled changed their mind, and we were able to

10   enter a stipulation.  And they're not willing to agree to

11   extend it.  As far as we're concerned, those threats are back

12   in force.

13         Now, I understand that Cicero is saying now that, for

14   example, they may -- they will -- they may take their time or

15   that the prior notices may not have been enough.  From our

16   vantage point, it's being a little too cute.

17         I mean, if they aren't -- if they don't actually

18   intend to do any of these things, then why don't they just

19   enter the stipulation -- or extend the stipulation?

20         THE COURT:  Okay.  Well, Ms. Grandfield, I want to

21   hear from you.  I'll tell you, that last point seems to be the

22   right one to me.  If you're not threatening to do anything,

23   why not agree to a stipulation?

24         MS. GRANDFIELD:  So we are -- the reason that we're

25   not agreeing to a stipulation is that that also includes terms

1   of payment and accrual of a late fee.  So it will relatively

2   ensure that the town will not get any payment of any fee at

3   all.  Because since we've entered into the stipulation, we've

4   received, of course, no fees from BNSF because, you know, that

5   was what the stipulation said.

6          So --

7          THE COURT:  Can I stop you on that, Ms. Grandfield?

8   I'm sorry to interrupt you.

9          So do you mean that you have not gotten even the

10  smaller original amount?

11         MS. GRANDFIELD:  Correct.

12         THE COURT:  Well, what about that, Mr. Mariotti?

13         The amount before was a certain number of dollars.

14  And they wanted to raise it to -- I think it was, what, give

15  or take $6,000 a month, and they wanted to increase it to

16  about 90,000 a month, give or take.

17         Do you know, is BNSF paying anything for water right

18  now?  And if so, what is it?

19         MR. MARIOTTI:  Yeah, my understanding is that we were

20  paying the prior bill of $6,643 a month.  So as far as I know,

21  we are paying that amount, and we have -- we would agree to

22  stipulate to pay that amount.

23         Regarding an accrual of a late fee, they were

24  charging us an accrual of a late fee of $18,060 a month, and

25  obviously that would itself be irreparable harm given that

1    there is no refund process --

2            THE COURT:  Right.

3            MR. MARIOTTI:  -- in place.

4            THE COURT:  Let's put aside the refund -- or -- I'm

5    sorry -- the late fee for a second.

6            Ms. Grandfield, he's telling me that you're getting

7    over $6,000 a month.  Do you know for certain that's

8    incorrect?

9            MS. GRANDFIELD:  I will tell you -- what the water

10   director told me is -- his exact quote was, "We're not getting

11   nothin' from them."  So --

12           THE COURT:  We're not -- we're not getting nothing.

13   I mean, I find it hard to believe that BNSF is getting free

14   water from the town.

15           MS. GRANDFIELD:  I should -- I wanted to clarify

16   that.  It's sewer.  It's the sewer fees.  They're -- they're

17   paying their water bill.  And we would not be shutting off

18   their water.  It's the sewer, which is a separate fee.

19           THE COURT:  All right.  So let's break this down for

20   a second.

21           So the -- well, whether I call it water or sewer, I

22   mean -- you know, sewer is water-related, right?  So the

23   motion talked about BNSF's sewer bills -- which sometimes I

24   just call water, but maybe I should call it sewer -- to

25   increase from $6,643 a month to $90,300 a month.

1      So my question to you is:  Is BNSF currently paying

2  sewer bills of $6,643 a month to the Town of Cicero?

3      MS. GRANDFIELD:  My understanding based on hearing

4  from the water director is no, but I did not visually view

5  their system to confirm that.

6      THE COURT:  Okay.

7      MR. MARIOTTI:  And, Judge, I just will say that I --

8  and, in fact, I have -- you know, my -- I just confirmed with

9  my client that our understanding is that we are continuing to

10 pay the original amount monthly.  So we'll confirm that, but

11 we absolutely should be paying that original amount, and that

12 is our intention, and we believe we are.

13     THE COURT:  And the stipulation is on file, right?

14 The stipulation is Docket No. 39.  I'm clicking on it here.

15 The stipulation covers enforcing the sewer rate charge and

16 late fees.  It doesn't say you're entitled to free water and

17 sewer, right?

18     So I guess I would be surprised if BNSF thinks it's

19 getting free sewer stuff.  And I am surprised to hear that

20 now.  And I guess my inclination is to think that I should

21 operate under the assumption that they're not getting free

22 sewer.

23     You know, if you want to submit a declaration from

24 this, Ms. Grandfield, I will certainly listen to you.  If

25 you're getting totally stiffed by the railroad and they aren't

1   paying anything for sewer, zero dollars, give me a

2   declaration.  I'll look at it, and I'll deal with it.  I don't

3   think that's consistent with what I'm hearing from the

4   railroad and that's not consistent with what I'm expecting

5   them to do.

6         I never thought they were saying they should pay you

7   nothing.  I thought the argument was always they shouldn't

8   have to pay you more.

9         MR. MARIOTTI:  That is our argument, Your Honor, just

10  to be crystal clear.

11        THE COURT:  Yep.  Right.

12        MS. GRANDFIELD:  Well -- yeah, and that's fine, but I

13  have also heard arguments that they should be only paying like

14  $150 a month.  So -- but either way, I -- like I said, that's

15  what the town water director told me, but I did not view it,

16  so I will have to, you know, check with him and make sure

17  that, you know, I get whatever that documentation is because I

18  don't want --

19        THE COURT:  Okay.

20        MS. GRANDFIELD:  -- to misrepresent it, you know.

21        THE COURT:  Here's what I'd like you to do, because

22  this is an important point, by Friday I'd like you to put

23  something on file that confirms whether BNSF is paying you for

24  sewer this year and how much it is per month.

25        MS. GRANDFIELD:  Okay.

1  THE COURT:  And maybe you could work cooperatively

2  with Mr. Mariotti.

3  I'd like you to check with your client, too, and

4  hopefully you folks can -- you should be able to do it in one

5  paragraph.  Just say, the parties have looked at their books

6  and confirmed that BNSF has paid X dollars per month to the

7  town for sewer.  Right?  It should be a sentence or two.

8  MS. GRANDFIELD:  Yeah.

9  MR. MARIOTTI:  We will.

10  THE COURT:  That way we've got a clean record.

11  Okay.  So for purposes of the discussion here, folks,

12  let's operate under the assumption that the railroad is

13  continuing to pay at the prelawsuit rate, the $6,500 and some

14  change here, give or take, okay?

15  So, Ms. Grandfield, take it from there.  What's your

16  understanding of the lay of the land?  Assuming that's

17  correct, what's your understanding of the *status quo*?

18  MS. GRANDFIELD:  So the rest of my understanding is,

19  so far as the notice of shutoff, that that would -- regardless

20  of whether they simply have a bill outstanding, which is under

21  the current ordinance that they recently passed with the

22  increased rate, that that would have to be reissued because of

23  the stipulation.  I mean, there's basically no precedent for

24  this.

25  So considering the, you know, admittedly extreme

1   nature of the enforcement, they would have to reissue that.

2   And I don't believe they have plans to do that currently

3   because of the logistical issues involved with shutting off

4   someone's sewer.  I mean, it's not like shutting off someone's

5   water where they can just --

6           THE COURT:  Why would they have to reissue the

7   ordinance?  I mean, the -- I think of it like a legislative

8   capacity and an executive capacity.  I understood the

9   stipulation basically to be an agreement that they wouldn't

10  enforce an ordinance that's on the books.

11          I thought you had filed something saying they had not

12  vacated the ordinance.

13          MS. GRANDFIELD:  Right, they have not vacated the

14  ordinance.

15          THE COURT:  Right.

16          MS. GRANDFIELD:  The ordinance --

17          THE COURT:  So it's on the --

18          MS. GRANDFIELD:  -- still exists.

19          THE COURT:  -- books -- right.  So it's on the books,

20  and it's not currently being enforced.  And I hear the

21  railroad's lawyer saying, look, they're nervous given the

22  overt threats from the town before that were held in abeyance

23  for purposes of 90 days and 90 days only.  Those threats have

24  now effectively come back to life because you've got an

25  ordinance on the books that has been used by the town before

1    to threaten them.  What's wrong with that argument?

2           MS. GRANDFIELD:  That argument -- the only thing

3    that's wrong with that argument is that they would still have

4    to reissue the notice of shutoff and -- so that would take

5    additional time, and they would have to choose that

6    enforcement method.  So there's no imminent threat because

7    they haven't issued the shutoff notice.

8           THE COURT:  I guess here's -- here's -- here's what I

9    don't understand:  We had a stipulation for 90 days where they

10   wouldn't enforce it.  I don't understand why the town would

11   refuse to continue the stipulation unless it had an intention

12   to enforce the ordinance.

13          If the town had no intention of enforcing the

14   ordinance, why not agree to the stipulation?

15          MS. GRANDFIELD:  I think the town at this point does

16   have an intention to enforce the ordinance in the sense of

17   getting payment because they don't want to agree to the

18   extension.  So --

19          THE COURT:  Okay.  And -- thank you for that.

20          MS. GRANDFIELD:  Correct.  Yes.

21          THE COURT:  Right.  So your understanding is that the

22   town is currently intending to enforce the ordinance against

23   BNSF?

24          MS. GRANDFIELD:  Yes, it's my understanding that they

25   will start again issuing bills to BNSF and seeking payment on

1    those bills, which was part of the stipulation.

2            THE COURT:  Right.

3            MS. GRANDFIELD:  And then to the extent they're not

4    paid, issuing a late fee.

5            Now, I have advised them that I don't think they can

6    start doing that until December 1st because that's when they

7    start -- because they issue a bill at the beginning of the

8    month.  So I don't -- you know, it's kind of a gray area with

9    the stipulation ending at the end of October.  I don't really

10   know how they could, you know, start doing that again.

11           So -- but, yeah, that's -- that's my understanding.

12           THE COURT:  And is the bill, I assume, going to be

13   retrospective till October 26th at the increased rate?

14           MS. GRANDFIELD:  Yes.

15           THE COURT:  Okay.  So as of today, your position is,

16   the increased rate applies to BNSF Railway?

17           MS. GRANDFIELD:  Correct.

18           THE COURT:  Okay.  Do you know any more granularity

19   about how soon the town is going to start enforcement

20   mechanisms?

21           In other words, are they going to send a letter?  Are

22   they going to send a notice of shutoff?  Are they going to try

23   to impose a lien?  Anything like that?  What's the plan?

24           MS. GRANDFIELD:  So their enforcement progression

25   plan, which they would just restart again, is generally that

1   they -- you know, they disburse -- importantly, issue a bill.

2   And then if the bill isn't paid, then they start imposing late

3   fees.

4         I think in this instance, they would consider placing

5   a lien if it still wasn't paid after a set period of time.

6   But that would not start until -- the progression would not

7   start until December 1st.

8         THE COURT:  Okay.

9         MS. GRANDFIELD:  Or whatever day that -- weekday that

10  is that's closest to it.  I --

11        THE COURT:  Right.

12        MS. GRANDFIELD:  -- should have looked at the

13  calendar.

14        THE COURT:  But, again, your perspective is that the

15  meter is -- the higher rate is currently running?

16        MS. GRANDFIELD:  Correct.

17        THE COURT:  Right.  Okay.  Okay.  So it seems pretty

18  clear to me we've got a live issue.

19        So, Mr. Mariotti, why do you think I ought to enter

20  the TRO?

21        MR. MARIOTTI:  Well, as a starting point, because the

22  meter is already running and we're already accruing a late

23  fee, and the Town of Cicero has no refund mechanism, BNSF is

24  already being harmed.  So as of this moment, BNSF is already

25  accruing a fee and is going to have to pay, let's say, a fee

1    that it is not going to be able to get back as a result of an

2    unlawful ordinance, an ordinance that I think is -- on its

3    face is unconstitu- -- or -- excuse me -- it violates the 4-R

4    Act and ICCTA -- and/or ICCTA.

5          Separate and apart from that, you know, we haven't

6    been able to get a clear sign here in terms of what exactly

7    this means in terms of -- and we've heard here an enforcement

8    framework.  It wasn't followed before, you know, before we got

9    here.  In fact, it escalated very quickly to threats of

10   shutoff, threats of pipes that were going to be dug up and so

11   forth.

12         And this is a very important interstate

13   transportation hub where -- you know, we all hear things on

14   the news about supply chain issues.  Here, this is a hub where

15   there are a lot of people that are counting on these trains to

16   enter and leave the station, so to speak, and get to their

17   destination.  There is a lot of money at risk.  There is also

18   a lot of people's jobs and livelihoods at risk.

19         So this is the sort of thing where essentially she's

20   suggesting there may be a lien, which would put us potentially

21   in state court, or potentially they could -- you know, they

22   could -- we could be back here again with a threatened

23   enforcement action in the not too distant future when we have

24   a briefing, frankly, that is almost done that would resolve

25   this issue.

1         So it appears to me it's -- that -- particularly when

2  you consider the totality of their conduct in this case, that

3  there -- that a PI motion should be issued -- should be

4  granted in this -- in this instance.

5         THE COURT:  Okay.  Thank you.

6         Ms. Grandfield, why shouldn't I issue a TRO?

7         MS. GRANDFIELD:  So I would say that the reason that

8  you shouldn't issue a TRO in this case is because there isn't

9  irreparable harm that's not monetary.  I believe that anything

10  that they would pay that would be later deemed unlawful could

11  be either directly refunded or assessed as damages or could

12  be, I don't know, taken off their ultimate bill.

13         They --

14         THE COURT:  Well, can I stop you on that?  What's the

15  mechanism for getting the money back?  I mean, suppose they

16  pay for two years, and then, you know, somebody says down the

17  road they shouldn't have had to pay, how are they going to get

18  their money back?

19         MS. GRANDFIELD:  Well, presumably if the Court were

20  to enter an order that it was unlawful, then we would have to

21  just refund the amount of the -- whatever the overpayment was

22  or work out some sort of plan with them where, you know, their

23  bill was lessened over time.

24         THE COURT:  So you're saying hypothetically that this

25  Court could enter a judgment in the meantime -- I'm sorry --

1    could enter a judgment, and they could recover it that way?

2          MS. GRANDFIELD:  Yes.  And I don't -- and so far as

3    their way of getting the money back, I mean, the town is one

4    of the oldest municipal corporations in the state.  We have an

5    obligation to do cross-payment for a variety of things.  And I

6    think our last budget was a hundred million dollars.  So I

7    mean -- you know, I don't understand -- I don't really follow

8    that argument, but -- so I think that that would be the

9    remedy.  If the ordinance is ultimately found unlawful, then

10    we would have to return any funds that the town wrongly

11    received or, like I said, in the alternative, work out some

12    sort of plan, you know, whatever -- whatever makes the most

13    sense.

14          THE COURT:  Do you want to speak to that,

15    Mr. Mariotti, about the ability to get the funds back?

16          MR. MARIOTTI:  Sure.

17          I inquired regarding a refund mechanism before we

18    filed the initial complaint, and the responses I got was a

19    threat to tear up the pipes.  I did not receive any -- this is

20    the first I've heard about any potential for a refund

21    mechanism here.

22          We would feel more comfortable if there -- if the

23    Court thought that payments at a higher amount were necessary

24    here, that they go into an escrow account controlled by the

25    Court, given the circumstances.

1    THE COURT:  I mean, I can certainly see why it might

2    give people pause about the collectability of something from a

3    municipality.  I'm seeing a lot of red tape, a lot of

4    bureaucracy, a lot of challenges.  It doesn't seem easy to me.

5    It's not like an ATM.  It's probably the opposite.

6         Go ahead, Ms. Grandfield.

7         MS. GRANDFIELD:  Yeah, I would just say that -- like

8    I said, we are -- we would be able to pay it back.  The town

9    has a -- in addition to their water/sewer fund, they have an

10   additional litigation fund or lawsuit fund that they would tap

11   into if necessary.  So I think that that could be resolved.

12        And -- I mean, I guess I would just also say that if

13   this ordinance is struck down, I -- you know, I do -- the town

14   does believe that BNSF should be paying a higher rate.  Now,

15   how that's calculated out if another ordinance is passed, at

16   this point it's unknown, but -- so that might affect it as

17   well, and that's why I was leaving the other option of, you

18   know, refunding it over time depending on what happens,

19   basically, with everything.

20        THE COURT:  And, Ms. Grandfield, you were speaking

21   more generally on your argument against the TRO when I jumped

22   in.  I want to give you an opportunity to say whatever you

23   want to say generally.  I think you were addressing my

24   question.

25        But to go back to my broader question, why shouldn't

1    I issue the TRO?

2            MS. GRANDFIELD:  So the reason you shouldn't issue

3    the TRO is that, first, like I said, there is no irreparable

4    harm in that there's nothing that's equitable harm that can't

5    be addressed with damages or with money.

6            Second, the reason I would say that there should not

7    be a TRO issued is pursuant to -- the plaintiff brings his TRO

8    pursuant to Counts I and II, which are the ICCTA (inaudible)

9    the 4-R Act.  I would say that under the --

10           THE COURT REPORTER:  Counsel, can you repeat that?

11           MS. GRANDFIELD:  Sure.

12           THE COURT REPORTER:  And if you are on speakerphone,

13   can you please get yourself off speaker?

14           MS. GRANDFIELD:  Yes.  I'm sorry.  I was.  You caught

15   me.  I should have not been doing that, especially while I was

16   pacing.

17           That attorney -- that BNSF brings this motion

18   pursuant to two counts.  The first count is the ICCTA count,

19   and the second count is the 4-R Act.

20           Under the ICCTA, I would argue that for purposes of

21   likelihood of success on the merits, it is not a regulation of

22   rail transportation.  Instead, it's an assessment of a sewer

23   fee, and any affect on rail transportation would be remote or

24   incidental.  And it's a sewer fee that while BNSF disputes

25   it's being charged more, it's being assessed against

1    everybody.

2          With respect to the 4-R Act, I would again argue that

3    there's not a -- the standard for likelihood of success on the

4    merits has been met in that instance either.  Because this fee

5    that the town is collecting is a fee which is in fact a fee

6    and not a tax within the meaning of the 4-R Act in that it's

7    assessed for the purposes of utilizing a system and a service

8    specific to the town.

9          So --

10         THE COURT:  I'm sorry, Ms. Grandfield.  Can you hear

11   me okay?

12         MS. GRANDFIELD:  Yes, I can.

13         THE COURT:  I have to apologize to you.  When my

14   court reporter said that you needed to speak up and get off

15   speakerphone, I then proceeded to bump my phone, and I

16   accidentally hit the button that dropped the call.  So I just

17   had to call back in.  So I'm having a bad display here.  I

18   both had a late arrival and an early departure.  I

19   inadvertently left the call, and you undoubtedly were saying

20   something thoughtful, none of which I heard.

21         So if you'd be kind enough, Ms. Grandfield, take it

22   from the top from when my court reporter asked you to -- and

23   I'll look back at the transcript later.  But if you can go

24   back and just rewind the tape for maybe 45 seconds.  Start

25   from there, please.  And I'm sorry about that.  I don't mean

1    to -- take your time.  Go ahead.

2         MS. GRANDFIELD:  No, no problem.  It was a stirring

3    argument.  I'm sure Mr. Mariotti would agree.

4         So my argument would additionally be that there is

5    not a likelihood of success on the merits because they have

6    not made out a claim under ICCTA because this was not a

7    regulation of rail transportation in any form; it is a --

8    simply an assessment of a sewer fee.  While they may dispute

9    that it's an assessment -- that it is a -- too high of a fee

10   or an appropriate fee, at the end of the day, it's not a

11   regulation of rail transportation.  So because of that, they

12   haven't passed step one and can't go to step two as if it's

13   too high and if it's too high in comparison with respect to

14   other entities.

15        Secondly, there is the lack of likelihood of success

16   on the merits with respect to the 4-R Act because, under the

17   case law, which I have cited to briefly in my response and

18   then more -- in more detail in my motion to dismiss, the town

19   believes that this is a fee and not a tax because it's a fee

20   that's being assessed for the use of the town's sewer system

21   and sewer service.

22        And because of that, again, the -- you can't go

23   further into the analysis as to whether the fee is

24   discriminatory or not because you have not met step one, which

25   is, it's not a tax within the meaning of the 4-R Act, so,

1     thus, it does not fall with it.

2          Lastly, I would say with respect to the balancing of

3     the equities that to the extent that's at all applicable or

4     relevant to the Court's consideration, that the town is an

5     economically disadvantaged suburb.  They are currently running

6     the sewer fund at -- based on the last audit that was

7     completed, a $1.2 million deficit.  And that fund is the only

8     fund that they are able to use this for.  So they simply need

9     the money.  And it is clear that BNSF does have the ability to

10    pay, so we're not looking at some sort of situation like I

11    think was raised in some dormant commerce clause cases where

12    you had small business owners that were unable to -- that it

13    turned into an equitable remedy because they were unable to

14    pay the fee because it would basically cost them to have to

15    close up shop and not be able to run the business anymore.

16         THE COURT:  Can I say -- and I appreciate that.  I

17    will tell you, I did not understand that argument in your

18    brief.  It seemed to be saying we need the money and they have

19    it, so we can take it.  You know, and this is not a criminal

20    situation, but I think about this in the criminal context.  It

21    would never be okay to say, look, I need the money, you've got

22    it, I can take it.

23         It seems funny to me to say, I could potentially do a

24    discriminatory tax against a railroad because they've got the

25    money and we need money, we're running a shortfall here.  Why

 1    should that matter to me at all?

 2         MS. GRANDFIELD:  I think it should -- I think it

 3    should matter because the town still has a deficit.  And I

 4    think even if the fee that is assessed is a greater fee than

 5    the Court deems appropriate, I think that BNSF should be

 6    liable for a higher fee, even if it's not $90,000, based on

 7    the lay of their land and that they have approximately

 8    250 acres of land.  They have large amounts of -- I always get

 9    it confused, but impermeable or impervious surfaces which

10    causes a lot of stormwater drainage into the town.  So their

11    usage is high.

12         And so it's not a case "you've got it, we should take

13    it"; it's a case that -- ultimately it's a question of math.

14    Is BNSF liable for a higher fee?  I believe yes, yes, they are

15    on the objective evidence.

16         Is -- are they liable for $90,000 and then being

17    placed in a separate category?  That's really the question

18    before this Court.  But I do believe from an equitable

19    standpoint that they are liable for a higher fee, because

20    prior to this, just, you know, rough back-of-the-napkin math,

21    they were paying approximately 1.5 percent of the total

22    collections for the sewer fee.  And at this current rate, they

23    would be paying 15 percent.  Even just doing a direct

24    dollars-to-dollars calculations of their -- the percentage of

25    land owned in the Town of Cicero, that would be approximately

1    7 percent, so that's about $450,000 a year.

2            So that doesn't even -- and that doesn't even account

3    for the fact that, again, their usage is higher because they

4    don't have drainage on that site and they have a lot of

5    blacktop paving, *et cetera*.

6            THE COURT:  Okay.  There is a lot there.  I

7    appreciate that.

8            Tell me how the sewer usage is correlated to acreage.

9            MS. GRANDFIELD:  So the -- you mean like -- you mean

10   how they calculated the current fee?

11           THE COURT:  Well, like more land equals more sewer

12   usage.  What's the relationship?

13           MS. GRANDFIELD:  Oh, yes.  Yes.  So more land equals

14   more sewer usage because the -- as I said before, the town

15   system is a -- which I'm sure nobody remembers because it's

16   not an exciting topic, but the town system is a combined sewer

17   and stormwater system because of its age.  So it's not just

18   stuff that, you know, goes down the drain when someone flushes

19   the toilet at BNSF; it's also any sort of stormwater runoff.

20           And so if there is a higher level of stormwater

21   runoff, which there is based on increased pavement, then that

22   results in a higher usage of the property.

23           So I'm basing that cal- -- of the system -- excuse

24   me.  So I'm basing that calculation based on the fact that,

25   okay, they own 7 percent of the land.  The coefficient for

1    runoff on something that's asphalt, for example, is very low.

2    It's -- I think it's like 5 or 10 percent.

3           But the coefficient of runoff for something that is

4    on -- excuse me -- I said "asphalt" -- on something like

5    gravel or soil.  You know, if you go and look at your house

6    and it's raining outside, you see wet soil.  But if there is a

7    lot of rain, you see it start running off the blacktop or the

8    sidewalk.  So that coefficient is nearly four times the rate.

9           So if you don't have some sort of detention or other

10   sort of drainage on the site, then all of that extra water is

11   running off your blacktop and concrete and going directly into

12   the town's system, which means a higher usage because we've

13   got more water going into the town system directly as opposed

14   to seeping into the ground.

15          THE COURT:  Okay.  How much is the shortfall in the

16   budget right now?

17          MS. GRANDFIELD:  1.2 million.

18          THE COURT:  Why would I be wrong in assuming the

19   following:  Somebody at this town said, gee, we've got

20   basically a million dollar shortfall, why don't we increase

21   BNSF's fees to 90 grand a month?  12 months, that's a million

22   bucks.  We'll just get -- we'll make BNSF pay for it.  Problem

23   solved.  Why shouldn't I assume that's what's going on here?

24          MS. GRANDFIELD:  That's not what's going on here

25   because BNSF's rate was always assessed on an acreage basis

1  since approximately the '50s.  Around the time that they

2  enacted the other category for the commercial industrial

3  property that is outside the town's limits, which is the same

4  rate per acre, they also looked at BNSF's rate and determined

5  that that rate needed to be raised as well and was a lower

6  rate than was appropriate.

7      THE COURT:  Well, let me -- so let me put it to you

8  this way --

9      MS. GRANDFIELD:  Sure.

10     THE COURT:  -- the ordinance is proposing to go from

11 $6,643 a month to $90,300 a month, according to the brief.

12     MS. GRANDFIELD:  Right.

13     THE COURT:  When I do the math, I calculate that's

14 basically a 13 and a half times increase.  In other words,

15 you're proposing to increase the fee by orders of magnitude 13

16 and a half times the amount.

17     And I will say, for any of us in any part of life, if

18 your home water bill went up by that much, if your credit card

19 bill went up by that much, if your taxes went up by that much,

20 if your parking fees, if your, you know, Secretary of State

21 license plate, any of that, if any of our fees went up by 13

22 and a half times, that would raise a lot of red flags, and I

23 think potentially it may not pass the straight face test.

24     Why shouldn't I infer from the boldness of the

25 increase that it's not actually correlated to a need for

1    appropriate compensation for usage but, rather, it is trying

2    to just get money out of the railroad because they've got it

3    and you need it?

4              MS. GRANDFIELD:  Because it's also something that was

5    always assessed by the town, and it was assessed with

6    respect -- as an acreage basis.  And it's a case that the town

7    doesn't necessarily review everything annually and discovered

8    that they believed that BNSF has been underpaying for a

9    significant amount of time.

10             So the -- I guess the flip side to that, to what the

11   Court has said, is that if BNSF has been underpaying, does

12   that mean that the town can never increase its fee a

13   substantial amount just because, well, that's what the rate

14   was before?

15             THE COURT:  I hear you.

16             MS. GRANDFIELD:  So --

17             THE COURT:  Let me ask you, whose idea was it

18   (indiscernible)?

19             THE COURT REPORTER:  Judge, I'm having a hard time

20   hearing you.

21             THE COURT:  Whose idea was it to increase the fees

22   from $6,000 a month to $90,000 a month?

23             MS. GRANDFIELD:  It was -- well, the ordinance was

24   passed by the town board, of course, and it was reevaluated

25   after they passed the other one -- I forget how many months --

1   four -- by --

2        THE COURT:  I'm sorry.  Rewind the tape.  And I know

3   it was passed by the -- by the board.  I want to know whose

4   idea was it.  Who said to the board, hey, we ought to increase

5   the fees for BNSF, and we ought to do it by, you know,

6   increasing it 13 and a half times, we ought to go to $90,000 a

7   month?  Whose idea was that?

8        MS. GRANDFIELD:  I believe it was the water

9   director's idea along with taking the calculations of the town

10  engineer for the previous ordinance.  And the standard

11  practice in the town is that then an ordinance is drafted by

12  the town attorney, not me specifically -- or not me at all,

13  and then the ordinance is put on the agenda, and then the

14  agenda is gone over with by the town attorney, again, not me,

15  with the town president, and then it's presented.

16       THE COURT:  And how did you get to that number,

17  $90,300 a month?

18       MS. GRANDFIELD:  So how the town board got to the --

19  or how the town got -- sorry, I'm used to saying town board.

20       How the town got to that number was the -- excuse me.

21  So the town engineer had previously calculated an amount for

22  the other commercial and industrial property outside the town

23  limit, which was also assessed at the same rate of $350 an

24  acre.  He did that by looking at old sewer atlases and how

25  much the City of Chicago charged per connection, and he came

1    up with approximately $300, and then the town and its board in

2    its discretion raised that to 350.

3         After that, they looked at the railroad rate because

4    that had also -- because that was at a much lower rate.  It

5    was at $25, I think, beforehand per acre.  And they just

6    correlated it with the -- the other commercial industrial

7    property that they assessed the $350 an acre and deemed it

8    about similar.  And so that's the rate they imposed for rail

9    yards as well.

10        And then I will say, in addition to that, the town

11   has said that they are -- they were also concerned about --

12   and I understand -- I'm not trying to throw in things that the

13   Court doesn't think is relevant, but the town was concerned

14   about the flooding that was going on that they felt was being

15   caused by BNSF and the fact that they were being charged a low

16   rate for what they felt was high usage.

17             THE COURT:  Got it.

18        And I will say, I was not sure that I was following

19   the point in the brief about the railroad not settling the

20   runoff case.  I mean, you know, there are two lawsuits here.

21   There is the one that BNSF filed about the sewer usage, and

22   then you all folks -- you folks filed a separate lawsuit in

23   state court that was removed and then reassigned to me about

24   water runoff.  And, frankly, it seemed to me like you were

25   saying we're not going to stipulate to an extension of this

1    because they're not settling the runoff case.  And I'm not

2    sure why those two should be linked at all.

3           Go ahead.

4           MS. GRANDFIELD:  So the town thinks that the other

5    one is related because that affects their usage and what they

6    should be charged.  And it also affects that part of -- the

7    reason that they passed this and wanted to enforce this so

8    much is they do feel that BNSF's in particular usage is high

9    and that they're causing more than the system can bear.

10          And the way I see them related, and I think the way

11   the town sees them related, is that if they are -- if there is

12   some relief so far as some sort of agreed remediation in that

13   case, then that would, I would presume, affect the usage if

14   they, for example, put in some sort of drainage.  I'm not

15   saying what that specifically would be.

16          So that might -- that would help to settle what sort

17   of fees should be charged and how much should be charged.  So

18   the town's primary concern is the flooding that they believe

19   is being caused by BNSF.

20          Their secondary, but still obviously important or

21   they wouldn't have refused to extend the stay, is that they

22   get a sewer fee from BNSF that covers their costs and that

23   they feel is appropriate based on BNSF's usage.

24          THE COURT:  Can I ask you another thing, by the way,

25   about the -- getting the money back point and irreparable

1   injury?  I understood you to say that the sewer fund is in a

2   hole.  No pun intended.  It's running a deficit of a million

3   and a half a year.

4         How could BNSF be confident that they're going to get

5   their money back if they're dealing with a municipality with a

6   sewer budget deficit in an area in question?

7         MS. GRANDFIELD:  I believe that the town would have

8   to pull money from other funds to pay that back.  And they

9   have additional funds --

10        THE COURT:  Do they have it, though?  I mean . . .

11        MS. GRANDFIELD:  Yes, they have additional funds,

12  including, like I said, a large litigation fund that is, I

13  believe, several million dollars.  I'd have to check the

14  budget.  But they have a large fund for that because the town,

15  given its size, is largely self-insured.  In other words,

16  nothing kicks in insurance-wise until like, you know, a

17  million bucks.

18        THE COURT:  But you could probably use that money for

19  other things.  I'm going to go out on a limb and guess the

20  Town of Cicero doesn't have a bunch of money lying around, you

21  know.

22        MS. GRANDFIELD:  I mean, they --

23        THE COURT:  I'll take the silence as a deafening

24  stipulation to that effect.

25        MS. GRANDFIELD:  I mean, I'm never going to say that

1    the Town of Cicero has a bunch of money laying around.  That

2    has so many implications.  But --

3          THE COURT:  Here's the -- and I make light of it for

4    humor value there, but it does seem to me that there is a

5    legitimate concern about the ability to get the money back

6    from the municipality.  Go ahead.

7          MS. GRANDFIELD:  Yeah, so I would never say that.

8    However, there are statutes that I believe would apply, such

9    as the Local Government Prompt Payment Act, that would require

10   the town to pay it back, whether it does or not.  So that

11   would take a priority.

12         So even in instances where -- you know, I've had

13   cases that are wrongful conviction and they had to pay an

14   extra million bucks out of it because they had less insurance

15   at the time, blah-blah-blah.  And, you know, they just have to

16   move funds away and move funds around and be able to do that.

17   So there's not really an option of nonpayment.

18         THE COURT:  Okay.  Go ahead.

19         MS. GRANDFIELD:  I was going to say, does it mean

20   that they're going to have less money for other things or, you

21   know, that sort of thing?  Yes, but it doesn't mean that

22   they're not going to be able to somehow pay the money back.  I

23   can't think of -- I've represented the town for about 12 years

24   now, and I can't think of a single time, even when they had

25   various judgments entered against them that were rather large,

1   that they have not been able to pay back the funds, even

2   accounting for the fact that of course, as everybody knows,

3   their former town president stole $12 million from their

4   pension fund.

5           THE COURT:  Yeah.  Okay.  Is there anything else you

6   would like to say, Ms. Grandfield, about the TRO request

7   before I turn the floor back to Mr. Mariotti?

8           I always give the movant the first and the last word.

9   So go ahead.  If there's anything else you want to say, I'll

10  listen to you.

11          MS. GRANDFIELD:  There is nothing else that I want to

12  say.  I think I've rambled on enough, and --

13          THE COURT:  No, no.

14          MS. GRANDFIELD:  -- thank you for the Court's

15  patience.

16          THE COURT:  You've answered my questions, so I

17  appreciate you doing that.

18          Mr. Mariotti, anything else you'd like to say?

19          MR. MARIOTTI:  Yeah, a few things, Judge.

20          One thing I want to make clear is that if -- you

21  know, there was a lot of discussion about, for example, the

22  size of BNSF's facility and the fact that it's got paved

23  surface and so forth.  But there are not -- other industrial

24  users within the Town Cicero are not charged on this basis.

25          If, for example, the Amazon distribution center or

1    the shopping malls and other large parcels of land that were

2    paved were charged -- you know, were on the same rate, they

3    would -- you know, that would be a dramatic increase for them.

4    And if BNSF was charged based on the usual industrial

5    commercial rate, we'd be paying about $150 a month as opposed

6    to, you know, 6600 or 90-something thousand.

7            So it just is -- at a baseline, this is an ordinance

8    that discriminates against railway.  And it -- I understand

9    that there is a need for additional funds, but just to be

10   crystal clear -- and I understand that there's -- there's been

11   some statements that have been made about costs.  But when we

12   went to actual depositions -- and this is before Your Honor in

13   our initial reply in support of our motion for a TRO -- when I

14   deposed the individuals who actually calculated this rate,

15   this $350-per-acre figure was a town -- the town engineer

16   looking at the bills that Cicero was receiving from Chicago,

17   ballparking a figure from that that the town changed.  They

18   didn't consider -- and they don't even know the cost to

19   provide sewer service to BNSF, the amount of runoff, the

20   amount of pavement.

21           All of the discussion here is hypothetical because

22   none of that actually went into the -- to the ordinance.  And

23   so really I -- this is really about a discriminatory ordinance

24   and the impact that it's -- that it is placing on an

25   interstate rail facility.

1          THE COURT:  Okay.  Anything else from you,

2     Ms. Grandfield, on that point?

3          MS. GRANDFIELD:  I just want to reiterate my point

4     before that you don't get to the point of discrimination

5     without bringing it within the provisions of the act, which

6     are -- again, it's not a regulation of rail transportation and

7     it's not a tax within the meaning of the 4-R Act.

8          And I also want to say that with respect to the

9     method of calculation, that it does not have to be a precise

10    dollar-for-dollar calculation.  There is no mathematical

11    equation required.

12         And then lastly, with respect to the point of the

13    coefficient, that is not hypothetical or unknown.  Our town

14    engineer was able to view that and was able to determine that

15    there is a substantial portion of paving on the BNSF site.

16    There appears to be a lack of drainage.  There -- you know,

17    there's no detention ponds on there, something you can easily

18    visualize.  And the coefficient is something that was -- that

19    I was referring to earlier is something that was

20    mathematically determined by the Metropolitan Water

21    Reclamation District in about 2014.  So that is an absolute --

22    well, maybe it's not absolute.  I'm not an engineer.  But that

23    is -- does have a foundation and a basis.

24         THE COURT:  Okay.  Mr. Mariotti, last word.

25         MR. MARIOTTI:  All right.  Just regarding this

1    regulation issue, it does seem to me that the Town of Cicero

2    does want to regulate BNSF.  They have threatened to kick them

3    out of their own intermodal railroad facility because they're

4    not willing to pay discriminatory and highly inflated fees.

5         So it's in -- I think -- you know, we've already

6    briefed this issue.  I'm not going to spend more time on it.

7    But it appears to me to be within the four corners of the act.

8         THE COURT:  Okay.  Thank you, Counsel.  I appreciate

9    the dialogue back and forth.

10        Here is my ruling:  The motion for a TRO is granted.

11   It is pretty obvious to me that there is a live issue.  The

12   town has an ordinance on the books.  The meter is running at

13   the higher rate as of end of October, October 26th, give or

14   take.  And the village -- excuse me -- the town is intending

15   to collect on that, including both a higher rate and late fees

16   and has not taken off the table the possibility of using more

17   coercive steps for getting that money.  So it seems pretty

18   clear to me that there is a live dispute between the parties.

19        I find that all of the requirements for a TRO are

20   satisfied.  There is a likelihood of success on the merits,

21   irreparable harm, inadequate remedy at law, plus a public

22   interest at play here.

23        The likelihood of success on the merits, the

24   ordinance on its face is facially discriminatory against the

25   railways -- the railroad, rather.  It expressly targets a

1    railroad and increases a fee for a railroad.  So it seems

2    pretty obviously targeted to a railroad.  And that's something

3    that they're not allowed to do, as I understand it, under the

4    statute.

5          It sure seems to me, based on what I know now -- and

6    that's an important caveat -- based on what I know now, that

7    the town is attempting to hold the railroad hostage.  They

8    want their pound of flesh from the railroad to close a

9    shortfall in their budget, and they are doing so through an

10    increase that does not appear to be tied to actual usage; it,

11    rather, seems to be a tax targeted at a railroad in

12    particular.

13          The interstate railway system in this country cannot

14    operate if every municipality along the way gets their pound

15    of flesh, and it sure seems to me that that is what the town

16    is attempting to do here.  I see that there is a likelihood of

17    success for the merits.  Irreparable harm comes into play here

18    because I am not convinced at all that there is an adequate

19    remedy for getting the money back.  And if they had to shut

20    down, you know, that's going to harm their customers, their

21    network, and their ability to move product from place to

22    place.  That's never a good thing when you're dealing with an

23    interstate railway system.  It's especially not a good thing

24    now, especially not a good thing now in the pandemic in

25    Chicago.

1          So I find that there is a likelihood of success on

2     the merits, irreparable harm, no adequate remedy.  I also

3     think that there are strong equitable interests of the public

4     at play.  You've got a lot of people working in that rail

5     yard.  A lot of people depend on it:  customers, suppliers,

6     shippers, distributors.  A lot of people need the goods, and

7     the town here I think has frankly gotten over their skis,

8     gotten overtly threatening to the railroad.  It seems a bit

9     over the top to say you're going to go in there and shut off

10    the water, tear up the pipes and shut them down.  It really

11    seems like you're trying to hold the railway -- railroad

12    hostage.

13         That's how I see it as things stand here.  This is

14    simply a temporary restraining order.  It is not a preliminary

15    injunction.  So I want to talk to you about next steps.  I

16    want to know from you folks what your preferred battle plan

17    would be for a motion for a preliminary injunction.  Did you

18    need additional discovery?  Do you want an evidentiary

19    hearing?  Do you want to file additional briefs?  And if so,

20    when?

21         So, Mr. Mariotti, I'll -- and I'll say on this, if

22    you want to think it over, talk it over and propose something

23    to me on Friday, you certainly can.  Maybe that's what we

24    ought to do.  You know, maybe you can take it back to your

25    clients and talk with each other.  But why don't you folks

1   give me your reaction to each of those points.

2          Do you think you need additional discovery?  Do you

3   think you want an evidentiary hearing?  And what would the

4   timing look like if you want to have a hearing and want

5   additional briefs?  Mr. Mariotti?

6          MR. MARIOTTI:  We have already briefed this issue.

7   You already have existing papers on the preliminary injunction

8   previously before the stipulation was entered.  And at this

9   point we're almost done with motion for summary judgment

10  briefing, so our view would be just to go forward on the

11  papers that have already been filed.

12         THE COURT:  All right.  Is everything in the record

13  from your standpoint of -- from the depositions that I

14  authorized?

15         MR. MARIOTTI:  Yes, we've already -- we already

16  submitted to you selections from those depositions and put the

17  facts in front of you.

18         THE COURT:  I just want to make sure there's nothing

19  else out there.

20         How about from your standpoint, Ms. Grandfield?

21         Ms. Grandfield, are you there?

22         Mr. Mariotti, are you still there?

23         MR. MARIOTTI:  I am.

24         MS. GRANDFIELD:  I'm sorry.  I'm sorry.  I hit the

25  mute button.  I'm sorry.  Classic --

 1              THE COURT:  That's okay.

 2              MS. GRANDFIELD:  -- teleconference.  I'm here.

 3    Sorry.

 4              THE COURT:  Okay.

 5              MS. GRANDFIELD:  So -- so I would like to supplement

 6    my response to the motion for preliminary injunction with

 7    the -- some of the arguments that I made in my, you know,

 8    motion to dismiss, or I can just incorporate those somehow,

 9    whatever is easiest and most efficient for the parties,

10    because I don't want to get into some weird like surresponse

11    or surreply.

12              I will say just most simply, I was under a lot of

13    time pressure in the previous briefs, and I feel like I

14    made -- and maybe I didn't, maybe it was confusing, but I feel

15    like I made a better argument in my motion to dismiss with

16    respect to the ICCTA and the 4-R Act than I made in my

17    response brief because I just -- you know, I was under time

18    constraints.

19              THE COURT:  That's fine.  It sounds like you've

20    already got it in the can.  Can you do it by a week from

21    Friday?

22              MS. GRANDFIELD:  Yes.

23              THE COURT:  So today is the 10th.  So that's going to

24    be the 19th, if I ballpark it.

25              MS. GRANDFIELD:  Yes.

1          THE COURT:  And then, Mr. Mariotti, I don't know if

2    you are going to want a chance to respond to that.  Maybe you

3    folks feel like you've shot your wad already and then some.

4          I guess the other thing I care to know is, does

5    anyone want an evidentiary hearing, or do you want me to just

6    rule on the papers?

7          MR. MARIOTTI:  I think we can go based on the papers,

8    Your Honor.  And, I mean, this has already been fully briefed.

9    We could even do an argument on the motion to dismiss and PI

10   together if -- if counsel is -- you know, thinks that that

11   would -- the argument --

12         MS. GRANDFIELD:  And I would say I don't want to

13   burden the Court, but I am fine with -- and actually that's

14   why -- I agree.  I am fine with that.  Because I don't want to

15   be -- you know, I don't want to be briefing something over and

16   over again that the Court has already said no to.

17         You know, so if we go ahead and decide this -- decide

18   that as well, then we can just decide it together.  And then,

19   you know, to the extent I need to put it in my response to

20   summary judgment just to preserve the argument, then I will,

21   but we don't have to keep going --

22         THE COURT:  Okay.

23         MS. GRANDFIELD:  -- through this over and over --

24         THE COURT:  Yep.

25         MS. GRANDFIELD:  -- again.

1     THE COURT: Got it. Okay. Thank you. That's

2 helpful.

3     So here's the battle plan: Go ahead, Ms. Grandfield,

4 get your supplemental submission on file by a week from

5 Friday, the 19th. I will then take everything under

6 advisement. I have interests at play here that may or may not

7 be the same as the parties. It is possible that I'm going to

8 want a hearing, either argument or testimony. I think it's

9 probably unlikely that I'll want to hear testimony. But any

10 injunction request that comes to me, it's up to me to decide

11 what to -- what I need before deciding it.

12     So my presumption will be that I'm going to do it on

13 the papers alone, but stay tuned on that. Okay. So I -- it's

14 a long way of saying, I'm inclined to agree with you, but if

15 I'm seeing factual holes that I think need to be filled, I'll

16 make sure that you know that, and we'll fill them. Okay?

17     So the motion for a TRO is granted. I'll go ahead

18 and get a minute order out. I'll get a TRO out, and we'll

19 take it from there.

20     Mr. Mariotti, anything else that you want to cover

21 today?

22     MR. MARIOTTI: No, Your Honor. Thank you.

23     THE COURT: I guess one last question to you,

24 Mr. Mariotti, do we have a draft TRO order in our proposed

25 order inbox, I assume?

1          MR. MARIOTTI:  I believe so, but we can -- we'll take

2    a look, and we can -- I believe that that -- I believe so, and

3    I believe it's still up to date, but I'll take a close look.

4    If it isn't, I'll send an updated one.

5          THE COURT:  Okay.  Sounds good.

6          Ms. Grandfield, anything that you want to raise?

7          MS. GRANDFIELD:  I had a few points of clarification

8    based on my notes.

9          You had earlier said that you wanted me to file some

10   sort of declaration by Friday as to what the -- BNSF was

11   paying if they were paying that 6600.  Would you still like me

12   to do that?

13         THE COURT:  Yeah, I'd still like you to do it.  And

14   it doesn't have to be a declaration in the standpoint it

15   doesn't have to be a statement under penalty of perjury.  I

16   didn't mean it like that.  I just want -- I want the parties

17   to file something jointly, probably a sentence or two will

18   suffice, that says BNSF is or is not paying money and the

19   money is X dollars.

20         MS. GRANDFIELD:  Okay.  Would there be -- I'm

21   actually -- so I'm going out of town with my two best friends

22   for the first time in two years, and I'm going to be out of

23   the office on Friday.  Would there be any way that we could

24   file --

25         THE COURT:  No worries.

1          MS. GRANDFIELD:  -- this on Monday?

2          THE COURT:  How about Wednesday of next week?

3          MS. GRANDFIELD:  Yeah, that would be great.  Okay.

4    And then -- does that work okay for you, Mr. Mariotti?  I

5    should have asked.

6          MR. MARIOTTI:  Wednesday of next week works fine for

7    me.

8          MS. GRANDFIELD:  Okay.  And then the last follow-up

9    question, I hope.  With respect to this TRO, does this mean

10   the new ordinance only in that the town can still collect its

11   previous rate of 6600 a month?

12         THE COURT:  Yeah, I will tell you, I was inclined to

13   rule that you cannot do the increase, the proposed increase.

14   I was not planning on giving anybody a license for free sewer

15   stuff.

16         Mr. Mariotti, any reason why I'm wrong about that?

17         MR. MARIOTTI:  Nope.  In fact, I -- it was my

18   understanding, and still is, that we have been paying and we

19   believe we should continue to pay that 6600 a month.

20         THE COURT:  That's right.  So it's not a

21   get-sewer-free card I'm issuing here today, Ms. Grandfield;

22   it's simply a bar -- a temporary bar against applying the rate

23   increase and associated penalties and enforcement mechanisms.

24         MS. GRANDFIELD:  Okay.  I just wanted to make sure so

25   I could accurately convey that to the town water and sewer

1    department.  Thank you.

2         THE COURT:  Okay, folks.  Thank you for your time and

3    attention today.  And, again, thank you for bearing with me on

4    the late start.  I knew when I put you in today that it was

5    going to be a tight squeeze, but I try to give good customer

6    service and get people in here when they tell me that there's

7    a TRO and they need to get in here.  And the downside of that

8    is, sometimes it's hard to squeeze everybody in.

9         So thank you for your professionalism on the late

10   start today.  But we'll go ahead and get the stuff on file and

11   look forward to getting your submission next week,

12   Ms. Grandfield.  Okay?

13        MS. GRANDFIELD:  Thank you, Your Honor.

14        THE COURT:  Thank you, folks.  We're adjourned.  Take

15   care now.

16        MS. GRANDFIELD:  Okay.  Bye.

17      (Which were all the proceedings heard.)

18

19

20

21

22

23

24

25

1              *   *   *   *   *   *

2                  C E R T I F I C A T E

3

4          I certify that the foregoing is a correct transcript, to

5     the extent possible, of the record of proceedings in the

6     above-entitled matter, given the limitations of conducting

7     proceedings via telephone.

8

9     */s/ Amy M. Spee*              *11/15/2021*
      _____    _____
10    AMY M. SPEE, CSR, RPR, CRR      Date
      Official Court Reporter
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25