**UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| BNSF RAILWAY COMPANY, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 21-cv-3072 |
| | ) | |
| v. | ) | Hon. Steven C. Seeger |
| | ) | |
| TOWN OF CICERO, ILLINOIS, | ) | |
| | ) | |
| Defendant. | ) | |
| ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯ | ) | |

## <u>MEMORANDUM OPINION AND ORDER</u>

Plaintiff BNSF Railway Company operates a major railyard in the Chicagoland area, one of its largest facilities in the entire country. It sits in the Town of Cicero. The facility is so big that it take up almost 10% of the entire town. BNSF has laid down stakes in Cicero, and it depends on the Town for water and sewer. That dependence means that BNSF, an out-of-state railroad, is a fat target.

The Town of Cicero recently passed an ordinance that increased BNSF's sewer bill from $6,643 to $90,300 per month. That's an increase of over 1,000%. Added up, BNSF's sewer bill to the Town of Cicero would be over $1,000,000 each year.

The Town of Cicero didn't increase the bill because BNSF started using more water and sewage services. And it didn't increase the rates for other types of users, either. Instead, the Town Board passed a new Sewer Rate Ordinance that would increase the rates for railroads, and only railroads.

Cicero charges a flat rate for residential service, and charges commercial and industrial customers – like Citgo, ExxonMobil, and Walmart – based on how much water they use. But for

railroads, Cicero charges by the acre. And in the ordinance in question, Cicero changed the rate from $27.42 to $350 per acre. That's a big difference for a big railyard.

When a bill for $90,300 unceremoniously arrived, BNSF reached out to the Town of Cicero, assuming that it was a mistake. But Cicero demanded full payment. And then it tightened the screws. Cicero told BNSF that if it didn't pay, the Town would shut off BNSF's water and sewer, dig up and remove pipes, and force the property to be vacated as a health hazard.

That increase put BNSF in a tight spot. A railyard isn't so easy to move. It's not easy to go someplace else. After months of trying, BNSF couldn't get Cicero to change course. So it filed suit.

BNSF advanced three claims, seeking a declaratory judgment and injunctive relief. BNSF claims that the ordinance (1) regulates railroad transportation and thus is preempted by the Interstate Commerce Commission Termination Act, (2) imposes a discriminatory tax in violation of the Railroad Revitalization and Regulatory Reform Act of 1976, and (3) violates the dormant Commerce Clause.

The Town of Cicero moved to dismiss for failure to state a claim. For the reasons stated below, Defendant's motion is denied.

## Background

At the motion to dismiss stage, the Court must accept as true the well-pleaded allegations of the complaint. *See Lett v. City of Chicago*, 946 F.3d 398, 399 (7th Cir. 2020). The Court "offer[s] no opinion on the ultimate merits because further development of the record may cast the facts in a light different from the complaint." *Savory v. Cannon*, 947 F.3d 409, 412 (7th Cir. 2020).

BNSF Railway Company operates one of the largest freight railroad networks in North America. *See* Cplt., at ¶¶ 14, 16 (Dckt. No. 1). It ships goods on trains. As a result, it owns and operates railyards and railroad rights-of-way across America.

One of BNSF's railyards is in the Town of Cicero. *Id.* at ¶¶ 14, 17. The Cicero railyard is an intermodal rail and maintenance yard. *Id.* at ¶ 17. Intermodal shipping moves goods in containers from point A to point B using multiple forms of transportation. *Id.* For example, in intermodal shipping, a freight container might arrive in the Pacific Northwest on a ship, before getting loaded onto a truck. *Id.* at ¶¶ 17, 18. The truck takes the container to a railyard, where it is transferred to a train. *Id.* That train then moves the container to a rail hub (like the one in Cicero). *Id.* Eventually, the goods reach their destination after another leg of travel via rail or truck. *Id.*

The Cicero railyard is a major transportation hub, linking the Midwest to the Pacific Northwest. *Id.* at ¶ 18. It often serves as the final destination for foreign imports. *Id.* And passenger railroad services like Amtrak and Metra pass through BNSF's Cicero railyard daily. *Id.*

BNSF employs hundreds of people in the surrounding area. *Id.* at ¶ 19. A big business has big needs, including water and sewer. BNSF's Cicero railyard is connected to the Town of Cicero's utilities, including Cicero's combined storm/sanitary sewer system. *Id.* at ¶¶ 20, 23.

This case is about that sewer system, and specifically the rate that Cicero charges railroads like BNSF for sewer use.

Cicero's Sewer Rate Ordinance establishes different sewer rates for different types of property. *Id.* at ¶ 21. Specifically, the ordinance categorizes property as (1) residential; (2) commercial and industrial; (3) railroad yards and rights-of-way; or (4) commercial and industrial

3

*outside* Cicero's border. It charges each type of property a different rate. *Id.*; *see also* Cicero, Illinois, Code of Ordinances ch. 98 § 98-266 (Dckt. No. 1-1).

In December 2020, Cicero's Board of Trustees adopted Ordinance No. 72-20, amending the Sewer Rate Ordinance's section on railroads. *See* Cplt., at ¶ 24 (No. 1). Ordinance No. 72-20 stated that the ordinance's purpose is to "increase rates for railroad yards and rights-of-way to ensure the proper operation and maintenance of combined waterworks and sewage system." *Id.* at ¶ 25.

The new ordinance increased the monthly sewer rates charged to railroads, from $27.42 per acre to $350 per acre. *Id.* at ¶¶ 24, 26. As a result, BNSF's monthly sewer bill soared from $6,643.04 to $90,300. *Id.* at ¶ 26.

All the while, sewer rates for residential properties and for commercial and industrial properties remained the same. *Id.* Residential properties must pay a bimonthly sewer rate of $26.59, while local commercial and industrial properties must pay based on actual water consumption. *Id.* at ¶ 27.

The Board adopted the ordinance at a meeting that lasted only 15 minutes. *Id.* at ¶ 41. Cicero didn't tell BNSF (or any other railroad) that it planned to amend the sewer rates. *Id.* at ¶ 30. The Board meeting's agenda provided the only notice of the change, stating that "a vote would be taken on 'An Ordinance Amending Chapter 98, Section 98-266 Of The Code of Ordinances Of the Town Of Cicero, Illinois, Regarding Sewer Rates For The Town of Cicero, County of Cook, State of Illinois.'" *Id.* at ¶ 31.

BNSF first learned about the rate increase when it received its February 2021 sewer bill totaling $90,300. That one bill exceeded BNSF's sewer charges for the entire previous year. *Id.* at ¶ 33. At first, BNSF thought the bill was a mistake. *Id.*

4

Eventually, BNSF found out about the new ordinance and reached out to Cicero President Larry Dominick to express concern about the Sewer Rate Ordinance. *Id.* at ¶ 34. BNSF thought that the ordinance "was arbitrary and capricious, discriminatory, lacked an adequate basis in law, and was contrary to federal and state law." *Id.*

Cicero gave BNSF the back of its hand (if not a clenched one). Cicero refused to acknowledge BNSF's concerns and instead demanded full payment, including any late penalties. *Id.* at ¶ 35. On March 16, 2021, Cicero's attorney wrote BNSF saying: "[T]here is no 'pending dispute' to 'work towards resolution.' . . . BNSF was sent an invoice and the Town expects payment of the full amount plus a 20% penalty for failure to pay by close of business on March 26, 2021. If payment is not received, we will issue a 60-day notice of water and sewer shut off, which may include digging underground to remove pipes as well as the placement of a lien for the unpaid amount." *Id.*

BNSF, through counsel, continued to reach out to Cicero. During multiple telephone conferences between BNSF's counsel, Cicero's counsel, and other Cicero officials, BNSF sought information and justification for the sewer rate increase. *Id.* at ¶ 36. But Cicero wouldn't provide any information. *Id.*

With bills piling up, including an $18,060 late penalty per month, BNSF looked for ways to avoid penalties while still investigating and disputing the rate increase. *Id.* at ¶ 37. It asked Cicero if the town had a refund process in place. *Id.* BNSF wanted to pay its bill, including the higher rate and late penalties, but also leave open the opportunity to recover excess payments if court challenges resulted in a determination that BNSF overpaid. *Id.*

Cicero didn't identify a refund process. *Id.* at ¶ 38. Instead, on May 19, 2021, Cicero sent BNSF a 60-day notice of termination. *Id.* The notice demanded immediate payment of

5

$395,450.88 and stated that if the bill wasn't paid BNSF's sewer service "WILL BE SHUT OFF, DISCONTINUED, AND DISCONNECTED (SIXTY) 60 DAYS FROM MAY 20, 2021." *Id.* The notice went on to state that "IF THE TOTAL BILL IS NOT PAID AND THE SEWER IS DISCONTINUED AND DISCONNECTED, THE PROPERTY WILL BECOME A HEALTH DEPARTMENT PROBLEM" and "WILL HAVE TO BE VACATED." *Id.*

Ripping up the railyard would have cataclysmic effects on BNSF, and on interstate shipping in America more generally. BNSF needs water and sewer services to operate the railyard. *Id.* at ¶ 39. Without water and sewer, BNSF would have to shut down the entire facility. *Id.* And that shutdown, in turn, would render a "major transportation hub inoperable" and thus "significantly disrupt rail and intermodal service, severely impact interstate commerce, and harm BNSF, its customers, and its employees." *Id.*

So the Town of Cicero gave BNSF a choice, but it wasn't much of a choice. BNSF needed to pay more than $1 million each year for water and sewer, or else Cicero would shut down one of the county's vital transportation hubs.

BNSF responded by filing this lawsuit against the Town of Cicero, seeking a declaratory judgment and injunctive relief. BNSF brings three claims about Cicero's new Sewer Rate Ordinance. *Id.* at ¶¶ 43–60.

First, BNSF claims that the ordinance is an impermissible regulation of railroad transportation that is preempted by the Interstate Commerce Commission Termination Act. *Id.* at ¶¶ 43–47. Second, BNSF claims that the ordinance imposes a discriminatory tax in violation of the Railroad Revitalization and Regulatory Reform Act of 1976. *Id.* at ¶¶ 48–54. And third, BNSF challenges the ordinance under the dormant Commerce Clause. *Id.* at ¶¶ 55–60.

6

BNSF later filed a motion for a temporary restraining order and preliminary injunction. *See* Pl.'s Mtn. (Dckt. No. 12). In November 2021, this Court held a hearing and granted BNSF's motion for a temporary restraining order. *See* 11/10/21 Order (Dckt. No. 62). Since then, the status quo has remained in place. BNSF is paying the old monthly rate.

During the hearing, counsel for the Town of Cicero stated that the sewer fund was running a deficit of $1,200,000. *See* 11/10/21 Tr., at 22 (Dckt. No. 66). "So they simply need the money." *Id.* Based on the Court's back-of-the-envelope math, an extra $1 million from BNSF would go a long way toward plugging a $1.2 million hole.

The Town of Cicero moved to dismiss for failure to state a claim under Rule 12(b)(6). *See* Def.'s Mtn. to Dismiss (Dckt. No. 45). For the reasons stated below, Defendant's motion is denied.

## Legal Standard

A motion to dismiss under Rule 12(b)(6) challenges the sufficiency of the complaint, not the merits of the case. *See* Fed. R. Civ. P. 12(b)(6); *Gibson v. City of Chicago*, 910 F.2d 1510, 1520 (7th Cir. 1990). In considering a motion to dismiss, the Court must accept as true all well-pleaded facts in the complaint and draw all reasonable inferences in the plaintiff's favor. *See AnchorBank, FSB v. Hofer*, 649 F.3d 610, 614 (7th Cir. 2011). To survive, the complaint must give the defendant fair notice of the basis for the claim, and it must be facially plausible. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *see also Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678.

When reviewing a motion to dismiss under Rule 12(b)(6), the court may consider "the complaint itself, documents attached to the complaint, documents that are critical to the complaint and referred to in it, and information that is subject to proper judicial notice." *Geinosky v. City of Chicago*, 675 F.3d 743, 745 n.1 (7th Cir. 2012).

## Analysis

BNSF seeks a declaratory judgment that Cicero's Sewer Rate Ordinance is invalid and unenforceable as applied to railyards and railroad rights-of-way. *See* Cplt. (Dckt. No. 1). It challenges the ordinance on three grounds. First, BNSF claims that the ordinance is preempted by the Interstate Commerce Commission Termination Act ("ICCTA"). Second, BNSF claims that the ordinance imposes an invalid discriminatory tax under the Railroad Revitalization and Regulatory Reform Act ("4-R Act"). Third, BNSF alleges that the ordinance violates the dormant Commerce Clause by burdening interstate commerce.

Cicero moves to dismiss all three counts, and the Court will consider each in order.

## I.       The Interstate Commerce Commission Termination Act (Count I)

First, BNSF claims that Cicero's ordinance is preempted by the ICCTA. *See* Cplt., at ¶¶ 43–47 (Dckt. No. 1).

Under the Supremacy Clause, the Constitution and federal law are "the supreme Law of the Land." *See* U.S. Const. art. VI, cl. 2. As a result, "federal law 'preempts state laws that interfere with, or are contrary to, federal law.'" *Union Pac. R.R. Co. v. Chicago Transit Auth.*, 647 F.3d 675, 768 (7th Cir. 2011) (quoting *Boomer v. AT&T Corp.*, 309 F.3d 404, 417 (7th Cir. 2002)).

For railroads, the ICCTA contains an express preemption provision, preempting state law in certain circumstances. *See Fleury v. Union Pac. R.R. Co.*, 528 F. Supp. 3d 885, 893 (N.D. Ill.

2021).  The ICCTA created the Surface Transportation Board ("STB") to administer the Act, and "conferred on the Board 'exclusive' jurisdiction over the regulation of railroad transportation." *See Chicago Transit Auth.*, 647 F.3d at 768.  The preemption provision gives the STB exclusive jurisdiction over rail carriers:

> (b) The jurisdiction of the [STB] over –
>
>> (1) transportation by rail carriers, and the remedies provided in this part with respect to rates, classifications, rules (including car service, interchange, and other operating rules), practices, routes, services, and facilities of such carriers; and
>>
>> (2) the construction, acquisition, operation, abandonment, or discontinuance of spur, industrial, team, switching, or side tracks, or facilities, even if the tracks are located, or intended to be located, entirely in one State,
>
> is exclusive.  Except as otherwise provided in this part, the remedies provided under this part with respect to regulation of rail transportation are exclusive and preempt the remedies provided under Federal or State law.

*See* 49 U.S.C. § 10501(b).

Congress also defined "transportation" broadly, giving it a wider scope than its ordinary meaning.  *See Fleury*, 528 F. Supp. 3d at 893–94.  It isn't limited to moving.  Under the ICCTA, "transportation" includes a "yard, property, facility, instrumentality, or equipment of any kind related to the movement of passengers or property, or both, by rail . . . [and] services related to that movement, including receipt, delivery, . . . transfer in transit, . . . handling, and interchange of passengers and property . . . ."  *See* 49 U.S.C. § 10102(9).  As a result, courts have characterized section 10501(b)'s preemptive scope as "broad and sweeping."  *See Chicago Transit Auth.*, 647 F.3d at 678 & n.1 (collecting cases).

The Act "preempts all 'state laws that may reasonably be said to have the effect of managing or governing rail transportation, while permitting the continued application of laws

9

having a more remote or incidental effect on rail transportation.'" *N.Y. Susquehanna & W. Ry. Corp. v. Jackson*, 500 F.3d 238, 252 (3d Cir. 2007) (quoting *Fla. E. Coast Ry. Co. v. City of W. Palm Beach*, 266 F.3d 1324, 1331 (11th Cir. 2001)); *see also Adrian & Blissfield R.R. Co. v. Village of Blissfield*, 550 F.3d 533, 539 (6th Cir. 2008). But the ICCTA's preemption provision "does not encompass everything touching on railroads." *Fleury*, 528 F. Supp. 3d at 894 (quoting *Delaware v. Surface Transp. Bd.*, 859 F.3d 16, 18 (D.C. Cir. 2017) (collecting cases)). In other words, states have the power to "impose 'rules of general applicability,'" including the "authority to issue and enforce regulations whose effect on railroads is 'incidental,'" as long as the rules "address state concerns generally, without targeting the railroad industry." *Surface Transp. Bd.*, 859 F.3d at 19 (quoting *Ass'n of Am. R.Rs. v. S. Coast Air Quality Mgmt. Dist.*, 622 F.3d 1094, 1098 (9th Cir. 2010), *Franks Inv. Co. v. Union Pac. R.R. Co.*, 593 F.3d 404, 410–11 (5th Cir. 2010), and *N.Y. Susquehanna*, 500 F.3d at 254); *see also Fla. E. Coast Ry. Co.*, 266 F.3d at 1331; *Norfolk S. Ry. Co. v. City of Alexandria*, 608 F.3d 150, 157–58 (4th Cir. 2010).

"The Seventh Circuit has adopted a two-tiered analysis offered by the STB to determine whether a state law or regulation is preempted by § 10501(b)." *Fleury*, 529 F. Supp. 3d at 894. "[T]here are two manners in which state or local actions could be preempted: (1) categorical, or *per se*, preemption, and (2) as-applied preemption." *Wedemeyer v. CSX Transp., Inc.*, 850 F.3d 889, 894 (7th Cir. 2017).

"Categorical preemption occurs when a state or local action is preempted on its face despite its context or rationale." *Chicago Transit Auth.*, 647 F.3d at 679. BNSF does not "assert [categorical] preemption here" because "the STB does not directly regulate sewer charges or utility services." *See* Pl.'s Resp. to Def.'s Mtn. to Dismiss, at 2 (Dckt. No. 51). Instead, BNSF brings a claim about as-applied preemption.

"An action may be preempted 'as applied' based on the degree of interference that it has on railroad transportation – that is, if the action would have the effect of preventing or unreasonably interfering with railroad transportation." *Wedemeyer*, 850 F.3d at 895.  In determining whether a regulation is preempted as-applied, courts consider if the regulation is "unreasonably burdensome" or "discrimate[s] against railroads."  *See Adrian*, 550 F.3d at 541; *N.Y. Susquehanna*, 500 F.3d at 253.

A regulation cannot be "so draconian that it prevents the railroad from carrying out its business in a sensible fashion."  *Adrian*, 550 F.3d at 541.  And to satisfy non-discrimination, a state regulation must address state concerns generally without targeting the railroad.  *Id.*  And even then, a regulation addressing state concerns generally cannot be used "as pretext for interfering with or curtailing rail service."  *Id.*

Cicero argues that Ordinance 72-20, amending the Town's Sewer Ordinance section on railroads, is not a "regulation of rail transportation" under the ICCTA and thus BNSF has not sufficiently pled an ICCTA claim.  *See* Def.'s Mtn. to Dismiss, at 3 (Dckt. No. 45).

"Whether a particular activity constitutes transportation by rail carrier under section 10501(b) is a case-by-case, fact-specific determination."  *Town of Babylon & Pinelawn Cemetery – Petition for Declaratory Order*, 2008 WL 275697, at *3 (STB 2008).  "[C]ourts view the 'as applied' test as a fact-intensive inquiry."  *Belt Ry. Co. of Chicago v. Weglarz Hotel III, LLC*, 2020 WL 6894664, at *9 (N.D. Ill. 2020); *see also Union Pac. R.R. Co. v. Chicago Transit Auth.*, 2009 WL 448897, at *8 (N.D. Ill. 2009); *N.Y. Susquehanna*, 500 F.3d at 253; *Tubbs v. Surface Transp. Bd.*, 812 F.3d 1141, 1144 (8th Cir. 2015).

At this early stage, BNSF has alleged enough to state a plausible claim that the ordinance is a regulation of rail transportation under the ICCTA.  BNSF alleges that its "facility and

operations in Cicero fall under ICCTA's broad definition of 'transportation.'" *See* Cplt., at ¶ 45 (Dckt. No. 1). To back this up, BNSF alleges that the Cicero railyard is an intermodal rail yard serving as a major transit hub in addition to allowing Amtrak and Metra trains to pass through daily. *Id.* at ¶¶ 16–19.

And BNSF alleges that Cicero's ordinance "singles out and targets railroads for a rate that is higher than the rate paid by other commercial and industrial properties located within Cicero." *Id.* at ¶ 47. After all, according to BNSF, the increase in rates *only* applies to railroads and increased rates over 1,000%, from $27.42 per month to $350 per month. *Id.* at ¶ 26. BNSF's *monthly* bill under the new ordinance was more than its *yearly* bill before the change. *Id.* at ¶ 33.

These allegations suffice to state a plausible claim that the ordinance is "unreasonably interfering with railroad transportation." *See Wedemeyer*, 850 F.3d at 895. The ordinance does not simply impact railroads – it effectively holds them hostage. The Town told BNSF that it could pay the rate, or Cicero would shut off water, dig up pipes, and evict the railroad. *See* Cplt., at ¶ 38 (Dckt. No. 1). Cicero sent BNSF an unmistakable message: pay up, or get run out of town.

A town or state can impose health and safety measures of general applicability, but they cannot use them "as pretext for interfering with or curtailing rail service." *See Adrian*, 550 F.3d at 541. It's at least plausible that the 1,000% spike in sewer rates interferes with rail service and prevents BNSF from carrying out its business.

In sum, BNSF has sufficiently alleged that the ordinance is a regulation of railroad transportation. Cicero's motion to dismiss Count I is denied.

## II.     The Railroad Revitalization and Regulatory Reform Act (Count II)

Second, BNSF claims that the Sewer Rate Ordinance is a discriminatory tax that violates the 4-R Act. *See* Cplt., at ¶¶ 48–54 (Dckt. No. 1).

"The Railroad Revitalization and Regulatory Reform Act ('4-R Act') prevents states and their subdivisions from imposing discriminatory taxes against railroad carriers." *Kan. City S. Ry. Co. v. Koeller*, 653 F.3d 496, 499 (7th Cir. 2011); *see also CSX Transp., Inc. v. Ala. Dep't of Revenue*, 562 U.S. 277, 280 (2011); 49 U.S.C. § 11501. "Railroads 'are easy prey for State and local tax assessors in that they are nonvoting, often nonresident, targets for local taxation, who cannot easily remove themselves from the locality.'" *Union Pac. R.R. Co. v. Wis. Dep't of Revenue*, 940 F.3d 336, 339 (7th Cir. 2019) (quoting *W. Air Lines, Inc. v. Bd. of Equalization of State of S.D.*, 480 U.S. 123, 131 (1987)). So, the 4-R Act states that a State may not "[i]mpose another tax that discriminates against a rail carrier." *See* 49 U.S.C. § 11501(b)(4).

The Act does not define the term "tax," but the Supreme Court has explained that "the 'meaning of "tax" is expansive,' and the phrase 'another tax,' is 'best understood to . . . encompass any form of tax a State might impose, on any asset or transaction, except the taxes on property addressed in subsections (b)(1)–(3).'" *See Koeller*, 653 F.3d at 505 (quoting *CSX Transp.*, 562 U.S. at 284–85). In other words, "another tax" is a catch-all. *Id.*; *see also Burlington N. Ry. Co. v. Superior*, 932 F.2d 1185, 1186 (7th Cir. 1991) ("[Subsection (b)(4)] is a catch-all designed to prevent the state from accomplishing the forbidden end of discriminating against railroads by substituting another type of tax. It could be an income tax, a gross-receipts tax, a use tax, an occupation tax . . . – whatever.").

While a "tax" may be broad, not every charge is a tax. The 4-R Act does not apply to fees, special assessments, or other exactions. *See Koeller*, 653 F.3d at 505 (collecting cases).

13

The distinction between a tax actionable under the 4-R Act and a non-actionable fee or assessment depends on how the funds are used.

The Seventh Circuit distinguishes "between taxes, which are designed to generate revenue, and other exactions designed either to punish or to compensate for a service that the state provides." *Id.* at 506. "[A] government levy is a tax if it raises revenue to spend for the general public welfare." *Id.* (quoting *Chicago & N. W. Transp. Co. v. Webster Cnty. Bd. of Superiors*, 71 F.3d 265, 267 (8th Cir. 1995)). Taxes often apply "across-the-board to property owners" and "support a broad public system." *Id.* at 507. Conversely, a government levy is not a tax if it is "tied to a particular benefit obtained by a specific taxpayer." *Id.* Instead of raising revenue for a general fund of a town, a non-actionable fee or assessment confers a benefit on the railroad. *Id.*; *see also Wheeling & Lake Erie Ry. Co. v. Pub. Util. Comm'n of the Commonwealth of Pa.*, 141 F.3d 88, 96–97 (3d Cir. 1998).

A tax discriminates under the 4-R Act "when it treats 'groups [that] are similarly situated' differently without sufficient 'justification for the difference in treatment.'" *Ala. Dep't of Revenue v. CSX Transp., Inc.*, 575 U.S. 21, 26 (2015) (quoting *CSX Transp., Inc.*, 562 U.S. at 287). This discrimination inquiry has two steps. *See Kan. City S. Ry. Co. v. Sny Island Levee Drainage Dist.*, 831 F.3d 892, 898 (7th Cir. 2016) (citing *BNSF Ry. Co. v. Tenn. Dep't of Revenue*, 800 F.3d 262, 271 (6th Cir. 2015)); *see also CSX Transp., Inc.*, 562 U.S. at 288 n.8.

First, the railroad must establish a *prima facie* case of discriminatory tax treatment. *See Sny Island Levee Drainage Dist.*, 831 F.3d at 898. In other words, the railroad needs to identify similarly situated persons – a comparison class – and show different treatment. *See Ala. Dep't of Revenue*, 575 U.S. at 26–30. If the railroad succeeds, then the burden shifts to the defendant to offer a sufficient justification. *See Sny Island Levee Drainage Dist.*, 831 F.3d at 898. A

14

sufficient justification may be an alternative, roughly equivalent tax, imposed on the comparison class. *See Ala. Dep't of Revenue*, 575 U.S. at 30–31.

The Town of Cicero makes two arguments. First, Cicero argues that the sewer rate is not a tax within the meaning of the 4-R Act. *See* Def.'s Mtn. to Dismiss, at 5–6 (Dckt. No. 45). For example, the Town cites to a 1961 Illinois Supreme Court opinion holding that a compulsory service charge for connection with a county sewer system was not a "tax." *Id.* at 5 (citing *People ex rel. Du Page County v. Smith*, 21 Ill. 2d 572, 173 N.E.2d 485 (1961)). And Cicero cites *Empress Casino Joilet Corp. v. Balmoral Racing Club, Inc.*, 651 F.3d 722 (7th Cir. 2011), for the proposition that "[f]ees for products (people buy electricity from public utilities) and bona fide user fees (a toll for crossing a bridge, for example) are not 'taxes' in either lay or legal lingo." *Id.* at 6.

But Seventh Circuit dicta suggests that sewage charges could be taxes. In *Kansas City Southern Railway Co. v. Koeller*, 653 F.3d 496 (2011), the Seventh Circuit considered whether an "annual maintenance assessment" charged by the Sny Island Levee Drainage District for flood control constituted a "tax" under the 4-R Act. *Id.* at 504. The Seventh Circuit held that the annual maintenance assessment did constitute a tax, emphasizing that the charge's ultimate use was for the whole District and not tied to a particular benefit for the railroad. *Id.* at 507. In coming to this conclusion, the Seventh Circuit talked about the general benefits and responsibilities of flood control and, importantly, sewage.

The Seventh Circuit said that "[f]lood control . . . cannot be considered an optional service that someone might want to take or leave. It is just as much a public responsibility as the provision of roads or sewage. The District's annual exaction distributes the cost of this public good across all of those living within Sny Island, not just the Railroads or even RPU properties.

15

Everyone in the District (indeed, arguably everyone in the state, to the extent that state monies are typically expended for disaster relief) benefits by having fewer or less extreme floods when the Mississippi begins to swell." *Id.* at 506. While only addressing sewage in passing, the Seventh Circuit seems to indicate that sewage charges may qualify as taxes, raising revenue for general public welfare, rather than a fee.

BNSF's allegations plausibly state that the sewage rate is a tax. BNSF alleges that "the sewer rate charge is in substance 'another tax' within the meaning of 49 U.S.C. § 11501(b)(4)." *See* Cplt., at ¶ 51 (Dckt. No. 1). BNSF backs this up with allegations that the stated purpose of the revision was "to increase rates for railroad yards and rights-of-way to ensure the proper operation and maintenance of the combined waterworks and sewage system." *Id.* at ¶ 23. It alleges that sewer rates for railyards are assessed on a per-acre basis regardless of water consumption or sewer use while local commercial and industrial properties are charged on actual use, and that BNSF is required to connect to Cicero's sewer system. *Id.* at ¶¶ 25, 27.

These factual allegations tell a plausible story that the sewer rate charges are not tied to a benefit to BNSF, but rather subsidize the waterworks and sewage system for the general public. The facts might not pan out through discovery, but at this point, the Court cannot say that the sewer rate charge is not a tax.

Second, Cicero argues that BNSF failed to allege how the sewer rate is discriminatory. Cicero contends that BNSF failed to identify a comparator class and to allege that the comparator class was treated differently. *See* Def.'s Mtn. to Dismiss, at 8–9 (Dckt. No. 45).

But BNSF's complaint alleged that "[t]he sewer rate charge impermissibly discriminates against railroads vis-à-vis other local commercial and industrial payers because the plain text of the Sewer Rate Ordinance singles out and targets railroad yards and rights-of-way, which are

owned only by railroads, for differential and worse treatment than other similarly-situated property." *See* Cplt., at ¶ 52 (Dckt. No. 1). The complaint further alleged that railroads are charged $350 per acre per month, while commercial and industrial payers are charged on actual consumption. *Id.* at ¶¶ 26–27. And the complaint alleged that the Sewer Rate Ordinance establishes rates based on property type, distinguishing residential property, commercial and industrial property, railroad yards and rights-of-way, and commercial and industrial property outside the Town's border. *Id.* at ¶ 21.

"All general and commercial taxpayers may be an appropriate comparison class for a subsection (b)(4) claim . . . ." *Ala. Dep't of Revenue*, 575 U.S. at 21. But "[a]ll general and commercial taxpayers is not the only available comparison class. *Id.* Instead, "the comparison class is to be determined based on the theory of discrimination alleged in the claim." *Id.* Here, BNSF specifically alleges that the ordinance placed it at a disadvantage compared to other commercial and industrial properties. *See* Cplt., at ¶ 52 (Dckt. No. 1).

That point of comparison makes sense. Other commercial and industrial properties are likely consuming water at high quantities than residential properties, like BNSF. So commercial and industrial properties, like railroads, are likely going to be charged differently than individual consumers.

It appears that Cicero would like to compare BNSF to commercial and industrial properties located *outside* the Town. *See* Def.'s Mtn. to Dismiss, at 6 (Dckt. No. 45). Those properties are charged the same acreage rate as railroads – that is, $350 per acre. *Id.* But those properties are not required to connect to Cicero's sewer system. *See* Pl.'s Resp. to Def.'s Mtn. to Dismiss, at 10 (Dckt. No. 51). And Cicero provides the Court with no other reason that other commercial and industrial properties outside the Town is the proper comparator class.

17

At this point, BNSF alleged a comparator class (commercial and industrial properties in the Town) that like BNSF must be on Cicero's sewer system, but are charged drastically different rates. This comparator class is one that the Supreme Court accepts, and this Court will too.

In sum, BNSF has sufficiently alleged that the sewer rate charge is a tax, and that BNSF is taxed differently than other commercial and industrial properties. Cicero's motion to dismiss Count II is denied.

## III. Dormant Commerce Clause (Count III)

Finally, BNSF claims that the Town of Cicero's Sewer Rate Ordinance violates the dormant Commerce Clause. *See* Cplt., at ¶¶ 55–60 (Dckt. No. 1). BNSF brings its dormant Commerce Clause Claim under 42 U.S.C. § 1983. *Id.*

The Town of Cicero makes two arguments for dismissal. First, Cicero argues that the claim is time barred under section 1983's statute of limitations. Second, the Town argues that BNSF failed to plausibly allege a dormant Commerce Clause claim. The Court will deal with Cicero's arguments in that order.

### A. Statute of Limitations

The first issue is the timeliness of BNSF's dormant Commerce Clause claim.

Section 1983 authorizes a civil action for a "deprivation of any rights, privileges, or immunities" secured by the Constitution or federal law against a person who acts under color of state law. *See* 42 U.S.C. § 1983; *see also Wilson v. Warren County*, 830 F.3d 464, 468 (7th Cir. 2016). The statute sweeps broadly and covers claims under the dormant Commerce Clause. *See Dennis v. Higgins*, 498 U.S. 439, 443, 451 (1991); *Liberty Disposal, Inc. v. Scott*, 648 F. Supp. 2d 1047, 1054 (N.D. Ill. 2009).

18

But the Town of Cicero argues that BNSF's dormant Commerce Clause claim is not timely. According to Cicero, the Town has assessed railroads and railyards at a different rate than other types of property since at least 1958. *See* Def.'s Mtn. to Dismiss, at 9 (Dckt. No. 45). Cicero argues that if BNSF wanted to challenge the Sewer Rate Ordinance, it needed to do so in the 1950s, not half a century later. *Id.*

Section 1983 does not contain an express statute of limitations. Instead, it borrows from state law. "Claims brought under § 1983 are governed by the statute of limitations for personal-injury claims in the state where the plaintiff's injury occurred." *Neita v. City of Chicago*, 830 F.3d 494, 498 (7th Cir. 2016). "In Illinois the statute of limitations for personal-injury actions is two years from when the cause of action accrued." *Id.* (citing 735 ILCS 5/13-202).

A statute of limitations is an affirmative defense, and "a plaintiff ordinarily need not anticipate and attempt to plead around affirmative defenses." *Hyson USA, Inc. v. Hyson 2U, Ltd.*, 821 F.3d 935, 939 (7th Cir. 2016). But "the statute of limitations may be raised in a motion to dismiss 'if the allegations of the complaint itself set forth everything necessary to satisfy the affirmative defense.'" *Brooks v. Ross*, 578 F.3d 574, 579 (7th Cir. 2009) (quoting *United States v. Lewis*, 411 F.3d 838, 842 (7th Cir. 2005)).

The Court must act cautiously before dismissing a complaint based on a statute of limitations. "[B]ecause affirmative defenses frequently 'turn on facts not before the court at [the pleading] stage,' dismissal is appropriate only when the factual allegations in the complaint unambiguously establish all the elements of the defense. In other words, the plaintiff 'must affirmatively plead himself out of court.'" *Hyson USA, Inc.*, 821 F.3d at 939 (citations omitted). And here, the Court cannot say that BNSF pled itself out of court.

The parties ultimately disagree about when the statute of limitations began to accrue. Cicero says that the clock began running when the Sewer Rate Ordinance started distinguishing between different types of property in the 1950s. *See* Def.'s Mtn. to Dismiss, at 9 (Dckt. No. 45). Meanwhile, BNSF says that the ordinance is an ongoing wrong and the 2020 ordinance amending the Sewer Rate Ordinance is also a discrete wrong re-starting the clock. *See* Pl.'s Resp. to Def.'s Mtn. to Dismiss, at 12 (Dckt. No. 51).

Importantly, BNSF alleges that Cicero amended the ordinance in December 2020 through Ordinance 72-20, raising rates *only* on railroads and railyards. *See* Cplt., at ¶ 24 (Dckt. No. 1). The stated purpose of Ordinance 72-20 was "to increase rates for railroad yards and rights-of-way to ensure the proper operation and maintenance of the combined waterworks and sewage system." *Id.* at ¶ 25.

Maybe BNSF suffered some type of injury when the Sewer Rate Ordinance first started distinguishing between property types in the 1950s. But BNSF isn't challenging the bills that it had to pay in the preceding 70 years. Instead, it challenges the ordinance that targeted railroads for a special increase in December 2020. At this point, BNSF's allegations support the notion that Ordinance 72-20 imposed a discrete injury for the purpose of the statute of limitations.

BNSF filed this suit in June 2021, only six months after the passage of Ordinance 72-20 and well within the two-year statute of limitations. *See* Cplt. (Dckt. No. 1). The Court denies Cicero's motion to the extent that Cicero seeks to dismiss the dormant Commerce Clause claim as barred by the statute of limitations.

### B.      Dormant Commerce Clause

Cicero also challenges the sufficiency of BNSF's dormant Commerce Clause claim.

The Commerce Clause gives Congress the power to regulate commerce among the states. *See* U.S. Const. art. I, § 8, cl. 3.  It includes "not only an affirmative authorization for Congress to regulate interstate commerce" but also "a corresponding restraint on the power of state and local governments to regulate that commerce."  *Regan v. City of Hammond*, 934 F.3d 700, 702 (7th Cir. 2019); *see also Dep't of Revenue of Ky. v. Davis*, 553 U.S. 328, 337–38 (2008); *Am. Trucking Ass'ns, Inc. v. Mich. Pub. Serv. Comm'n*, 545 U.S. 429, 433 (2005).

"That restraint is referred to as the dormant commerce clause, and it precludes states and municipalities from erecting obstacles to interstate commerce even where Congress has not regulated."  *Regan*, 934 F.3d at 702; *see also Tenn. Wine & Spirits Retailers Ass'n v. Thomas*, 139 S. Ct. 2449, 2459–61 (2019); *Comptroller of Treasury of Md. v. Wynne*, 575 U.S. 542, 548 (2015); *Endsley v. City of Chicago*, 230 F.3d 276, 284 (7th Cir. 2000).  It is not enough that a state or municipal law affects interstate commerce in some way.  Rather, the "Dormant Commerce Clause doctrine applies only to laws that *discriminate* against interstate commerce, either expressly or in fact."  *Park Pet Shop, Inc. v. City of Chicago*, 872 F.3d 495, 501 (7th Cir. 2017) (emphasis in original).

The Town argues that BNSF's claim fails because (1) there is no dormant Commerce Clause, (2) BNSF failed to sufficiently allege that the Town lacks a rational basis for the sewer rate, and (3) the Town is a market participant, exempting the sewer rate from the dormant Commerce Clause.  *See* Def.'s Mtn. to Dismiss, at 9–15 (Dckt. No. 45).

To begin, both the Supreme Court and Seventh Circuit recognize the dormant Commerce Clause.  *See, e.g.*, *Tenn. Wine & Spirits Retailers Ass'n*, 139 S. Ct. at 2459–61; *Regan*, 934 F.3d

at 702–03. The dormant Commerce Clause's "roots go back as far as *Gibbons v. Ogden*, 22 U.S. (9 Wheat.) 1, 6 L.Ed. 23 (1824) . . . ." *Tenn. Wine & Spirits Retailers Ass'n*, 139 S. Ct. at 2459. And "the proposition that the Commerce Clause by its own force restricts state protectionism is deeply rooted in [] case law." *Id.* at 2460. This Court must follow the Supreme Court and Seventh Circuit's precedent. *See Cross v. United States*, 892 F.3d 288, 303 (7th Cir. 2018); *Ruffin v. Mitchell*, 2021 WL 2809525, at *9 (N.D. Ill. 2021); *Rodriguez de Quijas v. Shearson/Am. Express, Inc.*, 490 U.S. 477, 484 (1989). They chart the course, and this Court must follow.

Second, Cicero argues that "BNSF fails to sufficiently allege that the Town lacks a rational basis for the imposition of the fee." *See* Def.'s Mtn. to Dismiss, at 9 (Dckt. No. 45). But Cicero fails to back up this single sentence with any supporting argument or citations to authority. "Perfunctory and undeveloped arguments, as well as arguments that are unsupported by pertinent authority, are waived." *White v. United States*, 8 F.4th 547, 552 (7th Cir. 2021). Cicero's single sentence is entirely undeveloped and cites no authority, so it is waived. The Court denies Cicero's motion to dismiss to the extent that it argues BNSF failed to sufficiently allege the Town lacks a rational basis.

Finally, the Town of Cicero argues that it is exempt from any claim of alleged discrimination because it is a market participant. *See* Def.'s Mtn. to Dismiss, at 12 (Dckt. No. 45).

The dormant Commerce Clause places restrictions on the states, but an exception applies when a state acts as a "market participant" rather than a market regulator. *See Endsley v. City of Chicago*, 230 F.3d 276, 284 (7th Cir. 2000); *Owner-Operator Indep. Drivers Ass'n, Inc. v. Holcomb*, 990 F.3d 565, 566–67 (7th Cir. 2021). "The market-participant doctrine permits a

State to influence a discrete, identifiable class of economic activity in which it is a major participant." *Endsley*, 230 F.3d at 284 (quoting *S. – Cent. Timber Dev. v. Wunnicke*, 467 U.S. 82, 97 (1984)). In other words, when a state is a market participant, "it is entitled to discriminate in favor of its own citizens." *See Owner-Operator Indep. Drivers Ass'n, Inc.*, 990 F.3d at 566.

The Seventh Circuit has noted the difficulty of drawing a principled distinction between "that which is considered a government function or regulatory activity and that which is considered proprietary activity." *See Endsley*, 230 F.3d at 285. Regulatory activities often "have a substantial regulatory effect outside of" the particular market in which the state participates. *Id.* But the state or municipality may act as a market participant when it charges fees for providing services. *Id.* (citing *New Orleans S.S. Ass'n v. Plaquemines Port, Harbor & Terminal Dist.*, 784 F.3d 1018, 1021 (5th Cir. 1989) (explaining that the Port was a market participant when it "offer[ed] a service and receives payments tied to the costs of providing the service, just as would a private business" in a fee-for-service approach).

At first glance, it might look like Cicero is a market participant. Cicero charges a fee in exchange for providing sewage and stormwater services. And the Seventh Circuit endorsed the idea that the fee-for-service approach is not regulation, but rather market participation. *See Endsley*, 230 F.3d at 285; *see also Gelita USA, Inc. v. Hammond Water Works Dep't*, 392 F. Supp. 3d 901, 904 (N.D. Ill. 2019) (finding the Hammond Water Works Department, which supplied water filtration to customers, was a market participant).

But BNSF offers a few counterarguments, which move the needle.

First, BNSF argues that Cicero is a market regulator because it used tools in pursuit of compliance that a private actor could not use. Recall, Cicero threatened to cut off BNSF's water and sewer, dig underground to remove BNSF's sewer pipes, and force BNSF off its property.

*See* Pl.'s Resp. to Def.'s Mtn. to Dismiss, at 13–14 (Dckt. No. 51). It swung the heavy hammer of the state, a hammer that a market participant could not wield.

At least two Circuits hold that "[a] governmental entity acts as a market regulator when it employs tools in pursuit of compliance that no private actor could wield, such as the threat of civil fines . . ." *Tri-M Grp., LLC v. Sharp*, 638 F.3d 406, 425 (3d Cir. 2011); *United Haulers Ass'n, Inc. v. Oneida-Herkimer Solid Waste Mgmt. Auth.*, 438 F.3d 150, 157 (2d Cir. 2006).

A private sewer provider could shut off sewer access if a customer doesn't pay, but a private sewer provider could not enter a customer's land, dig up the pipes, and condemn the property. An electric company could shut off the power if a customer does not pay the electricity bill, but the electric company could not take down or dig up power lines.

But Cicero threatened that if BNSF didn't pay, "THE PROPERTY WILL BECOME A HEALTH DEPARTMENT PROBLEM" and "WILL HAVE TO BE VACATED." *See* Cplt., at ¶ 38 (Dckt. No. 1). That's a heavy hand – the heavy hand of the state. No private company could use the tools that Cicero threatened to use. Cicero was not just charging a fee for a service, but also acting as a market regulator through enforcing compliance.

Second, BNSF argues that Cicero is not a market participant because there is no market. There are no other competitors. BNSF did not get to choose its sewer provider. A Town Ordinance, Section 98-187, required BNSF to connect to the Cicero sewer system. *See* Cplt., at ¶ 23 (Dckt. No. 1). Cicero's role in providing sewer service seems different than the government buying concrete, selling eggs, or even managing toll roads because there are no competitors in the Cicero sewage provider market. BNSF cannot avoid the sewer charges. *See, e.g.*, *Owner-Operator Indep. Drivers Ass'n*, 990 F.3d at 567–68 (finding that the Indiana Finance Authority was a market participant, in part because "[t]ruckers who want to avoid the tolls can use the

24

many free roads in Indiana (including two toll-free interstate highways that cross the middle and south of the state from east to west)"). It wasn't a market participant – it *was* the market.

Ultimately, Cicero says that its enforcement mechanisms and monopoly on sewer services don't matter. Cicero suggests that "the Town is merely charging BNSF a fee in exchange for providing BNSF with sewer and stormwater services. The Town (assuming it does not seek to disconnect BNSF from the system) is not infringing upon BNSF's ability to ship its products across the nation using the rail lines." *See* Def.'s Reply, at 11 (Dckt. No. 55).

That pollyannish characterization glosses over the fact that Cicero was actively threatening to disconnect BNSF from the system. Cicero's role was not merely providing a service for a fee. It used its police and regulatory powers to force BNSF to purchase that service – at a price dictated by Cicero – *or else*.

As a result, this Court cannot conclude at the motion to dismiss stage that Cicero is a market participant. Cicero's motion to dismiss is denied.

## Conclusion

For the reasons stated above, the Court denies the Town of Cicero's motion to dismiss.


Date:   March 21, 2022

Steven C. Seeger
United States District Judge

25